UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
PENICK CORPORATION,                     )
                                        )
                Plaintiff,              )
                                        )
        v.                              )       CIVIL ACTION NO.:  1:07CV00397
                                        )
ALBERTO R. GONZALES, *et al.*           )       Hon. Royce C. Lamberth
                                        )
                Defendants.             )
_____)

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

        Penick Corporation ("Penick") respectfully requests that this Court enter a preliminary

injunction enjoining Defendants, Attorney General Alberto R. Gonzales, the United States

Department of Justice, Administrator Karen P. Tandy, and the United States Drug Enforcement

Administration, from:

        (a) proceeding on either of two separate applications filed by Rhodes Technologies

("Rhodes") and Cody Laboratories Inc. ("Cody") for United States Drug Enforcement

Administration ("DEA") registration to import controlled substances known as narcotic raw

materials ("NRMs"); and

        (b) enforcing DEA's two Orders of January 25, 2007 that (1) improperly prohibit

importers, importer applicants and manufacturers of products made from NRMs from submitting

comments, objections, and requests for hearings on applications to import NRMs; and (2) unlawfully announced that DEA may refuse to publish notices of applications to import NRMs in the Federal Register, effectively prohibiting the submission of comments, objections, and requests for hearings on those applications from any source.

Injunctive relief is warranted because DEA has abrogated Penick's right to request and participate in hearings related to both the Cody and Rhodes registration applications, and because DEA has prevented Penick's participation in any future NRM importer registration, through comment, objection or at a hearing. In so doing, DEA's Orders violate the letter and longstanding interpretation of its own regulations. First, DEA regulations expressly require the publication of notices of importer applications in the Federal Register. *See* 21 C.F.R. § 1301.34(a). Second, by well-established interpretation and application of this same rule, DEA has long allowed importers and bulk manufacturers of products made from NRMs (such as Penick) to request and participate in hearings on the importer registration applications filed by other potential NRM importers. Finally, DEA has taken these abrupt and unlawful actions without providing notice and comment rulemaking, thereby violating the Administrative Procedure Act ("APA") (5 U.S.C. §§ 701-706) and Penick's fundamental rights under the Fifth Amendment of Constitution of the United States.

Thus, an injunction is warranted. A Proposed Order is attached. Penick requested by telephone multiple times that Defendants identify their counsel in order to discuss whether this Motion would be opposed, but Defendants could not do so.

Respectfully submitted,

_/s/ Joshua Fowkes_
Wayne Matelski (Bar No. 211607)
Joshua A. Fowkes (Bar No. 494700)
ARENT FOX LLP
1050 Connecticut Avenue, NW
Washington, DC 20036-5339
(202) 857-6000
matelski.wayne@arentfox.com
fowkes.joshua@arentfox.com
Attorneys for Plaintiff, Penick Corporation

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION was sent via First Class Mail, this 22nd day of March 2007 to the following:

> Alberto R. Gonzales, in his official capacity as
> Attorney General of the United States
> United States Department of Justice
> 950 Pennsylvania Avenue, NW
> Washington, DC  20530;
>
> United States Department of Justice
> 950 Pennsylvania Avenue, NW
> Washington, DC  20530;
>
> Karen P. Tandy, in her official capacity as
> Administrator of the United States Drug Enforcement Agency
> United States Drug Enforcement Agency
> 2401 Jefferson Davis Highway
> Alexandria, Virginia  22301; and
>
> United States Drug Enforcement Agency
> 2401 Jefferson Davis Highway
> Alexandria, Virginia  22301

*/s/ Joshua A. Fowkes*
One of the Attorneys for Plaintiff,
Penick Corporation

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
PENICK CORPORATION,                      )
                                         )
                    Plaintiff,           )
                                         )
            v.                           )        CIVIL ACTION NO.:  1:07CV00397
                                         )
ALBERTO R. GONZALES, *et al.*            )
                                         )
                    Defendants.          )
_____)

## PROPOSED ORDER

Upon consideration of the entire record, it is hereby

ORDERED that Defendants are enjoined from:

(a) proceeding on either of two separate applications filed by Rhodes Technologies and

Cody Laboratories Inc. for United States Drug Enforcement Administration registration to

import controlled substances known as narcotic raw materials; and

(b) enforcing DEA's two Orders of January 25, 2007 that (1) improperly prohibit

importers, importer applicants and manufacturers of products made from NRMs from submitting

comments, objections, and requests for hearings on applications to import NRMs; and (2)

unlawfully announced that DEA may refuse to publish notices of applications to import NRMs in

the Federal Register, effectively prohibiting the submission of comments, objections, and

requests for hearings on those applications from any source.


                                    _____
                                    Hon. Royce C. Lamberth
                                    United States District Court Judge

Cc:

Wayne Matelski
Joshua A. Fowkes
ARENT FOX LLP
1050 Connecticut Avenue, NW
Washington, DC  20036-5339

Alberto R. Gonzales, in his official capacity as
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC  20530;

United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC  20530;

Karen P. Tandy, in her official capacity as
Administrator of the United States Drug Enforcement Agency
United States Drug Enforcement Agency
2401 Jefferson Davis Highway
Alexandria, Virginia  22301; and

United States Drug Enforcement Agency
2401 Jefferson Davis Highway
Alexandria, Virginia  22301

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| _____ | ) | |
| PENICK CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.:  1:07CV00397 |
| | ) | |
| ALBERTO R. GONZALES, *et al.* | ) | Hon. Royce C. Lamberth |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**PLAINTIFF'S STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF ITS
MOTION FOR PRELIMINARY INJUNCTION**

Penick Corporation ("Penick") respectfully submits the following Statement of Points

and Authorities in Support of Its Motion for a Preliminary Injunction.

## I.    INTRODUCTION

Penick seeks an Order preliminarily enjoining Defendants, Alberto R. Gonzales, United

States Department of Justice, Karen P. Tandy, and the United States Drug Enforcement

Administration, from:

 (a) proceeding on either of two separate applications filed by Rhodes Technologies

("Rhodes") and Cody Laboratories Inc. ("Cody") for United States Drug Enforcement

Administration ("DEA") registration to import controlled substances known as narcotic raw

materials ("NRMs");

(b) enforcing DEA's two Orders of January 25, 2007 that (1) improperly limit the persons and entities that may submit comments, objections, and requests for hearings on applications to import NRMs to only bulk manufacturers of NRMs, thereby essentially prohibiting requests for hearings and the submission of comments and objections from NRM importers, other importer applicants, and manufacturers of products made from the NRMs; and (2) unlawfully announced that DEA may refuse to publish notices of applications to import NRMs in the Federal Register, effectively prohibiting the submission of comments, objections, and requests for hearings on those applications from any source; and

(c) proceeding on any other future or pending application for NRM importer registration.

Injunctive relief is warranted because DEA has abrogated Penick's right to request and participate in hearings related to both the Cody and Rhodes registration applications and has prevented Penick's participation in any future NRM importer registration, through comment, objection or at a hearing.  In so doing, DEA's Orders violate the letter and longstanding interpretation of its own regulations.  First, DEA regulations expressly require the publication of notices of importer applications in the Federal Register.  *See* 21 C.F.R. § 1301.34(a).  Second, by well-established interpretation and application of this same rule, DEA has long allowed importers and bulk manufacturers of products made from the NRMs (such as Penick) to request and participate in hearings on the importer registration applications filed by other potential NRM importers.  Finally, DEA has taken these abrupt and unlawful actions without providing notice and comment rulemaking, thereby violating the Administrative Procedure Act ("APA") (5 U.S.C. §§ 701-706) and Penick's fundamental rights under the Fifth Amendment to the Constitution of the United States.

As a result of the DEA's unlawful Orders, Penick has suffered (and will continue to suffer) various severe and irreparable injuries.  First, unless DEA is enjoined from proceeding

with the Cody and Rhodes applications during the course of the proceedings before this Court,

should DEA decide to grant those applications, Penick's arguments regarding its right to

participate in those application proceedings might be rendered moot.  Accordingly, those

proceedings must be stayed in order to allow this Court to decide the important issues in this

case.  Second, unless DEA is enjoined from enforcing its Order announcing its refusal to publish

notices of NRM importer applications in the Federal Register, DEA may take significant and

irreversible action on new applications for DEA registration without Penick (and others) even

knowing that new applications have been submitted.  For this same reason, Penick also seeks an

injunction staying DEA from processing any further NRM importer applications pending the

outcome of this action.  Unless DEA is so enjoined, the same fundamental rights Penick seeks to

protect in the Cody and Rhodes proceedings will be violated in *any* future applications for NRM

importer registrations.

## II.     FACTS

**A.     DEA Regulation of the Importation of Controlled Substances.**

Congress allows for a hearing on DEA importation registration applications under certain

circumstances, and DEA regulations and policy have long provided this opportunity to NRM

importers such as Penick.  DEA's arbitrary decision to cancel ongoing hearings and to deny the

rights to comment, objection, and request a hearing ignores the intent of Congress and the

procedural protections of the APA.

### (i)     Narcotic Raw Material Regulation and Control.

The Controlled Substances Act of 1970 and the Controlled Substances Import and Export

Act (collectively, "the Controlled Substances Act" or "CSA"), 21 U.S.C. § 801 *et seq*., authorize

DEA to control against the illicit distribution of certain drugs known as "controlled substances."

DEA defines controlled substances as drugs that have a potential for abuse and addiction.  *See,*

*e.g.,* 71 Fed. Reg. 58569 (Oct. 4, 2006).  These drugs include substances classified as opiates,

stimulants, depressants, hallucinogens, anabolic steroids, and drugs that are immediate

precursors of these classes of substances.  *Id.*  DEA divides controlled substances into five

schedules.  Schedule I substances have a high potential for abuse and have no accepted medical

use.  These substances may be used only for research, chemical analysis, or manufacture of other

drugs.  The remaining schedules, II-V, include substances that have an accepted medical use and

also have a potential for abuse and addiction.  NRMs (opium, poppy straw, and concentrate of

poppy straw ("CPS")) are classified in Schedule II and are the materials from which morphine,

codeine, and thebaine are extracted for purposes of manufacturing a number of Schedule II

controlled substances.  *Id.* at 58569-70; 21 C.F.R. § 1308.12.  To control against the potential

diversion of controlled substances for illicit purposes, the CSA requires that all domestic bulk

manufacturers and all importers of Schedule II controlled substances be registered with DEA.

For decades, all NRMs have been imported into the United States rather than produced

domestically.  "The United States, based on long-standing policy, does not cultivate or produce

NRM, but relies solely on opium, poppy straw, and CPS produced in other countries for the

NRM necessary to meet the legitimate medical needs of the United States."   71 Fed. Reg. at

58570 (Oct. 4, 2006).  Under the requirements of the CSA, a small number of companies import

all the NRMs the United States requires, and then they use or sell the NRMs to manufacture

narcotic drugs or drug ingredients ("active pharmaceutical ingredients" or "APIs").  Penick is

among these "NRM importer/manufacturers." 70 Fed. Reg. 71560 (Nov. 29, 2005).

**(ii)      CSA Provisions for NRM Importer Registration.**

As mentioned above, the CSA mandates that DEA register all importers of Schedule II

4

controlled substances:

Sec. 952. Importation of controlled substances

(a) Controlled substances in schedule I or II and narcotic drugs in schedule III, IV, or V; exceptions It shall be unlawful to import into the customs territory of the United States from any place outside thereof (but within the United States), or to import into the United States from any place outside thereof, any controlled substance in schedule I or II of subchapter I of this chapter, or any narcotic drug in schedule III, IV, or V of subchapter I of this chapter, except that -

(1) such amounts of crude opium, poppy straw, concentrate of poppy straw, and coca leaves as the Attorney General finds to be necessary to provide for medical, scientific, or other legitimate purposes, and

(2) such amounts of any controlled substance in schedule I or II or any narcotic drug in schedule III, IV, or V that the Attorney General finds to be necessary to provide for the medical, scientific, or other legitimate needs of the United States -

(A) during an emergency in which domestic supplies of such substance or drug are found by the Attorney General to be inadequate,

(B) in any case in which the Attorney General finds that competition among domestic manufacturers of the controlled substance is inadequate and will not be rendered adequate by the registration of additional manufacturers under section 823 of this title, or

(C) in any case in which the Attorney General finds that such controlled substance is in limited quantities exclusively for scientific, analytical, or research uses, may be so imported under such regulations as the Attorney General shall prescribe. No crude opium may be so imported for the purpose of manufacturing heroin or smoking opium.

21 U.S.C. § 952.

In order to receive a registration to import a Schedule II controlled substance, an applicant must establish that its registration is both necessary and consistent with the public interest.  21 U.S.C. §§ 958(a), 823(a).  The CSA provides that "manufacturers holding registrations for the bulk manufacture of the substance" sought to be imported be given an opportunity for a hearing on the importer application:

Except in emergency situations as described in section 952(a)(2)(A) of this title, prior to issuing a registration under this section to a bulk manufacturer of a controlled substance in schedule I or II, and prior to issuing a regulation under

section 952(a) of this title authorizing the importation of such a substance, the Attorney General shall give manufacturers holding registrations for the bulk manufacture of the substance an opportunity for a hearing.

*Id.* at § 958(i).

**(iii)     DEA Regulations Allowing Hearing on NRM Applications.**

Following passage of the CSA in 1970, in 1971, and following notice and comment rulemaking, DEA promulgated regulations to implement its Congressional mandates. *See* 36 Fed. Reg. 7814 (April 24, 1971). Among these regulations was 21 C.F.R. § 1301.34, which set forth the procedures by which one could apply for registration to import Schedule I and II substances. Central to this, Section 1301.34(a) provides:

> In the case of an application for registration or reregistration to import a controlled substance listed in Schedule I or II, under the authority of section 1002(a)(2)(B) of the Act (21 U.S.C. 952(a)(2)(B)), the Administrator shall, upon the filing of such application, publish in the Federal Register a notice naming the applicant and stating that such applicant has applied to be registered as an importer of a Schedule I or II controlled substance, which substance shall be identified. A copy of said notice shall be mailed simultaneously to each person registered as a bulk manufacturer of that controlled substance and to any other applicant therefor. Any such person may, within 30 days from the date of publication of the notice in the Federal Register, file written comments on or objections to the issuance of the proposed registration, and may, at the same time, file a written request for a hearing on the application pursuant to § 1301.43. If a hearing is requested, the Administrator shall hold a hearing on the application in accordance with § 1301.41. Notice of the hearing shall be published in the Federal Register, and shall be mailed simultaneously to the applicant and to all persons to whom notice of the application was mailed. Any such person may participate in the hearing by filing a notice of appearance in accordance with § 1301.43 of this chapter. Notice of the hearing shall contain a summary of all comments and objections filed regarding the application and shall state the time and place for the hearing, which shall not be less than 30 days after the date of publication of such notice in the Federal Register.

As set forth above, the mandate to provide notice in the Federal Register of pending importer applications is clear: "… the Administrator shall, upon the filing of such application, publish in the Federal Register a notice naming the applicant and stating that such applicant has applied to be registered as an importer of a Schedule I or II controlled substance, which

substance shall be identified." *Id.* Moreover, with this regulation, DEA expanded the right to request a hearing to applicants for bulk manufacturer registration, as well as bulk manufacturers themselves: "A copy of said notice shall be mailed simultaneously to each person registered as a bulk manufacturer of that controlled substance and to any other applicant therefor. Any such person may, within 30 days from the date of publication of the notice in the Federal Register, file written comments on or objections to the issuance of the proposed registration, and may, at the same time, file a written request for a hearing on the application…" *Id.*

    **(iv)    DEA Practice Allowing Hearing on NRM Applications.**

As discussed above, under long-standing United States policy, there are no domestic producers of NRMs, nor have there been since before the passage of the CSA. In order to effectuate the Congressional mandate to allow hearings on importer registration applications, DEA has long provided NRM importer/manufacturers with the notice and opportunity to comment on, and object to, NRM importer registration applications, and with the right to request and participate in hearings on these applications.

In fact, the DEA has consistently followed this interpretation of its regulations, allowing NRM importer/manufacturers to comment, object, and request and participate in hearings on new NRM importer applications. *See, e.g.,* Penick Corp.; Importation and Manufacture of Controlled Substances, Objections, Requests for Hearing, and Hearing, 45 Fed. Reg. 82760 (Dec. 16, 1980); Mallinckrodt, Inc.; Conditional Grant of Registration of Import Schedule II Substances, 67 Fed. Reg. 39041 (June 6, 2002); Penick Corporation, Inc.; Grant of Registration to Import Schedule II Substances, 68 Fed. Reg. 6947, 6948 (Feb. 11, 2003); Chattem Chemicals, Inc.; Grant of Registration to Import Schedule II Substances, 71 Fed. Reg. 9834 (Feb. 27, 2006).

Over the years, DEA's actual notice provided in the Federal Register outlining the standard for participation has been inconsistent, at best. *See, e.g.,* 46 Fed. Reg. 34732 (July 2, 1981) (*Importation of Controlled Substances; Application* (McNeilab, Inc.)) ("Any other such applicant, and any person who is presently registered with DEA to bulk manufacture such substances, may file comments or objections to the issuance of the above application and may also file a written request for a hearing thereon in accordance with 21 CFR 1301.54 and in the form prescribed by 21 CFR 1316.47."); 48 Fed. Reg. 43237 (September 22, 1983) (*Importation of Controlled Substances; Applications* (Penick)) ("Any other applicant, and any other person who is presently registered with the Drug Enforcement Administration as a bulk importer of these substances may file comments or objections to the issuance of the above application and may also file a written request for a hearing thereon in accordance with 21 CFR 1311.42 and in the form prescribed by 21 CFR 1316.47.").

Despite the inconsistencies of the specific language DEA has used in the notices themselves, however, DEA's practice has been steady and clear. For at least the past ten years (the period of time DEA itself has chronicled the practice), whenever another importer which also held downstream manufacturers' registrations for the products derived from the NRMs sought to be imported had requested a hearing, the DEA would grant and hold that hearing.[1] Through this consistent custom and practice, DEA recognized that there was a <u>right</u> of DEA importers/manufacturers to request hearings on importation applications.

---

[1] The CSA defines "manufacturer" as "a person who **manufactures** a drug or other substance", 21 U.S.C. § 802(15); 21 CFR § 1300.01(b)(27)(emphasis added) and "manufacture" as "the production, preparation, propagation, compounding or processing of a drug or other substance …" <u>Id.</u> Penick is a registered importer of opium, poppy straw, and CPC and is also a registered bulk manufacturer of products (such as codeine, oxycodone, hydrocodone, morphine and thebaine) which are derived from opium, poppy straw, and CPC.

Indeed, when Penick itself challenged that right to request hearings on its own importation application, DEA ruled that the agency had "decided to afford a right to a hearing on any application other than those filed pursuant to Section 952(a)(2)(A)." *See* Ex. __ Memorandum to Counsel and Rulings on Motions, In re Penick Corp., DEA Docket No. 01-03 (April 13, 2000), at 22 and nn. 67 & 68. In that ruling, the Administrative Law Judge, citing to no fewer than twenty instances over the past ten years in which DEA had afforded the opportunity for such a hearing, concluded, *inter alia*, that "the agency has decided to afford a right to a hearing on any application other than those filed pursuant to Section 952(a)(2)(A)." *Id*. Moreover, the Deputy Administrator's final decision in the *Penick* case specifically adopted the Administrative Law Judge's "well-reasoned ruling" on this right. *See* Ex. __, Penick Corporation Inc., Grant of Registration to Import Schedule II Substances, 68 Fed. Reg. 6947, 6948 (Feb. 11, 2003).

      (v)        **DEA's Previous Efforts to Abridge Hearing Rights.**

DEA has limited hearing rights on registrant applications before, and did so by means of notice and comment rulemaking. It has given no justification for is arbitrary and capricious decision to abandon the need for notice and comment rulemaking here.

As mentioned above, the CSA requires that not only importers of Schedule II substances be registered with DEA, but also requires DEA registration for domestic bulk manufacturers. In its 1971 rulemaking implementing the CSA, in addition to the rights granted to NRM importer/manufacturers and applicants to submit comments, objections and hearing requests regarding applications for importer registrations, DEA also granted domestic manufacturers and applicants the right to provide comments, objections and requests for hearings on applications for domestic manufacturer registrations. [CITE]

In 1995, DEA rescinded the right to request a hearing on applications for domestic bulk manufacturer registrations, doing so through an extensive notice and comment rulemaking proceeding. 58 Fed. Reg. 52246 (Oct. 7, 1993)(Advanced Notice of Proposed Rulemaking); 58 Fed. Reg. 52246 (Oct. 7, 1993) (Notice of Proposed Rulemaking); 59 Fed. Reg. 30555 (June 14, 1994) (Supplemental Notice of Proposed Rulemaking); 60 Fed. Reg. 32099)( June 20, 1995) (Final Rule). DEA has made no effort to explain why such an exhaustive notification process and opportunity for public comment was necessary in that instance, but a parallel change here may be done by simple fiat.

In fact, the need for notice and comment may be even more compelling in this instance, as DEA recognized in 1994-95. In the 1993 proposed rulemaking, DEA originally sought to abridge hearing rights as to importer applications, as well as to manufacturer applications. 58 Fed. Reg. 52246-02 (Oct. 7, 1993). Shortly thereafter, however, DEA conceded that 21 U.S.C. § 958(i) expressly gives registered domestic manufacturers the right to a hearing on an importer application. *See* 59 Fed. Reg. at 30555-01. Thus, the DEA left unchanged a bulk manufacturer's right to request a hearing on an importer's registration. *Id*. The final rule also confirmed that the DEA would not change that right to a hearing. 60 Fed. Reg. at 32100 ("it can be inferred that Congress was concerned with the potential impact on domestic competition by existing bulk manufactures who wanted to import controlled substances as well").

