## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

)
PENICK CORPORATION,                    )
                                       )
            Plaintiff,                  )
                                       )
      v.                                )        CIVIL ACTION NO.:  1:07CV00397
                                       )
ALBERTO R. GONZALES, *et al.*           )        Hon. Royce C. Lamberth
                                       )
            Defendants.                 )
_____)

### PLAINTIFF'S NOTICE OF ERRATA

        Penick Corporation ("Penick") respectfully submits this Notice of Errata.  Earlier on

March 22, 2007, Penick attempted to file its Motion for Preliminary Injunction, Its Statements of

Points and Authorities in Support of that Motion, and all related exhibits.  However, the Court's

ECF system displayed an incorrect version of Plaintiff's Statement of Points and Authorities.  As

instructed by the Clerk, Penick has attached the correct versions of its Motion for Preliminary

Injunction and of its Statement of Points and Authorities in Support of Its Motion for a

Preliminary Injunction.

                                        Respectfully submitted,

                                        */s/ Joshua Fowkes*_____
                                        Wayne Matelski (Bar No. 211607)
                                        Joshua A. Fowkes (Bar No. 494700)
                                        ARENT FOX LLP
                                        1050 Connecticut Avenue, NW
                                        Washington, DC  20036-5339
                                        (202) 857-6000
                                        matelski.wayne@arentfox.com
                                        fowkes.joshua@arentfox.com

                                        Attorneys for Plaintiff, Penick Corporation

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing PLAINTIFF'S NOTICE OF ERRATA was sent via First Class Mail, this 22nd day of March 2007 to the following:

> Alberto R. Gonzales, in his official capacity as
> Attorney General of the United States
> United States Department of Justice
> 950 Pennsylvania Avenue, NW
> Washington, DC 20530;
>
> United States Department of Justice
> 950 Pennsylvania Avenue, NW
> Washington, DC 20530;
>
> Karen P. Tandy, in her official capacity as
> Administrator of the United States Drug Enforcement Agency
> United States Drug Enforcement Agency
> 2401 Jefferson Davis Highway
> Alexandria, Virginia 22301; and
>
> United States Drug Enforcement Agency
> 2401 Jefferson Davis Highway
> Alexandria, Virginia 22301

*/s/ Joshua A. Fowkes*
One of the Attorneys for Plaintiff,
Penick Corporation

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
PENICK CORPORATION,                  )
                                                    )
                        Plaintiff,              )
                                                    )
            v.                                    )          CIVIL ACTION NO.:  1:07CV00397
                                                    )
ALBERTO R. GONZALES, *et al.*        )          Hon. Royce C. Lamberth
                                                    )
                        Defendants.          )
_____)

<u>**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**</u>

Penick Corporation ("Penick") respectfully requests that this Court enter a preliminary

injunction enjoining Defendants, Attorney General Alberto R. Gonzales, the United States

Department of Justice, Administrator Karen P. Tandy, and the United States Drug Enforcement

Administration, from:

(a) proceeding on either of two separate applications filed by Rhodes Technologies

("Rhodes") and Cody Laboratories Inc. ("Cody") for United States Drug Enforcement

Administration ("DEA") registration to import controlled substances known as narcotic raw

materials ("NRMs"); and

(b) enforcing DEA's two Orders of January 25, 2007 that (1) improperly prohibit

importers, importer applicants and manufacturers of products made from NRMs from submitting

comments, objections, and requests for hearings on applications to import NRMs; and (2) unlawfully announced that DEA may refuse to publish notices of applications to import NRMs in the Federal Register, effectively prohibiting the submission of comments, objections, and requests for hearings on those applications from any source.

Injunctive relief is warranted because DEA has abrogated Penick's right to request and participate in hearings related to both the Cody and Rhodes registration applications, and because DEA has prevented Penick's participation in any future NRM importer registration, through comment, objection or at a hearing.  In so doing, DEA's Orders violate the letter and longstanding interpretation of its own regulations.  First, DEA regulations expressly require the publication of notices of importer applications in the Federal Register.  *See* 21 C.F.R. § 1301.34(a).  Second, by well-established interpretation and application of this same rule, DEA has long allowed importers and bulk manufacturers of products made from NRMs (such as Penick) to request and participate in hearings on the importer registration applications filed by other potential NRM importers.  Finally, DEA has taken these abrupt and unlawful actions without providing notice and comment rulemaking, thereby violating the Administrative Procedure Act ("APA") (5 U.S.C. §§ 701-706) and Penick's fundamental rights under the Fifth Amendment of Constitution of the United States.

Thus, an injunction is warranted.  A Proposed Order is attached.  Penick requested by telephone multiple times that Defendants identify their counsel in order to discuss whether this Motion would be opposed, but Defendants could not do so.

Respectfully submitted,

*/s/ Joshua Fowkes*
Wayne Matelski (Bar No. 211607)
Joshua A. Fowkes (Bar No. 494700)
ARENT FOX LLP
1050 Connecticut Avenue, NW
Washington, DC  20036-5339
(202) 857-6000
matelski.wayne@arentfox.com
fowkes.joshua@arentfox.com
Attorneys for Plaintiff, Penick Corporation

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION was sent via First Class Mail, this 22nd day of March 2007 to the following:

> Alberto R. Gonzales, in his official capacity as
> Attorney General of the United States
> United States Department of Justice
> 950 Pennsylvania Avenue, NW
> Washington, DC  20530;
>
> United States Department of Justice
> 950 Pennsylvania Avenue, NW
> Washington, DC  20530;
>
> Karen P. Tandy, in her official capacity as
> Administrator of the United States Drug Enforcement Agency
> United States Drug Enforcement Agency
> 2401 Jefferson Davis Highway
> Alexandria, Virginia  22301; and
>
> United States Drug Enforcement Agency
> 2401 Jefferson Davis Highway
> Alexandria, Virginia  22301

> */s/ Joshua A. Fowkes*
> One of the Attorneys for Plaintiff,
> Penick Corporation

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
PENICK CORPORATION,                     )
                                        )
                    Plaintiff,          )
                                        )
        v.                              )        CIVIL ACTION NO.:  1:07CV00397
                                        )
ALBERTO R. GONZALES, *et al.*           )        Hon. Royce C. Lamberth
                                        )
                    Defendants.         )
_____)

**PLAINTIFF'S STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF ITS**
**MOTION FOR PRELIMINARY INJUNCTION**

Penick Corporation ("Penick") respectfully submits the following Statement of Points and Authorities in Support of Its Motion for a Preliminary Injunction.

