IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

PENICK CORPORATION,                  )
                                     )
                    Plaintiff,       )      Case Number: 1:07cv00397
                                     )
            v.                       )      Hon. Royce C. Lamberth
                                     )
ALBERTO GONZALES, *et al.*           )
                                     )
                    Defendants.      )
_____    )

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR A PRELIMINARY INJUNCTION**

**INTRODUCTION**

Plaintiff Penick Corporation, through its motion for a preliminary injunction, seeks to

participate in other companies' applications to the Drug Enforcement Administration ("DEA") to

import narcotic raw materials, even though Plaintiff has no statutory or regulatory right to do so.

Plaintiff does not challenge the outcome of any DEA proceeding (which has yet to occur), but

argues that it is entitled to participate in DEA's decision-making process. Plaintiff's request for

such extraordinary relief should be denied.

As an initial matter, this Court lacks jurisdiction over this case because Congress has

vested the courts of appeals with exclusive jurisdiction over federally cognizable claims brought

under the Controlled Substances Act ("CSA" or "the Act"). This Court also lacks jurisdiction

over Plaintiff's claims because Plaintiff has not met the most basic of standing requirements –

that of a judicially cognizable injury. Even if Plaintiff's claims were properly before this Court,

such claims would fail on the merits. In this case, DEA cancelled hearings on two applications

to import narcotic raw materials because DEA determined that no entity that had requested a

hearing had the statutory or regulatory right to request such a hearing.  DEA's decision complies

with both the requirements of the Administrative Procedure Act and due process.  Because

Plaintiff cannot meet any of the requirements necessary to obtain a preliminary injunction,

Plaintiff's motion should be denied.

## STATUTORY AND REGULATORY BACKGROUND

The CSA, 21 U.S.C. § 801, *et seq*., sets out a comprehensive framework for the

regulation of controlled substances.  In recognition of certain controlled substances' "useful and

medical purpose," Congress has authorized Attorney General to regulate their distribution within

a "closed system."  The Attorney General has delegated his regulatory authority under the Act to

the Administrator of the DEA.  21 U.S.C. § 871(a); 28 C.F.R. § 0.100(b).  As part of its statutory

responsibilities under the Act, the Attorney General is authorized to "promulgate rules and

regulations and to charge reasonable fees relating to the registration and control of the

manufacture, distribution, and dispensing of controlled substances."  21 U.S.C. § 821.  The Act

also provides authority for the Attorney General to "promulgate and enforce any rules,

regulations, and procedures which he may deem necessary and appropriate for the efficient

execution of his functions under [the Act]."  21 U.S.C. § 871(b).  Pursuant to this authority, DEA

has issued regulations implementing the CSA, which are found in 21 C.F.R. Parts 1300-1316.

The CSA contains stringent requirements for the importation of controlled substances, as

it finds the importation of controlled substances to be unlawful, except when certain

requirements are met.  21 U.S.C. § 952(a).  In order to import a controlled substance under

schedule I or II, or a narcotic drug under schedule III, IV or V, the Attorney General must find

the amounts to be "necessary to provide for the medical, scientific, or other legitimate needs of

the United States," and that one of following three circumstances apply: first, if there is an

emergency in which domestic supplies are found to be inadequate, 21 U.S.C. § 952(a)(2)(A);

second, if "the Attorney General finds that competition among domestic manufacturers of the

controlled substance is inadequate and will not be rendered adequate by the registration of

additional manufacturers," *id.* at 952(a)(2)(B); and third, when the Attorney General finds that

"such controlled substance is in limited quantities exclusively for scientific, analytical, or

research uses." *Id.* at § 952(a)(2)(C).

The CSA has less stringent standards to allow the Attorney General to import narcotic

raw materials ("NRM").[1] Rather than specify the three circumstances under which the

importation of narcotic raw materials can be imported (as the CSA does for other controlled

substances), the CSA allows the Attorney General to import "such amounts of crude opium,

poppy straw, concentrate of poppy straw, and coca leaves . . . as the Attorney General finds to be

necessary to provide for medical, scientific, or other legitimate purposes." 21 U.S.C. §

952(a)(1).[2] Allowing these substances to be imported under less stringent standards is in line

with the "long-standing policy" of the United States not to cultivate or produce narcotic raw

materials, but to rely "solely on opium, poppy straw, and CPS produced in other countries for the

NRM necessary to meet the legitimate medical needs of the United States." 71 Fed. Reg. at

---

[1] Narcotic raw materials are opium, poppy straw, and concentrate of poppy straw ("CPS"). *See* 71 Fed. Reg. 58569, 58570 (Oct. 4, 2006).

[2] Opium, poppy straw and concentrate of poppy straw are also considered schedule II controlled substances under the CSA. 21 U.S.C. § 812. Even though 21 U.S.C. § 952(a)(2) discusses schedule II substances as a general matter, the importation of these substances is governed by Section 952(a)(1), because Congress delineates these substances by name in 952(a)(1). *See See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992) (noting that "it is a commonplace of statutory construction that the specific governs the general").

58570. *See also* 72 Fed. Reg. 3417, 3418 n.4 (Jan. 25, 2007) (noting that the requirements of 21 U.S.C. § 952(a)(2) are stricter than § 952(a)(1) due to the policy to favor importation of NRM "over domestic production of the raw materials and over the importation of processed narcotic materials and finished narcotic products").

The CSA also contains provisions to ensure that the Attorney General takes the public interest into consideration. The Act requires the Attorney General to register an applicant to import a Schedule I or II substance "if he determines that such registration is consistent with the public interest and with United States obligations under international treaties, conventions, or protocols in effect on May 1, 1971." 21 U.S.C. § 958(a). In determining the public interest, the Attorney General considers several factors: (1) the maintenance of effective controls against diversion by limiting the importation and bulk manufacture of schedule I or II controlled substances to a number of establishments which can produce an adequate and uninterrupted supply of those substances under adequately competitive conditions; (2) compliance with state and local laws; (3) the promotion of technical advances in the art of manufacturing the substances and the development of new substances; (4) prior conviction record of the applicant relating to the manufacture, distribution, or dispensing of such substances; (5) past experience in the manufacture of controlled substances and establishing effective control against diversion; and (6) other factors that are relevant to and consistent with public health and safety. 21 U.S.C. §§ 958(a), 823(a).