**B.     The DEA's Notices of Applications of Cody and Rhodes.**

As had been the case in so many previous NRM importation applications, DEA began the hearing process in the same way with regard to the Cody and Rhodes applications. On January 26, 2006, DEA published in the Federal Register a notice of Cody's application for a DEA importer registration. *See* 71 Fed. Reg. 3545 (Jan. 26, 2006). That notice of application

announced that Cody had applied for registration as an importer of the NRMs raw opium, poppy straw and CPS.  *Id*.  The notice also stated that "[p]ursuant to 21 U.S.C. 958(i), the Attorney General shall, prior to issuing a registration under this Section to a bulk manufacturer of a controlled substance in Schedule I or II and prior to issuing a regulation under 21 U.S.C. 952(a)(2)(B) authorizing the importation of such a substance, provide manufacturers holding registrations for the bulk manufacture of the substance an opportunity for a hearing." *Id*.  It continued: "Any manufacturer who is presently, or is applying to be, registered with DEA to manufacture [raw opium, poppy straw  and concentrate of raw poppy straw] may file comments and objections to the issuance of the proposed registration and may … file a written request for a hearing on such application …." *Id*.

Similarly, on April 21, 2006, the DEA published a notice of Rhodes's application for DEA importer registration in the Federal Register.  *See* 71 Fed. Reg. 20729 (Apr. 21, 2006).  That notice of application announced that Rhodes, too, had applied to be registered as an importer of raw opium and concentrate of poppy straw.  *Id*.  That notice also stated that "pursuant to 21 U.S.C. 958(i), the Attorney General shall, prior to issuing a registration under this Section to a bulk manufacturer of a controlled substance in Schedule I or II and prior to issuing a regulation under 21 U.S.C. 952(a)(2)(B) authorizing the importation of such a substance, provide manufacturers holding registrations for the bulk manufacture of the substance an opportunity for a hearing." *Id*.  It continued: "Any manufacturer who is presently, or is applying to be, registered with DEA to manufacture [raw opium and concentrate of poppy straw] may file comments or objections to the issuance of the proposed registration and may … file a written request for a hearing on such application …." *Id*.

**C.      Penick Requests Hearings on Cody's Application and on Rhodes's Application.**

On February 21, 2006, Penick submitted comments, objections and a request for hearing on the Cody importation application. *See* Ex. __, Declaration of Stuart Rose, Ph.D. at __.  Like Penick, two other companies — Mallinckrodt Inc. and Noramco, Inc. — also submitted comments and objections and requests for a hearing on Cody's application. *Id.* As it had consistently done in the past, DEA proceeded with the Cody hearing by assigning an administrative law judge to the case. *Id. See* Ex. ___, ALJ's Memorandum to Parties.  The parties filed initial memoranda, submitted all written testimony, and the oral phase of the hearing had been scheduled to begin in February 2007. *See e.g.,* Ex. __, ALJ's August 9, 2006 Prehearing Ruling; Ex. __, Penick's Prehearing Memorandum; Ex. __, Noramco's Prehearing Memorandum.

In Rhodes, on May 18, 2006, Penick (as an NRM importer/manufacturer) submitted comments, objections, and a request for a hearing on the Rhodes importer application. *See* Ex. ___Declaration of Dr. Stuart Rose at ¶ __.  Once again, Mallinckrodt Inc. and Noramco, Inc. did likewise. *Id.* Again, DEA proceeded with the hearing. *See* Ex. _, Order for Prehearing Memoranda.  The same administrative law judge was assigned to the Rhodes proceeding and initial memoranda were filed, but this case had not yet proceeded to the submission of testimony. *See* Ex. ___Declaration of Dr. Stuart Rose at ¶ __.

Penick has a significant interest in both the Rhodes and Cody applications because, *inter alia,* (1) Penick has experience as a registered importer of raw opium, poppy straw and CPS; and (2) Penick has extensive history as a registered bulk manufacturer of various controlled substances, including codeine base, codeine phosphate, morphine base, morphine sulfate, thebaine, hydrocodone bitartrate, oxycodone hydrochloride, oxycodone terephthalate, and

dihydrocodone bitartrate, oxycodone, oxymorphone and others.  *See* Ex. __, Declaration of Dr.

Stuart Rose at ¶ ___.  As such, Penick is concerned with assuring, *inter-alia*:

> (a)    that there is an adequate and uninterrupted supply of NRMs for medical,
>        scientific, and other legitimate purposes under adequately competitive
>        conditions; and

> (b)    that the domestic system of regulatory controls against diversion remains
>        stable and unimpaired.

Because of these critical interests and concerns, Penick requested hearings on both the

Cody and Rhodes importer applications in order to be heard and to present evidence that would

demonstrate that each of these applications should be denied for two independent reasons.  First,

the importation of the NRMs by Cody and Rhodes was not "necessary" under 21 U.S.C. §

952(a)(1).  Second, neither Cody's registration nor Rhodes's registration was in the "public

interest."  21 U.S.C. §§ 823(a) and 958(a).  Declaration of Dr. Stuart Rose at __.

**D.    The DEA Abruptly — and Without Notice or Affording Penick an Opportunity to
        Comment or Object — Reversed Its Longstanding Interpretation of Its Regulations
        That Had Held That Existing Importers Were Entitled to Hearings.**

On January 25, 2007, DEA — without any notice or allowing comments and objections

to be submitted — fundamentally changed its interpretation of the regulations to which Penick

and other NRM importers are subject.  On that date, DEA issued two self-styled "Corrections to

Notice of Application" for both the January 23, 2006 notice of Cody's importer application and

the April 21, 2006 notice of Rhodes's importer application.  *See* 72 Fed. Reg. 3417-19 (Jan. 25,

2007).

Those "Corrections" dramatically reversed DEA's longstanding interpretation of its

regulations.  In particular, DEA stated that its April 21, 2006 notice of Rhodes's application

"incorrectly stated that 'any manufacturer who is presently, or is applying to be, registered with

DEA to manufacture such basic classes of controlled substances may file comments or

13

objections to the issuance of the proposed registration and may … file a written request for a hearing on such application ….'" *Id.* at 3417. After identifying this supposedly incorrect statement, the DEA continued: "Correctly stated, … the notice of application … should have stated that 'bulk manufacturers' of raw opium or concentrate of poppy straw may file a written request for a hearing. … [S]ince there are no domestic bulk manufacturers of narcotic raw materials registered with DEA, no registrant has the statutory or regulatory right to request a hearing on the application." *Id.* Additionally, that "Correction to Notice" stated that "the DEA is denying [Penick's] requests for hearing and dismissing the case on the agency's administrative docket." *Id.*

Further, the DEA also concluded that "applications to import narcotic raw materials, including raw opium and concentrate of poppy straw, are not required to be published in the Federal Register." *Id.* Finally, the DEA also "direct[ed] the ALJ to remove from the [DEA's] administrative docket the hearing on the application of Rhodes Technologies to register as an importer of narcotic raw materials." *Id.*

Significantly, DEA expressly conceded that it had previously granted requests for hearings made by the NRM importer/manufacturers. *Id.* at 3418. However, despite this concession, DEA abruptly — and without prior notice or an opportunity to comment or object — reversed that practice by instantly revising its interpretation of its regulations: "I now conclude that the most sound reading of the statute and regulations is that which limits the right to a hearing to those situations in which Congress expressly provided such a right." *Id.* The DEA further summarily concluded: "Finding no valid justification for the past practice [of granting hearings to importer registrants, manufacturer registrants of APIs from the NRMs to be imported, and applicants thereof], and finding such practice inconsistent with the particular

14

criteria for a hearing rights [*sic*] set forth in the CSA and implementing regulations, I decline to follow this practice." *Id*. The DEA concluded by denying the requests for a hearing on Rhodes's application and ordering the Administrative Law Judge presiding at the hearing to remove that hearing from the DEA's docket and to dismiss the case. *Id*. at 3419. Having been ordered to do so, on February 1, 2007, the DEA's Administrative Law Judge cancelled the pending hearing on Rhodes's application and terminated "all proceedings" in the matter of Rhodes's application. *See* Ex. __, ALJ's February 1, 2007 Order Terminating Rhodes Proceeding.

As in the Rhodes application, the DEA issued a similar "Notice of Correction to Notice of Application" on the Cody application. *See* 72 Fed. Reg. 3417 (Jan. 25, 2007). In that Correction, the DEA stated that its January 23, 2006, notice of Cody's application also "incorrectly stated that '[a]ny manufacturer who is presently, or is applying to be, registered with DEA to manufacture such basic classes of controlled substances may file comments or objections to the issuance of the proposed registration and may … file a written request for a hearing on such application….'" *Id*. And once again, after identifying this supposedly incorrect statement, the DEA continued:

> Correctly stated, …, the notice of application, although not required to be published at all, should have stated that "bulk manufacturers" of raw opium, poppy straw, or concentrate of poppy straw may file a written request for a hearing. As explained in the Correction to Notice of Application pertaining to Rhodes Technologies published today, since there are no domestic bulk manufacturers of narcotic raw materials registered with DEA, no registrant has a statutory or regulatory right to a hearing on the application.

*Id*.

The DEA further "direct[ed] the Administrative Law Judge to remove from the agency's administrative docket the hearing on the application of Cody Laboratories, Inc. to be registered as an importer of narcotic raw materials." *Id*. Again, on February 1, 2007, DEA's

Administrative Law Judge cancelled the pending hearing on Cody's application — the oral phase of which had been scheduled for February 26-March 2, 2007 and March 5-9, 2007.  *See* Ex. __, ALJ's February 1, 2007 Order Terminating Cody Proceeding.  She also terminated "all proceedings" in the matter of Cody's application.  *Id.*

Finally, and significantly, DEA also announced that "applications to import narcotic raw materials, including raw opium, poppy straw, and concentrate of poppy straw, are not required to be published in the Federal Register." *See* 72 Fed. Reg. 3417 (Jan. 25, 2007).

## III.    ARGUMENT

### A.    The Standard for Granting Injunctive Relief.

In order to obtain a preliminary injunction, a plaintiff must demonstrate the following: "(1) a substantial likelihood of success on the merits; (2) that [it] would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Assn. of Community Org. For Reform Now (ACORN) v. FEMA*, 463 F.Supp.2d 26, 33 (D.D.C. 2006) (granting injunction) (*citing Katz v. Georgetown Univ.*, 246 F.3d 685, 687-88 (D.C. Cir. 2001)); *Jasperson v. Federal Bureau of Prisons*, 460 F.Supp.2d 76, 88 (D.D.C. 2006) (granting injunction).  Because these four factors "interrelate on a sliding scale," the Court must balance the strengths of the factors against each other.  *Id.* (citing *Serono Labs. v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998)).

"If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak."  *CityFed. Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995).  In other words, a plaintiff need not prevail on each of these four factors:

> [Instead,] the factors must be viewed as a continuum, with more of
> one factor compensating for less of another.… An injunction may
> be justified where there is a particularly strong likelihood of
> success on the merits even if there is a relatively slight showing of
> irreparable injury. Conversely, when the other three factors
> strongly favor interim relief, a court may grant injunctive relief
> when the moving party has merely made out a 'substantial' case on
> the merits. The necessary level or degree of likelihood of success
> that must be shown will vary according to the Court's assessment
> of the other factors. In sum, an injunction may be issued 'with
> either a high probability of success and some injury, or vice versa.'

*Bracco Diagnostics, Inc. v. Shalala*, 963 F.Supp. 20, 27 (D.D.C. 1997) (citing *Cuomo v. United States Nuclear Reg. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985)).

As demonstrated below, an injunction is warranted.

**B.      Penick Has a Substantial Likelihood of Success on the Merits of Its Claim.**

With regard to all of DEA's actions that Penick seeks to enjoin, Penick has a substantial likelihood of success on the merits. First, Penick has a substantial likelihood of successfully enjoining DEA from enforcing its two Orders prohibiting manufacturers that are presently, or are applying to be, registered with DEA to import NRMs and manufacture APIs from them from requesting hearings on applications to import NRMs. In those Orders, DEA abruptly reversed its longstanding interpretation of its regulation that NRM importer/manufacturers such as Penick are entitled to request hearings on applications to import NRMs and that hearings would be held. The DEA's decision was arbitrary and capricious.

The D.C. Circuit has consistently held that before an agency may change its interpretation of a regulation, it must engage in notice and comment rulemaking. In *Environmental Integrity Project v. EPA*, the D.C. Circuit held that the EPA's revised interpretation of a regulation "complies with the APA only if preceded by adequate notice and opportunity for public comment." *Environmental Integrity Project v. EPA*, 425 F.3d 992, 997

(D.C. Cir. 2005).  In underscoring that a rule's interpretation "cannot be modified without the notice and comment procedure," the court reasoned that without that fundamental requirement of notice and comment, an agency "could easily evade notice and comment requirements by amending a rule under the guise of reinterpreting it."  *Id*. at 995.

In another case reaching this same conclusion, the D.C. Circuit explained why an agency's changes in its interpretations of regulations require notice and comment by closely scrutinizing the APA's text:  "Under the APA, agencies are obligated to engage in notice and comment before formulating regulations, which applies as well to '*repeals*' or '*amendments*.' *See* 5 U.S.C. § 551(5).  To allow an agency to make a fundamental change in its interpretation of a substantive regulation without notice and comment obviously would undermine those APA requirements."  *Paralyzed Veterans of America v. D.C. Arena, L.P.*, 117 F.3d 579, 586 (D.C. Cir. 1997) (emphasis in original).

The D.C. Circuit's holding in *Environmental Integrity Project* reiterated and reaffirmed its previous holding in *Alaska Prof. Hunters Assn. v. FAA*, 177 F.3d 1030, 1034 (D.C. Cir. 1999).  There, the court held that "[w]hen an agency has given its regulation a definitive interpretation and later significantly revises that interpretation, the agency has in effect amended its rule, something it cannot accomplish without notice and comment."  *Alaska Prof. Hunters Assn.*, 177 F.3d at 1034.  The D.C. Circuit emphasized that an agency's "current doubts about the wisdom of the regulatory system followed … for more than thirty years does not justify disregarding the requisite procedures for changing that system."  *Id*. at 1035 (granting petition for review and invalidating agency's notice because it was published without notice and comment).  In fact, the court concluded that revising an agency's interpretation of a regulation required notice and

comment even where the original interpretation itself was never adopted through notice and comment. *Id*.

In holding that revisions to agency interpretations require notice and comment, the D.C. Circuit has underscored its concern for regulated parties that are subject to reversals of agency interpretations. In particular, it emphasized that "[t]he notice and comment guarantees would not be meaningful if an agency could effectively, constructively amend regulations by means of nonobvious readings without giving the affected parties an opportunity either to affect the content of the regulations at issue or at least be aware of the scope of their demands." *Nat. Family Planning and Reproductive Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 240 (D.C. Cir. 1992). The court concluded that permitting an agency to completely reverse its interpretation without notice and comment rulemaking "would render the requirements of [APA §553] basically superfluous in legislative rulemaking by permitting agencies to alter their requirements for affected public members at will through the ingenious device of 'reinterpreting' their own rule." *Id*. at 232 (affirming district court's ruling that granted injunctive and declaratory relief enjoining the Secretary of H.H.S. from enforcing the new interpretation of regulation without engaging in notice and comment).

Finally, the Supreme Court of the United States has also recognized this critical rule. Specifically, it acknowledged that APA rulemaking is required if a regulation "adopted a new position inconsistent with any of the … existing regulations"). *Shalala v. Guernsey Memorial Hosp.*, 514 U.S. 87, 99 (1995). *See also Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861, 912 (2000) (Stevens, J., dissenting) (noting "the APA's requirement of new rulemaking when an agency substantially modified its interpretation of a regulation.").

Under this well-established authority, DEA's dramatic reversal of its interpretation of its regulations at issue here requires notice and comment rulemaking.  DEA did not merely clarify its interpretation of its regulations.  Instead, in its self-styled "Correction," the DEA conceded that it had previously granted requests for hearings to "persons that were not bulk manufacturers of the narcotic raw material."  *See* 72 Fed. Reg. 3417-02 (Jan. 25, 2007).  Despite this important concession, however, DEA "conclude[d] that the most sound reading of the statute and regulations is that which limits the right to a hearing to" only bulk manufacturers.  *Id*.  DEA's own statement demonstrates that it substantially changed its "reading" or interpretation of its regulations.  Consequently, notice and comment rulemaking was required.  Based on the law of this Circuit, Penick has a substantial likelihood of successfully enjoining DEA from enforcing its Order that prohibits NRM importer/manufacturers from submitting requests for hearings on NRM importer applications.

Second, Penick also has a substantially likelihood of success on its claim to enjoin DEA from enforcing its Orders announcing that DEA is no longer required to publish notices of the applications to import NRMs in the Federal Register, thereby effectively denying NRM importer/manufacturers, and applicants therefor, from notice or the opportunity to comment on or object to these applications.  21 C.F.R. § 1301.34(a) expressly requires DEA to publish these notices in the Federal Register:

> In the case of an application for registration or reregistration to import a controlled substance listed in Schedule I or II, . . ., the Administrator shall, upon the filing of such application, publish in the Federal Register a notice naming the applicant and stating that such applicant has applied to be registered as an importer of a Schedule I or II controlled substance, which substance shall be identified.

21 C.F.R. § 1301.34(a).  The language of this regulation could not be more clear.  Nevertheless,

DEA has plainly violated this requirement by stating that it need not publish these notices: "…

applications to import narcotic raw materials, …, are not required to be published in the Federal

Register."  *See* 72 Fed. Reg. 3417-19 (Jan. 25, 2007).  As discussed above, an agency may not

simply change or refuse to recognize its own regulations without notice and the opportunity to

comment.  Thus, Penick has a substantial likelihood of success on its claim to enjoin DEA from

enforcing its Order that DEA is not required to publish the notices of NRM importer applications

in the Federal Register.

**C.**     **Penick Will Suffer Severe, Imminent and Irreparable Harm Unless an Injunction Is Issued, While DEA Will Not Be Harmed From That Injunction.**

The balance of harm overwhelmingly favors issuing the injunctive relief that Penick

seeks.  Unless that relief is issued, Penick will suffer severe, imminent and irreparable harm.

Most critical, if DEA moves forward and grants the Cody and Rhodes applications during the

course of this lawsuit, Penick's arguments regarding the validity of DEA's cancellation of the

hearings on those applications will be moot, depriving Penick of any opportunity to seek relief or

make its claim.

If DEA grants those applications during the course of this lawsuit and this Court finds

that Penick should have been allowed to participate in a hearing on the applications, DEA cannot

simply revoke the granted registrations and take up the hearings where it left off.   Importantly,

under the CSA and its implementing regulations, to revoke a registration, the DEA must show

cause, a critical shift of the burden of proof from the burden DEA bears when initially granting

an application.  *See* 21 U.S.C. § 958(d)(2), (4); 21 C.F.R. § 1301.36(b)(2), (d).  Under a different

burden of proof, Penick would have different – significantly abridged – rights.   Although the

outcomes of the Cody and Rhodes applications are not certain at this point, Penick's ability to

protect its rights through this action would be irrevocably damaged if their applications are allowed to proceed and are granted.

For similar reasons, Penick will suffer severe, imminent and irreparable injury unless DEA is enjoined from enforcing its Orders announcing that DEA is refusing to publish notices of applications to import NRMs in the Federal Register.  Unless DEA is enjoined from refusing to publish future notices of applications, Penick (and others) will be entirely unaware of future applications to import NRMs and, consequently, will be unable even to consider submitting comments, objections, and requests for hearings on these future applications.  By effectively concealing critical information such as notices of application from NRM importers/manufacturers such as Penick, DEA will continue to irreparably harm Penick (and exclude valuable information from its determination process).  Pending resolution of this proceeding, DEA should be enjoined from denying Penick, other importers/NRM manufacturers, and the public this information because that denial directly violates DEA's own regulations.

With regard to any such future (or now pending) NRM importer applications, Penick will suffer severe, imminent and irreparable harm unless the DEA is enjoined from acting on these applications as well.  Like the applications of Cody and Rhodes, and for the same reasons, any such future applications should not be decided until the rights of Penick and other importers/NRM manufacturers are considered.

In contrast to the severe and irreparable harm Penick faces, DEA will not suffer significant harm from the requested injunction.  An injunction would not harm DEA or the public because an adequate supply of NRMs for medical, scientific, and other legitimate purposes already exists.   At worst, an injunction may only briefly delay DEA from making a decision as to Rhodes's and Cody's applications.  For example, in the Cody application, DEA

had already scheduled the oral phase of the hearing date to start in February 2007 and received

written testimony and initial memoranda from the parties to the proceeding.  In the Rhodes

application, DEA had already assigned an administrative law judge, and the parties filed initial

memoranda.  Assuming that Penick is successful, these proceedings could be easily

recommenced.  As to any future NRM importer applicant whose application would be stayed,

while this injunction may cause some delay, any injury is, at most, purely speculative at this

point and should not be given any significant weight.