## I.        INTRODUCTION

Penick seeks an Order preliminarily enjoining Defendants, Attorney General Alberto R. Gonzales, the United States Department of Justice, Administrator Karen P. Tandy, and the United States Drug Enforcement Administration, from:

(a) proceeding on either of two separate applications filed by Rhodes Technologies ("Rhodes") and Cody Laboratories Inc. ("Cody") for United States Drug Enforcement Administration ("DEA") registration to import controlled substances known as narcotic raw materials ("NRMs");  and

(b) enforcing DEA's two Orders of January 25, 2007 that (1) improperly prohibit importers, importer applicants and manufacturers of products made from NRMs from submitting comments, objections, and requests for hearings on applications to import NRMs; and (2) unlawfully announced that DEA may refuse to publish in the Federal Register notices of applications to import NRMs, effectively prohibiting the submission of comments, objections, and requests for hearings on those applications from any source.

Injunctive relief is warranted because DEA has abrogated Penick's right to request and participate in hearings related to both the Cody and Rhodes registration applications and has prevented Penick's participation in any future NRM importer registration, through comment, objection or at a hearing.  In so doing, DEA's Orders violate the letter and longstanding interpretation of its own regulations.  First, DEA regulations expressly require the publication of notices of importer applications in the Federal Register.  *See* 21 C.F.R. § 1301.34(a).  Second, by well-established interpretation and application of this same rule, DEA has long allowed importers and bulk manufacturers of products made from the NRMs (such as Penick) to request and participate in hearings on the importer registration applications filed by other potential NRM importers.  Finally, DEA has taken these abrupt and unlawful actions without providing notice and comment rulemaking, thereby violating the Administrative Procedure Act ("APA") (5 U.S.C. §§ 701-706) and Penick's fundamental rights under the Fifth Amendment to the Constitution of the United States.

As a result of the DEA's unlawful Orders, Penick has suffered (and will continue to suffer) various severe and irreparable injuries.  First, unless DEA is enjoined from proceeding with the Cody and Rhodes applications during the course of the proceedings before this Court, should DEA decide to grant those applications, any subsequent challenge from Penick about the

DEA's unlawful cancellation of the hearings on those applications would be so greatly damaged that Penick would very well lose the opportunity to seek relief.  Accordingly, those proceedings must be stayed in order to allow this Court to decide the important issues in this case.  Second, unless DEA is enjoined from enforcing its Order announcing its refusal to publish notices of NRM importer applications in the Federal Register, DEA may take significant and irreversible action on new applications for DEA registration without Penick (and others) even knowing that new applications have been submitted.

## II.    FACTS

**A.    DEA Regulation of the Importation of Controlled Substances.**

Congress allows for a hearing on DEA importation registration applications under certain circumstances, and DEA regulations and policy have long provided this opportunity to NRM importers such as Penick.  DEA's arbitrary decision to cancel ongoing hearings and to deny the rights to comment, object, and request a hearing ignores the intent of Congress and the procedural protections of the APA.

### (i)    Narcotic Raw Material Regulation and Control.

The Controlled Substances Act of 1970 and the Controlled Substances Import and Export Act (collectively, "the Controlled Substances Act" or "CSA"), 21 U.S.C. § 801 *et seq.*, authorize DEA to control against the illicit distribution of certain drugs known as "controlled substances." DEA defines controlled substances as drugs that have a potential for abuse and addiction.  *See, e.g.,* 71 Fed. Reg. 58569 (Oct. 4, 2006).  These drugs include substances classified as opiates, stimulants, depressants, hallucinogens, anabolic steroids, and drugs that are immediate precursors of these classes of substances.  *Id.*  DEA divides controlled substances into five schedules.  Schedule I substances have a high potential for abuse and have no accepted medical

use.  These substances may be used only for research, chemical analysis, or manufacture of other

drugs.  The remaining schedules, II-V, include substances that have an accepted medical use and

also have a potential for abuse and addiction.  NRMs (opium, poppy straw, and concentrate of

poppy straw ("CPS")) are classified in Schedule II and are the materials from which morphine,

codeine, and thebaine and other chemicals known as alkaloids are extracted for purposes of

purification into medically acceptable forms or as the starting chemicals to be used in the

manufacturing a number of Schedule II controlled substances.  *Id.* at 58569-70; 21 C.F.R.

§ 1308.12.  To control against the potential diversion of controlled substances for illicit purposes,

the CSA requires that all domestic bulk manufacturers and all importers of Schedule II controlled

substances be registered with DEA.

For decades, all NRMs have been imported into the United States rather than produced

domestically.  "The United States, based on long-standing policy, does not cultivate or produce

NRM, but relies solely on opium, poppy straw, and CPS produced in other countries for the

NRM necessary to meet the legitimate medical needs of the United States."  71 Fed. Reg. at

58570 (Oct. 4, 2006).  Under the requirements of the CSA, a small number of companies import

all the NRMs the United States requires, and then they use or sell the NRMs to manufacture

narcotic drugs or drug ingredients ("active pharmaceutical ingredients" or "APIs").  Penick is

among these "NRM importer/manufacturers."  70 Fed. Reg. 71560 (Nov. 29, 2005).