The CSA also allows companies holding registrations for the bulk manufacture of a controlled substance the opportunity to request a hearing when another company applies to become registered to bulk manufacture or import that controlled substance. It provides:

> Except in emergency situations as described in section
> 952(a)(2)(A) of this title, prior to issuing a registration under this
> section to a bulk manufacturer of a controlled substance in
> schedule I or II, and prior to issuing a regulation under section
> 952(a) of this title authorizing the importation of such a substance,
> the Attorney General shall give manufacturers holding
> registrations for the bulk manufacture of the substance an
> opportunity for a hearing.

21 U.S.C. § 958(i).

In 1971, following the enactment of the CSA, the Bureau of Narcotics and Dangerous

Drugs (DEA's predecessor) promulgated the first regulations implementing the Act.  36 Fed.

Reg. 7776 (April 24, 1971).  Among the regulations is a provision, now found at 21 C.F.R.

§ 1301.34(a), addressing hearing rights for applications to import Schedule I or II substances

under the authority of 21 U.S.C. § 952(a)(2)(B).  By its own terms, this regulation does not apply

to import applications pursuant to 21 U.S.C. § 952(a)(1).  The regulation provides that, when the

Administrator receives an application for registration to import a Schedule II controlled

substance under the authority of 21 U.S.C. § 952(a)(2)(B), he shall publish a notice in the

Federal Register naming the applicant and identifying the substance sought to be imported.  21

C.F.R. § 1301.34(a).  The regulation further provides:

> A copy of said notice shall be mailed simultaneously to each
> person registered as a bulk manufacturer of that controlled
> substance and to any other applicant therefor.  Any such person
> may, within 30 days from the date of publication of the notice in
> the Federal Register, file written comments on or objections to the
> issuance of the proposed registration and may, at the same time,
> file a written request for a hearing on the application pursuant to
> § 1301.43

*Id.*

## FACTUAL BACKGROUND

Two companies applied to DEA for registrations to import narcotic raw materials.  Cody Laboratories ("Cody") applied to import raw opium, poppy straw, and concentrate of poppy straw.  71 Fed. Reg. 3545 (Jan. 23, 2006).  Rhodes Technologies ("Rhodes") applied to import raw opium and concentrate of poppy straw.  71 Fed. Reg. 20729, 20730 (Apr. 21, 2006).  DEA published notices of these applications in the Federal Register, in January and April 2006, respectively.  For each of these applications, Plaintiff submitted comments, objections and a request for a hearing on the applications.  Declaration of Stuart A. Rose, March 22, 2007 at ¶¶ 4-5 (Pl.'s Ex. B).  DEA's Administrative Law Judge accepted the requests for hearings and placed the cases on DEA's administrative hearing docket.  72 Fed. Reg. at 3417.

On January 25, 2007, DEA published a corrective notice in the Federal Register.  This notice dismissed the pending hearings on the Cody and Rhodes applications because DEA determined that holding a hearing would be inconsistent with the CSA and its implementing regulations.  72 Fed. Reg. at 3417-18.  DEA's corrective notice began by stating that publication of the Cody and Rhodes applications in the Federal Register was not required under the Act and that, if published, the original notice should have stated that only bulk manufacturers of the NRMs sought to be imported could file a written request for a hearing.  72 Fed. Reg. at 3417-18; *see also* 21 U.S.C. § 958(i).  DEA further explained that "if no one is registered to bulk manufacture the substance that the applicant seeks to import, no one is entitled to a hearing on that application."  72 Fed. Reg. at 3417.  DEA concluded (and Plaintiff concedes) that there are no U.S. bulk manufacturers of the products that Cody and Rhodes seek to import.[3]  72 Fed. Reg.

---

[3]  Plaintiff asserts that it "has an extensive history as a registered bulk manufacturer of various controlled substances, including cocaine, codeine, dihydrocodeine, hydromorphone,

6

at 3417.  Therefore, DEA concluded that no statutory right to a hearing existed and it cancelled

the hearings on the Cody and Rhodes applications.  *Id.*

Moreover, DEA concluded that its regulations did not provide any right to request a

hearing on the Cody and Rhodes applications.  The regulatory provision at issue applies only

cases in which an applicant seeks to import a controlled substance pursuant to 21 U.S.C.

§ 952(a)(2)(B).  *See* 72 Fed. Reg. at 2318 n.3; 21 C.F.R. § 1301.34(a).  The regulations also limit

those who can apply for a hearing in that situation, as they only allow a hearing to be requested

by a "'registered bulk manufacturer of that controlled substance' or an 'applicant therefor.'"  72

Fed. Reg. at 2318 (quoting 21 C.F.R. § 1301.34(a)).  Neither Plaintiff nor any other entity

requesting a hearing in the Cody and Rhodes matters were registered bulk manufacturers of the

controlled substances at issue or applicants therefor.

In its January 25, 2007 notice, DEA acknowledged that it had previously "granted

requests for hearings made by persons that were not bulk manufacturers of the narcotic raw

material – despite the fact that no such hearing right is contemplated by the governing statute or

implementing regulations."  72 Fed. Reg. at 3418.  DEA explained that this was not done

pursuant to any agency policy:

> In these past cases, the agency did not state that such non-bulk
> manufacturers were entitled to a hearing under 21 U.S.C. § 958(i)
> or 21 C.F.R. § 1301.34(a).  Rather, the agency either granted the
> hearing without explanation or did so based on what it terms its
> "discretionary authority."

ecgonine, hydrocodone, morphine, thebaine, oxycodone, and oxymorphone."  Pl.'s Mem. at 12.
*See also* 70 Fed. Reg. 71560 (Nov. 29, 2005) (applying to be registered as a bulk manufacturer
for the above substances).  Plaintiff does not allege, however, that it is a bulk manufacturer of the
substances sought to be imported by Cody and Rhodes.  Under the Act, only those involved in
the bulk manufacture of the substances *sought to be imported* have a right to request a hearing.
*See* 21 U.S.C. § 958(i).

*Id.  See also In re Penick Corp.*, Docket No. 01-3 at 23 (Apr. 13, 2001) (Pl.'s Ex. A) ("I conclude that neither the statute nor DEA's implementing regulations require the agency to afford a hearing to importers of a narcotic raw material on the application of another manufacturer to import the same substance.  However, I further conclude that the agency has the discretionary authority to afford that hearing right and it has done so in other proceedings as well as this one.").