   Finally, DEA will not suffer harm from being enjoined merely from refusing to publish

notices of applications to import NRMs in the Federal Register.  Indeed, this publication is

required by its own regulation in 21 C.F.R. § 1301.34(a).

   Consequently, the balance of harm overwhelmingly favors issuing the injunction.

**D.     Granting an Injunction Advances the Public Interest.**

   For several reasons, granting an injunction advances the public interest.  First, an

injunction advances the public interest by allowing review by this Court of the legitimacy of the

DEA's actions in attempting to interpret its mandate under the CSA.  As another judge on this

Court has found, "there is an overriding public interest ... in the general importance of an

agency's faithful adherence to its statutory mandate."  *Electronic Privacy Information Center v.*

*DOJ,* 416 F.Supp.2d 30, 42 (D.D.C. 2006) (citing *Jacksonville Port Auth. v. Adams*, 556 F.2d 52,

59 (D.C. Cir. 1977)).  Here, the public has a strong interest in ensuring that the DEA

appropriately administers the laws protecting against the illegal diversion of controlled

substances.

   In addition, protecting Penick's ability to assert its rights through this lawsuit

undoubtedly advances the public interest of vigilantly protecting due process rights.  As another

judge on this Court recently emphasized, the D.C. Circuit has "clearly articulated that the public has an interest in the government maintaining procedures that comply with constitutional requirements." *ACORN,* 463 F.Supp.2d at 36 (citing *O'Donnell Constr. Co. v. District of Columbia*, 963 F.2d 420, 429 (D.C. Cir. 1992)).  Because DEA has violated due process and the APA's requirements, an injunction to stay regulatory proceedings while the legitimacy of agency Orders is determined advances the public interest.

Finally, an injunction advances the public interest because it prevents DEA from ruling on Cody and Rhodes's applications without the valuable evidence that Penick and others seek to submit.  Receiving evidence from manufacturers such as Penick in an administrative hearing is the best way for DEA to utilize the NRM industry's substantial resources, experience and expertise regarding industry practices, adequate competition, the DEA's ability to monitor any additional new registrants, and technological advances — particularly when there is already an adequate supply of the NRMs at issue.

Thus, the injunction clearly furthers the public interest.

## IV.    CONCLUSION

A preliminary injunction is needed to protect Penick from imminent, severe and irreparable harm resulting from DEA's unlawful Orders.  In addition, as demonstrated above, Penick is entitled to that injunction.  Consequently, this Court should enter an Order preliminarily enjoining Defendants from:

(a) proceeding on either of the separate applications filed by Rhodes and Cody for DEA registration to import NRMs;

(b) enforcing its two Orders of January 25, 2007 that unlawfully announced that DEA may refuse to publish notices of applications to import NRMs in the Federal Register; and

(c) proceeding on any other future or pending application for NRM importer registration.

Respectfully submitted,

*/s/ Joshua Fowkes*
Wayne Matelski (Bar No. 211607)
Joshua A. Fowkes (Bar No. 494700)
ARENT FOX LLP
1050 Connecticut Avenue, NW
Washington, DC  20036-5339
(202) 857-6000
matelski.wayne@arentfox.com
fowkes.joshua@arentfox.com

Attorneys for Plaintiff, Penick Corporation

25

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing PLAINTIFF'S STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION was sent via First Class Mail, this ___ day of March, 2007 to the following:

> Alberto R. Gonzales, in his official capacity as
> Attorney General of the United States
> United States Department of Justice
> 950 Pennsylvania Avenue, NW
> Washington, DC  20530;
>
> United States Department of Justice
> 950 Pennsylvania Avenue, NW
> Washington, DC  20530;
>
> Karen P. Tandy, in her official capacity as
> Administrator of the United States Drug Enforcement Agency
> United States Drug Enforcement Agency
> 2401 Jefferson Davis Highway
> Alexandria, Virginia  22301; and
>
> United States Drug Enforcement Agency
> 2401 Jefferson Davis Highway
> Alexandria, Virginia  22301

> /s/ Joshua A. Fowkes
> One of the Attorneys for Plaintiff,
> Penick Corporation

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
PENICK CORPORATION,                                 )
                                                    )
                          Plaintiff,                )
                                                    )
              v.                                    )        CIVIL ACTION NO.:  1:07CV00397
                                                    )
ALBERTO R. GONZALES, *et al.*                       )
                                                    )
_____Defendants._____)

**<u>PROPOSED ORDER</u>**

       Upon consideration of the entire record, it is hereby

ORDERED that Defendants are enjoined from:

       (a) proceeding on either of two separate applications filed by Rhodes Technologies and

Cody Laboratories Inc. for United States Drug Enforcement Administration registration to

import controlled substances known as narcotic raw materials; and

       (b) enforcing DEA's two Orders of January 25, 2007 that (1) improperly prohibit

importers, importer applicants and manufacturers of products made from NRMs from submitting

comments, objections, and requests for hearings on applications to import NRMs; and (2)

unlawfully announced that DEA may refuse to publish notices of applications to import NRMs in

the Federal Register, effectively prohibiting the submission of comments, objections, and

requests for hearings on those applications from any source.


                                            _____
                                            Hon. Royce C. Lamberth
                                            United States District Court Judge

Cc:

Wayne Matelski
Joshua A. Fowkes
ARENT FOX LLP
1050 Connecticut Avenue, NW
Washington, DC  20036-5339

Alberto R. Gonzales, in his official capacity as
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC  20530;

United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC  20530;

Karen P. Tandy, in her official capacity as
Administrator of the United States Drug Enforcement Agency
United States Drug Enforcement Agency
2401 Jefferson Davis Highway
Alexandria, Virginia  22301; and

United States Drug Enforcement Agency
2401 Jefferson Davis Highway
Alexandria, Virginia  22301

# EXHIBIT A

## UNITED STATES DEPARTMENT OF JUSTICE

## Drug Enforcement Administration

In the Matter of

**Penick Corporation**                                              Docket No. 01-3

## MEMORANDUM TO COUNSEL AND RULINGS ON MOTIONS

### I. Background

On April 11, 2000, Penick Corporation (Penick) filed an application with the Drug

Enforcement Administration (DEA) for registration as an importer of the Schedule II

controlled substances coca leaves, raw opium, poppy straw, and poppy straw concentrate.

On August 18, 2000, DEA published a notice of Penick's application in the Federal

Register.[1] The notice named the controlled substances listed in Penick's application and

advised, among other things, that "[a]ny manufacturer holding, or applying for,

registration as a bulk manufacturer of these basi[c] classes of controlled substances may

file written comments on or objections to the application . . . and may, at the same time,

file a written request for a hearing on such application in accordance with 21 C.F.R.

§ 1301.43 in such form as prescribed by 21 C.F.R. § 1316.47."[2]

On November 15, 2000, this office received comments, objections, and requests

for hearing on Penick's application from Mallinckrodt, Inc. (Mallinckrodt), and Noramco

of Delaware, Inc. (Noramco), and comments from Organichem Corporation

(Organichem). Mallinckrodt stated that it had standing to participate in this proceeding

---

[1] Importation of Controlled Substances; Notice of Application, 65 Fed. Reg. 50568 (DEA 2000).
[2] Id.

because it "is a registered importer of raw opium and poppy straw concentrate . . . and a registered manufacturer of opium extracts, opium fluid extract, opium tincture, opium powdered, opium granulated and other products derived from opium and poppy straw concentrate . . . .";[3] Noramco stated that it is entitled to participate in this proceeding because it is registered as an importer of raw opium and poppy straw and as a bulk manufacturer of codeine, oxycodone, hydrocodone, morphine, and thebaine;[4] and Organichem stated that it is a registered bulk manufacturer of meperidine.[5]

On December 19, 2000, Penick filed Penick Corporation's Motion to Strike Comments, Objections, and Requests for Hearing Submitted by Mallinckrodt, Noramco, and Organichem (Motion to Strike) and Penick Corporation's Motion for an Order Recommending the Immediate Grant of its Applications to Import Coca Leaves and Poppy Straw and for an Order Limiting the Issues in this Hearing to Whether Penick's Application to Import Raw Opium and Poppy Straw Concentrate Should be Granted (Motion for an Order). On January 16, 2001, Organichem, Mallinckrodt, and Noramco filed responses to Penick's motions.

## II. The Parties' Contentions

In its Motion to Strike, Penick asserts, in substance, that Organichem, Mallinckrodt, and Noramco are not bulk manufacturers of the substances that Penick seeks to import and, therefore, none of them has standing to object, comment upon, or request a hearing on Penick's application. Penick contends that the only entities with standing to request a hearing on its application are bulk manufacturers of the goods it

---

[3] Letter from Patricia Hitt Duff, Esq., Mallinckrodt, Inc., to John H. King, Deputy Assistant Administrator, Office of Diversion Control, Drug Enforcement Administration of September 15, 2000, at 1.
[4] Noramco of Delaware, Inc.'s Comments on, Objections To , and Request for a Hearing of Penick Corporation's Application to Register as an Importer of Raw Opium and Poppy Straw Concentrate at 1, In the Matter of Penick Corporation ( DEA Docket No. 01-3).
[5] Letter from Peter Mathers, Esq., et al., to John H. King, Deputy Assistant Administrator, Office of Diversion Control, Drug Enforcement Administration of September 14, 2000, incorporating by reference a previous submission from August 24, 2000, at 1.

seeks to import or other applicants for registration to import those same goods, and that

none of the objecting manufacturers meet either of these criteria. Penick further asserts

that the objectors do not have prudential standing to comment, object, or request a

hearing because they are neither within the zone of interest protected by the regulatory

provisions granting the right to a hearing nor suitable challengers to Penick's application.

More specifically, Penick quotes 21 C.F.R. § 1301.34 (2000), requiring that a

copy of the notice of application be sent to "each person registered as a bulk

manufacturer of that controlled substance and to any other applicant therefor."[6] Penick

contends that this "regulation is unambiguous and means that only bulk manufacturers of

the controlled substance sought to be imported and applicants who also currently seek

permission to import those substances may file written comments, object, or request a

hearing."[7]

Penick further contends that the objectors do not have prudential standing in this

proceeding because they are not "'arguably within the zone of interests Congress

intended either to regulate or protect,'"[8]

In its Motion for an Order, Penick asserts, in substance, that no comments,

objections, or requests for hearing have been submitted on its application to import coca

leaves and poppy straw and that, therefore, I should recommend the immediate grant of

the application with respect to these substances.

In its response to the Motion for an Order, Organichem asserts that I may not

recommend any such action because even if whatever hearings are held do not

encompass all aspects of Penick's application, I may do no more than "refer back to DEA

those aspects of the applications that are deemed to be not appropriately encompassed by

---

[6] Motion to Strike at 3.
[7] Id. at 4 (emphasis omitted).
[8] Id. (quoting *Liquid Carbonic Indus. Corp. v. FERC*, 29 F.3d 697, 704 (D.C. Cir. 1994) (hereinafter Liquid Carbonic)).

the hearing requests."[9] In its response to the Motion to Strike, Organichem asserts that even if no person who requested a hearing has standing to do so, "that is no basis for striking the comments and objections received," and that "[r]egardless of the need for a hearing at this stage of the consideration of Penick's importation and manufacturing applications, the comments solicited and received by the DEA on those applications from interested persons who took the time to prepare and provide them to the agency must be given due and appropriate consideration."[10] Finally, Organichem requests that in the event there are further proceedings on Penick's motions, it be afforded notice and an opportunity to participate.

In its response to the Motion for an Order, Noramco asserts that it does not wish to be heard on Penick's application to import coca leaves and poppy straw and that it does not object to Penick's motion to the extent that it seeks to limit Noramco's participation in the hearing to the issue of whether Penick should be granted a registration to import raw opium and poppy straw concentrate. Noramco does, however, oppose Penick's motion that I recommend immediate grant of Penick's application to import coca leaves and poppy straw, arguing that whether or not any manufacturer comments or seeks a hearing on Penick's application to import these substances, Penick has a duty to establish that it meets the statutory and regulatory requirements for that registration.

In its response to Penick's Motion to Strike, Noramco asserts that no one in the United States either manufactures or has applied for registration to manufacture the

---

[9] Response of Organichem Corporation to Penick Corporation Motions at 2.
[10] Id. at 1.

substances that Penick seeks to import[11] because such manufacture is illegal. Consequently, according to Noramco, granting Penick's motion would effectively preclude any registrant from requesting a hearing or challenging Penick's application.

Noramco notes that a literal reading of 21 C.F.R. § 1301.34 arguably supports Penick's contentions, but asserts that such an interpretation would be wrong. Noramco further asserts that 21 U.S.C. § 958(i) specifically grants a right to a hearing on applications to import Schedule I and Schedule II controlled substances, that "[t]here is no evidence that Congress intended to restrict import hearings to those Schedule II substances that can be lawfully manufactured in this country,"[12] and that "statutes should not be read literally if it would distort the plain purpose of the law."[13]

Noramco also emphasizes that the relevant statutory and regulatory provisions have been interpreted to allow importers to object to and request hearings, and that in 1984 the House Committee on the Judiciary considered and rejected a suggestion to eliminate the right to hearings on imports.[14] Noramco asserts that an inquiry into competitive conditions is just as important to Schedule I and II controlled substances that are not domestically manufactured as to those that are.

---

[11] Noramco characterizes Penick's assertion as a contention that Organichem, Noramco, and Mallinckrodt "do not have standing, allegedly because they do not 'manufacture' coca leaves, raw opium, poppy straw, and poppy straw concentrate, and they have not applied to manufacture these substances." Noramco of Delaware, Inc.'s Opposition to Penick Corporation's Motion to Strike Comments, Objections, and Requests for Hearing Submitted by Mallinckrodt, Noramco and Organichem at 1(hereinafter Noramco's Response to Motion to Strike). However, as noted above, Penick asserts that the only manufacturers with standing to request a hearing are those who are registered to manufacture the substances sought to be imported or who have applied for registration to import those substances.

[12] Noramco's Response to Motion to Strike at 2.

[13] Id. at 3 (citing *Bob Jones Univ. v. United States*, 461 U.S. 574, 586 (1983)).

[14] "The Committee believes that the opportunity for public hearings in these matters are important and should be retained. The question of additional registrations often involves economic questions concerning the adequacy of competitive conditions for which expert testimony can be valuable." Id. at 4, (quoting H.R. Rep. No. 98-835, pt. 1, at 11 (1984), the legislative history of the Dangerous Drug Diversion and Control Act of 1984).

Noramco further asserts that to its knowledge DEA has never addressed directly the question whether 21 U.S.C. § 958(i) and 21 C.F.R. § 1301.34 were intended to provide the opportunity for hearings in import cases involving narcotic raw materials, but that DEA's actions in these cases are not consistent with Penick's contentions. More specifically, Noramco notes that DEA has sought comments from bulk importers[15] and that there have been at least two proceedings where the agency held hearings on applications to import raw opium and poppy straw concentrate.[16] Noramco emphasizes that in *McNeilab*, Penick was an objector and requested a hearing, although it did not manufacture the controlled substances McNeilab sought to import, and that in a 1997 proceeding involving an earlier application by Penick to import narcotic raw materials, Penick did not argue that the objectors lacked standing because they did not manufacture the controlled substances that Penick sought to import. Thus, Noramco argues, granting Penick's motion in this proceeding would represent a fundamental change in DEA policy.

Noramco also urges that if I accept Penick's contention that the regulations are intended to protect only manufacturers of the product sought to be imported, the regulations would protect no one, because there is no domestic manufacturer of these substances. Noramco emphasizes that the global market for narcotic raw materials is highly regulated and characterized by chronic shortages, and that Noramco has a strong interest in DEA's decision to grant or deny Penick's application and meets the test of standing.

Noramco also asserts that granting the application will not only create additional demand for scarce raw materials, but will also increase the number of manufacturers that produce the same substances that Noramco and Mallinckrodt do, and that the United States Court of Appeals for the District of Columbia Circuit has recognized competitive

---

[15] Id. at 6 (citing 48 Fed. Reg. 43237-38 (DEA 1983); 45 Fed. Reg. 74596 (DEA 1980)).
[16] Id. (citing *In the Matter of McNeilab, Inc.*, DEA Docket No. 78-13 (hereinafter McNeilab); *In the Matter of Johnson Matthey*, DEA Docket No. 99-27 (hereinafter Johnson Matthey)).

injury as sufficient to support a claim of standing.[17] Thus, according to Noramco, it and
Mallinckrodt have prudential standing under a "zone of interests" test because they are
subject to the entry restrictions specified in DEA regulations. Finally, Noramco
distinguishes *Liquid Carbonic*, cited by Penick, on grounds that in that case the would-be
challenger did not purchase or sell products in competition with the regulated exporters,
but sold a different type of product.

    In its response to Penick's Motion for an Order, Mallinckrodt asserts that
inasmuch no one has requested a hearing on Penick's application to import poppy straw
or coca leaves, the issue of whether Penick's application should be granted is not before
me and I cannot make any recommendation on that issue.

    In its response to the Motion to Strike, Mallinckrodt asserts that Penick
erroneously states that Mallinckrodt is not a bulk manufacturer of the raw materials
Penick seeks to import. Mallinckrodt asserts that it meets the Controlled Substances Act's
definition of "manufacturer" because it processes opium and poppy straw concentrate
into a variety of drugs, and processing is "manufacturing" under the Controlled
Substances Act and its implementing regulations.[18] Therefore, according to Mallinckrodt,
it has the right to object to, comment, and request a hearing on Penick's application to
import these controlled substances.

    Mallinckrodt further asserts that if prudential standing is an issue, its injury is
within the zone of interests protected by the Controlled Substances Act.[19] More
specifically, Mallinckrodt contends that it seeks to ensure an adequate supply of the
narcotic raw materials that Penick seeks to import, and that it views Penick's application
as a threat to maintenance of that supply. Mallinckrodt further asserts that, in any event,
prudential standing does not apply to administrative proceedings such as this.

---

[17] Id. at 10 (citing *MD Pharm. Inc. v. Mallinckrodt Chemical Inc.*, 133 F.3d 8 (D.C. Cir.
1998)(hereinafter MD Pharmaceutical.)).
[18] *See* Mallinckrodt's Response to Penick's Motion to Strike at 2.
[19] Id. at 3 (citing *MD Pharm.* 133 F.3d at 12).

### III. The Statutory and Regulatory Framework

### A. The Controlled Substances Act

Pursuant to 21 U.S.C. § 952(a), it is unlawful to import into the United States any Schedule I or II controlled substances except that

> (1) such amounts of crude opium, poppy straw, concentrate of poppy straw, and coca leaves as the Attorney General finds to be necessary to provide for medical, scientific, or other legitimate purposes, and

> (2) such amounts of any controlled substance in Schedule I or II or any narcotic drug in Schedule III, IV or V that the Attorney General finds to be necessary to provide for the medical, scientific, or other legitimate needs of the United States –
> (A) during an emergency in which domestic supplies of such substance or drug are found by the Attorney General to be inadequate,
> (B) In any case in which the Attorney General finds that competition among domestic manufacturers of the controlled substance is inadequate and will not be rendered adequate by the registration of additional manufacturers under section 823 of this title, or
> (C) in any case in which the Attorney General finds that such controlled substance is in limited quantities exclusively for scientific, analytical, or research uses, may be imported under such regulations as the Attorney General shall prescribe.[20]

Pursuant to 21 U.S.C. § 958(a),

> The Attorney General shall register an applicant to import or export a controlled substance in schedule I or II if he determines that such registration is consistent with the public interest and with United States obligations under international treaties, conventions, or protocols in effect on May 1, 1971.[21]

The basis for hearings in proceedings such as this is 21 U.S.C. § 958(i):

> Except in emergency situations as described in section 952(a)(2)(A) of this title, prior to issuing a registration under this section to a bulk manufacturer of a controlled substance in schedule I or II, and prior to issuing a regulation under section 952(a) of this title authorizing the importation of such a substance, the Attorney General shall give manufacturers holding registrations for the bulk manufacture of the substance an opportunity for a hearing.[22]

The Controlled Substances Act defines "manufacturer" as "a person who manufactures a drug or other substance,"[23] and "manufacture" as

---

[20] 21 U.S.C. § 952 (1996).
[21] 21 U.S.C. § 958(a) (1996).
[22] 21 U.S.C. § 958(i) (1996).
[23] 21 U.S.C. § 802(15) (1996).

the production, preparation, propagation, compounding, or processing of a drug or other substance, either directly or indirectly or by extraction from substances of natural origin, or independently by means of chemical synthesis or by a combination of extraction and chemical synthesis, and includes any packaging or repackaging of such substance or labeling or relabeling of its container....[24]

In addition, 21 U.S.C. § 823(c) provides, in pertinent part:

Registration granted under [§ 823(a)(b)] shall not entitle a registrant to manufacture or distribute controlled substances in Schedule I or II other than those specified in the registration. . . .[25]

## B. The Implementing Regulations

The principal regulatory provision relevant to this proceeding is

21 C.F.R. § 1301.34:

(a) In the case of an application for registration or reregistration to import a controlled substance listed in Schedule I or II, under the authority of ... (21 U.S.C. 952(a)(2)(B)), the Administrator shall, upon the filing of such application, publish in the FEDERAL REGISTER a notice naming the applicant and stating that such applicant has applied to be registered as an importer of a Schedule I or II controlled substance, which substance shall be identified. A copy of said notice shall be mailed simultaneously to each person registered as a bulk manufacturer of that controlled substance and to any other applicant therefor. Any such person may, within 30 days from the date of publication of the notice in the FEDERAL REGISTER, file written comments on or objections to the issuance of the proposed registration, and may, at the same time, file a written request for a hearing on the application pursuant to § 1301.43. If a hearing is requested, the Administrator shall hold a hearing on the application in accordance with § 1301.41. Notice of the hearing shall be published in the FEDERAL REGISTER, and shall be mailed simultaneously to the applicant and to all persons to whom notice of the application was mailed. Any such person may participate in the hearing by filing a notice of appearance in accordance with § 1301.43 of this chapter.[26]

## IV. Discussion

### A. The Motion to Strike

#### 1. The Standing Issue

As noted above, Penick contends that the objectors do not have statutory or prudential standing to comment on, object to, or request a hearing on its application.