**(ii)     CSA Provisions for NRM Importer Registration.**

As mentioned above, the CSA mandates that DEA register all importers of Schedule II

controlled substances:

Sec. 952. Importation of controlled substances

 (a) Controlled substances in schedule I or II and narcotic drugs in schedule III,
IV, or V; exceptions It shall be unlawful to import into the customs territory of the
United States from any place outside thereof (but within the United States), or to

import into the United States from any place outside thereof, any controlled substance in schedule I or II of subchapter I of this chapter, or any narcotic drug in schedule III, IV, or V of subchapter I of this chapter, except that -

(1) such amounts of crude opium, poppy straw, concentrate of poppy straw, and coca leaves as the Attorney General finds to be necessary to provide for medical, scientific, or other legitimate purposes, and

(2) such amounts of any controlled substance in schedule I or II or any narcotic drug in schedule III, IV, or V that the Attorney General finds to be necessary to provide for the medical, scientific, or other legitimate needs of the United States -

(A) during an emergency in which domestic supplies of such substance or drug are found by the Attorney General to be inadequate,

(B) in any case in which the Attorney General finds that competition among domestic manufacturers of the controlled substance is inadequate and will not be rendered adequate by the registration of additional manufacturers under section 823 of this title, or

(C) in any case in which the Attorney General finds that such controlled substance is in limited quantities exclusively for scientific, analytical, or research uses, may be so imported under such regulations as the Attorney General shall prescribe. No crude opium may be so imported for the purpose of manufacturing heroin or smoking opium.

21 U.S.C. § 952.

In order to receive a registration to import a Schedule II controlled substance, an applicant must establish that its registration is both necessary and consistent with the public interest.  21 U.S.C. §§ 958(a), 823(a).  The CSA provides that "manufacturers holding registrations for the bulk manufacture of the substance" sought to be imported be given an opportunity for a hearing on the importer application:

Except in emergency situations as described in section 952(a)(2)(A) of this title, prior to issuing a registration under this section to a bulk manufacturer of a controlled substance in schedule I or II, and prior to issuing a regulation under section 952(a) of this title authorizing the importation of such a substance, the Attorney General shall give manufacturers holding registrations for the bulk manufacture of the substance an opportunity for a hearing.

*Id.* at § 958(i).

(iii)     **DEA Regulations Allowing Hearing on NRM Applications.**

Following passage of the CSA in 1970, in 1971, and following notice and comment

rulemaking, DEA promulgated regulations to implement its Congressional mandates.  *See* 36

Fed. Reg. 7814 (April 24, 1971).  Among these regulations was 21 C.F.R. § 1301.34, which set

forth the procedures by which one could apply for registration to import Schedule I and II

substances.   Central to this, Section 1301.34(a) provides:

> In the case of an application for registration or reregistration to import a
> controlled substance listed in Schedule I or II, under the authority of section
> 1002(a)(2)(B) of the Act (21 U.S.C. 952(a)(2)(B)), the Administrator shall, upon
> the filing of such application, publish in the Federal Register a notice naming the
> applicant and stating that such applicant has applied to be registered as an
> importer of a Schedule I or II controlled substance, which substance shall be
> identified.  A copy of said notice shall be mailed simultaneously to each person
> registered as a bulk manufacturer of that controlled substance and to any other
> applicant therefor.  Any such person may, within 30 days from the date of
> publication of the notice in the Federal Register, file written comments on or
> objections to the issuance of the proposed registration, and may, at the same time,
> file a written request for a hearing on the application pursuant to § 1301.43.  If a
> hearing is requested, the Administrator shall hold a hearing on the application in
> accordance with § 1301.41.  Notice of the hearing shall be published in the
> Federal Register, and shall be mailed simultaneously to the applicant and to all
> persons to whom notice of the application was mailed.  Any such person may
> participate in the hearing by filing a notice of appearance in accordance with §
> 1301.43 of this chapter.  Notice of the hearing shall contain a summary of all
> comments and objections filed regarding the application and shall state the time
> and place for the hearing, which shall not be less than 30 days after the date of
> publication of such notice in the Federal Register.

As set forth above, the mandate to provide notice in the Federal Register of pending

importer applications is clear:  "… the Administrator shall, upon the filing of such application,

publish in the Federal Register a notice naming the applicant and stating that such applicant has

applied to be registered as an importer of a Schedule I or II controlled substance, which

substance shall be identified."  *Id.*  Moreover, with this regulation, DEA expanded the right to

request a hearing to applicants for bulk manufacturer registration, as well as bulk manufacturers

themselves:  "A copy of said notice shall be mailed simultaneously to each person registered as a

bulk manufacturer of that controlled substance and to any other applicant therefor.  Any such

person may, within 30 days from the date of publication of the notice in the Federal Register, file

written comments on or objections to the issuance of the proposed registration, and may, at the

same time, file a written request for a hearing on the application…"  *Id.*

        **(iv)**    **DEA Practice Allowing Hearing on NRM Applications.**

As discussed above, under long-standing United States policy, there are no domestic

producers of NRMs, nor have there been since before the passage of the CSA.  In order to

effectuate the Congressional mandate to allow hearings on importer registration applications,

DEA has long provided NRM importer/manufacturers with the notice and opportunity to

comment on, and object to, NRM importer registration applications, and with the right to request

and participate in hearings on these applications.

In fact, the DEA has consistently followed this interpretation of its regulations, allowing

NRM importer/manufacturers to comment, object, and request and participate in hearings on new

NRM importer applications.  *See, e.g.,* Penick Corp.; Importation and Manufacture of Controlled

Substances, Objections, Requests for Hearing, and Hearing, 45 Fed. Reg. 82760 (Dec. 16, 1980);

Mallinckrodt, Inc.; Conditional Grant of Registration of Import Schedule II Substances, 67 Fed.

Reg. 39041 (June 6, 2002); Penick Corporation, Inc.; Grant of Registration to Import Schedule II

Substances, 68 Fed. Reg. 6947, 6948 (Feb. 11, 2003); Chattem Chemicals, Inc.; Grant of

Registration to Import Schedule II Substances, 71 Fed. Reg. 9834 (Feb. 27, 2006).