DEA's decision to cancel the hearings at issue was explicitly based on statutory interpretation, and fully explained in the Federal Register.[4]  As DEA explained, the fact that  21 U.S.C. § 958(i) limits hearing rights to bulk manufacturers "indicates a determination on [Congress's] part that extending the hearing right to others is not necessary to advance the goals of the CSA."  72 Fed. Reg. at 2318.  It noted that conducting a hearing can add months or years to a decision on an application, and that competitors could use hearings as a delaying tactic.  *Id.* It also noted that DEA had no criteria to decide when to allow a hearing and that, if a competitor could simply request a hearing without any threshold showing that it would either assist the agency in making its decision or otherwise advance the goals of the CSA, "it would be difficult to envision how the agency could act on such hearing requests other than on [an] arbitrary basis."  *Id.*  DEA reasoned that Congress concluded that the delay was warranted for requests by other bulk manufacturers, but not in other instances:  "that Congress expressed clear criteria as to when the hearing right applied reflects a clear delineation by Congress as to when such hearing right does – or does not – advance the overall goals of the Act."  *Id.*  Because Congress specified

_____

[4]  In the Federal Register notice, DEA's Deputy Administrator stated, "I now conclude that the most sound reading of the statute and regulations is that which limits the right to a hearing to those situations in which Congress expressly provided such a right."  72 Fed. Reg. at 3418.

who had a right to a hearing, DEA concluded that Congress did not intend to allow hearings to other entities.[5]

DEA further clarified that the cancellation of the hearing did nothing to alter the fact that DEA would act on the applications in a manner consistent with the CSA and give the applications appropriate scrutiny.  Thus, DEA will evaluate the Cody and Rhodes applications in accordance with statutory mandates to ensure that each of these applicants will only obtain the requested registration if doing so would comport with the public interest.  72 Fed. Reg. at 3418; 21 U.S.C. § 958(a); 21 U.S.C. § 823(a).

After DEA cancelled the hearings on the Cody and Rhodes applications, Plaintiff filed actions in both this Court and the Court of Appeals for the District of Columbia Circuit, seeking to overturn DEA's statutory interpretation articulated in the January 25, 2007 Federal Register notice.  Plaintiff's district court action seeks injunctive and declaratory relief.  Compl. at 11, 14. Specifically, Plaintiff seeks a determination that DEA's January 25, 2007 notice in the Federal Register was arbitrary and capricious under the Administrative Procedure Act.  5 U.S.C. § 706(2)(A); Compl. ¶ 42-43.  Plaintiff also claims a violation of the Fifth Amendment of the Constitution, alleging that DEA deprived it of liberty and property interests without due process of law.  Compl. ¶ 45.  Plaintiff asks the Court to strike down DEA's statutory interpretation and allow it to participate in administrative hearings on the Cody and Rhodes import applications.

Subsequently, Plaintiff filed the instant motion for a preliminary injunction.  Plaintiff also filed a motion for injunctive relief in its separate, appellate court action.

---

[5] DEA's regulation comports with this congressional intent, because it allows only bulk manufacturers of the substance sought to be imported or those with a pending application to be a bulk manufacturer of that substance to receive notice and the ability to request a hearing.  21 C.F.R. § 1301.34(a).

## ARGUMENT

I.  **THE DISTRICT COURT LACKS SUBJECT MATTER JURISDICTION OVER PLAINTIFF'S CLAIMS**

Plaintiff's claims arise under the CSA, 21 U.S.C. § 801, *et seq.* and DEA regulations thereunder.  The CSA provides courts of appeals with exclusive jurisdiction over disputes arising under it:

> All final determinations, findings, and conclusions of the Attorney General under this subchapter shall be final and conclusive decisions of the matters involved, except that any person aggrieved by a final decision of the Attorney General may obtain review of the decision in the United States Court of Appeals for the District of Columbia or for the circuit in which his principal place of business is located upon petition filed with the court and delivered to the Attorney General within thirty days after notice of the decision.  Findings of fact by the Attorney General, if supported by substantial evidence, shall be conclusive.

21 U.S.C. § 877.  While the language of Section 877 references Subchapter I of the CSA, this Section is incorporated into Subchapter II of the CSA, as well.  21 U.S.C. § 965.

Courts have recognized the exclusive jurisdiction of the courts of appeals over disputes arising under the CSA.  *See Oregon v. Ashcroft*, 368 F.3d 1118, 1120 (9th Cir. 2004) (finding it had original jurisdiction over challenge to interpretive rule issued by Attorney General) *aff'd sub nom Gonzales v. Oregon*, 546 U.S. 243 (2006); *Steckman v. DEA*, No. Civ. A.H-97-1334, 1997 WL 588871 at *1-2 (S.D. Tex. Sept. 16, 1997) (finding that it had no subject matter jurisdiction over CSA-related claim because the only proper forum was in the court of appeals).  In a recent opinion, Judge Kollar-Kotelly performed a lengthy analysis of Section 877 and concluded that "Section 877 . . . seems to explicitly vest exclusive jurisdiction in the courts of appeals over any CSA-based agency determination that could properly be before a federal court."  *Doe v.*

*Gonzalez [sic]*, No. 06-966, 2006 WL 1805685 at *22 (D.D.C. June 29, 2006).  *But see See PDK Labs Inc. v. Reno*, 134 F. Supp. 2d 24, 29 (D.D.C. 2001) (finding that letter sent to private party did not constitute final agency action and retaining jurisdiction over case).

Because Plaintiff brings this action pursuant to the APA, it must be proceeding under the theory that DEA's challenged notice is a final agency action.  In fact, Plaintiff has also filed a petition in the Court of Appeals for the District of Columbia involving the very same claims. *See Penick v. DEA,* Court of Appeals Docket No. 07-1055 (filed Feb. 23, 2007).