---

[24] Id.
[25] 21 U.S.C. § 823 (c) (1996).
[26] 21 C.F.R. 1301.34 (2000).

Penick cites *Liquid Carbonic*[27] in support of its position, while Noramco and Mallinckrodt cite *MD Pharmaceutical*[28] for the contrary proposition.

At the outset, I note the view that prudential standing in administrative proceedings raises the issue of whether a person is entitled to challenge agency action in federal courts, not whether a person is entitled to participate in an agency decisionmaking process.[29] Consequently, I think that the cases cited by the parties have little bearing on the issue of whether Noramco and Mallinckrodt are entitled to an evidentiary hearing on Penick's application for registration to import. However, in case the Administrator disagrees with my assessment, I think it worthwhile to discuss *Liquid Carbonic* and *MD Pharmaceutical*.

In *Liquid Carbonic,* the court found that Article III standing requirements were met by the competitive injury petitioner Liquid Carbonic Industries Corporation (Liquid Carbonic) would suffer as a result of action by the Federal Energy Regulatory Commission (FERC).[30] The court concluded that it was required by the Federal Power Act's authorization of judicial review for "'[a]ny party ... aggrieved by an order issued by [FERC]'" to apply prudential limitations to Liquid Carbonic's petitions for review.[31]

The court then used a zone of interests test to determine whether Liquid Carbonic had prudential standing: "'whether a would-be challenger to agency action is pursuing an interest "arguably within the zone of interests" Congress intended either to regulate or

---

[27] *Liquid Carbonic*, 29 F.3d 697 (D.C. Cir. 1994).
[28] *MD Pharm.*, 133 F.3d 8 (D.C. Cir. 1998)
[29] *See ECEE, Inc. v. FERC*, 645 F.2d 339, 349 (5th Cir. 1981). *See also* CHARLES H. KOCH, JR., ADMINISTRATIVE LAW AND PRACTICE §§14.10-14.15 (2d ed. 1997).
[30] *Liquid Carbonic*, 29 F. 3d at 700. *See also* U.S. Const. Art. III, § 2, cl.1, "The judicial Power shall extend to all Cases, . . . arising under this Constitution, the Laws of the United States, . . . [and] to Controversies to which the United States shall be a Party...".
[31] *Liquid Carbonic*, 29 F.3d at 702. I note that this is a narrower scope of review than that in the Administrative Procedure Act: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof ...." *See* 5 U.S.C. § 702 (1976).

protect.'"[32]  The court found that "[p]arties regulated by a statute or those whom it protects fall within its 'zone of interest.'"[33]  The court noted, among other things, that the relevant statute did not regulate Liquid Carbonic and that there was no indication that Congress intended the statute to benefit such a competitor. The court further found that the proceeding before it was not an entry-restriction case, and that Liquid Carbonic did not have prudential standing to challenge the agency action.

*MD Pharmaceutical* involved applications by Mallinckrodt for a DEA registration to manufacture the Schedule II controlled substance methylphenidate. At that time, DEA regulations provided that registered manufacturers of a Schedule I or II controlled substances had the right to request a hearing on the application of another manufacturer for registration to manufacture the same substance. MD Pharmaceutical, Inc. (MD), a registered manufacturer of methylphenidate, filed a request for hearing pursuant to that regulation. After a hearing was held before me but before I issued a recommended decision, DEA issued a new final rule eliminating third parties' rights to a hearing and changing the circumstances in which an applicant for registration could withdraw its application. The day these new regulations went into effect, Mallinckrodt withdrew its pending applications and submitted a new application for registration to manufacture methylphenidate.  Consequently, I terminated all proceedings before me.

Eventually, DEA granted Mallinckrodt's application and MD filed a petition for review. The Court of Appeals for the District of Columbia Circuit rejected the government's contention that MD did not have standing to challenge DEA's action, noting that the elements of the "irreducible constitutional minimum" of standing were met:

> First, the plaintiff must have suffered an injury in fact--an invasion of a
> legally protected interest which is (a) concrete and particularized and (b)

---

[32] *Liquid Carbonic*, 29 F. 3d at 704, (quoting *Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918, 922 (D.C. Cir. 1989)).
[33] *Liquid Carbonic*, 29 F.3d at 704.

actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of--the injury has to be fairly traceable to the challenged action of the defendant.... Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.[34]

The court further observed,

We have previously held that "increased competition represents a cognizable Article III injury," and MD's competitive injury is fairly traceable to DEA's decision to issue a certificate of registration to Mallinckrodt.[35]

The court then found that MD had prudential standing under the zone of interests test, i.e., "whether 'the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute . . . in question,'"[36] on grounds that

a competitor need not be an intended beneficiary to fall within the zone of interests of an entry- restricting statute . . . . [L]itigants fall within the zone of interests if they are regulated by the particular agency action being challenged, or if they are considered to be protected by the statute in question (citation omitted). Litigants are considered to be "protected" by the statute if they are intended beneficiaries of the legislation, or if they are suitable challengers of the agency action because their interests are sufficiently congruent with the interests of the intended beneficiaries.[37]

The court concluded

We hold that MD, as a manufacturer facing potential competition from Mallinckrodt, is a suitable challenger and thus falls within the zone of interests of the statute. When a regulatory system 'by its very nature restricts entry into a particular field or transaction,' firms that are already operating in the regulated industry have an interest in enforcing the restrictions on potential market entrants...(citation omitted). The Controlled Substance[s] Act is a quintessential entry-restricting statute.[38]

The Controlled Substances Act provision for judicial review specifies that "any person aggrieved by a final decision of the Attorney General may obtain review of the

---

[34] MD Pharm., 133 F.3d at 11, (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).
[35] Id. at 11, (quoting Liquid Carbonic, 29 F.3d at 697). .
[36] Id. at 12, (quoting Association of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153 (1970)).
[37] Id. at 12, (citing First National Bank and Trust Co. v. National Credit Union Admin., 988 F.2d 1272, 1275 (D.C. Cir. 1993)).
[38] Id. at 12-13.

decision in the United States Court of Appeals for the District of Columbia or for the circuit in which his principal place of business is located . . . ."[39] Thus, if standing is an issue in these proceedings, it would appear under *Liquid Carbonic* that an objector would have to meet prudential standing requirements. However, *MD Pharmaceutical* certainly seems to stand for the propositions that a proceeding such as this is an entry-restriction case, and that inasmuch as Noramco and Mallinckrodt are registered to import poppy straw concentrate and raw opium, two of the controlled substances that Penick seeks to import, Penick is their potential competitor in the market to purchase these substances. I therefore find that Noramco and Mallinckrodt are within the zone of interests sought to be protected by the statutory scheme as far as judicial review is concerned. Consequently, if standing is an issue, Noramco and Mallinckrodt would apparently have standing to challenge DEA's action if it grants Penick's application.[40]

## 2. The Interpretation of 21 U.S.C. § 958(i)

As noted above, Section 958(i) specifies that, except in emergency situations described in 21 U.S.C. § 952(a)(2)(A), before DEA issues a regulation permitting importation of a Schedule I or II controlled substance or grants a registration to a bulk manufacturer to import such a substance, bulk manufacturers "of the substance" are entitled to a hearing. Taking these words at face value, it would seem that the right to a hearing applies to all proposed importations under § 952(a) except those permitted in emergency situations. In other words, the right to a hearing would apply to proposed importations of narcotic raw materials (including coca leaves, poppy straw concentrate and crude opium), any Schedule I or II controlled substance or narcotic drug that is manufactured in the United States where the person seeking the importation asserts that

---

[39] 21 U.S.C. § 877 (1996).
[40] Organichem has stated only that it manufactures meperidine, and the record thus far does not indicate whether granting Penick a registration as an importer of narcotic raw materials – as opposed to a registration to manufacture other controlled substances from these materials – would put it in a position to compete directly with Organichem.

competition among domestic manufacturers is inadequate and will not be rendered adequate by registering additional manufacturers, and proposed importations of controlled substances in limited quantities for scientific, analytical, or research uses. It would further seem that the only registrants entitled to request a hearing are those who are registered to manufacture the same substance sought to be imported or those who have applied for registration to manufacture that substance.[41] Consequently, literal construction of Section 958(i) would have the result, as Noramco asserts, that bulk manufacturers who are registered to import narcotic raw materials would not have the statutory right to request a hearing on the application of another manufacturer for registration to import those same raw materials.

### a. Whether the Objectors are "Manufacturers" of Opium and Poppy Straw Concentrate

As noted above, Mallinckrodt asserts that because it processes opium and poppy straw concentrate and "processing" is included in the Controlled Substances Act's definition of manufacture, it qualifies as a manufacturer of these materials for the purposes of § 958(i). However, there is no indication that Mallinckrodt, Noramco, or Organichem holds a manufacturer's registration specifying these narcotic raw materials,[42] and pursuant to 21 U.S.C. § 823(c), a registrant may not manufacture a Schedule I or II

---

[41] As noted above, Penick asserts that 21 C.F.R. § 1301.34 (2000), requiring that a copy of the notice of application be sent to "each person registered as a bulk manufacturer of that controlled substance and to any other applicant therefor," "is unambiguous and means that only bulk manufacturers of the controlled substance sought to be imported and applicants who also currently seek permission to import those substances may file written comments, object, or request a hearing" (emphasis omitted). *See* Motion to Strike at 4, 6. I disagree, because I interpret the word "therefor" to refer back to the phrase "registered as a bulk manufacturer of that controlled substance." Thus, I find that the regulation provides for notice of applications only to bulk manufacturers *of the substance to be imported*, and not to other importers.

[42] As mentioned earlier, Mallinckrodt stated in its request for a hearing that it "is a registered importer of raw opium and poppy straw concentrate and a registered manufacturer of opium extracts, opium fluid extract, opium tincture, opium powdered, opium granulated and other products derived from opium and poppy straw concentrate." *See* footnote 3. Similarly, in its request for a hearing Noramco asserted that it is registered "as an importer of raw opium and poppy straw concentrate, and as a bulk manufacturer of codeine, oxycodone, hydrocodone, morphine and thebaine." *See* footnote

substance that is not specified in its registration. I therefore find that the objectors are not "manufacturers" of the narcotic raw materials that Penick seeks to import.

### b. Whether It Is Unlawful to Produce Opium Poppies in the United States

As noted above, Noramco asserts in its response to the Motion to Strike that there are no manufacturers of narcotic raw materials in the United States because such manufacture is unlawful.[43] Consequently, according to Noramco, although on its face Section 958(i) affords a right to a hearing only to manufacturers of narcotic raw materials and not importers, such a literal construction reading of this provision would make the right to a hearing meaningless because there neither are nor have been any such manufacturers since this section was enacted in 1970.

Noramco does not cite any authority for the proposition that it is unlawful to produce narcotic raw materials in the United States, and I have not found any such provision in the Controlled Substances Act. According to my research, although opium was subject to tax, and producers of opium were required to register with the collector of internal revenue,[44] domestic production of opium was lawful until passage of the Opium Poppy Control Act of 1942.[45] This legislation restricted production of opium, requiring producers of the opium poppy to be licensed by the Secretary of the Treasury pursuant to regulations issued by him. However, the Controlled Substances Act repealed the Opium Poppy Control Act of 1942.[46] I am not aware of any provision in the Controlled

---

registered "as an importer of raw opium and poppy straw concentrate, and as a bulk manufacturer of codeine, oxycodone, hydrocodone, morphine and thebaine." *See* footnote 4. Organichem stated that it is a registered manufacturer of meperidine. *See* footnote 5.

[43] Noramco's Response to Motion to Strike at 1.

[44] *See* The Harrison Narcotic Act, Pub. L. No. 223 (1914) (hereinafter, The Harrison Act).

[45] *See* The Opium Poppy Control Act of 1942, Pub. L. No. 797 (1942).

[46] *See* Controlled Substances Act, Pub. L. No. 91-513 § 1101(7) (1970).

Substances Act or in the implementing regulations that distinguishes production of the opium poppy from the manufacture of other Schedule II controlled substances.

Consequently, it appears that a manufacturer can lawfully grow and process opium poppies if it obtains a DEA registration for that purpose pursuant to 21 U.S.C. § 823(a).

### c. Pertinent Legislative History

In an attempt to understand Congress's intent in enacting Section 958(i), I reviewed the legislative history of the Controlled Substances Act, the Controlled Substances Import and Export Act (21 U.S.C. § 951 et seq.), and some of the earlier federal legislation concerning controlled substances.

In 1909, Congress prohibited importation of opium except for medicinal purposes.[47] In an effort to control opium production, Congress passed legislation in January 1914 requiring manufacturers of opium for smoking to file various records with district collectors of internal revenue and to pay a prohibitive tax.[48] In December 1914, Congress passed the Harrison Narcotic Act, providing that all persons (except physicians, dentists, and veterinary surgeons who dispensed the regulated drugs in the course of professional practice) who produced, imported, manufactured, or otherwise handled opium or coca leaves were required to register with the appropriate collector of internal revenue and pay an occupational tax.[49] Subsequent legislation imposed additional requirements on manufacturers and importers of opium and coca leaves.

Beginning in 1922, the Narcotic Drugs Import and Export Act prohibited the importation of any finished controlled substances into the United States. However, importation of crude opium and coca leaves for medical and legitimate use was permitted

---

[47] An Act to prohibit the importation and use of opium for other than medicinal purposes, Pub. L. No. 221 (1909).
[48] Act of January 17, 1914, Pub. L. No. 47 (1914) (subsequently amended).
[49] The Harrison Act.

pursuant to regulations promulgated by the Federal Narcotics Control Board.[50] The legislation did not include any provisions for hearings before issuance of these regulations.

In 1969, the administration introduced legislation that ultimately resulted in the Controlled Substances Act of 1970 and the Controlled Substances Import and Export Act.[51] Each of these bills included a change in existing law to permit importation of finished controlled substances:

> Sec. 401. (a) It shall be unlawful to import or land into the United States any controlled dangerous substance listed in Schedules I and II . . . unless pursuant to such exceptions as the Attorney General may provide by regulation as being necessary for medical, scientific, or other legitimate purposes.

The bills also included general provisions for hearings:

> Sec. 605. (a) In carrying out his function, the Attorney General may hold hearings, sign and issue subpoenas, administer oaths, examine witnesses and receive evidence at any place in the United States.
> (b) Except as otherwise provided in this Act, notice shall be given and hearings shall be conducted under appropriate procedures of subchapter II of chapter 5, title 5, United States Code.

None of these bills included any specific provisions for registering importers.

These bills were later replaced by H.R. 17463 and S. 3246.[52] Neither of these bills referred to registering importers and both included a provision that:

> Sec. 401. (a) It shall be unlawful to import or bring into the continental United States, State of Hawaii, or Puerto Rico from any insular possession or other place subject to the jurisdiction of the United States, any controlled dangerous substance listed in schedules I or II of title II of this Act, or any narcotic drug listed in schedules III or IV of title II of this Act, except that
>
> (1) such amounts of crude opium and coca leaves as the Attorney General finds to be necessary to provide for medical scientific or other legitimate purposes, or (2) such amounts of any schedule I or II substance or any narcotic drug that the Attorney General finds to be necessary to provide for the medical, scientific, or other legitimate needs of the United States (A) during an emergency in which

---

[50] Narcotic Drugs Import and Export Act, Pub. L. No. 227, § 2(b) (1922).
[51] H.R. 13742 and H.R. 13743, 91st Cong. (1969); S. 2637, 91st Cong. (1969).
[52] H.R. 17463, 91st Cong. (1970); S. 2346, 91st Cong. (1969).

domestic supplies of such substance are found by the Attorney General to be inadequate or (B) if the Attorney General finds that competition among domestic manufacturers of the drug is inadequate and will not be rendered adequate by the registration of additional manufacturers under section 303 hereof, may be imported under such regulations as the Attorney General shall prescribe. . . .[53]

The provisions for hearings, however, differed. The provision in S. 3246 read the same as that in S. 2637. The provision in H.R. 17463 read:

Sec. 605. (a) In carrying out his functions, the Attorney General may hold hearings, sign and issue subpoenas, administer oaths, examine witnesses, and receive evidence at any place in the United States.
(b) Except in emergency situations as described in subsection 401(a)(2), prior to issuing a registration under subsection 303(a) to a bulk manufacturer of a controlled substance included in schedule I or II of title II of this Act, and prior to issuing a regulation under subsection 401(a) authorizing the importation of such a substance, the Attorney General shall give manufacturers holding registrations for the bulk manufacture of the substance an opportunity for a hearing.
(c) Except as otherwise provided in this Act, notice shall be given and hearings shall be conducted under appropriate procedures of subchapter II of chapter 5, title 5, United States Code.

On February 5, 1970, S. 3246 passed the Senate. A new bill, H.R. 18583,[54] replaced H.R. 17463, and for the first time included provisions requiring registration of importers. Title III of H.R. 18583 was enacted as the Controlled Substances Import and Export Act on October 14, 1970, and included, in substance and insofar as pertinent here, what are now 21 U.S.C. §§ 952(a)(1), 952(a)(2)(A) and (B), and 958(a), (b), and (i). Specifically, relevant sections provided:

Sec. 1002. (a) It shall be unlawful to import or bring into the United States and controlled dangerous substance listed in schedules I or II of title II of this Act, or any narcotic drug listed in schedules III or IV of title II of this Act, except that –
(1) such amounts of crude opium and coca leaves as the Attorney General finds to be necessary to provide for medical, scientific, or other legitimate purposes, or
(2) such amounts of any schedule I or II substance or any narcotic drug that the Attorney General finds to be necessary to provide for the medical, scientific, or other legitimate needs of the United States (A) during an emergency in which domestic supplies of such substances are found by the Attorney General to be inadequate or (B) if the Attorney General finds that

---

[53] Id.
[54] H.R. 18583, 91st Cong. (1970).

will not be rendered adequate by the registration of additional
manufacturers under section 303 hereof,
may be imported under such regulations as the Attorney General shall
prescribe.[55]

Sec. 1008. (h) Except in emergency situations as described in section
1002(a)(2), prior to issuing a registration under this section to a bulk
manufacturer of a controlled substance included in schedule I or II of title
II of this Act, and prior to issuing a regulation under subsection 1002(a)
authorizing the importation of such a substance, the Attorney General
shall give manufacturers holding registrations for the bulk manufacture of
the substance an opportunity for a hearing.[56]

The legislative history described above leads to the observations that (1) when

Congress permitted importation only of narcotic raw materials and not finished goods,

importers of those raw materials had no right to a hearing on any issue pertaining to their

own or another importer's authority to import; and (2) the first provision affording

competitors a right to a hearing appeared in bills that also included specific limitations on

the circumstances in which finished Schedule I or II substances could be imported.

In 1984 there were proposals to amend what is now § 958(i) to read:

Prior to issuing a registration under section [952(a)(2)(B)], the Attorney
General shall give manufacturers holding registrations for the bulk
manufacture of such controlled substance an opportunity to comment upon
the adequacy of existing competition among domestic manufacturers.[57]

As Noramco has noted, these proposals were not adopted, and the substance of

§ 958(i) has remained the same from 1970 to date.

### d. The Agency's Interpretation of Sec. 958(i)
#### i. The Notice of Hearing in *McNeilab*

In *McNeilab*, the applicant sought to import raw opium, poppy straw, and

concentrate of poppy straw pursuant to an application filed in1978. In the Federal

Register notice of the application[58] the then-Administrator advised that poppy straw and

---

[55] Pub. L. No. 91-513, Title III, § 1002, Oct 27, 1970, 84 Stat. 1285.
[56] Pub. L. No. 91-513, Title III, § 1008, Oct 27, 1970, 84 Stat. 1289.
[57] H.R. 4698, 98th Cong. (1984); H.R. 5656, 98th Cong. (1984); S.1762 98th Cong.
(1984).
[58] Importation of Controlled Substances, Application, 43 Fed. Reg. 27908 (DEA 1978).

concentrate of poppy straw were currently imported into the United States only under the

emergency provisions of 21 U.S.C. § 952(a)(2)(A), and that therefore

> the terms of section 1008(h) clearly leave it to the discretion of the
> Administrator to grant or deny a hearing to any party on issues concerning
> such importation.
> In addition, the terms of section 1008(h) of the Controlled
> Substances Import and Export Act (21 U.S.C. 958(h)) obligate the
> Administrator to give only to manufacturers holding registrations for the
> bulk manufacturer of a substance sought to be imported the opportunity
> for a hearing on issues associated with the proposed actual importation of
> the substance. In the case of imported raw opium, there exists no
> registered bulk manufacturer of the substance, hence, it is likewise left to
> the discretion of the Administrator to grant or deny a hearing to any party
> on issues concerning the importation of raw opium.[59]

Presumably, the Administrator concluded that it was appropriate to conduct a

hearing on that application, for there was a hearing which resulted in the final order in

*McNeilab*.[60] I note that both Penick Corporation and Mallinckrodt participated in the

proceeding.