Over the years, DEA's actual notice provided in the Federal Register outlining the

standard for participation has been inconsistent, at best.  *See, e.g.,* 46 Fed. Reg. 34732 (July 2,

1981) (*Importation of Controlled Substances; Application* (McNeilab, Inc.)) ("Any other such

applicant, and any person who is presently registered with DEA to bulk manufacture such

7

substances, may file comments or objections to the issuance of the above application and may also file a written request for a hearing thereon in accordance with 21 CFR 1301.34 and in the form prescribed by 21 CFR 1316.47."); 48 Fed. Reg. 43237 (September 22, 1983) (*Importation of Controlled Substances; Applications* (Penick)) ("Any other applicant, and any other person who is presently registered with the Drug Enforcement Administration as a bulk importer of these substances may file comments or objections to the issuance of the above application and may also file a written request for a hearing thereon in accordance with 21 CFR 1311.42 and in the form prescribed by 21 CFR 1316.47.").

Despite the inconsistencies of the specific language DEA has used in the notices themselves, however, DEA's practice has been steady and clear. For at least the past ten years (the period of time DEA itself has chronicled the practice), whenever another importer which also held downstream manufacturers' registrations for the products derived from the NRMs sought to be imported had requested a hearing, the DEA would grant and hold that hearing. Through this consistent custom and practice, DEA recognized that there was a <u>right</u> of NRM importers/manufacturers to request hearings on importation applications.

Indeed, when Penick itself challenged that right to request hearings on its own importation application, DEA ruled that the agency had "decided to afford a right to a hearing on any application other than those filed pursuant to Section 952(a)(2)(A)." *See* Ex. A Memorandum to Counsel and Rulings on Motions, In re Penick Corp., DEA Docket No. 01-03 (April 13, 2001), at 22 and nn. 67 & 68. In that ruling, the Administrative Law Judge, citing to no fewer than twenty instances over the past ten years in which DEA had afforded the opportunity for such a hearing, concluded, *inter alia*, that "the agency has decided to afford a right to a hearing on any application other than those filed pursuant to Section 952(a)(2)(A)." *Id.*

8

Moreover, the Deputy Administrator's final decision in the *Penick* case specifically adopted the Administrative Law Judge's "well-reasoned ruling" on this right.  *See* Penick Corporation Inc., Grant of Registration to Import Schedule II Substances, 68 Fed. Reg. 6947, 6948 (Feb. 11, 2003).

      **(v)**      **DEA's Previous Efforts to Abridge Hearing Rights.**

DEA has limited hearing rights on registrant applications before, and did so by means of notice and comment rulemaking.  It has given no justification for is arbitrary and capricious decision to abandon the need for notice and comment rulemaking here.

As mentioned above, the CSA requires that not only importers of Schedule II substances be registered with DEA, but also requires DEA registration for domestic bulk manufacturers.  In its 1971 rulemaking implementing the CSA, in addition to the rights granted to NRM importer/manufacturers and applicants to submit comments, objections and hearing requests regarding applications for importer registrations, DEA also granted domestic manufacturers and applicants the right to provide comments, objections and requests for hearings on applications for domestic manufacturer registrations.  36 Fed. Reg. 7776, 7782 (April 24, 1971) (finalizing former 21 C.F.R. § 301.43(a)).

In 1995, DEA rescinded the right to request a hearing on applications for domestic bulk manufacturer registrations, doing so through an extensive notice and comment rulemaking proceeding.  58 Fed. Reg. 52246 (Oct. 7, 1993) (Notice of Proposed Rulemaking); 59 Fed. Reg. 30555 (June 14, 1994) (Supplemental Notice of Proposed Rulemaking); 60 Fed. Reg. 32099 (June 20, 1995) (Final Rule).  DEA has made no effort to explain why such comprehensive notification process and opportunity for public comment was necessary in that instance, but a parallel change here may be done by simple fiat.

In fact, the need for notice and comment may be even more compelling in this instance, as DEA recognized in 1994-95. In the 1993 proposed rulemaking, DEA originally sought to abridge hearing rights as to importer applications, as well as to manufacturer applications. 58 Fed. Reg. 52246-02. Shortly thereafter, however, DEA conceded that 21 U.S.C. § 958(i) expressly gives registered domestic manufacturers the right to a hearing on an importer application. *See* 59 Fed. Reg. at 30555-01. Thus, the DEA left unchanged a bulk manufacturer's right to request a hearing on an importer's registration. *Id.* The final rule also confirmed that the DEA would not abridge that right to a hearing. 60 Fed. Reg. at 32100. Following that rulemaking — which ended the right to a hearing on certain applications for DEA registration — DEA continued its practice of allowing NRM manufacturer/importers to request and participate in hearings on new importer registrations.

**B.      The DEA's Notices of Applications of Cody and Rhodes.**

As had been the case in so many previous NRM importation applications, DEA began the hearing process in the same way with regard to the Cody and Rhodes applications. On January 26, 2006, DEA published in the Federal Register a notice of Cody's application for a DEA importer registration. *See* 71 Fed. Reg. 3545 (Jan. 26, 2006). That notice of application announced that Cody had applied for registration as an importer of the NRMs raw opium, poppy straw and CPS. *Id.* The notice also stated that "[p]ursuant to 21 U.S.C. 958(i), the Attorney General shall, prior to issuing a registration under this Section to a bulk manufacturer of a controlled substance in Schedule I or II and prior to issuing a regulation under 21 U.S.C. 952(a)(2)(B) authorizing the importation of such a substance, provide manufacturers holding registrations for the bulk manufacture of the substance an opportunity for a hearing." *Id.* It continued: "Any manufacturer who is presently, or is applying to be, registered with DEA to

manufacture [raw opium, poppy straw  and concentrate of raw poppy straw] may file comments and objections to the issuance of the proposed registration and may … file a written request for a hearing on such application ….” *Id*.