Defendants do not concede that plaintiff has challenged final agency action, and reserve the right to argue in the court of appeals that judicial review must await DEA's final order on the Rhodes and Cody applications.  For present purposes, however, it may be assumed that Plaintiff is challenging final agency action because only final agency action is subject to review under the APA.  If plaintiff's claims are *not* predicated on final agency action, then it cannot bring an APA claim in any court.  *See Doe v. Gonzalez [sic]*, 443 F. Supp. 2d 1, 2 (D.D.C. 2006).  The APA "bars review prior to final agency action."  *Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 13 (D.C. Cir. 2005).  *See also* 5 U.S.C. § 704 (limiting APA actions to those made reviewable by statute and final agency actions); *Rochester Tel. Corp*. v. *United States*, 307 U.S. 125, 131 (1939) ("ever since the first Judiciary Act, Congress has been loathe to authorize review of interim steps in a proceeding").  As Judge Kollar-Kotelly explained, if a case meets the "final agency action" requirement sufficient to permit APA review, then it meets the final agency action requirement of 21 U.S.C. § 877, for which the court of appeals maintains exclusive jurisdiction.  *See Doe*, 2006 WL 1805685 at *20.[6]

---

[6]  The D.C. Circuit has held that the APA waives sovereign immunity against federal agencies, even for non-APA claims that do not rely on final agency action.  *Trudeau v. FTC*, 456

## II.    PLAINTIFF LACKS STANDING TO BRING ITS CLAIMS

This Court lacks jurisdiction for a second reason; Plaintiff lacks standing to bring this lawsuit.  Standing is a "threshold jurisdictional question," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998), that Plaintiff bears the burden of establishing.  *Am. Library Ass'n v. FCC*, 401 F.3d 489, 492 (D.C. Cir. 2005).  In this case, Plaintiff cannot meet the standing requirement of an injury-in-fact, that is both concrete and particularized.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). In order to be particularized, the injury "must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1.

Plaintiff has not proffered any injury that is personal to it.  Plaintiff sets forth two interests in this case: (1) in assuring that there is "an adequate and uninterrupted supply of NRMs for medical, scientific, and other legitimate purposes under adequately competitive conditions;" and (2) in assuring that "the domestic system of regulatory controls against diversion remains stable and unimpaired."  Rose Decl. at ¶ 6 (Pl.'s Ex. B).  These interests are not personal to Plaintiff, but are in the nature of generalized grievances that could be brought by any citizen, which does not confer standing upon parties.  *U.S. v. Richardson*, 418 U.S. 166, 180 (1974).

In addition, the only injury of which Plaintiff complains is a procedural one – the alleged right to participate in administrative hearings involving DEA's decision to allow other companies to import narcotic raw materials.  The Supreme Court has determined that procedural injury, by itself, is insufficient to constitute Article III standing. *Lujan*, 504 U.S. at 573 & n.8.

F.3d 178, 187 (D.C. Cir. 2006).  Therefore, it is theoretically possible that this Court could determine that it had jurisdiction over Plaintiffs' due process claim as one involving a non-final agency action.  However, as discussed in Section III.B.2, *supra*, Plaintiff cannot meet the most basic requirements for bringing a due process claim because Plaintiff has no protected interest.

When a litigant raises a claim involving its procedural rights, he can do so only "so long as the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." *Id.* at 573 n.8. As the Seventh Circuit has summarized:

> The Supreme Court made clear in *Lujan* that, unless the denial of a procedural right endangered a separate substantive right of the plaintiff, a plaintiff may not invoke the federal judicial power to vindicate the denial of that procedural right. . . . Consequently, we, along with other circuits, have acknowledged that the denial of a procedural right, unconnected to a plaintiff's concrete harm, is not enough to convey standing.

*Bensman v. United States Forest Service*, 408 F.3d 945, 952 (7th Cir. 2005) (internal quotations and citations omitted). The D.C. Circuit recognizes the rule of *Lujan*, as well, as it has held that "[t]he mere violation of a procedural requirement does not authorize all persons to sue to enforce the requirement. A party has standing to challenge an agency's failure to abide by a procedural requirement only if the government act performed without the procedure in question will cause a distinct risk to a particularized interest of the plaintiff." *Fund Democracy, LLC v. SEC*, 278 F.3d 21, 27 (D.C. Cir. 2002) (internal citation omitted).

Here, Plaintiff's alleged injury is purely procedural. This case does not involve Plaintiff's rights relating to its own application to import materials, but addresses whether Plaintiff can participate in DEA's decision-making process regarding the applications of other entities. Plaintiff has not alleged that it has sustained any injury other than the procedural right to file objections with DEA regarding others' applications.[7] In fact, the administrative process is

---

[7] Arguably, Plaintiff could try to assert an informational injury based on that portion of its claim asserting that DEA "is refusing to publish notices" on NRM import applications. Pl.'s Mem. at 21-22. This assertion is factually unsubstantiated. In its January 25, 2007 announcement, DEA merely stated that its previous publication of the Cody and Rhodes applications was not required by statute and the previous publication should have used different language. 72 Fed. Reg. at 3417. In any event, Plaintiff cannot meet the requirements to assert a

13

not even complete, as DEA has not issued a decision on whether Cody and Rhodes may import narcotic raw materials. Any substantive injury to Plaintiff (as opposed to the non-cognizable procedural injury) would flow only from DEA's decision to allow or disallow the companies' applications to import narcotic raw materials and, therefore, occurs only *after* DEA issues such a decision. Until then, there is simply no substantive injury upon which Plaintiff can base its standing.

## III.    PLAINTIFF IS NOT ENTITLED TO A PRELIMINARY INJUNCTION

Even if this Court had jurisdiction and Plaintiff had the requisite standing to bring its lawsuit, it cannot meet the requirements for a preliminary injunction. A request for emergency injunctive relief is an extraordinary remedy, and the power to issue such an injunction "should be sparingly exercised." *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969) (quotation marks omitted). For a plaintiff to prevail in its motion for a preliminary injunction, it "must demonstrate: 1) a substantial likelihood of success on the merits, 2) that it would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction." *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995). Since "[t]he basis of injunctive relief in the federal courts has always been irreparable

---

cognizable informational injury. To do so, it must show that "a statute (on the claimants' reading) requires that the information 'be publicly disclosed' and there 'is no reason to doubt [its] claim that the information would help [it]." *Ethyl Corp. v. EPA*, 306 F.3d 1144, 1148 (D.C. Cir. 2002) (quoting *Federal Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998)). Here, there is no language in the CSA that could be read to require public disclosure of NRM import applications. Even if there were, Plaintiff cannot assert that receipt of the information would help it, as neither the statute nor regulations confers upon Plaintiff a right to request a hearing on the applications. *See* 12 C.F.R. 1301.34 (mandating Federal Register publication of applications only under 21 U.S.C. § 952(a)(2)(B)).

14

harm," a plaintiff's lack of showing irreparable harm is sufficient reason for a court to deny a preliminary injunction, even if the other three prongs are met. *Id.* at 747 (quoting *Samson v. Murray*, 415 U.S. 61, 88 (1974)).