### ii. The 1995 Regulatory Change

Prior to July 1995, as now, DEA regulations provided that manufacturers have the

right to a hearing on another manufacturer's application to import a Schedule I or II

controlled substance.[61] The regulations also provided that if a manufacturer applied for

registration to manufacture a Schedule I or II controlled substance, other manufacturers

of that same basic class of substance were entitled to a hearing.[62]

By notice published in the Federal Register on October 7, 1993, the then-Director

of DEA's Office of Diversion Control proposed to delete both these provisions.[63] In

explaining the reasons for the proposed change, the Director stated:

---

[59] Id. at 27909; *see also* 21 U.S.C. § 958(h) (1970) (as amended § 958(i) (1984)).
[60] 46 Fed. Reg. 22089 (1981).
[61] 21 C.F.R.§ 1311.42 (1995).
[62] *See* 21 C.F.R. § 1301.43 (1995).
[63] Registration of Manufacturers and Importers of Controlled Substances, 58 Fed. Reg.
52246 (1993).

Pursuant to the subject regulations, manufacturers may object to the registration of additional manufacturers or importers as adversely affecting diversion or competition in a highly regulated environment.
These regulations have been in existence for more than two decades. In that time, no [Administrator] has [ever] denied registration to an applicant on the basis of increased danger of diversion or adverse impact upon domestic competition. To the contrary, the Administrators to whom these issues have been presented have found that registration of additional manufacturers would not have an adverse impact upon this agency's efforts to control diversion and that such registration would have a salutary effect upon competition among bulk manufacturers. The record of these proceedings notwithstanding, currently registered manufacturers use the regulatory hearing requirement to deter others from applying or to delay entry of competitors into their marketplace. As often as not, a company whose new application is opposed by a current manufacturer retaliates by opposing the annual renewal of the other's registration. This abuse of the regulatory hearing requirement adversely affects competition by delaying new registrations and results in the unnecessary expenditure of the DEA resources needed to hear and review these cases.[64]

However, in a Supplemental Notice of Proposed Rulemaking published June 14, 1994,[65] the Director announced that the provisions relating to hearings on applications to import would remain unchanged, on grounds that "the proposed amendment to [§ 1311.42] cannot be reconciled with the hearing provisions of [21 U.S.C. § 958(i)]."[66]

### 3. The Agency's Interpretation of 21 C.F.R. Sec. 1301.34

Although Section 1301.34 on its face requires publication only of applications for registration to import under the authority of 21 U.S.C. § 952(a)(2)(B), the Office of Diversion Control also publishes notices of applications – and of the right to object, comment, or request a hearing on the application – filed pursuant to Sections 952(a)(1)[67]

---

[64] Id. at 52247.
[65] Registration of Manufacturers and Importers of Controlled Substances, 59 Fed. Reg. 30555 (1994).
[66] Id.
[67] Witness the instant case and also Mallinckrodt, Inc., 65 Fed. Reg. 24226 (DEA 2000); Stepan Company, 65 Fed. Reg. 68158 (DEA 2000); Noramco of Delaware, Inc., 64 Fed. Reg. 24679 (DEA 1999); Mallinckrodt Chemical, Inc., 64 Fed. Reg. 22645 (DEA 1999); Stepan Company, 64 Fed. Reg. 22646 (DEA 1999); Ethical Nutrional, LLC, 64 Fed. Reg. 18056 (DEA 1999)* Johnson Matthey, Inc., 64 Fed. Reg. 17415 (DEA 1999) (a hearing was held in this proceeding in *); Stepan Company, 63 Fed. Reg. 27591 (DEA 1998); Mallinckrodt Chemical Inc., 63 Fed. Reg. 10944 (DEA 1998); Noramco of Delaware, Inc., 63 Fed. Reg. 10946 (DEA 1998); Penick Corporation, 62 Fed. Reg. 25972 (DEA 1997) (a hearing was scheduled in that proceeding (Docket No. 97-16) but cancelled when the applicant withdrew its application); Mallinckrodt Chemical, Inc., 62 Fed. Reg. 14946 (DEA 1997); Stepan Company, 62 Fed. Reg. 14947 (DEA 1997); Noramco of

and 952(a)(2)(C).[68] It thus appears that the agency has decided to afford a right to a hearing on any application to import other than those filed pursuant to Section 952(a)(2)(A).

It further appears that by publishing notices of applications filed pursuant to Section 952(a)(1), DEA at least implicitly affords a hearing to manufacturers who are registered to import, rather than to manufacture, the substances the applicant seeks to import. For, although it appears from the above discussion that it is at least theoretically possible to obtain a registration to manufacture narcotic raw materials in the United States, it is undisputed that there are no manufacturers registered to do so, nor, as far as I am aware, are there any pending applications for such registration. Consequently, there is no purpose to publishing the notice of application and affording the opportunity to object, comment, or request a hearing, unless DEA intends that other importers avail themselves of that opportunity.[69]

It further appears that granting this right is within the agency's discretion. As the United States Court of Appeals for the Fifth Circuit held in *Ecee, Inc. v. FERC*:

> [W]ithin their legislative mandates, agencies are free to hear actions brought by parties who might be without standing if the same issues happened to be before a federal court. (citations omitted.) An agency's responsibility for implementation of statutory purposes justifies a wider discretion, in determining what actions to entertain, than is allowed to the courts by either the Constitution or the common law (citation omitted.)[70]

The court went on to find that in the case before it, the interested person standard was the appropriate test, in light of the Administrative Procedure Act's provision that "an interested person may appear before an agency for the presentation, adjustment, or

---

Delaware, Inc., 62 Fed. Reg. 8041 (DEA 1997).
[68] *See e.g.*, Cerilliant Corporation, 66 Fed. Reg. 2003 (DEA 2001) and 65 Fed. Reg. 70936 (DEA 2000); Research Triangle Institute, 65 Fed. Reg. 70938 (DEA 2000); Calbiochem-Novabiochem Corporation, 65 Fed. Reg. 51331 (DEA 2000); Radian International LLC, 65 Fed. Reg. 38860 (DEA 2000).
[69] Indeed, DEA has published a notice of application to import and stated in the notice that there are no domestic producers of the substances at issue. *See* Wildlife Laboratories, Inc., 62 Fed. Reg. 32824 (DEA 1997).
[70] *Ecee*, 645 F.2d at 349-350.

determination of an issue, request or controversy in a proceeding, whether interlocutory, summary or otherwise, in conjunction with an agency function."[71]

## 4. Conclusion

Based on the foregoing, I conclude that neither the statute nor DEA's implementing regulations require the agency to afford a hearing to importers of a narcotic raw material on the application of another manufacturer to import the same substance. However, I further conclude that the agency has the discretionary authority to afford that hearing right and that it has done so in other proceedings as well as this one. Accordingly, Penick's Motion to Strike Comments, Objections, and Requests for Hearing Submitted by Mallinckrodt, Noramco, and Organichem is denied.

## B. The Motion for an Order

Penick asserts that because none of the objectors have standing to object upon its application to import coca leaves or poppy straw, its application with respect to those two substances should be granted immediately and I should so recommend. However, inasmuch as there is no request for a hearing with respect to these substances, I have no jurisdiction over Penick's application as to them, and no authority to make the recommendation Penick seeks.

Similarly, inasmuch as there is no request for a hearing with respect these substances, there is no reason to issue an order limiting the issues as Penick's motion requests; the statement of the issue that will be included in a prehearing ruling will accomplish the same purpose.

In light of the foregoing, Penick's Motion for an Order Recommending the Immediate Grant of its Applications to Import Coca leaves and Poppy Straw and for an Order Limiting the Issues in this Hearing to Whether Penick's Application to Import Raw Opium and Poppy Straw Concentrate Should be Granted is denied. A ruling on

---

[71] *Ecee*, 645 F. 2d at 350.

Organichem's request to participate in this proceeding is held in abeyance pending a showing by Organichem that it is entitled to such participation.

Dated: April 13, 2001

*Mary Ellen Bittner*

Mary Ellen Bittner
Administrative Law Judge

CERTIFICATE OF SERVICE

This is to certify that the undersigned on April 13, 2001, caused a copy of the foregoing to be delivered to Government's counsel, Robert Walker, Office of Chief Counsel, Drug Enforcement Administration, Washington, D.C. 20537, and copies to be mailed, postage paid, to: counsel for Penick Corporation, Wayne H. Matelski, Esq., Arent Fox Kintner Plotkin & Kahn, P.L.L.C., 1050 Connecticut Avenue, N.W., Washington, D.C. 20036-5339; counsel for Mallinckrodt, Steven J. Poplawski, Esq., Brian Cave, L.L.P., 211 North Broadway, Suite 3600, St. Louis, MO 63102; counsel for Noramco, John A. Gilbert, Esq., Hyman, Phelps & McNamara, P.C., 700 Thirteenth Street, N.W., Suite 1200, Washington, D.C. 20005; and counsel for Organichem, Peter R. Mathers, Esq., Kleinfeld, Kaplan and Becker, 1140 Nineteenth Street, N.W., Washington, D.C. 20036-6601.

Patricia A. Medico
Secretary to Mary Ellen Bittner
Chief Administrative Law Judge

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PENICK CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.: 1:07CV00397 |
| | ) | |
| ALBERTO R. GONZALES, *et al.* | ) | Hon. Royce C. Lamberth |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF STUART A. ROSE, Ph.D.

Stuart A. Rose, Ph.D., under penalty of perjury, states as follows:

1.     I submit this declaration based on personal knowledge of facts set forth herein.

2.     I am over eighteen years of age and am competent to testify to the facts set forth in this declaration.

3.     I am President of Penick Corporation. I hold a Ph.D. in Analytical Chemistry from Wayne State University. I have worked in the pharmaceutical industry for over 35 years.

4.     On February 21, 2006, Penick submitted to the United States Drug Enforcement Administration ("DEA") comments, objections and a request for hearing on the importation application of Cody Laboratories Inc. ("Cody") to import raw opium, poppy straw and concentrate of poppy straw (all "narcotic raw materials" or "NRMs"). Like Penick, two other companies — Mallinckrodt Inc. and Noramco, Inc. — also submitted comments, objections and requests for a hearing on Cody's application. DEA proceeded with the Cody hearing by

assigning an administrative law judge to the case. The parties filed initial memoranda, submitted all written testimony, and the oral phase of the hearing had been scheduled to begin in February 2007.

5.    On May 18, 2006, Penick submitted to DEA comments, objections, and a request for a hearing on the application of Rhodes Technologies ("Rhodes") to import raw opium and concentrate of poppy straw. Once again, Mallinckrodt Inc. and Noramco, Inc. did likewise. The same DEA administrative law judge was assigned to the Rhodes proceeding as in the Cody proceeding, and initial memoranda were filed in the Rhodes proceeding. However, the Rhodes case has not proceeded to the submission of testimony.

6.    Penick has a significant interest in both the Rhodes and Cody applications because, *inter alia,* (i) Penick has experience as a registered importer of raw opium, poppy straw and CPS; and (ii) Penick has an extensive history as a registered bulk manufacturer of various controlled substances, including codeine base, codeine phosphate, morphine base, morphine sulfate, thebaine, hydrocodone bitartrate, oxycodone hydrochloride, dihydrocodone bitartrate, oxycodone, oxymorphone and others. As such, Penick is concerned with assuring, *inter-alia*:

(a)    that there is an adequate and uninterrupted supply of NRMs for medical, scientific, and other legitimate purposes under adequately competitive conditions; and

(b)    that the domestic system of regulatory controls against diversion remains stable and unimpaired.

7.    Penick requested hearings on both the Cody and Rhodes importer applications in order to be heard and to present evidence that would demonstrate that each of these applications should be denied for two independent reasons. First, the importation of the NRMs by Cody and Rhodes was not necessary under 21 U.S.C. § 952(a)(1). Second, neither Cody's registration nor Rhodes's registration was in the public interest.

2

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 2, 2007.

Stuart A. Rose

3

# EXHIBIT C



**United States Department of Justice**

Drug Enforcement Administration
Office of Administrative Law Judges
Washington, D.C. 20537
(202) 307-8188

June 20, 2006

Terence J. Lynam, Esq.
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036

Wayne Patrick, Esq.
Office of Chief Counsel
Drug Enforcement Administration
600 Army Navy Drive
Arlington, Virginia 22202

Wayne H. Matelski, Esq.
Arent Fox Kintner Plotkin & Kahn, PLLC
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5339

Steven J. Poplawski, Esq.
Bryan Cave LLP
700 Thirteenth Street, N.W., Suite 600
Washington, D.C. 20005-3960

Andrew D. Schau, Esq.
Patterson, Belknap, Webb & Tyler, LLP
1133 Avenue of the Americas
New York, New York 10036-6710

Re: *In the Matter of Cody Laboratories, Inc.*
Docket No. 06-53

Dear Counsel:

    This letter is to confirm that a pre-hearing telephone conference in this matter has been scheduled for Thursday, July 13, 2006, at 11:00 a.m. eastern daylight time.

    The purpose of the pre-hearing conference is to (1) explain the ground rules and procedure of the hearing, (2) specify the issue or issues involved, (3) agree to proposed stipulations, (4) set a schedule for document production, (5) deal with any ambiguities in the proposed witness testimony, (6) decide a date, time, and place for the hearing,

(7) assess the approximate duration of the hearing, and (8) clarify or address any other issues that either the judge or the parties wish to raise.

Due to the large number of participants, this will be an operator assisted telephone conference call. To join the conference call you must dial (202) 353-0880 and enter the password 3832 followed by the pound key. Please do not add additional counsel without first notifying this office. If you have any questions or concerns, please contact me at (202) 307-8188.

Sincerely,

Nicole M. Stoduto
Attorney Advisor to Mary Ellen Bittner
Administrative Law Judge

# EXHIBIT D

**UNITED STATES DEPARTMENT OF JUSTICE**
**Drug Enforcement Administration**

In the Matter of

**Cody Laboratories, Inc.**                     Docket No. 06-53

### PREHEARING RULING

On July 13, 2006, the undersigned conducted a prehearing conference by telephone with counsel for all the parties[1]. This Prehearing Ruling is made pursuant to 21 C.F.R. § 1316.55 (2005).

I. **ISSUE**

Whether, based upon the record as a whole, Cody Laboratories, Inc. (Cody), has shown by a preponderance of the credible evidence that it meets the conditions of 21 U.S.C. §§ 952(a)(1) and 958(a) and 21 C.F.R. § 1301.34(b)(2005) to be registered as an importer of raw opium, poppy straw, and concentrate of poppy straw.

II. **STIPULATIONS**

The parties have agreed to propose joint stipulations no later than 4:00 p.m. eastern standard time on December 4, 2006.

III. **WRITTEN DIRECT TESTIMONY**

In lieu of direct examination of witnesses at the hearing, the parties are to submit written direct testimony of each witness identified in their respective prehearing memoranda. Written direct testimony must be filed no later than 4:00 p.m. eastern standard time on December 4, 2006. The direct testimony of each witness shall be listed and marked as an exhibit, and each page and line of the testimony shall be numbered (the first line of each page to be numbered "1").

IV. **WITNESSES**

Counsel for the parties intend to make available the witnesses for whom written

---

[1] References to "parties" herein are to Cody Laboratories, Inc.; the Government; Penick Corporation; Mallinckrodt Inc.; and Noramco of Delaware, Inc. Rhodes Technologies (Rhodes) also intends to participate in the hearing in this matter and counsel for Rhodes also participated in the conference call.

direct testimony is offered for the purpose of cross-examination. Counsel are reminded to have all witnesses available to testify so as not to delay the proceedings. I remind counsel that I will entertain objections to any questions on cross-examination that go beyond the scope of direct examination. The parties are also reminded that witnesses not identified in prehearing memoranda or supplements thereto may be excluded at the hearing.

V.  DOCUMENTS

The parties intend to offer into evidence the documents identified in their respective prehearing memoranda. No later than 4:00 p.m. eastern standard time on December 4, 2006, counsel are to provide to each other copies of all documents listed in their respective prehearing memoranda.

Counsel are reminded that documents not listed in prehearing memoranda or supplements thereto or not timely supplied to all other parties and to Rhodes may be excluded at the hearing. At the hearing, counsel are to supply to the undersigned an extra copy of each document to be offered in evidence and/or shown to a witness. Counsel are to ensure that all documents consisting of five or more pages have all pages consecutively numbered.

VI.  PROTECTIVE ORDER

The attached protective order will govern this proceeding.

VII.  HEARING

The hearing will begin at 9:30 a.m. on February 26, 2007, in the hearing room at the Drug Enforcement Administration headquarters, 600 Army Navy Drive, in Arlington, Virginia. It is anticipated that the hearing will proceed through March 2, 2007, and will resume March 5 and continue, if necessary, through March 9, 2007. Counsel are to meet the courtroom clerk in the courtroom at 9:00 a.m. on the morning of February 26, 2007, to have exhibits marked.

VIII.  OTHER MATTERS

Counsel should note that this office will not accept filings by facsimile of more than twenty pages.

Dated:  August 9, 2006

*Mary Ellen Bittner*

Mary Ellen Bittner
Administrative Law Judge

2

## CERTIFICATE OF SERVICE

This is to certify that the undersigned on August 9, 2006, caused a copy of the foregoing to be faxed and delivered via interoffice mail to counsel for the Government, Wayne Patrick, Esq., Office of Chief Counsel, Drug Enforcement Administration, Washington, D.C. 20537, and copies to be faxed and mailed, postage paid, to counsel for Mallinckrodt, Inc., Steven J. Poplawski, Esq., Bryan Cave LLP, 700 Thirteenth Street, N.W. Suite 600, Washington, D.C. 20005-3960; counsel for Penick Corporation, Wayne H. Matelski, Esq., Arent Fox PLLC, 1050 Connecticut Avenue, N.W., Washington, D.C. 20036-5339; counsel for Noramco of Delaware, Inc., Andrew D. Schau, Esq., Patterson, Belknap, Webb & Tyler, LLP, 1133 Avenue of the Americas, New York, New York 10036-6710; counsel for Cody Laboratories, Inc., Terence J. Lynam, Esq., Akin Gump Strauss Hauer & Feld, LLP, 1333 New Hampshire Avenue, N.W., Washington, D.C. 20036; and counsel for Rhodes Technologies, Peter R. Mathers, Esq., Kleinfeld, Kaplan and Becker LLP, 1140 19th Street, N.W., Washington, D.C. 20036.

Patricia A. Medico
Secretary to Mary Ellen Bittner
Administrative Law Judge

3

**UNITED STATES DEPARTMENT OF JUSTICE**
**Drug Enforcement Administration**

In the Matter of

**Cody Laboratories, Inc.**                    Docket No. 06-53

**PROTECTIVE ORDER**

1. As used in this Protective Order,

(a) "administrative law judge" means the undersigned;

(b) "days" means working days, not including Saturdays, Sundays, and federal holidays;

(c) "DEA" means those personnel of the United States Drug Enforcement Administration and any other personnel of the United States Department of Justice involved in investigating, litigating, and deciding this proceeding, and their staffs;

(d) "person" means any individual, corporation, firm, association, partnership, government body, or legal or business entity;

(e) to "produce" information means to adduce or proffer it in response to the demand or request (including pursuant to subpoena) of any other party or at the direction of the administrative law judge or at the producing party's own initiative;

(f) "third party" means any person other than the administrative law judge, the DEA, a party, or an employee, agent, or representative of a party.

2. Designation of information as "Confidential and Protected" or "Highly Confidential and Protected."

(a) At the time a party[1] produces information that it believes should be subject to this Protective Order, it shall file the information and a motion with the administrative law judge to designate the information "Confidential and Protected" or "Highly

---

1 For purposes of this Order, "party" refers to Cody Laboratories, Inc.; the Government, Penick Corporation; Mallinckrodt Inc.; Noramco of Delaware, Inc.; and Rhodes Technologies. Note that "party" has a different meaning in this Order than it does in the Prehearing Ruling also issued today.

Confidential and Protected," explaining the basis for seeking that designation. Copies of the motion and the information shall be served on all other counsel simultaneously with the filing. Such filing and service shall be by fax or overnight courier. Any persons who view the motion and the information, including parties and their attorneys, shall not, prior to the entry of an order resolving such motion, disclose the motion's contents or any information designated as confidential contained therein or attached thereto to any third party (or, with respect to information designated "Highly Confidential and Protected," to an employee of a party other than the DEA) or use or disclose the motion or the confidential information for any purpose except preparation and conduct of this proceeding, and then solely as contemplated herein. Copies of the motion and information shall be filed with the administrative law judge and served on counsel for the other parties, the information shall be in sealed envelopes which shall be endorsed with the title of this proceeding, an indication of the nature of the contents of such sealed envelope, the phrase "CONFIDENTIAL AND PROTECTED" or "HIGHLY CONFIDENTIAL AND PROTECTED," and a statement substantially in the following form: "This envelope contains documents which are filed in this case by [name of party] and the contents thereof shall not be displayed or revealed except by order of the administrative law judge."