Similarly, on April 21, 2006, the DEA published a notice of Rhodes's application for DEA importer registration in the Federal Register.  *See* 71 Fed. Reg. 20729 (Apr. 21, 2006). That notice of application announced that Rhodes, too, had applied to be registered as an importer of raw opium and concentrate of poppy straw.  *Id*.  That notice also stated that “[p]ursuant to 21 U.S.C. 958(i), the Attorney General shall, prior to issuing a registration under this Section to a bulk manufacturer of a controlled substance in Schedule I or II and prior to issuing a regulation under 21 U.S.C. 952(a)(2)(B) authorizing the importation of such a substance, provide manufacturers holding registrations for the bulk manufacture of the substance an opportunity for a hearing.”  *Id*.  It continued: “Any manufacturer who is presently, or is applying to be, registered with DEA to manufacture [raw opium and concentrate of poppy straw] may file comments or objections to the issuance of the proposed registration and may … file a written request for a hearing on such application ….”  *Id*.

## C.    Penick Requests Hearings on Cody's Application and on Rhodes's Application.

On February 21, 2006, Penick submitted comments, objections and a request for hearing on the Cody importation application.  *See* Ex. B, Declaration of Stuart Rose, Ph.D. at 4.   Like Penick, two other companies — Mallinckrodt Inc. and Noramco, Inc. — also submitted comments and objections and requests for a hearing on Cody's application.  *Id*.  As it had consistently done in the past, DEA proceeded with the Cody hearing by assigning an administrative law judge to the case.  *Id*.  *See* Ex. C, ALJ's Memorandum to Parties.  The parties filed initial memoranda, submitted all written testimony, and the oral phase of the hearing had

been scheduled to begin in February 2007.  *See e.g.,* Ex. D, ALJ's August 9, 2006 Prehearing

Ruling; Ex. E, Penick's Prehearing Memorandum; Ex. F, Noramco's Prehearing Memorandum.

In Rhodes, on May 18, 2006, Penick (as an NRM importer/manufacturer) submitted

comments, objections, and a request for a hearing on the Rhodes importer application.  *See* Ex. B

Declaration of Dr. Stuart Rose at ¶ 5.  Once again, Mallinckrodt Inc. and Noramco, Inc. did

likewise.  *Id.*  Again, DEA proceeded with the hearing.  *See* Ex. G, Order for Prehearing

Memoranda.  The same administrative law judge was assigned to the Rhodes proceeding and

initial memoranda were filed, but this case had not yet proceeded to the submission of testimony.

*See* Ex. B Declaration of Dr. Stuart Rose at ¶ 5.

Penick has a significant interest in both the Rhodes and Cody applications because, *inter*

*alia,* (1) Penick has experience as a registered importer of raw opium, poppy straw and CPS; and

(2) Penick has extensive history as a registered bulk manufacturer of various controlled

substances, including cocaine, codeine, dihydrocodeine, hydromorphone, ecgonine,

hydrocodone, morphine, thebaine, oxycodone, and oxymorphone.  *Id.* at ¶ 6.  As such, Penick is

concerned with assuring, *inter-alia*:

> (a)     that there is an adequate and uninterrupted supply of NRMs for medical,
> scientific, and other legitimate purposes under adequately competitive
> conditions; and

> (b)     that the domestic system of regulatory controls against diversion remains
> stable and unimpaired.

*Id.*

Because of these critical interests and concerns, Penick requested hearings on both the

Cody and Rhodes importer applications in order to be heard and to present evidence that would

demonstrate that each of these applications should be denied for two independent reasons.  First,

the importation of the NRMs by Cody and Rhodes was not "necessary" under 21 U.S.C. §

952(a)(1). Second, neither Cody's registration nor Rhodes's registration was in the "public interest." 21 U.S.C. §§ 823(a) and 958(a). *Id.* at ¶ 7.

**D.      The DEA Abruptly — and Without Notice or Affording Penick an Opportunity to Comment or Object — Reversed Its Longstanding Interpretation of Its Regulations That Had Held That Existing Importers Were Entitled to Hearings.**

On January 25, 2007, DEA — without any notice or allowing comments and objections to be submitted — fundamentally changed its interpretation of the regulations to which Penick and other NRM importers are subject. On that date, DEA issued two self-styled "Corrections to Notice of Application" for both the January 23, 2006 notice of Cody's importer application and the April 21, 2006 notice of Rhodes's importer application. *See* 72 Fed. Reg. 3417-19 (Jan. 25, 2007).

Those "Corrections" dramatically reversed DEA's longstanding interpretation of its regulations. In particular, DEA stated that its April 21, 2006 notice of Rhodes's application "incorrectly stated that '[a]ny manufacturer who is presently, or is applying to be, registered with DEA to manufacture such basic classes of controlled substances may file comments or objections to the issuance of the proposed registration and may … file a written request for a hearing on such application ….'" *Id.* at 3417. After identifying this supposedly incorrect statement, the DEA continued: "Correctly stated, … the notice of application … should have stated that 'bulk manufacturers' of raw opium or concentrate of poppy straw may file a written request for a hearing. … [S]ince there are no domestic bulk manufacturers of narcotic raw materials registered with DEA, no registrant has the statutory or regulatory right to request a hearing on the application." *Id.* Additionally, that "Correction to Notice" stated that "the DEA is denying [Penick's] requests for hearing and dismissing the case on the agency's administrative docket." *Id.*

Further, the DEA also concluded that "applications to import narcotic raw materials, including raw opium and concentrate of poppy straw, are not required to be published in the Federal Register." *Id*. Finally, the DEA also "direct[ed] the ALJ to remove from the [DEA's] administrative docket the hearing on the application of Rhodes Technologies to register as an importer of narcotic raw materials." *Id*.

Significantly, DEA expressly conceded that it had previously granted requests for hearings made by the NRM importer/manufacturers. *Id*. at 3418. However, despite this concession, DEA abruptly — and without prior notice or an opportunity to comment or object — reversed that practice by instantly revising its interpretation of its regulations: "I now conclude that the most sound reading of the statute and regulations is that which limits the right to a hearing to those situations in which Congress expressly provided such a right." *Id*. The DEA further summarily concluded: "Finding no valid justification for the past practice [of granting hearings to importer registrants, manufacturer registrants of APIs from the NRMs to be imported, and applicants thereof], and finding such practice inconsistent with the particular criteria for a hearing rights [*sic*] set forth in the CSA and implementing regulations, I decline to follow this practice." *Id*. The DEA concluded by denying the requests for a hearing on Rhodes's application and ordering the Administrative Law Judge presiding at the hearing to remove that hearing from the DEA's docket and to dismiss the case. *Id*. at 3419. Having been ordered to do so, on February 1, 2007, the DEA's Administrative Law Judge cancelled the pending hearing on Rhodes's application and terminated "all proceedings" in the matter of Rhodes's application. *See* Ex. H, ALJ's February 1, 2007 Order Terminating Rhodes Proceeding.