Here, Plaintiff has made no showing that it will suffer any irreparable injury, which is sufficient, standing alone, to deny the injunction. Nor has Plaintiff met its burden on any of the other three prongs necessary for the entry of a preliminary injunction.

### A.     Plaintiff Has Not Demonstrated Imminent, Irreparable Harm

In order to succeed on a claim of irreparable harm, a litigant must show several things. "First, the injury must be both certain and great; it must be actual and not theoretical." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). "Even more important, the plaintiff[ ] must show that the injury will be impossible to correct or redress after it occurs[.]" *Power Mobility Coalition v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005); *see also Va. Petroleum Jobbers Ass'n v. Federal Power Comm'n*, 259 F.2d 921 (D.C. Cir. 1958) ("[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm"). In addition, "the party seeking injunctive relief must show that the injury complained of [is] of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Wisc. Gas*, 758 F.2d at 674 (emphasis in original) (internal quotations and citation omitted). Otherwise, injunctive relief prior to an adjudication of the case on the merits is unnecessary and thus inappropriate.

As discussed in Section II, *supra*, Plaintiff cannot demonstrate any cognizable injury, because its injuries are purely of a procedural nature. *Lujan*, 504 U.S. at 572-73. Because

15

Plaintiff does not have a cognizable injury at all, it certainly cannot meet the higher burden of having an irreparable injury.

Even if Plaintiff's injury were sufficient to confer standing, it is certainly not irreparable. Plaintiff's allegation of imminent harm is that, in the event DEA were to grant an import license to Rhodes and/or Cody, any subsequent challenge by Plaintiff to those applications "would be so greatly damaged that Penick would very well lose the opportunity to seek relief." Pl.'s Mem. at 21. This alleged damage is based on Plaintiff's belief that – in the event the Court ultimately determined that DEA erroneously granted the applications of Cody and Rhodes because it unlawfully denied Plaintiff and others the right to participate – DEA would necessarily have to institute revocation procedures, where the burden of proof is different than in the application process, rendering Plaintiff's rights "significantly abridged." *Id.* This underlying assumption, however, is false.[8] In the event a court with jurisdiction were to find an APA violation, the court would have the authority to set aside agency action, *see* 5 U.S.C. § 706, and would remand the matter to DEA for the purpose of re-instituting proceedings on the applications in which Plaintiff would then participate. Thus, there is nothing irreparable about Plaintiff's alleged harm, as a court with proper jurisdiction has the power to rectify any legal wrongs at a later date in a

_____

[8] Even if Plaintiff's assumption that revocation proceedings were necessary, that the burden of proof is different in such proceedings and that this somehow relates to Plaintiff's rights, Plaintiff has cited no support for the proposition that an alteration in the level of a burden of proof in an administrative proceeding constitutes an irreparable injury warranting a preliminary injunction. *Cf. Aluminum Co. of Am. v. United States*, 790 F.2d 938, 942 (D.C. Cir. 1986) (noting, in dismissal of case, that "the Commission's action did not deprive Alcoa of a substantive right that had purportedly been conclusively adjudicated, but only prolonged the pending proceeding in one fashion rather than another. At most it denied Alcoa the procedural advantages attendant to the less-than-*de novo* review under § 11501(c)").

manner that would protect Plaintiff's interest, in the event Plaintiff would prevail on its claims.[9]
*See Wisc. Gas*, 758 F.2d at 674 (finding "theoretical" harms do not warrant preliminary injunctive relief).

In any event, DEA has the obligation to independently review whether the import applications are in the public interest and may or may not grant the import applications of Rhodes and Cody based on its analysis. If DEA does not grant the applications (as Plaintiff would urge if it had the opportunity to file its objections), there is no harm done to Plaintiff whatsoever.

Plaintiff's other allegation of imminent, irreparable harm also suffers from false assumptions. Plaintiff alleges that it is facing imminent, irreparable harm from DEA's decision not to publish notices of applications to import narcotic raw materials because Plaintiff will not be able to consider filing objections in those hearings. *See* Pl.'s Mem. at 21-22. In fact, DEA did not state in its January 25, 2007 notice that it was altering the notice requirements of 21 C.F.R. § 1301.34(a). It merely stated that, because the Cody and Rhodes were not proceeding under 21 U.S.C. § 952(a)(2)(B), the notice requirements of 21 C.F.R. § 1301.34(a) do not apply. This claimed injury also presupposes that entities such as Plaintiff have a right to request hearings, which they do not. *See* 21 U.S.C. § 958(i) (granting right to request hearings solely to

_____

[9] As discussed above, if any court has jurisdiction over Plaintiff's APA claim, it is the Court of Appeals. Plaintiff's argument that revocation procedures would be necessary after DEA's decision ignores the fact that 21 U.S.C. § 877 allows for review in the courts of appeals of any final agency determinations. In the normal course, a party with a cognizable interest could appeal DEA's decision to a court of appeals and raise alleged procedural defects as part of its substantive appeal. *See* 5 U.S.C. § 704 ("A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action."). Plaintiff cites no authority for short-circuiting this process by filing federal lawsuits while the substantive determination is pending.

bulk manufacturers of the substance sought to be imported).  Therefore, any alleged lack of

publication regarding applications on which Plaintiff does not have the right to comment cannot

amount to irreparable harm.  In addition, this allegation addresses speculative, future actions.

With respect to the matters currently pending before the DEA, Plaintiff is already well aware of

the Cody and Rhodes applications.  Plaintiff does not allege that there are other, imminent

applications about which it has the right to request a hearing.  In the event that court

subsequently might determine that such notice is legally required and that Plaintiff has a right to

participate in the administrative proceedings, appropriate relief could be fashioned. The

emergency remedy of a preliminary injunction is not warranted.

### B.    Plaintiff Has Not Demonstrated a Likelihood of Success on the Merits

### 1.    Plaintiff is Not Likely to Succeed on the Merits of its APA claim

Plaintiff has failed to demonstrate a likelihood of success on its APA claim because this

Court does not have jurisdiction over it.  This claim either involves a final agency action as to

which the D.C. Court of Appeals has exclusive jurisdiction, or it does not involve final agency

action, which means that the claim is not cognizable in any court.  *See Nat'l Ass'n of Home

Builders v. Norton*, 415 F.3d at 13; *Doe*, 443 F. Supp. 2d at 2.