(b) Any other party may, within five days of service of the motion and information described in subparagraph (a), file and serve an objection to designation of the information as "Confidential and Protected" or "Highly Confidential and Protected" stating the reasons for the objection. The producing party shall have three days after service of the objection to file and serve its response. If the objection or response contains information which itself should be designated Confidential and Protected or Highly Confidential and Protected, that information shall be in a sealed envelope, with the same "CONFIDENTIAL AND PROTECTED" or "HIGHLY CONFIDENTIAL AND PROTECTED" legend and other identifying information and shall be subject to the same strictures set forth in paragraph 2(a) above for the initial motion and information.

(c) Until the administrative law judge rules on the motion that information be designated "Confidential and Protected," or "Highly Confidential and Protected" it shall be so considered.

2

(d) In determining whether or not information should be designated "Confidential and Protected," the administrative law judge will consider whether justice requires such designation because (i) the information at issue is a trade secret or other confidential research, development, financial, or commercial information, or (ii) the information at issue is exempt from mandatory disclosure under the Freedom of Information Act and the public interest would be served by that designation. In determining whether or not information should be designated "Highly Confidential and Protected," the administrative law judge shall consider whether justice requires such designation because the information (i) meets the definition of "Confidential and Protected" and (ii) is extremely sensitive commercial or personnel information and the need to protect the particular information from undue dissemination outweighs the need of the non-designating party to have wider dissemination.

(e) Each page of any document containing information designated "Confidential and Protected" shall be stamped "Confidential and Protected." Each page of any document containing information designated "Highly Confidential and Protected" shall be stamped "Highly Confidential and Protected" and designated with an asterisk (*).

3. The following persons shall be entitled to access to information designated "Confidential and Protected" without seeking advance permission of the administrative law judge:

(a) the DEA, including the administrative law judge and her staff;

(b) counsel of record and their partners, associates, and employees normally privy to confidential information;

(c) any individual who

(i) is an employee of Cody Laboratories, Inc. (Cody), Penick Corporation (Penick), Mallinckrodt Inc. (Mallinckrodt), Noramco of Delaware, Inc. (Noramco), or Rhodes Technologies (Rhodes), or an expert witness or an employee of an expert witness, and

(ii) executes a confidentiality agreement, which shall be in the form of Exhibit A hereto, in which he or she agrees to comply and be bound by this Protective Order, provided that a copy of such agreement, showing the name, home address, and telephone number of the person signing the agreement and the name, address, and

3

telephone number of his or her employer, is supplied to counsel for all other parties and to the administrative law judge prior to the individual being afforded access to the information.

(d) any individual employed by the court reporting service engaged to prepare the transcript in this proceeding who is involved in preparing that transcript. Any such individual shall use the information only for preparing the transcript and not for any other purpose.

4. The following persons shall be entitled to access to information designated "Highly Confidential and Protected" without seeking advance permission of the administrative law judge:

(a) the DEA, including the administrative law judge and her staff;

(b) counsel of record and their partners, associates, and employees normally privy to confidential information;

(c) any individual who

(i) is an expert witness or an employee of an expert witness, and

(ii) executes a confidentiality agreement, which shall be in the form of Exhibit A hereto, in which he or she agrees to comply and be bound by this Protective Order, provided that a copy of such agreement, showing the name, home address, and telephone number of the person signing the agreement and the name, address, and telephone number of his or her employer, is supplied to counsel for all other parties and to the administrative law judge prior to the individual being afforded access to the information.

(d) any individual employed by the court reporting service engaged to prepare the transcript in this proceeding who is involved in preparing that transcript. Any such individual shall use the information only for preparing the transcript and not for any other purpose.

5. All persons who are entitled to receive, or who are afforded access to, any information designated "Confidential and Protected" or "Highly Confidential and Protected" by reason of this Protective Order shall not disclose such information to any third party (or, in the case of "Highly Confidential and Protected," to an employee of a party other than the DEA) and shall neither use nor disclose the information for any

4

purpose except preparation and conduct of this proceeding, and then solely as contemplated herein. In addition, such persons shall take all reasonable precautions to keep the information secure in accordance with the purpose of this Protective Order. If a party that has designated information "Confidential and Protected" or "Highly Confidential and Protected" discloses it publicly, the information will no longer be entitled to the "Confidential and Protected" or "Highly Confidential and Protected" designation.

6. When information designated "Confidential and Protected" or "Highly Confidential and Protected" is in the form of testimony to be adduced at the hearing in this proceeding or is otherwise to be orally stated at the hearing, the hearing room will be closed to all persons not entitled to receive information designated as "Confidential and Protected" or "Highly Confidential and Protected" under the terms of this Protective Order, and the transcript of such testimony or other statements will be kept under seal.

7. The administrative law judge may, upon motion by a party and for good cause shown, permit access to information designated "Confidential and Protected" or "Highly Confidential and Protected" by a person not entitled to access under paragraph 3 or paragraph 4. Prior to giving such access to any other person, counsel shall deliver a copy of this Protective Order to the person who is to obtain access. Prior to disclosure of the information, such person shall agree in writing to comply with and be bound by this Protective Order, and counsel shall supply to the administrative law judge and to counsel for the party that produced the information a copy of the written agreement, which shall be in the form of Exhibit A hereto, showing the name, home address, and telephone number of the person signing the agreement and the name, address, and telephone number of his or her employer.

8. Only counsel of record, the administrative law judge, the Deputy Administrator of the DEA, and employees under their supervision and subject to this Protective Order may make copies or extracts of material containing information designated "Confidential and Protected" or "Highly Confidential and Protected." They shall make only such copies and extracts as are reasonably necessary to prepare for or participate in this proceeding and shall not transmit such copies and extracts to any person not entitled to access pursuant to this Protective Order. The administrative law judge shall decide upon

5

appropriate motion, prior to transmittal of the record to the Deputy Administrator, any other issue regarding access or copies as to which the parties are unable to agree.

9. Upon breach of this Protective Order, the aggrieved party may ask the administrative law judge to impose such sanctions as are within her jurisdiction and may pursue any other remedies that are provided under applicable law.

10. Upon termination of this proceeding, including any appeals therefrom, counsel for each party shall return all documents designated "Confidential and Protected" or "Highly Confidential and Protected" and any copies of such documents, including any copies supplied to third parties, to counsel for the producing party. The termination of this proceeding shall not relieve any person of the obligations imposed by this Protective Order.

11. Nothing herein shall be construed to prevent the administrative law judge, the Deputy Administrator of the DEA, or any reviewing authority from disclosing such information as may be necessary to reach a decision on any matter raised in connection with this proceeding.

Dated: August 9, 2006

Mary Ellen Bittner
Administrative Law Judge

6

[Exhibit A]

## AGREEMENT TO BE BOUND BY PROTECTIVE ORDER

I, _____, of _____, home

      [print your full name]             [print your home address]

telephone number, _____, and currently employed by

      [your home telephone number]

_____, of _____,

[print your employer's name]        [print your employer's address]

telephone number _____,

      [print your employer's telephone number]

hereby acknowledge that I have both received and read a copy of the Protective Order dated August 9, 2006, entered in *In the Matter of Cody Laboratories, Inc.*, Docket No. 06 - 53, before the United States Department of Justice, Drug Enforcement Administration, and I fully understand the terms and provision of the Protective Order.

I hereby agree to be bound by <u>all</u> terms and provisions of the Protective Order.

I also agree to be subject to the jurisdiction of the United States District Court for the District of Columbia for purposes of enforcing the Protective Order, including any contempt of court citation or other appropriate sanctions for any violations of this Agreement or the Protective Order.

Dated: _____, 20___.

_____

               Signature

7

CERTIFICATE OF SERVICE

This is to certify that the undersigned on August 9, 2006, caused a copy of the foregoing to be faxed and delivered via interoffice mail to counsel for the Government, Wayne Patrick, Esq., Office of Chief Counsel, Drug Enforcement Administration, Washington, D.C. 20537, and copies to be faxed and mailed, postage paid, to counsel for Mallinckrodt, Inc., Steven J. Poplawski, Esq., Bryan Cave LLP, 700 Thirteenth Street, N.W. Suite 600, Washington, D.C. 20005-3960; counsel for Penick Corporation, Wayne H. Matelski, Esq., Arent Fox PLLC, 1050 Connecticut Avenue, N.W., Washington, D.C. 20036-5339; counsel for Noramco of Delaware, Inc., Andrew D. Schau, Esq., Patterson, Belknap, Webb & Tyler, LLP, 1133 Avenue of the Americas, New York, New York 10036-6710; counsel for Cody Laboratories, Inc., Terence J. Lynam, Esq., Akin Gump Strauss Hauer & Feld, LLP, 1333 New Hampshire Avenue, N.W., Washington, D.C. 20036; and counsel for Rhodes Technologies, Peter R. Mathers, Esq., Kleinfeld, Kaplan and Becker LLP, 1140 19th Street, N.W., Washington, D.C. 20036.

Patricia A. Medico
Secretary to Mary Ellen Bittner
Administrative Law Judge

8

# EXHIBIT E

**UNITED STATES DEPARTMENT OF JUSTICE**
**DRUG ENFORCEMENT ADMINISTRATION**

IN THE MATTER OF          )
                                  )
                                  )
                                  )      Docket No. 06-53
Cody Laboratories, Inc.       )
                                  )

**PREHEARING MEMORANDUM**
**OF PENICK CORPORATION**

Wayne H. Matelski
ARENT FOX PLLC
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5339
(202) 857-6340

Dated:  April 17, 2006

Pursuant to the March 27, 2006 Memorandum to Parties and Order for Prehearing Memoranda and the April 14, 2006 Memorandum to Parties and Rulings on Motions of Administrative Law Judge Mary Ellen Bittner, Penick Corporation ("Penick") hereby submits its Prehearing Memorandum in the matter of Cody Laboratories, Inc. ("Cody") for registration as an importer of raw opium (9600), poppy straw (9650) and concentrate of poppy straw("CPS") (9670) (collectively, "the Schedule II substances").

## I.    STATEMENT OF POSITION

Penick seeks to establish in this proceeding that Cody's pending application for registration as an importer of the Schedule II substances does not satisfy the public interest criteria established under 21 U.S.C. §§ 958(a) and 823(a).  To be approved as an importer of the Schedule II substances, Cody must demonstrate that: (1) the Schedule II substances it seeks to import are "necessary to provide for medical, scientific, or other legitimate purposes," 21 U.S.C. § 952(a)(1); and (2) Cody's registration is consistent with U.S. obligations under international treaties, conventions, or protocols, and also with the public interest.  21 U.S.C. §§ 958(a) and 823(a).

Section 303(a) of the Controlled Substances Act ("CSA"), 21 U.S.C. § 823(a), provides that the following factors shall be considered in determining the public interest:

(1)    maintenance of effective controls against diversion of controlled substances by limiting their importation and bulk manufacture to a number of establishments that can produce "an adequate and uninterrupted supply" under "adequately competitive conditions";

(2)    compliance with applicable state and local law;

-2-

(3)     promotion of technical advances in the art of manufacturing these substances and

the development of new substances;

(4)     prior conviction record of applicant under federal and state laws relating to the

manufacture, distribution, or dispensing of such substances;

(5)     past experience in the manufacture of controlled substances, and the existence in

the establishment of effective controls against diversion; and

(6)     such other factors as may be relevant to and consistent with the public health and

safety.

Cody, as the applicant in this proceeding, has the burden of proving by a preponderance

of the credible evidence that its registration would be consistent with the public interest.  21

C.F.R. § 1301.44(c).  Cody cannot satisfy this burden for several reasons, including, but not

limited to, the following:  (1) the unprecedented approval of five registered importers of

Schedule II substances, the most recent of which was only approved by the Deputy

Administrator less than three months ago,[1] makes it impossible for the U.S. Drug Enforcement

Administration ("DEA") to assess accurately the adequacy of competition, the adequacy of

supply, and the DEA's ability to monitor and control against diversion; (2) Cody is currently in

violation of federal law governing the manufacture of Schedule II substances; and (3) Cody is

incapable of contributing any technology that will advance the art of manufacturing and/or the

development of new substances.

---

[1] *In re Chattem*, 71 Fed. Reg. 9834 (Feb. 27, 2006), *petition for review pending sub nom, Penick Corporation v. U.S. Drug Enforcement Administration*, No. 06-1105 (D.C. Cir. Mar. 24, 2006).

A.    **The Recent, Rapid and Continuing Approval of Additional Importers Makes It Impossible to Determine the Adequacy of Competition, Adequacy and Stability of Supply, and the DEA's Ability to Control Against Diversion.**

As previously noted, under the language of the CSA, Congress has required the DEA to limit the number of registered importers to those that it can effectively monitor so as to control against diversion, while at the same time allowing a sufficient number of registered importers that will ensure an adequate supply under adequately competitive conditions.  21 U.S.C. §§ 958(a) and 823(a)(1).[2]  The United States has assumed separate, but equally controlling, obligations to control against diversion under a number of international drug control treaties.[3]  In other words, under various authorities, Congress has directed DEA to determine the appropriate ceiling to be placed on the number of registered importers by balancing a host of factors.  These factors include the DEA's ability to monitor registrants, the level of industry competitiveness, and the adequacy and stability of supply.[4]

At this time, there are five registered importers of raw opium and CPS – Chattem Chemicals, Inc.; Johnson Matthey, Inc.; Mallinckrodt, Inc.; Noramco of Delaware, Inc.; and Penick – and there are at least two more companies in addition to Cody – Houba, Inc. and Rhodes Technologies – with applications pending before the DEA to register to import raw

---

[2] *See, e.g., CSA, Hearings before the Subcomm. to Investigate Juvenile Delinquency of Sen. Comm. on the Judiciary,* 91st Cong. 261-62 (1969) (Statement of Attorney Gen. Mitchell) ("[T]here is no intention on the part of the Justice Department nor the Bureau of Narcotics and Dangerous Drugs by this provision to expand beyond necessity . . . any manufacturers in this particular area").

[3] *See, e.g.,* the United Nations Single Convention on Narcotic Drugs of 1961, which obligates the United States to take all necessary measures to ensure that the international movement of narcotics is limited to legitimate medical and scientific needs.

[4] This position is consistent with that taken by Government counsel in Government Exceptions to the Opinion and Recommended Ruling, Findings of Fact, Conclusions of Law, and Decision of the Administrative Law Judge ("Government's Exceptions in *Houba*") at 2-3 in *In re Houba,* Docket No. 02-6 (May 12, 2006) ("It is Government counsel's position that the only interpretation of the 823(a)(1) factor that comports with the rules of statutory interpretation is to read that provision to require a systemic control on diversion by means of limiting the number of manufacturers and importers to a number that can produce an adequate and uninterrupted supply of these substances under competitive conditions.").

-4-

opium and CPS. *See*, *In the Matter of Houba, Inc.*, (Docket No. 02-6); 71 Fed. Reg. 20729-30

(April 21, 2006) (notice of Rhodes Technologies application to import raw opium and CPS). A

meaningful assessment of marketplace competition, adequacy and stability of supply, and the

DEA's ability to monitor any additional new registrants cannot be made with regard to Cody at

least until the DEA Administrator issues a final decision on the pending *Houba* application,[5] and

until there has been sufficient time to evaluate the effect of the most recently approved

registrants on the DEA's resources and on the marketplace.

      For the past three months, there have been five registered importers. This is completely

unprecedented in the DEA's history or experience. The prospect of possibly adding a sixth,

seventh and eighth importer utterly transforms the landscape in terms of both enforcement and

competition. Until the DEA has had time to assess the effect of its recent and pending approvals

on its monitoring capacity, it is simply not possible for Cody to demonstrate that its entry will

not have an adverse impact on potential diversion and the DEA's ability to fulfill its

Congressional mandate and the United States' international treaty obligations to monitor that

diversion.

      In short, at this time, Cody cannot reliably establish the adequacy of competition, supply,

and the DEA's ability to monitor all of the registrants. By itself, this critical public interest

factor necessarily dooms Cody's application. However, at least two other public interest factors

also weigh heavily in the conclusion that Cody's application should be denied. As discussed

below, Cody is currently in violation of federal law governing the production of pharmaceutical

---

[5] A final decision in *Houba* is especially critical in light of the fact that Government counsel in that case has asked "the Deputy Administrator to expressly overrule the *Chattem* Final Order to the extent that the Final Order is erroneous as a matter of law regarding the interpretation and application of 21 U.S.C. § 823(a)(1)." Government's Exceptions in *Houba* at 5.

products, based in part on concerns expressed by Food and Drug Administration ("FDA")

inspection officials dating back to 2002. This calls into serious question the adequacy of Cody's

facilities – a refitted abandoned Wal-Mart – and its internal controls. Finally, it is extremely

unlikely that Cody has any ability to advance the art of manufacturing and/or the development of

new substances. Each of these factors is further discussed below.

**B.     Cody Is Currently Out of Compliance with Relevant Federal Law Regarding the Manufacture of Controlled Substances.**

Cody is not currently demonstrating the quality of production that is required of a

company importing or manufacturing Schedule II substances. As discussed below, Cody's

demonstrated lack of adequate protocols and procedures in place to meet Schedule II production

requirements does not indicate the expertise or capacity to either import or manufacture Schedule

II substances or to adequately control against diversion.

1.     The Warning Letter

Just last month, on April 6, 2006, Cody received a serious Warning Letter from FDA (the

"Warning Letter") regarding the company's violation of the Federal Food, Drug & Cosmetic Act

("FFDCA"). The Warning Letter was the culmination of a ten-day inspection of Cody's

facilities in March of 2005, as well as FDA's review of a Drug Master File and at least four

subsequent written responses from Cody. According to the Warning Letter, FDA determined

that at least one Cody Active Pharmaceutical Ingredient (API) product, Hydromorphone HCI,

and one finished drug product, Morphine Sulfate Concentrate Oral Solution, were adulterated

within the meaning of the FFDCA because they had not been manufactured, processed,

packaged, and/or held in accordance with Current Good Manufacturing Practices.

The violations noted by FDA were both numerous and serious, and included: a failure to ensure that automatic, mechanical, or electrical equipment would function satisfactorily; a failure to follow standard operating procedures ("SOPs"); inadequate written performance protocols; a failure to ensure a correctly working air filtration system; inadequate written procedures for equipment cleaning and maintenance; a failure to investigate a batch that did not meet specifications; inadequate Master Production and Control records; inadequate washing facilities; and inadequate complaint procedures. The Warning Letter includes other deficiencies, as well, including: a failure to follow written procedures for production and process control designed to ensure the identity, strength, quality and purity of drug products; failure to test each batch of API to determine conformance to specifications; failure to establish adequate written procedures for cleaning of equipment; failure to have an adequate written program for manufacturing equipment performance and failure to assure that manufacturing equipment is performing properly; and the use of inadequately qualified manufacturing equipment. Importantly, the Warning Letter states that this lengthy list of violations "is not intended to be an all-inclusive list of deficiencies at your facility." Warning Letter, p. 8.

The Warning Letter notes that several relevant issues were brought to the attention of Cody's management at least three years before the 2005 inspection – during an earlier, March 2002 inspection – including the need to establish procedures to prevent cross-contamination and the necessity for process validation. "Based on the findings of the current inspection, the violations indicated above, and the response you have provided, this advice was not heeded." *Id.*

2.    The Recalls

On March 1, 2006, FDA's Enforcement Report provided information about a January 16, 2006, recall by Cody of a lot of hydromorphone based on the presence of isopropyl alcohol that

-7-

exceeded impurity specifications. Two weeks later, FDA's Enforcement Report of March 15, 2006, provided information on yet another Cody recall, again on or about January 16, 2006, this time for sufentanil citrate, due to a finding that the level of acetone within sufentanil citrate was out of specification.

### C.  Promotion of Technical Advances

It is extremely doubtful that Cody possesses the facilities and technology to process opium and/or CPS. Additionally, based on its current poor manufacturing performance, it is almost inconceivable that Cody can, in any way, advance the technology of manufacturing opiate APIs.

## II.  PROPOSED STIPULATIONS AND ADMISSIONS OF FACT

1.  Penick is currently registered with the DEA as a bulk manufacturer of numerous Schedule II narcotic controlled substances produced by processing CPS and/or opium, including oxycodone, hydrocodone, hydromorphone, morphine, thebaine, codeine, and dihydrocodeine. 70 Fed. Reg. 71560 (Nov. 29, 2005).

2.  Penick is registered with the DEA as an importer of coca leaf, raw opium, poppy straw and CPS. *Id.*

3.  Noramco of Delaware, Inc. ("Noramco") is currently registered with the DEA as a bulk manufacturer of numerous Schedule II controlled substances, including codeine, oxycodone, hydrocodone, morphine and thebaine. 71 Fed. Reg. 23950 (April 25, 2006). Noramco produces these drugs by processing imported opium and CPS, which it is registered to import. 71 Fed. Reg. 23949 (April 25, 2006).

4.  Mallinckrodt Chemical, Inc. ("Mallinckrodt") is currently registered with the DEA as a bulk manufacturer of a number of schedule II controlled substances, including

thebaine, amphetamine, opium extracts, opium fluid extract, opium tincture, opium powdered and opium granulated. 70 Fed. Reg. 48441 (Aug. 17, 2005). Mallinckrodt produces these drugs by processing imported coca leaves, opium, poppy straw and CPS, which it is registered to import. 70 Fed. Reg. 43456 (July 27, 2005).

     5.    Johnson Matthey, Inc. ("Johnson Matthey") is currently registered with the DEA as a bulk manufacturer of a number of schedule II controlled substances, including codeine, oxycodone, hydromorphone, hydrocodone, morphine, and thebaine. 71 Fed. Reg. 4379 (Jan. 26, 2006). Johnson Matthey is also registered to import raw opium and CPS. 71 Fed. Reg. 23949 (April 25, 2006).