As in the Rhodes application, the DEA issued a similar "Notice of Correction to Notice of Application" on the Cody application. *See* 72 Fed. Reg. 3417 (Jan. 25, 2007). In that Correction, the DEA stated that its January 23, 2006, notice of Cody's application also "incorrectly stated that '[a]ny manufacturer who is presently, or is applying to be, registered with DEA to manufacture such basic classes of controlled substances may file comments or objections to the issuance of the proposed registration and may … file a written request for a hearing on such application….'" *Id.* And once again, after identifying this supposedly incorrect statement, the DEA continued:

> Correctly stated, …, the notice of application, although not required to be published at all, should have stated that "bulk manufacturers" of raw opium, poppy straw, or concentrate of poppy straw may file a written request for a hearing. As explained in the Correction to Notice of Application pertaining to Rhodes Technologies published today, since there are no domestic bulk manufacturers of narcotic raw materials registered with DEA, no registrant has a statutory or regulatory right to a hearing on the application.

*Id.*

The DEA further "direct[ed] the Administrative Law Judge to remove from the agency's administrative docket the hearing on the application of Cody Laboratories, Inc. to be registered as an importer of narcotic raw materials." *Id.* Again, on February 1, 2007, DEA's Administrative Law Judge cancelled the pending hearing on Cody's application — the oral phase of which had been scheduled for February 26-March 2, 2007 and March 5-9, 2007. *See* Ex. I, ALJ's February 1, 2007 Order Terminating Cody Proceeding. She also terminated "all proceedings" in the matter of Cody's application. *Id.*

Finally, and significantly, DEA also announced that "applications to import narcotic raw materials, including raw opium, poppy straw, and concentrate of poppy straw, are not required to be published in the Federal Register." *See* 72 Fed. Reg. 3417 (Jan. 25, 2007).

# III.    ARGUMENT

## A.    The Standard for Granting Injunctive Relief.

In order to obtain a preliminary injunction, a plaintiff must demonstrate the following: "(1) a substantial likelihood of success on the merits; (2) that [it] would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Association of Cmty. Org. For Reform Now (ACORN) v. FEMA*, 463 F. Supp.2d 26, 33 (D.D.C. 2006) (granting injunction) (*citing Katz v. Georgetown Univ.*, 246 F.3d 685, 687-88 (D.C. Cir. 2001)); *Jasperson v. Federal Bureau of Prisons*, 460 F.Supp.2d 76, 88 (D.D.C. 2006) (granting injunction). Because these four factors "interrelate on a sliding scale," the Court must balance the strengths of the factors against each other. *Id.* (citing *Serono Labs. v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998)).

"If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *CityFed. Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995). In other words, a plaintiff need not prevail on each of these four factors:

> [Instead,] the factors must be viewed as a continuum, with more of one factor compensating for less of another.… An injunction may be justified "where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." Conversely, when the other three factors strongly favor interim relief, a court may grant injunctive relief when the moving party has merely made out a 'substantial' case on the merits. The necessary level or degree of likelihood of success that must be shown will vary according to the Court's assessment of the other factors. "In sum, an injunction may be issued 'with either a high probability of success and some injury, or vice versa.'"

*Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20, 27 (D.D.C. 1997) (citing *City Fed. Fin.*, 58

F.3d at 747 and *Cuomo v. United States Nuclear Reg. Comm'n*, 772 F.2d 972, 974 (D.C. Cir.

1985)).

 As demonstrated below, an injunction is warranted.

**B. Penick Has a Substantial Likelihood of Success on the Merits of Its Claim.**

 With regard to all of DEA's actions that Penick seeks to enjoin, Penick has a substantial

likelihood of success on the merits.  First, Penick has a substantial likelihood of successfully

enjoining DEA from enforcing its two Orders prohibiting manufacturers that are presently, or are

applying to be, registered with DEA to import NRMs and manufacture APIs from them from

requesting hearings on applications to import NRMs.  In those Orders, DEA abruptly reversed its

longstanding interpretation of its regulation that NRM importer/manufacturers such as Penick are

entitled to request hearings on applications to import NRMs and that hearings would be held.

The DEA's decision was arbitrary and capricious.

 The D.C. Circuit has consistently held that before an agency may change its

interpretation of a regulation, it must engage in notice and comment rulemaking.  In

*Environmental Integrity Project v. EPA*, the D.C. Circuit held that the EPA's revised

interpretation of a regulation "complies with the APA only if preceded by adequate notice and

opportunity for public comment."  *Environmental Integrity Project v. EPA*, 425 F.3d 992, 997

(D.C. Cir. 2005).  In underscoring that a rule's interpretation "cannot be modified without the

notice and comment procedure," the court reasoned that without that fundamental requirement of

notice and comment, an agency "could easily evade notice and comment requirements by

amending a rule under the guise of reinterpreting it."  *Id.* at 995 (citation omitted).

In another case reaching this same conclusion, the D.C. Circuit explained why an agency's changes in its interpretations of regulations require notice and comment by closely scrutinizing the APA's text:  "Under the APA, agencies are obligated to engage in notice and comment before formulating regulations, which applies as well to '*repeals*' or '*amendments*.'  *See* 5 U.S.C. § 551(5).  To allow an agency to make a fundamental change in its interpretation of a substantive regulation without notice and comment obviously would undermine those APA requirements."  *Paralyzed Veterans of America v. D.C. Arena, L.P.*, 117 F.3d 579, 586 (D.C. Cir. 1997) (emphasis in original).