Even assuming that this Court would have jurisdiction, and that DEA's decision

constituted a final agency action that would allow it to assert an APA claim (neither of which

Defendants concede), Plaintiff cannot succeed on the merits of such a claim.  Plaintiff asserts

that DEA must rescind the policies stated in its January 25, 2007 Federal Register notice because

DEA did not follow notice and comment procedures in making the determinations therein.[10]

---

[10]  In fact, companies have made their views on this issue known to DEA in
administrative proceedings. Interestingly, Plaintiff itself has argued to DEA the very same

Plaintiff errs in its assertion that notice and comment procedures were necessary for DEA's January 25, 2007 announcement.

The APA requirements for notice and comment apply only to legislative rules; they do not apply to "interpretive rules, general statements of policy, or rules of agency organization, procedure or practice." 5 U.S.C. § 553(b). Assuming that DEA's announcement regarding its interpretation of the CSA is a rule within the meaning of the APA, it constitutes an interpretive rule, as well as a procedural rule, and it does not fall within the realm of legislative rules requiring notice and comment.[11] The inapplicability of notice and comment rulemaking procedures is further confirmed by the fact that prior DEA practice to allow certain entities to request a hearing when an applicant sought to import narcotic raw materials pursuant to 21 U.S.C. § 952(a)(1) was never promulgated in a formal rule, let alone pursuant to APA notice and comment rulemaking procedures.

_____

position that it is currently challenging. *See In re Penick*, Docket No. 01-3 at 2 (2001) (Pl.'s Ex. A) ("In its Motion to Strike, Penick asserts, in substance, that Organichem, Mallinckrodt, and Noramco are not bulk manufacturers of the substances the Penick seeks to import and, therefore, none of them has standing to object, comment upon, or request a hearing on Penick's application.")

[11] The APA defines a rule as an "agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy . . ." 5 U.S.C. § 551(4). The January 25, 2007 notice announced who was entitled a hearing under the statute and regulation, which could be construed as an interpretive rule having future effect. The same cannot be said about DEA's discussion of the requirement of publication. DEA stated that the notices of the Cody and Rhodes applications "were not required to be published" and, given that they were published, DEA should have used different language in its original notice. 72 Fed. Reg. at 3417. This discussion of the publication issue with respect to Cody and Rhodes does not establish any agency policies with respect to future notices. DEA did not state that it was prohibited from publishing such notices (or even that it was error to do so); it merely stated that the original notices should have contained different language. *Id.*

a.       **The DEA Announcement Constitutes an Interpretive Rule**

Interpretive rules are "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979) (quoting the Attorney General's Manual on the APA at 30 n.3).  "All agencies charged with enforcing and administering a statute have inherent authority to issue interpretive rules informing the public of the procedures and standards it intends to apply in exercising its discretion."  *Metropolitan Sch. Dist. v. Davila*, 969 F.2d 485, 490 (7th Cir. 1992) (internal quotations and citation omitted).  The "crucial distinction" between a substantive rule requiring notice and comment and an interpretive rule is that "a substantive rule *modifies* or *adds* to a legal norm based on the agency's *own authority*."  *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 95 (D.C. Cir. 1997) (emphasis in original).   Here, DEA was not acting in an exercise of its own, congressionally-delegated authority.  Instead, it was interpreting statutory terms to ascertain the limits of its authority.

The D.C. Circuit has recognized that "[a] statement seeking to interpret a statutory or regulatory term is . . . the quintessential example of an interpretive rule."  *Orengo Caraballo v. Reich*, 11 F.3d 186, 195 (D.C. Cir. 1993).  *See also United Tech. Corp. v. EPA*, 821 F.2d 714, 719-20 (D.C. Cir. 1987) ("If the rule is based on specific statutory provisions, and its validity stands or falls on the correctness of the agency's interpretation of those provisions, it is an interpretive rule.").  This is exactly what DEA did in the January announcement – it interpreted the CSA to determine the scope of its authority to provide hearings for import applications.  *See, e.g.,* 72 Fed. Reg. at 3417 (addressing the statutory language and concluding that "the CSA contemplates that only 'bulk manufacturers' shall be entitled to hearing on an application to

import a schedule I or II substance and, further, that only those who are registered to bulk manufacture the particular substance that the applicant seeks to import"); *id.* at 3418 ("21 U.S.C. § 958(i), by its plain terms, gives the right to request a hearing *not* in the case of all applications for a registration to import, but only in those in which the applicant is a 'bulk manufacturer' and only where the person seeking the hearing is a 'bulk manufacturer' of the substance the applicant is seeking to import.").   DEA concluded that Congress did not give it the authority to hold hearings on import applications for entities other than bulk manufacturers, based on the language of the CSA itself.   This falls into the "quintessential example" of the type of interpretive rule that does not require notice and comment under the APA.  *Orengo Caraballo*, 11 F.3d at 195.

Moreover, the Supreme Court has stated that an agency "is not estopped from changing a view [it] believes to have been grounded on a mistaken legal interpretation."  *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417 (1993).   An agency's change in interpretation does not necessitate notice and comment proceedings.  As the D.C. Circuit has explained:

> [S]ince an agency's interpretation of an ambiguous statute is entitled to judicial deference under *Chevron*, it might be thought that the interpretive rule – particularly if it changes prior statutory interpretation **as an agency may do without notice and comment** – is, in reality a change in the legal norm.  Still, in such a situation the agency does not claim to be exercising authority to itself make positive law.  Instead, it is construing the product of congressional lawmaking based on specific statutory provisions.

*Syncor Int'l Corp*, 127 F.3d at 94 (emphasis added) (internal quotations and citation omitted). *See also White v. Shalala*, 7 F.3d 296, 304 (2d Cir. 1993) (noting that "an interpretive rule changing an agency's interpretation of a statute is not magically transformed into a legislative rule."); *Davila*, 969 F.2d at 492 ("an agency's change in its reading of a statute does not necessarily make the rule announcing the change legislative").