     6.    On February 17, 2006, the Deputy Administrator issued a final decision granting the application of Chattem Chemicals, Inc. ("Chattem") to import the narcotic raw materials raw opium, CPS and thebaine. 71 Fed. Reg. 9834 (Feb. 27, 2006). The decision became effective on March 29, 2006. *Id.* At 9839.

     7.    Notice of Cody's application for registration with the DEA as an importer of raw opium, poppy straw and CPS was published in the Federal Register on January 23, 2006. 71 Fed. Reg. 3545 (Jan. 23, 2006).

     8.    By letter dated February 21, 2006, Penick filed Comments on and Objections to Cody's application for an importer registration and further requested a hearing on Cody's application.

## III.   PROPOSED WITNESS LIST

     Below is a list of witnesses that Penick currently intends to call at this hearing. Penick respectfully requests permission to expand the list if testimony submitted by other parties indicates that it is necessary. In response to the ALJ's inquiry in her "Memoranda to Parties and

Order for Prehearing Memoranda" dated March 27, 2006, Penick would prefer that the direct

testimonies of the witnesses be taken orally, but would acquiesce in the usual practice of having

the direct testimonies be submitted in written form.

> **Stuart A. Rose, Ph.D.**
> **Penick Corporation**
> **33 Industrial Park Road**
> **Pennsville, NJ 08070**

Dr. Rose has a Ph.D. in Analytical Chemistry from Wayne State University. He is

President and Chief Executive Officer of Penick Corporation. Dr. Rose has over 35 years of

experience in the pharmaceutical industry.

Dr. Rose will submit testimony on the following matters:

- Penick's history and experience in the sourcing and processing opium and CPS, and in the bulk API manufacturing business.

- The demands of operating a successful narcotic API business in a manner that complies with all applicable regulatory requirements, including those imposed by the DEA, FDA, and EPA.

- The danger of granting an importer license to a company that does not have the experience or the means to operate a successful narcotic API business.

- The danger of granting an importer license to a company that is currently in violation of FFDCA manufacturing requirements, and the implications of an FDA Warning Letter.

- The absence of any public benefit to be gained if Cody's application is granted.

## IV.    DOCUMENTARY EVIDENCE

Below is a list of the currently available documentary evidence that Penick intends to submit for the record.  Penick respectfully requests permission to supplement these documents with other relevant evidence as Penick develops its case and as such evidence becomes available. In addition, because Cody bears the initial burden of proof in the matters to be adjudicated at this hearing, and because the ALJ has requested the simultaneous filing of all parties' prehearing memoranda, Penick also respectfully requests permission to supplement these documents with other relevant evidence that Penick may need to respond to issues raised by Cody.[6]

- Declaration of Stuart A. Rose, Ph.D.

- Warning Letters and related correspondence concerning FDA's inspection of Cody Laboratories, Inc.

- FDA Enforcement Reports concerning January 2006 voluntary recalls issued by Cody Laboratories, Inc.

- "Thriving in Cody: Drug Business Expects to Triple Staff," *Billings Gazette*, by Terra Cole (December 28, 2003), printed from www.billingsgazette.com on May 16, 2006.

- Copy of all pages on Cody Laboratories, Inc.'s website at www.codylabs.com, printed on May 5, 2006.

## V.    SITUS

Penick would prefer that the hearing be held at the DEA headquarters in Arlington, Virginia.

---

[6] This was expressly contemplated in the ALJ's "Memorandum to Parties and Rulings on Motions" dated April 14, 2006 at p. 3. ("The parties will have subsequent opportunities to supplement their memoranda or to otherwise refine the issues as appropriate.")

## VI.   DESIGNATION OF REPRESENTATIVE OF RECORD

Penick designates Wayne H. Matelski, Esq., as its representative of record in this

proceeding.

Respectfully submitted,

Wayne H. Matelski
ARENT FOX PLLC
1050 Connecticut Avenue
Washington, D.C.  20036
(202) 857-6340 (telephone)
(202) 857-6395 (facsimile)

Dated:  May 17, 2006

-12-

## Certificate of Service

This is to certify that on May 17, 2006, copies of the foregoing "Prehearing Memorandum of Penick Corporation" were served by Federal Express on the following individuals:

Counsel for Government:

Wayne Patrick, Esq.
Office of Chief Counsel
Drug Enforcement Administration
U.S. Department of Justice
Washington, D.C. 20537

Counsel for Cody Laboratories, Inc.:

Eric H. Singer, Esq.
Feldesman Tucker Leifer Fidell LLP
2001 L Street, N.W.
Second Floor
Washington, D.C. 20036

Counsel for Mallinckrodt, Inc.:

Scott M. Badami, Esq.
Steven J. Poplawski, Esq.
Bryan Cave LLP
700 Thirteenth Street, N.W.
Suite 600
Washington, D.C. 20005-3960

Counsel for Noramco of Delaware, Inc.:

Andrew D. Schau, Esq.
Patterson, Belknap, Webb & Tyler LLP
1133 Avenue of the Americas
New York, N.Y. 10036-6710

John A. Gilbert, Jr., Esq.
Douglas B. Farquahar, Esq.
Hyman, Phelps & McNamara, PC
700 Thirteenth Street, N.W.
Suite 1200
Washington, D.C. 20005


Wayne H. Matelski
Counsel to Penick Corporation

# EXHIBIT F

UNITED STATES DEPARTMENT OF JUSTICE
DRUG ENFORCEMENT ADMINISTRATION

|  |  |  |
|---|---|---|
| In the Matter of | )<br>)<br>) |  |
|  | ) | Docket No. 06-53 |
| Cody Laboratories, Inc. | )<br>)<br>) |  |

## PREHEARING MEMORANDUM OF NORAMCO, INC.

Andrew D. Schau
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York  10036-6710
(212) 336-2000

John A. Gilbert, Jr.
Douglas B. Farquhar
HYMAN, PHELPS & McNAMARA, P.C.
700 Thirteenth Street
Suite 1200
Washington, D.C.  20005
(202) 737-5600

Attorneys for Noramco, Inc.

May 18, 2006

UNITED STATES DEPARTMENT OF JUSTICE
DRUG ENFORCEMENT ADMINISTRATION

|  |  |
|---|---|
| ) | |
| ) | |
| In the Matter of ) | |
| ) | **Docket No. 06-53** |
| Cody Laboratories, Inc. ) | |
| ) | |
| ) | |

PREHEARING MEMORANDUM OF NORAMCO, INC.

In response to the Order of Administrative Law Judge Mary Ellen Bittner dated April

18, 2006, Noramco, Inc. (Noramco) submits this Prehearing Memorandum on Cody Laboratories,

Inc.'s (Cody) application to import raw opium and concentrate of poppy straw (CPS).

## I.    THE REGULATORY FRAMEWORK

With the possible exception of nuclear power, the international and domestic legal

controls placed over the manufacture and distribution of narcotic raw materials (NRMs) and opiate

medicines make it the most tightly controlled industry in the world.  Because these medically

important substances are highly sought after, easily abused, and very addictive, and because

importation and transportation of these substances present an inherent risk of diversion for illicit use,

DEA is required by law to limit the number of companies allowed to participate in the industry.

There are currently five approved NRM importers, a figure which is unprecedented in U.S. history.

Cody is one of three companies that is seeking to be added to the list.

Federal law and DEA regulations mandate that an applicant seeking to import NRMs

must demonstrate something more than a desire to profit from DEA licensure.  As a matter of public

interest, an applicant should demonstrate that its registration will ameliorate an existing problem,

1279031v1

such as inadequate competition, or provide some other benefit, such as improved technology. These public interest benefits must be real, practical and attainable when the registration is granted. It should not be sufficient to identify benefits that are no more than theoretical possibilities. Moreover, and of critical importance in light of DEA's evolving precedents in this area, if the applicant is also a registered <u>manufacturer</u> of controlled substances, it must at a minimum be able to demonstrate that its manufacturing operation is or will be fully compliant with all applicable rules and regulations. Absent a concrete benefit, and absent full regulatory compliance, the application should be denied.

A.     **The International Framework**

The 1961 Single Convention on Narcotic Drugs (1961 Single Convention) is the most important international treaty regulating opioids. It has two primary goals: (i) limiting the manufacture and distribution of narcotic drugs to those amounts necessary for medical and scientific purposes; and (ii) ensuring the availability of sufficient quantities of narcotic drugs for medical and scientific use. Supplementing this treaty are a number of resolutions and policies articulated by the International Narcotics Control Board (INCB) and the Commission on Narcotic Drugs (CND) establishing that prevention of diversion at both domestic and international levels while maintaining an adequate supply of narcotics for medical use is a shared responsibility of producer and consumer countries. In particular, the INCB has reminded governments that narcotic drugs and opiate raw materials are not ordinary commodities subject only to the routine dictates of a free market.

The United States plays a leadership role in the international effort to control narcotics. To that end it has passed various laws that regulate the import, manufacture and sale of narcotic drugs, including the Controlled Substances Act of 1970, 21 U.S.C. § 801, et. seq. (CSA) and the Controlled Substances Import and Export Act, 21 U.S.C. § 951, et. seq. (CSIEA). Through the DEA and the State Department, the United States plays an active role in the international drug control community. The United States actively supports international efforts to control the diversion of

3

1279031v1

narcotic drugs, even where such efforts are contrary to the economic interests of U.S. companies and consumers.

**B.    The Domestic Framework**

The granting of a DEA registration to import Schedule II narcotic drugs is governed by § 1008(a) of the CSIEA, 21 U.S.C. § 958(a).  This section provides that a company may be registered to import a Schedule I or II controlled substance if such registration is "consistent with the public interest and with United States obligations under international treaties, conventions, or protocols."  In determining the "public interest," the criteria set forth in § 303(a) of the CSA apply.

Section 303(a) of the CSA, 21 U.S.C. § 823(a), provides that, in determining the public interest, the following factors shall be considered:

(1)    maintenance of effective controls against diversion of particular controlled substances and any controlled substance in schedule I or II compounded therefrom into other than legitimate medical, scientific, research, or industrial channels, by limiting the importation and bulk manufacture of such controlled substances to a number of establishments which can produce an adequate and uninterrupted supply of these substances under adequately competitive conditions for legitimate medical, scientific, research, and industrial purposes;

(2)    compliance with applicable State and local law;

(3)    promotion of technical advances in the art of manufacturing these substances and the development of new substances;

(4)    prior conviction record of applicant under Federal and State laws relating to the manufacture, distribution, or dispensing of such substances;

(5)    past experience in the manufacture of controlled substances, and the existence in the establishment of effective control against diversion; and

(6)    such other factors as may be relevant to and consistent with the public health and safety.

The salient feature of the CSA is that it sets up a tightly regulated closed chain of distribution within which narcotic substances may be imported, manufactured and distributed.  This allows the United States to prevent the diversion of narcotic drugs as well as to meet its commitment

1279031v1

under the 1961 Single Convention, and other international initiatives. The regulatory structure created by the CSA necessarily subordinates free and unfettered competition to the need to control diversion. Many restrictions are imposed on the U.S. narcotic drug industry that would not occur in a free market.

There are several examples of laws and policies that promote the control of narcotic drugs at the expense of free and open competition. They include the following:

(1)    U.S. companies may not cultivate NRMs domestically, even though they could grow them more cheaply than they can purchase them from foreign suppliers;

(2)    U.S. companies may not import purified API made from NRM, even though API production might be accomplished more cheaply overseas than in the United States;

(3)    U.S. companies must purchase at least 80% of the total imported NRMs from only two countries, India and Turkey, even though they could be obtained more cheaply from other sources; and

(4)    Except in extreme circumstances, Schedule II active pharmaceutical ingredients (APIs), such as codeine and morphine, may not be imported at all, even though it might result in more competition and lower cost of drugs to import APIs rather than to import NRMs and then produce the APIs domestically.

Accordingly, in evaluating whether Cody's application would be in the public interest, the DEA must take into account the restrictions under which U.S. companies operate. Indeed, the regulations governing the importation of Schedule I and II substances specifically require DEA to take these government-imposed restraints into account. 21 C.F.R. § 1301.34(d)(4). Before approving an import application, DEA should assess the effect that approval would have on the public interest, paying close attention to each of the factors identified in 21 C.F.R. § 1301.34(d)(4).

C.    **Additional Requirements Applicable to Importers**

DEA regulations governing applications for a DEA registration to import Schedule I and II controlled substances specifically adopt the "public interest" criteria set forth in § 303(a) of the

5

CSA. 21 C.F.R. § 1301.34(b)(1) through (7). However, two additional requirements are included in the regulations.

First, the regulations add one additional "public interest" criteria: factor 6. This factor [21 C.F.R. § 1301.34(b)(6)(i)] requires that, in the case of opium and CPS, the applicant be permitted to import only:

> Such amounts of crude opium, poppy straw, concentrate of poppy straw, and coca leaves as the Administrator finds to be necessary to provide for medical, scientific, or other legitimate purposes.

Second, DEA has recognized that the number of importers should be more limited than the number of manufacturers. In 1995, DEA amended its regulations to eliminate the hearing requirement for manufacturing applications. Because the CSA explicitly provides that manufacturers have a right to a hearing where a company applies for an importing registration [21 U.S.C. § 958(I)], DEA retained the right to a hearing in connection with import applications. In doing so, it commented as follows (60 Fed. Reg. 32,099, 32,100, June 30, 1995):

> [R]egistrations to import Schedule I and II controlled substances are arguably granted under more limited conditions than manufacturer registrations.

DEA's recent decision in Chattem Chemicals, Inc., 71 Fed. Reg. 9834 (Feb. 27, 2006) is not inconsistent with prior DEA rulings, the underlying statutory scheme, or the current opposition to Cody's application for an importer registration. The DEA Deputy Administrator in Chattem credited Chattem's argument that the government's earlier decisions approving Chattem as a manufacturer of API was in tension with government's opposition to Chattem's registration as an importer of NRMs, i.e., if the government was opposed to one application it ought to be opposed to both applications. The Deputy Administrator noted, in dicta, that it would be "inequitable to deny an importer registration to Chattem while continuing to register bulk manufacturers of narcotics made from NRMs." 71 Fed. Reg. at 9838.

6

This reasoning is inapplicable to Cody because, as will be demonstrated at the hearing, Cody's manufacturing operation is beset by a host of serious deficiencies. Cody's problems, which are very grave, emerged only recently as a result of inspections of Cody's manufacturing operations by the U.S. Food and Drug Administration (FDA). Given FDA's findings, DEA's continued willingness to approve Cody as a manufacturer is—or should be—subject to serious doubt. In fact, unlike the situation in Chattem, Cody's manufacturing record reveals that Cody is completely unsuited to be an importer of NRM, let alone a bulk manufacturer of API. In sum, Cody's "past experience in the manufacture of controlled substances" weighs heavily in the balance as a reason to deny its import application.

The Chattem decision should be read as a call for increased vigilance in the scrutiny of manufacturing applications. In fact, speaking for the government in the Chattem case, Frank Sapienza, at that time the Chief, DEA Drug and Chemical Evaluation Section, testified that DEA had been too liberal in granting manufacturing licenses, possibly resulting in greater diversion of narcotic drugs. Noramco intends to file an objection to the renewal of Cody's manufacturing license at the appropriate time.

## II.    BURDEN OF PROOF

It is not Noramco's burden to prove that Cody is unfit for registration as an importer. Rather, pursuant to 21 C.F.R. §1301.44(c), the burden of proof is always on the applicant to show that it meets the criteria for registration. Accordingly, the burden is on Cody to prove, by a preponderance of the evidence, that its registration would be consistent with U.S. commitments under international treaties and conventions and that its registration would be in the public interest, taking into account the public interest factors set forth in the statute and the regulations. In the Matter of Roxane Laboratories, 63 Fed. Reg. 55,891 (Oct. 19, 1998); In the Matter of Johnson Matthey, Inc., 60 Fed. Reg. 26,050 (May 16, 1995). (See also 21 U.S.C. § 958(a) (registration should be denied if

7

the Attorney General "is unable to determine that such registration is consistent with the public interest…").

        An application should be denied if the applicant fails to show that its entry will serve the public interest by helping to solve an existing problem, such as inadequate competition, or by producing some other public benefit, such as improved technology. Registration of a company like Cody, which has demonstrated repeated and serious regulatory failures in its manufacturing operations, will not only not solve an existing problem, it is contrary to the public interest.

## III.    CODY'S APPLICATION

        Cody's has no discernable experience extracting, processing or manufacturing narcotic alkaloids from opium or CPS. The technology Cody will use to produce these products – assuming a technology has even been identified – has never been disclosed. The company's plans and procedures for maintaining the security of its opiate products are unknown. Its business objectives, marketing plans and pricing policies are secret. At the moment, Cody has provided no reason to believe that its application to import NRMs will be anything more than a "shelf registration."

        Cody has not shown that it has facilities capable of extracting alkaloids from opium or CPS, or that it has credible plans to construct such a facility. Cody has not submitted a security plan sufficient to demonstrate its capacity to prevent diversion of NRM. It has not demonstrated credible manufacturing and technology plans. It has not shown that it can comply with the applicable environmental and FDA requirements. To the contrary, as will be demonstrated, Cody's grievous failures to comply with existing laws and regulations cast a dire pall over its manufacturing prospects going forward.

        It is essential that Cody's manufacturing and security plans, if they exist, be disclosed before the hearing. Without advance disclosure of the basis upon which Cody intends to base it licensing case, the hearing before this Court will be substantially compromised. The hearing should

8

serve as a forum for informed comment and deliberation on Cody's application. If Cody's application remains inchoate, however, the value of holding a hearing will be compromised. Moreover, it will be critical for Cody to demonstrate that its manufacturing operation complies with all applicable laws and regulations. If Cody cannot demonstrate an ability to comply with the rules governing manufacturing, it will be unable to make use of imported NRM, even if its application were to be granted.

## IV.    WITNESSES

Below is a list of witnesses Noramco currently intends to call at this hearing. Noramco respectfully requests permission to expand this list if testimony submitted by other parties indicates that this is necessary.

> **James C. Morrison**
> **5166 Durham Road West**
> **Columbia, MD 21044**

Mr. Morrison is an independent consultant on drug regulatory issues and has been doing consulting and expert work for the past three years. Prior to that, he was employed by the FDA for 37 years. He has experience in virtually all aspects of drug regulation, including the requirements of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301, et seq., and the associated current good manufacturing practice (cGMP) standards.

Mr. Morrison will submit testimony on the following topics:

- The FDA's manufacturing requirements, designed to ensure the safety, efficacy and quality of drug products, that apply to pharmaceutical products;

- The meaning and significance of the FDA Warning Letter delivered to Cody in April 2006, and how it demonstrates that Cody failed to comply with many of the key provisions of applicable regulations;

- The meaning and significance of two Product Recalls, announced on March 1 and March 15, 2006, and how they demonstrate that Cody's failures to comply with many of the key provisions of applicable regulations have resulted in the shipment of product to customers which did not meet the required specifications;

9

- How the Warning Letter shows that Cody failed to understand the significance of the requirements relating to drug manufacturing, as evidenced by the company's inappropriate responses to the FDA inspectional findings issued to Cody in March 2005;

- The implications of Cody's regulatory failures for a lack of accountability relating to APIs, including, with regard to Cody, controlled substances;

- The implications of Cody's regulatory failures for a lack of accountability relating to APIs, including, with regard to Cody, controlled substances; and

- The serious consequences of a Warning Letter of this severity for a company in Cody's position.

**Frank L. Sapienza**
**The Drug & Chemical Advisory Group, LLC**
**4911 Heversham Court**
**Fairfax, Virginia  22032**

Mr. Sapienza is a principal in The Drug & Chemical Advisory Group, LLC, a privately owned professional services business providing a wide range of consulting services on matters related to regulation of controlled substances at the federal state and international level.  Prior to forming the consulting service, Mr. Sapienza was the Chief, Drug and Chemical Evaluation Section, Office of Diversion Control, Drug Enforcement Administration.  The responsibilities of that office include domestic and international drug scheduling, implementation and maintenance of the quota system, policy and scientific issues relating to NRMs, international treaty obligations and general scientific matters.

Mr. Sapienza began his career at the DEA (then, Bureau of Narcotics and Dangerous Drugs) in 1972 as a forensic chemist and has worked as a chemist and pharmacologist.  He has extensive experience in scientific and policy matters regarding the domestic and international control and diversion of narcotic drugs and psychotropic substances.

Mr. Sapienza will submit testimony on the following:

- The regulatory scheme under the CSA, the CSIEA and the 1961 Single Convention.

10

- The CSA's limitations on import and manufacture of narcotic drugs.

- DEA's regulations and policies to prevent diversion, both domestically and internationally, and their implications with respect to increasing the number of registered importers and shippers.

- The importance of requiring an applicant to provide a detailed and concrete plan showing that it will be able to comply with the applicable regulations.

- DEA's de facto policy against "shelf," or theoretical, registrations.

- The significance of the "80-20" rule and the need for all importers and manufactures to contribute to accomplishing this objective.

- The harm inflicted on U.S. and international policy interests by registering an unqualified enterprise as an importer of NRMs. For example, the CND and ECOSOC have adopted resolutions encouraging governments to prevent proliferation of sources of opiate raw materials including limiting the number of manufacturers and importers.