The D.C. Circuit's holding in *Environmental Integrity Project* reiterated and reaffirmed its previous holding in *Alaska Prof. Hunters Assn. v. FAA*, 177 F.3d 1030, 1034 (D.C. Cir. 1999).  There, the court held that "[w]hen an agency has given its regulation a definitive interpretation and later significantly revises that interpretation, the agency has in effect amended its rule, something it cannot accomplish without notice and comment."  *Alaska Prof. Hunters Assn.*, 177 F.3d at 1034.  The D.C. Circuit emphasized that an agency's "current doubts about the wisdom of the regulatory system followed … for more than thirty years does not justify disregarding the requisite procedures for changing that system."  *Id.* at 1035 (granting petition for review and invalidating agency's notice because it was published without notice and comment).  In fact, the court concluded that revising an agency's interpretation of a regulation required notice and comment even where the original interpretation itself was never adopted through notice and comment.  *Id.*

In holding that revisions to agency interpretations require notice and comment, the D.C. Circuit has underscored its concern for regulated parties that are subject to reversals of agency interpretations.  In particular, it emphasized that "[t]he notice and comment guarantees would not

be meaningful if an agency could effectively, constructively amend regulations by means of nonobvious readings without giving the affected parties an opportunity either to affect the content of the regulations at issue or at least be aware of the scope of their demands." *Nat. Family Planning and Reproductive Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 240 (D.C. Cir. 1992). The court concluded that permitting an agency to completely reverse its interpretation without notice and comment rulemaking "would render the requirements of [APA §553] basically superfluous in legislative rulemaking by permitting agencies to alter their requirements for affected public members at will through the ingenious device of 'reinterpreting' their own rule." *Id*. at 232 (affirming district court's ruling that granted injunctive and declaratory relief enjoining the Secretary of H.H.S. from enforcing the new interpretation of regulation without engaging in notice and comment).

Finally, the Supreme Court of the United States has also recognized this critical rule. Specifically, it acknowledged that APA rulemaking is required if a regulation "adopted a new position inconsistent with any of the … existing regulations." *Shalala v. Guernsey Memorial Hosp.*, 514 U.S. 87, 99 (1995). *See also Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861, 912 (2000) (Stevens, J., dissenting) (noting "the APA's requirement of new rulemaking when an agency substantially modified its interpretation of a regulation.").

Under this well-established authority, DEA's dramatic reversal of its interpretation of its regulations at issue here requires notice and comment rulemaking. DEA did not merely clarify its interpretation of its regulations. Instead, in its self-styled "Correction," the DEA conceded that it had previously granted requests for hearings to "persons that were not bulk manufacturers of the narcotic raw material." *See* 72 Fed. Reg. 3417-02 (Jan. 25, 2007). Despite this important concession, however, DEA "conclude[d] that the most sound reading of the statute and

19

regulations is that which limits the right to a hearing to" only bulk manufacturers.  *Id*.  DEA's

own statement demonstrates that it substantially changed its "reading" or interpretation of its

regulations.  Consequently, notice and comment rulemaking was required.  Based on the law of

this Circuit, Penick has a substantial likelihood of successfully enjoining DEA from enforcing its

Order that prohibits NRM importer/manufacturers from submitting requests for hearings on

NRM importer applications.

Second, Penick also has a substantially likelihood of success on its claim to enjoin DEA

from enforcing its Orders announcing that DEA is no longer required to publish notices of the

applications to import NRMs in the Federal Register, thereby effectively denying NRM

importer/manufacturers, and applicants therefor, from notice or the opportunity to comment on

or object to these applications.  21 C.F.R. § 1301.34(a) expressly requires DEA to publish these

notices in the Federal Register:

> In the case of an application for registration or reregistration to
> import a controlled substance listed in Schedule I or II, . . ., the
> Administrator shall, upon the filing of such application, publish in
> the Federal Register a notice naming the applicant and stating that
> such applicant has applied to be registered as an importer of a
> Schedule I or II controlled substance, which substance shall be
> identified.

21 C.F.R. § 1301.34(a).  The language of this regulation could not be more clear.  Nevertheless,

DEA has plainly violated this requirement by stating that it need not publish these notices: "…

applications to import narcotic raw materials, …, are not required to be published in the Federal

Register."  *See* 72 Fed. Reg. 3417-19 (Jan. 25, 2007).  As discussed above, an agency may not

simply change or refuse to recognize its own regulations without notice and the opportunity to

comment.  Thus, Penick has a substantial likelihood of success on its claim to enjoin DEA from

enforcing its Order that DEA is not required to publish the notices of NRM importer applications in the Federal Register.

**C.    Penick Will Suffer Severe, Imminent and Irreparable Harm Unless an Injunction Is Issued, While DEA Will Not Be Harmed From That Injunction.**

The balance of harm overwhelmingly favors issuing the injunctive relief that Penick seeks.  Unless that relief is issued, Penick will suffer severe, imminent and irreparable harm. Most critical, if DEA moves forward and grants the Cody and Rhodes applications during the course of this lawsuit, any subsequent challenge from Penick about the DEA's unlawful cancellation of the hearings on those applications would be so greatly damaged that Penick would very well lose the opportunity to seek relief.

If DEA grants those applications during the course of this lawsuit and this Court finds that Penick should have been allowed to participate in a hearing on the applications, DEA cannot simply revoke the granted registrations and take up the hearings where it left off.   Importantly, under the CSA and its implementing regulations, to revoke a registration, the DEA must show cause, a critical shift of the burden of proof from the burden DEA bears when initially granting an application.  *See* 21 U.S.C. § 958(d)(2), (4); 21 C.F.R. § 1301.36(b)(2), (d).  Under a different burden of proof, Penick would have different – significantly abridged – rights.   Although the outcomes of the Cody and Rhodes applications are not certain at this point, Penick's ability to protect its rights through this action would be irrevocably damaged if their applications are allowed to proceed and are granted.