> **b.** **DEA's Interpretive Rule Does Not Repudiate Previous Regulations, So Notice and Comment Is Not Necessary**

The exception to the general proposition that an agency may change its views without notice and comment is that a rule that alters a legislative rule that was promulgated by notice and comment must also comply with notice and comment procedures.  *See Shalala v. Guernsey Mem. Hosp.*, 514 U.S. 87, 100 (1995) (finding rulemaking required if agency adopts a new position inconsistent with existing regulations).  "Only where a  second rule repudiates or is irreconcilable with [a prior *legislative* rule], the second rule must be an amendment of the first[,] and . . . must itself be legislative." *Orengo Caraballo*, 11 F.3d at 196 (emphasis and brackets in original) (internal quotations and citations omitted). *See also Warder v. Shalala*, 149 F.3d 73, 82 (1st Cir. 1998) ("even supposing [the agency's] pre-Ruling policy was different, the earlier policy would not prevent [the agency] from adopting a contrary new interpretive rule."), *cert. denied*, 526 U.S. 1064 (1999); *Chief Probation Officers of Calif. v. Shalala*, 118 F.3d 1327, 1337 (9th Cir. 1997) (finding that, for notice and comment to be necessary, "the rule would have to be inconsistent with another rule having the force of law, not just any agency interpretation regardless of whether it had been codified.").

DEA's January 23, 2007 interpretation of its authority under 21 U.S.C. § 958(i) is consistent with its regulations.  As an initial matter, the regulation requiring notice and a right to request a hearing applies only when 21 U.S.C. § 952(a)(2)(B) is implicated – when "the Attorney General finds that competition among domestic manufacturers of the controlled substances is inadequate and will not be rendered adequate by the registration of additional manufacturers.  21 U.S.C. § 952(a)(2)(B); 21 C.F.R. § 1301.34(a) ("In the case of an application for registration or registration to import a controlled substance listed in Schedule I or II, *under the authority of*

*section 1002(a)(2)(B) of the Act (21 U.S.C. 952(a)(2)(B))*, the Administrator shall, upon filing of

such application, publish in the federal Register a notice . . .").  Here, the applicants sought to

import raw opium, poppy straw, and concentrate of poppy straw, so the provisions of 21 U.S.C.

§ 952(a)(1) apply.  Plaintiff does not allege that 21 U.S.C. § 952(a)(2)(B) has been triggered in

this case to require published notice in the Federal Register, but instead incorrectly assumes that

notice must be published and non-bulk manufacturers have a right to request a hearing in all

import applications.  Additionally, the regulation explicitly provides the right to request a

hearing only to "bulk manufacturers of that controlled substance" or "other applicants therefor:"

> A copy of said notice shall be mailed simultaneously to *each*
> *person registered as a bulk manufacturer of that controlled*
> *substance and to any other applicant therefor.  Any such person*
> may, within 30 days from the date of publication of the notice in
> the Federal Register, file written comments on or objections to the
> issuance of the proposed registration and may, at the same time,
> file a written request for a hearing on the application pursuant to
> § 1301.43.

21 C.F.R. § 1301.34 (emphasis added).   This regulation, like the statute, focuses on bulk

manufacturers.  Plaintiff does not allege that it is either a bulk manufacturer of the substance

sought to be imported or an "applicant therefor."  Thus, DEA's notice announcing its decision to

cancel the administrative hearings because Plaintiff had no right to request them is entirely

consistent with the statute and its regulations.  DEA has never had a policy that non-bulk

manufacturers such as Plaintiff are entitled to a hearing, and no statute or regulation states that it

does.

     Citing a line of cases following *Alaska Prof. Hunters Ass'n v. FAA*, 177 F.3d 1030 (D.C.

Cir. 1999), Plaintiff alleges that DEA must follow notice and comment procedures because it has

changed its longstanding interpretation of its regulation that entities such as Plaintiff were

"entitled to request hearings" on import applications.  Pl.'s Mem. at 17-18.  In *Alaska Hunters*,

the court stated that,"[w]hen an agency has given its regulation a *definitive* interpretation and

later significantly revises that interpretation, the agency has in effect amended its rule, something

it cannot accomplish without notice and comment."  *Alaska Prof. Hunters Ass'n*, 177 F.3d at

1034.  In fact, DEA has never *definitively* interpreted its regulation as entitling entities such as

Plaintiff to a request a hearing on the importation of narcotic raw materials, when that entity was

not a bulk manufacturer of the materials sought to be imported.  As the Administrator noted,

DEA has previously granted requests for hearings by non-bulk manufacturers of the raw

materials sought to be imported.  72 Fed. Reg. at 3418.  In those cases, however, "the agency did

not state that such non-bulk manufacturers were entitled to a hearing under 21 U.S.C. 958(i) or

21 C.F.R. § 1301.34(a).  Rather, the agency either granted the hearing without explanation or did

so based on what it termed its 'discretionary authority.'" *Id.* at 3418.  *Accord In re Penick Corp.*,

Docket No. 01-3 at 23 (Pl.'s Ex. A) ("I conclude that neither the statute nor DEA's

implementing regulations require the agency to afford a hearing to importers of a narcotic raw

material on the application of another manufacturer to import the same substance.").

    In order to fall within the ambit of the *Alaska Professional Hunters* line of cases, the

prior interpretation must be "express, direct and uniform."  *Ass'n of Am. R.R. v. Dep't of Transp.*,

198 F.3d 944, 949 (D.C. Cir. 1999) (rejecting applicability of *Alaska Hunters*).  That has not

been the case with respect to the instant statute.  *See* 72 Fed. Reg. at 3418 (noting that DEA

sometimes granted a hearing without an explanation and sometimes granted a hearing at its

discretion).  As far back as 1978, DEA had noted that entities such as Plaintiff did not have the

rights to a hearing. *See* 43 Fed. Reg. 27909, 27910 (June 27, 1978) (noting that the terms of the

CSA "obligates the Administrator to give only to manufacturers holding registrations for the bulk manufacture of a substance sought to be imported the opportunity for a hearing" and that, when there were no bulk manufacturers of that material, the Administrator had discretion to grant or deny a hearing).  The *Alaska Hunters* line of cases is distinguishable for another reason; Plaintiff did not rely to its detriment on the prior agency practice of granting a hearing beyond what was contemplated by the statute or regulations.  *See Ass'n of Am. R.R.*, 198 F.3d at 950 (noting that when a litigant has not relied upon the advice of the prior agency action, such as making capital expenditures or altering business practices, the rule of *Alaska Hunters* is distinguishable).  Here, Plaintiff could not possibly have detrimentally relied on DEA's prior practice as this proceeding arises out of an application from Plaintiff's potential competitors. Regardless of whether DEA followed or abandoned this practice, Plaintiff could have done nothing differently to stop anyone from applying for a DEA registration.  Moreover, the prior interpretation afforded it no substantive rights; at most, it involved the agency's discretion.