- The tightly controlled nature of the narcotics control industry, and corresponding need to reserve DEA registrations for those with a professional commitment to and understanding of the narcotics industry.

- The danger of granting a license application to any company that does not have the means or intent to operate a successful narcotics business.

- Excess supply of controlled substances and NRMs can lead to diversion and DEA's role is to limit the availability of narcotics to that needed for legitimate medical purpose. The registration of additional importers and manufacturers will increase the risk of domestic diversion of opiates. The registration of additional importers and manufacturers with regulatory difficulties increases that risk even further.

- Experience in administering the CSA quota system indicates that adding registrants to import controlled substances will inevitably result in importation and manufacture of greater amounts of NRMs than are needed for legitimate medical need. In particular, inflated aggregate production quotas provide an unrealistic picture of U.S. demand and can cause cultivating countries to over produce.

- The quota system alone is not capable of limiting the amounts of controlled substances that importers import and manufacturers produce to that level which reflects medical need, particularly at the retail level.

- A review of the publicly available information on Cody's lack of compliance with cGMP, some of which involve Schedule II controlled substances, indicates that such difficulties may have an effect on the quota system.

11

- An NRM importer and manufacturer must show DEA that it has experience, knowledge and capacity to effectively process all forms of NRMs, including opium and concentrate of poppy straw, and the opiates extracted from NRMs and to provide technical advances in this processing.

- The DEA Deputy Administrator affirmed in the Chattem matter that DEA should consider international diversion to the extent that there is evidence that such diversion will lead to diversion in the Untied States.

- DEA should limit the number of importers and manufacturers to those necessary to meet legitimate medical need.

**Michael E. Moy**
**The Drug & Chemical Advisory Group, LLC**
**4911 Heversham Court**
**Fairfax, Virginia 22032**

Mr. Moy is a principal in The Drug & Chemical Advisory Group, LLC, a privately owned professional services business providing a wide range of consulting services on maters related to regulation of controlled substances at the federal state and international level. Prior to forming the consulting service, Mr. Moy was employed for thirty years by the Drug Enforcement Administration. He served as the Chief, Drug Operations Section, Office of Diversion Control at DEA and also held positions in several DEA Field Offices involved in the review and inspection of DEA registrants.

Mr. Moy will submit testimony on the following:

- The Controlled Substances Act requirements for registration and regulation of manufacturers and importers of controlled substances, including NRMs.

- The DEA process and procedures for conducting a pre/registration investigation (Section 303 investigation) on a new or renewal application for Schedule I or II manufacturers, importers and exporters of controlled substances. The basis for requiring annual registrations and conducting comprehensive investigations of manufacturers and importers.

- The importance of recordkeeping, reporting and security procedures for the manufacture and import of controlled substances to reduce the potential for diversion. The failure to maintain complete and accurate records, including appropriate amounts and dates, have been the basis for administrative and civil actions against DEA registrants.

- The ability to comply with certain FDA requirements, particularly where it involves controlled substances, is a relevant factor that DEA should consider in determining whether a manufacturer or importer's registration is in the public interest.

- A review of the publicly available information on Cody's lack of compliance with cGMP, some of which involve controlled substances, may indicate lack of compliance with DEA requirements. A critical element of a DEA registration is the ability of the registrant to maintain complete and accurate records of handling controlled substances. Cody's failure to properly execute and document production and control records required by FDA may indicate a problem in complying with DEA recordkeeping requirements.

- Cody's recognized problems in identifying a theoretical yield raise serious concerns about potential drug diversion given that theoretical yields are critical to establishing accountability for inventories of raw materials, including appropriate documentation of waste material.

- Information reviewed indicates that Cody failed to establish and maintain certain procedures to comply with certain FDA requirements. Implementation and day-to-day compliance with federal, state and local drug control procedures and policies are critical elements of protecting against diversion. Failure to develop or follow established policies on a routine basis create opportunities for diversion. Registration of facilities by DEA that are incapable of such vigilance is not in the public interest.

- It has been noted that Cody has advertised on its website at least one Schedule II controlled substance for which it is currently not approved. Such misinformation is relevant to DEA's consideration of whether its registration as a manufacturer or importer is in the public interest.

**Mr. Michael Kindergan**
**Noramco, Inc.**
**309 Silverside Road**
**Suite 200**
**Wilmington DE 19809**

Mr. Kindergan has a Master's Degree in Chemistry from the California Institute of Technology and a Masters in Business Administration from Columbia University. He is Vice President of Noramco, responsible for its worldwide narcotics franchise since 1977.

Mr. Kindergan will submit testimony on the following topics:

- The challenge and expense of operating a successful narcotics business in a manner that complies with all applicable regulatory requirements, such as those imposed by DEA, FDA and EPA.

13

- The absence of any public benefit if Cody's application is granted.

- The adequacy and constancy of the supply of narcotic raw materials and manufactured schedule II controlled substances, including oxycodone, hydrocodone, morphine, thebaine and codeine.

- The adequacy of competition in the markets for opium-based active ingredients

- The significance of requiring Cody to comply with the "80-20" rule.

- The implications of domestic technology on diversion overseas.

- Noramco's business relationships with Cody.

- Noramco's business relationships with Lannett Company, Inc.

## V.   DOCUMENTARY EVIDENCE

### A.   McNeilab DEA Hearing

1.     McNeilab, Inc.; Grant of Registration, 46 Fed. Reg. 22,089 (April 15, 1981).

2.     Opinion and Recommended Ruling, Findings of Fact, Conclusions of Law and Decision of Administrative Law Judge, In the Matter of McNeilab, Inc., DEA Docket 78-13, Aug. 20, 1980.

3.     McNeilab's Statement of Witnesses and Documents and its Testimonial Evidence, In the Matter of McNeilab, Inc., DEA Docket 78-13, March 17, 1980.

4.     McNeilab's Exhibits, In the Matter of McNeilab, Inc., DEA Docket 78-13, March 17, 1980.

5.     Manufacturer/Importer of Controlled Substances; Application (McNeilab), 43 Fed. Reg. 27,908 (June 27, 1978).

6.     In the Matter of McNeilab, Inc., DEA Docket No. 78-13, 43 Fed. Reg. 35403 (Aug. 19, 1978).

7.     Various correspondence and memoranda from the hearing record.

### B.   DEA

1.     Import and manufacturing applications, registrations and notices, including those referring or relating to Mallinckrodt, Inc., Noramco, Inc., Johnson-Matthey, Inc., Penick Corporation, Cody, Inc., Houba, Inc., Chattem, Abbott Pharmaceuticals, Purdue-Pharma, Teva.

14

2.    Various documents pertaining to oxycodone *available at* http://www.deadiversion.usdoj.gov/drugs concern/oxycodone/oxycodone.htm.

3.    Aggregate production quota Federal Registers from 2000 - 2006 and historical information.

**C.    FDA**

1.    April 7, 2006 FDA Warning Letter issued to Cody Laboratories.

2.    Product Recalls notices and guidelines.

**D.    Cody**

1.    Various documents pertaining to Cody's business available at http://www.Codylabs.com.

2.    Information regarding Cody's FDA violations and warning letter.

3.    Correspondence between Cody and Noramco concerning Noramco's services.

4.    FDA inspection reports on Cody Laboratories.

**E.    Market & Competition**

1.    Various economic data and analyses as appropriate and necessary to address any claims regarding the adequacy of competition.

**F.    Miscellaneous**

1.    Articles pertaining to opiate diversion and abuse.

2.    The "80-20" rule, 21 C.F.R. § 1312.13(g), and related historical and policy documents.

3.    21 U.S.C. § 801, et seq., and related historical and regulatory documents.

4.    21 U.S.C. § 951, et seq., and related historical and regulatory documents.

5.    21 C.F.R. § 1301.34.

6.    1961 Single Convention on Narcotic Drugs, as amended, and related historical and policy documents.

7.    Various excerpts from reports published by the International Narcotics Control Board of the United Nations.

8.    Letter dated May 4, 1984 from Francis Mullen, Jr. to the Hon. William J. Hughes.

1279031v1

       9.     1980 Monograph by Donald E. Miller, Esq.

## VI.   SITUS

Noramco would prefer that the hearing be held at DEA headquarters in Arlington, Virginia.

## VII.   FORM OF TESTIMONY

Noramco believes that the parties should be required to provide written direct testimony in advance of the hearing, coupled with cross-examination at the hearing.

## VIII.   REPRESENTATIVE OF RECORD

Noramco designates Michael Kindergan as its representative of record.

## IX.   PROPOSED STIPULATIONS AND ADMISSIONS OF FACT

Noramco proposes the following Stipulations and Admissions of Fact:

1.     Noramco, Inc. (Noramco), 500 Swedes Landing Road, Wilmington, Delaware, 19801, is currently registered with DEA as a bulk manufacturer of the schedule II narcotic controlled substances codeine, oxycodone, hydrocodone, morphine and thebaine.  Noramco produces these drugs by processing imported opium and CPS, which it is registered to import.

2.     Mallinckrodt, Inc., Mallinckrodt and Second Street, St. Louis Missouri 63147 is currently registered with DEA as a bulk manufacturer of the schedule II narcotic controlled substances including codeine, oxycodone, hydrocodone, morphine and thebaine.  Mallinckrodt produces these drugs by processing imported opium and CPS, which it is registered to import.

3.     Johnson Matthey, Inc., Custom  Pharmaceuticals Department, 2003 Nolte Drive, West Depford, NJ  08066 is currently registered with DEA as a bulk manufacturer of the schedule II narcotic controlled substances including codeine, oxycodone, hydrocodone, morphine and thebaine.  Johnson Matthey has planned to produce these drugs by processing imported opium and CPS, which it is registered to import.

4.     Penick Corporation, 158 Mount Olivet Ave, Newark, NJ  07114 is currently registered with DEA as a bulk manufacturer of the schedule II narcotic controlled substances including codeine, oxycodone, hydrocodone, morphine and thebaine.  Penick produces these drugs by processing imported opium and CPS, which it is registered to import.

5.     Chattem Chemical Company is currently registered with the DEA as a manufacturer of NRMs and plans to import NRMs including opium and CPS.

6.     Cody has not imported significant quantities of NRMs.

16

7.    Cody received a Warning Letter dated April 7, 2006 detailing various "deviations from the current good manufacturing practice (CGMP) requirements within the meaning of 21 U.S.C. § 351(a)(2)(B) [Section 501(a)(2)(B) of the Federal Food, Drug and Cosmetic Act]."

8.    The April 7, 2006 Warning Letter sets forth FDA's determination that Cody's CGMP violations

cause [Cody's] Active Pharmaceutical Ingredient (API) product Hydromorphone HCl and finished drug product Morphine Sulfate Concentrate Oral Solution to be adulterated within the meaning of 21 U.S.C. § 351(a)(2)(B) [Section 501 (a)(2)(B) of the Act] in that the methods used in, or the facilities or controls used for, the manufacturing, processing, packing, storage or holding of these products are not operated or administered in conformity with CGMP.

17

Dated: May 18, 2006

Respectfully submitted,

Andrew D. Schau
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York  10036-6710
(212) 336-2000

John A. Gilbert, Jr.
HYMAN, PHELPS & MCNAMARA, P.C.
700 Thirteenth St., N.W.
Suite 1200
Washington, D.C. 20005
(202) 737-5600

By: _____
                    John A. Gilbert, Jr.

Attorneys for Noramco, Inc.

18

## CERTIFICATE OF SERVICE

This is to certify that the undersigned, on May 18, 2006, caused a copy of the foregoing to be delivered by hand to The Honorable Mary Ellen Bittner, Office of Administrative Law Judges, Drug Enforcement Administration, 600 Army Navy Drive, Arlington, Virginia, 22202, and copies to be sent by facsimile and first class mail to:

Wayne Patrick, Esq.
Office of Chief Counsel
Drug Enforcement Administration
600 Army Navy Drive
Arlington, Virginia  22202
**Counsel for the Government**

Eric H. Singer
Feldesman Tucker Leifer Fidell LLP
2001 L St., N.W., 2d Fl.
Washington, D.C. 20036

Wayne H. Matelski, Esq.
Arent Fox Kintner Plotkin & Kahn, PLLC
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5339
**Counsel for Penick Corporation**

Steven J. Poplawski, Esq.
Bryan Cave, LLP
211 North Broadway
St. Louis, Missouri  63102

Scott Badami, Esq.
Bryan Cave LLP
700 13th Street, N.W., Suite 600
Washington, D.C. 20005
**Counsel for Mallinckrodt**

Kathleen McKinley

# EXHIBIT G

## UNITED STATES DEPARTMENT OF JUSTICE
### Drug Enforcement Administration

| | |
|---|---|
| In the Matter of | |
| **Rhodes Technologies** | Docket No. 06-57 |

### ORDER FOR PREHEARING MEMORANDA

On August 29, 2005, Rhodes Technologies (Rhodes) filed an application with the Drug Enforcement Administration for registration as an importer of raw opium and concentrate of poppy straw, both Schedule II substances. On April 21, 2006, a notice of this application was published in the *Federal Register*. 71 Fed. Reg. 20,729 (2006). The notice stated that pursuant 21 U.S.C. § 958(i), the Attorney General shall, prior to issuing a registration under this Section to a bulk manufacturer of a controlled substance in Schedule I or II and prior to issuing a regulation under 21 U.S.C. § 952(a)(2)(B) authorizing the importation of such a substance, provide manufacturers holding registrations for the bulk manufacture of the substance an opportunity for a hearing.

On May 22, 2006, Mallinckrodt Inc. (Mallinckrodt), and Noramco of Delaware, Inc. (Noramco), separately requested a hearing on Rhodes' application. Additionally, on May 24, 2006, Penick Corporation (Penick) requested a hearing on Rhodes' application. Accordingly, it is

ORDERED that Rhodes, the Government, Mallinckrodt, Noramco, and Penick, no later than 4:00 p.m. eastern daylight time on July 12, 2006, file with the Hearing Clerk, in triplicate, and serve on each other, a written memorandum containing the following:

1. A statement of what the party seeks to prove in this proceeding;
2. Proposed stipulations and admissions of fact;
3. A list of all witnesses, including addresses, whose testimony is to be presented;
4. A brief synopsis of the anticipated testimony of each witness and the party's position as to whether the direct testimony of its witnesses in its case-in-chief should be submitted in written form or taken orally at the hearing;

5.  A description of all documentary evidence, other exhibits, and affidavits to be offered in evidence; and

6.  A designation of one representative of record.

It is further ordered that the Mallinckrodt, Noramco, and Penick serve on Rhodes their respective requests for hearing no later than June 12, 2006. All proceedings will be governed by the provisions of 21 C.F.R. §§ 1316.41 -1316.68 (2005). The date of the hearing will be set subsequent to the filing of prehearing memoranda.

Dated:  June 5, 2006

_Mary Ellen Bittner_
Mary Ellen Bittner
Administrative Law Judge

N.B.  Attention is directed to 21 C.F.R § 1316.45 (2005) which provides that papers are "deemed filed upon receipt by the Hearing Clerk." The Hearing Clerk's address is:

Office of Administrative Law Judges
Drug Enforcement Administration
Washington, D.C. 20537

The parties are cautioned that failure to file timely a prehearing memorandum as directed above may be considered a waiver of hearing and an implied withdrawal of a request for hearing. The parties are cautioned that documents are to be filed in triplicate.

## CERTIFICATE OF SERVICE

This is to certify that the undersigned on June 5, 2006, caused a copy of the foregoing to be delivered via interoffice mail to counsel for the Government, Wayne Patrick, Esq., Office of Chief Counsel, Drug Enforcement Administration, Washington, D.C. 20537, and copies to be mailed, postage paid, to counsel for Mallinckrodt, Inc., Steven J. Poplawski, Esq., Bryan Cave LLP, 211 North Broadway, St. Louis, Missouri 63102; counsel for Noramco of Delaware, Inc., Andrew D. Schau, Esq., Patterson, Belknap, Webb & Tyler, LLP, 1133 Avenue of the Americas, New York, New York 10036-6710; counsel for Penick Corporation, Wayne H. Matelski, Esq., Arent Fox Kintner Plotkin & Kahn, PLLC, 1050 Connecticut Avenue, N.W., Washington, D.C. 20036-5339; and to Rhodes Technologies, 498 Washington Street, Coventry, Rhode Island 02816.

Patricia A. Medico
Secretary to Mary Ellen Bittner
Administrative Law Judge

# EXHIBIT H

**UNITED STATES DEPARTMENT OF JUSTICE**
**Drug Enforcement Administration**

In the Matter of

**Rhodes Technologies**                    Docket No. 06-57

### ORDER TERMINATING PROCEEDINGS

On January 30, 2007, counsel for the Government filed a motion to cancel the hearing and terminate proceedings in the above-captioned matter. Counsel for the Government referenced a *Notice* published in the *Federal Register* on January 25, 2007, entitled "Importer of Controlled Substances: Correction to Notice of Application,"[1] in which the Drug Enforcement Administration (DEA) notified Rhodes Technologies (Rhodes), the public, and objectors that DEA was denying the requests for hearing and dismissing the case. The *Notice* specifically directs me to remove from the agency's administrative docket the hearing on Rhodes' application to be registered as an importer of narcotic raw materials. Accordingly, it is hereby

ORDERED that the pending hearing is cancelled, and it is further

ORDERED that all proceedings in this matter before the undersigned be and they hereby are terminated.

Dated:  February 1, 2007

Mary Ellen Bittner
Administrative Law Judge

---

[1] 72 Fed. Reg. 3,417.

CERTIFICATE OF SERVICE

This is to certify that the undersigned on  February 1, 2007, caused a copy of the foregoing to be delivered via interoffice mail to counsel for the Government, Brian Bayly, Esq., Office of Chief Counsel, Drug Enforcement Administration, Washington, D.C. 20537, and copies to be mailed, postage paid, to counsel for Mallinckrodt, Inc., Steven J. Poplawski, Esq., Bryan Cave LLP, 211 North Broadway, St. Louis, Missouri 63102; counsel for Noramco of Delaware, Inc., Andrew D. Schau, Esq., Patterson, Belknap, Webb & Tyler, LLP, 1133 Avenue of the Americas, New York, New York 10036-6710; counsel for Penick Corporation, Wayne H. Matelski, Esq., Arent Fox PLLC, 1050 Connecticut Avenue, N.W., Washington, D.C. 20036-5339; and to counsel for Rhodes Technologies, Peter R. Mathers, Esq., Kleinfeld, Kaplan and Becker LLP, 1140 19th Street, N.W., Washington, D.C. 20036.

Patricia A. Medico
Secretary to Mary Ellen Bittner
Administrative Law Judge

2

# EXHIBIT I

**UNITED STATES DEPARTMENT OF JUSTICE**
**Drug Enforcement Administration**

In the Matter of

**Cody Laboratories, Inc.**                    Docket No. 06-53

### ORDER TERMINATING PROCEEDINGS

On January 25, 2007, counsel for the Government filed a motion to cancel the hearing and terminate proceedings in the above-captioned matter. Counsel for the Government referenced a *Notice* published in the *Federal Register* on January 25, 2007, entitled "Importer of Controlled Substances: Correction to Notice of Application,"[1] in which the Drug Enforcement Administration (DEA) notified Cody Laboratories, Inc. (Cody), the public, and objectors that DEA was denying the requests for hearing and dismissing the case. The *Notice* specifically directs me to remove from the agency's administrative docket the hearing on Cody's application to be registered as an importer of narcotic raw materials. Accordingly, it is hereby

ORDERED that the hearing scheduled for February 26-March 2, 2007, and March 5-9, 2007, is cancelled, and it is further

ORDERED that all proceedings in this matter before the undersigned be and they hereby are terminated.

Dated:  February 1, 2007

*Mary Ellen Bittner*
Mary Ellen Bittner
Administrative Law Judge

---

[1] 72 Fed. Reg. 3,417.

## CERTIFICATE OF SERVICE

This is to certify that the undersigned on February 1, 2007, caused a copy of the foregoing to be delivered via interoffice mail to counsel for the Government, Wayne M. Patrick, Esq., Office of Chief Counsel, Drug Enforcement Administration, Washington, D.C. 20537, and copies to be mailed, postage paid, to counsel for Mallinckrodt, Inc., Steven J. Poplawski, Esq., Bryan Cave LLP, 700 Thirteenth Street, N.W., Suite 600, Washington, D.C. 20005; counsel for Penick Corporation, Wayne H. Matelski, Esq., Arent Fox Kintner Plotkin & Kahn, PLLC, 1050 Connecticut Avenue, N.W., Washington, D.C. 20036; counsel for Noramco of Delaware, Inc., Andrew D. Schau, Esq., Patterson, Belknap, Webb & Tyler, LLP, 1133 Avenue of the Americas, New York, New York 10036 and John A. Gilbert, Jr., Esq., Hyman, Phelps & McNamara PC, 700 Thirteenth Street, N.W., Washington, D.C. 20005; counsel for Cody Laboratories, Inc., Terence J. Lynam, Esq., Akin Gump Strauss Hauer & Feld, LLP, 1333 New Hampshire Avenue, N.W., Washington, D.C. 20036; and counsel for Rhodes Technologies, Inc., Peter R. Mathers, Esq., Kleinfeld, Kaplan and Becker LLP, 1140 19th Street, N.W., Washington, D.C. 20036.

Patricia A. Medico
Secretary to Mary Ellen Bittner
Administrative Law Judge