For similar reasons, Penick will suffer severe, imminent and irreparable injury unless DEA is enjoined from enforcing its Orders announcing that DEA is refusing to publish notices of applications to import NRMs in the Federal Register.  Unless DEA is enjoined from refusing to publish future notices of applications, Penick (and others) will be entirely unaware of future

21

applications to import NRMs and, consequently, will be unable even to consider submitting comments, objections, and requests for hearings on these future applications. By effectively concealing critical information such as notices of application from NRM importers/manufacturers such as Penick, DEA will continue to irreparably harm Penick (and exclude valuable information from its determination process). Pending resolution of this proceeding, DEA should be enjoined from denying Penick, other importers/NRM manufacturers, and the public this information because that denial directly violates DEA's own regulations.

In contrast to the severe and irreparable harm Penick faces, DEA will not suffer significant harm from the requested injunction. An injunction would not harm DEA or the public because an adequate supply of NRMs for medical, scientific, and other legitimate purposes already exists. At worst, an injunction may only briefly delay DEA from making a decision as to Rhodes's and Cody's applications. For example, in the Cody application, DEA had already scheduled the oral phase of the hearing date to start in February 2007 and received written testimony and initial memoranda from the parties to the proceeding. In the Rhodes application, DEA had already assigned an administrative law judge, and the parties filed initial memoranda. Assuming that Penick is successful, these proceedings could be easily recommenced. Finally, DEA will not suffer harm from being enjoined merely from refusing to publish notices of applications to import NRMs in the Federal Register. Indeed, this publication is required by its own regulation in 21 C.F.R. § 1301.34(a).

Consequently, the balance of harm overwhelmingly favors issuing the injunction.

**D.    Granting an Injunction Advances the Public Interest.**

For several reasons, granting an injunction advances the public interest. First, an injunction advances the public interest by allowing this Court to review the legitimacy of the

DEA's actions in attempting to interpret its mandate under the CSA.  Because no bulk

manufacturing of NRMs is allowed in the United States, DEA's "Corrections" would negate the

expressed intent of Congress to allow for hearings and testimony from domestic manufacturers

on new importer registrations.  DEA's novel, harsh and arbitrary interpretation in its

"Corrections" should be subject to judicial review.  As another judge on this Court has found,

"there is an overriding public interest ... in the general importance of an agency's faithful

adherence to its statutory mandate."  *Electronic Privacy Information Center v. DOJ,* 416

F.Supp.2d 30, 42 (D.D.C. 2006) (citing *Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C.

Cir. 1977)).  Here, the public has a strong interest in insuring that the DEA appropriately

administers the laws that prohibit the illegal diversion of controlled substances.

 In addition, an injunction will uphold the intent of Congress as set forth in the CSA by

preventing DEA from ruling on Cody and Rhodes's applications without the valuable evidence

that Penick and others seek to submit.  Receiving testimony and other evidence from

manufacturers such as Penick in an administrative hearing is the best way for DEA to utilize the

NRM industry's substantial resources, experience and expertise regarding industry practices,

adequate competition, the DEA's ability to monitor any additional new registrants, and

technological advances –  particularly when there is already an adequate supply of the NRMs at

issue.  Further, by having the DEA itself present evidence at the hearing before an impartial

Administrative Law Judge and then by having that Administrative Law Judge make

recommended findings of fact and conclusions of law, the final decision-maker (the DEA's

Deputy Administrator) will have an adequate record to make a reasoned and comprehensive

conclusion on whether a new applicant should be registered.  Such a process also allows the

Court of Appeals (the reviewing court of final DEA determinations under 21 U.S.C. § 877) to

have a full record in order to determine whether the DEA registration of a particular importer was arbitrary and capricious or otherwise not in compliance with the law.

Finally, protecting Penick's ability to assert its rights through this lawsuit undoubtedly advances the public interest of vigilantly protecting due process rights. As another judge on this Court recently emphasized, the D.C. Circuit has "clearly articulated that the public has an interest in the government maintaining procedures that comply with constitutional requirements." *ACORN,* 463 F.Supp.2d at 36 (citing *O'Donnell Constr. Co. v. District of Columbia*, 963 F.2d 420, 429 (D.C. Cir. 1992)). Because DEA has violated due process and the APA's requirements, an injunction to stay regulatory proceedings while the legitimacy of agency Orders is determined advances the public interest.

Thus, the injunction clearly furthers the public interest.

## IV.    CONCLUSION

A preliminary injunction is needed to protect Penick from imminent, severe and irreparable harm resulting from DEA's unlawful Orders. In addition, as demonstrated above, Penick is entitled to that injunction. Consequently, this Court should enter an Order preliminarily enjoining Defendants from:

(a) proceeding on either of the separate applications filed by Rhodes and Cody for DEA registration to import NRMs; and

(b) enforcing its two Orders of January 25, 2007 that improperly prohibit importers, importer applicants, and manufacturers of NRMs from submitting comments, objections, and requests for hearings on applications to import NRMs and unlawfully announced that DEA may refuse to publish notices of applications to import NRMs in the Federal Register.

Respectfully submitted,

*/s/ Joshua Fowkes*
Wayne Matelski (Bar No. 211607)
Joshua A. Fowkes (Bar No. 494700)
ARENT FOX LLP
1050 Connecticut Avenue, NW
Washington, DC  20036-5339
(202) 857-6000
matelski.wayne@arentfox.com
fowkes.joshua@arentfox.com

Attorneys for Plaintiff, Penick Corporation

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing PLAINTIFF'S STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION was sent via First Class Mail, this 22nd day of March 2007 to the following:

>Alberto R. Gonzales, in his official capacity as
>Attorney General of the United States
>United States Department of Justice
>950 Pennsylvania Avenue, NW
>Washington, DC  20530;

>United States Department of Justice
>950 Pennsylvania Avenue, NW
>Washington, DC  20530;

>Karen P. Tandy, in her official capacity as
>Administrator of the United States Drug Enforcement Agency
>United States Drug Enforcement Agency
>2401 Jefferson Davis Highway
>Alexandria, Virginia  22301; and

>United States Drug Enforcement Agency
>2401 Jefferson Davis Highway
>Alexandria, Virginia  22301

>*/s/ Joshua A. Fowkes*
>One of the Attorneys for Plaintiff,
>Penick Corporation