> **c.      The DEA Announcement Constitutes a Procedural Rule**

In addition to exempting interpretive rules from notice and comment requirements, the APA exempts "rules of agency organization, procedure, or practice" from its notice and comment requirement.  5 U.S.C. § 553(b)(A).  DEA's January 25, 2007 announcement falls within this exemption for procedural rules.[12]

The purpose of the procedural rule exemption "is to ensure that agencies retain latitude in

---

[12]  It is a "very basic tenet of administrative law that agencies should be free to fashion their own rules of procedure." *Vt. Yankee Nuclear Power Corp. v. Natural Res. Defense Council, Inc.*, 435 U.S. 519, 544 (1978).  Agencies are in "a better position than federal courts or Congress itself to design procedural rules adapted to the peculiarities of the industry and the tasks of the agency involved." *Fed. Communications Comm'n v. Schreiber*, 381 U.S. 279, 290 (1965).

organizing their internal operations." *American Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1047 (D.C. Cir. 1987) (internal quotations omitted). The exception applies to "technical regulation of the form of agency action and proceedings," *Pickus v. Bd. of Parole*, 507 F.2d 1107, 1113 (D.C. Cir. 1974), and matters that "relate to and deal with methods of operation." *American Meat Inst. v. Bergland*, 459 F. Supp. 1308, 1314 (D.D.C. 1978). The "critical feature" of this exception "is that it covers agency actions that do not themselves alter the rights or interests of parties, although it may alter the manner in which the parties present themselves or their viewpoints to the agency." *JEM Broadcasting Co. v. FCC*, 22 F.3d 320, 326 (D.C. Cir. 1994) (internal quotations omitted).

DEA's January 25, 2007 announcement easily meets these tests. The announcement stated how the agency is going to proceed when it receives an application to import narcotic raw materials. This announcement does not alter the rights of parties to the administrative proceeding - DEA will continue to follow its statutory mandate to receive applications to become registered to import controlled substances and to evaluate them in accordance with the statutory criteria established by Congress. While entities such as Plaintiff (who are not bulk manufacturers of the narcotic raw materials sought to be imported) cannot petition DEA to hold hearings on other companies' applications under DEA's clarification of its procedures, such entities never had the *right* to initiate a hearing.

### 2.    Plaintiff is Not Likely to Succeed on its Due Process Claim

Plaintiff has not demonstrated a likelihood of success on the merits of its due process claim. The Fifth Amendment requires due process protections only where there is a deprivation of a liberty or property interest. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). "To have a

property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972).

Plaintiff has not demonstrated a likelihood of success on the merits of its due process claim. In fact, Plaintiff does not address the merits its due process claim at all or identify any property or liberty interests that are implicated. Plaintiff is not a bulk manufacturer of the materials sought to be imported by Cody and Rhodes. Therefore, the plain language of the CSA does not grant Plaintiff the right to request a hearing on an import application. 21 U.S.C. § 958(i) (directing Attorney General to give "manufacturers holding registrations for the bulk manufacture of the substance" an opportunity for a hearing). Because Congress has not afforded entities such as Plaintiff a right to participate in import application proceedings, Plaintiff does not have a cognizable interest to state a due process claim.

Even if DEA's prior interpretation of the statute were in place – that DEA had the *discretion* to grant entities such as Plaintiff the right to request a hearing, *see* 72 Fed. Reg. at 3418 (noting that DEA had, in the past, exercised discretion to grant hearings requested by non-bulk manufacturers) – Plaintiff could not maintain a due process claim. Where an agency has discretion to determine a benefit, there is no constitutionally protected interest under the due process clause. *Roth*, 408 U.S. at 566-67. *See also Jago v. VanCuren,* 454 U.S. 14, 20-21 (1981) (per curiam) (no liberty interest when government maintains discretion regarding how to proceed). Here, at most, Plaintiff can argue that DEA has the discretion to allow hearings – it cannot point to a statutorily-created right to have the hearings. As such, its due process claim must fail.

27

### C.   Plaintiff Fails to Meet the Final Two Requirements For Receiving a Preliminary Injunction

In order to justify the entry of a preliminary injunction, Plaintiff must also show that an injunction would not substantially injure other interested parties and that the public interest would be furthered by the injunction.  Plaintiff cannot make this necessary demonstration.

Plaintiff, in its memorandum, does not even address potential injury to two parties with interests in this litigation; the two parties who have pending application proceedings before the DEA.  Plaintiff's injunction would prevent DEA from acting on their applications until the culmination of this lawsuit, further delaying an agency decision on their applications.  DEA has recognized that parties with import applications have an interest in their applications being processed without undue delay.  *See* 72 Fed. Reg. at 3418.

Delay in processing applications runs counter not only to applicants with proceedings pending before the DEA, but to the agency's obligations to the public.  As DEA noted in its January notice:

> An existing registrant could ask for a hearing simply to delay a competitor's entry into the market – particularly given that DEA has not promulgated any criteria for deciding whether to grant these types of hearing requests.  Such a delay would tend to run counter to the obligation of an agency under the Administrative Procedure Act [which] requires [agencies] to conclude adjudications "with due regard to the convenience and necessity of the parties . . . and within a reasonable time."

72 Fed. Reg. at 3418 (quoting 5 U.S.C. § 555(b)).  The interest in processing applications expeditiously, and in a manner that eliminates entities from being able to abuse the system for their own gain, is in the interest of both the agency and the public.

**CONCLUSION**

For the foregoing reasons, Plaintiff's motion for a Preliminary Injunction should be

denied.

Dated: April 2, 2007                    PETER D. KEISLER
                                        Assistant Attorney General

                                        JEFFREY A. TAYLOR
                                        United States Attorney

                    By:     _____/s/_____
                                        ARTHUR R. GOLDBERG, DC Bar No. 180661
                                        TAMARA ULRICH (NY Bar)
                                        United States Department of Justice
                                        Civil Division, Federal Programs Branch
                                        P.O. Box 883
                                        Washington D.C. 20044
                                        (202) 305-1432
                                        Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PENICK CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | Case Number: 1:07cv00397 |
| | ) | |
| v. | ) | Hon. Royce C. Lamberth |
| | ) | |
| ALBERTO GONZALES, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**ORDER**

Upon consideration of Plaintiff's motion for a Preliminary Injunction and Defendants'

opposition thereto, it is hereby ORDERED that Plaintiff's Motion for a Preliminary Injunction is

DENIED.

Dated: _____          _____
                                                             Royce C. Lamberth
                                                             United States District Judge