## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PENICK CORPORATION    )
             )
    v.        )
             )
ALBERTO R. GONZALES, *et al.,*  )
             )  CIVIL ACTION NO.: 1:07-CV-00397-RCL
     Defendants,  )
             )
   and       )
             )
RHODES TECHNOLOGIES   )
498 Washington Street     )
Coventry, RI  02816      )
             )
     Applicant for Intervention )
     as Defendant.   )
             )

## UNOPPOSED MOTION FOR LEAVE TO INTERVENE
## OF RHODES TECHNOLOGIES

   Rhodes Technologies ("Rhodes") hereby moves to intervene as a defendant in this action. Counsel for plaintiff has authorized the undersigned to state that Penick does not object to the intervention of Rhodes in this matter, and counsel for defendants has authorized the undersigned to state that the government takes no position on Rhodes' proposed intervention.

   On January 25, 2007, the United States Drug Enforcement Administration ("DEA") published a Federal Register Notice stating that the administrative hearing requested by Rhodes' competitors on its pending application for registration to import certain controlled substances was not required by statute or regulation, and would not be held.  The Notice further stated that DEA would, consistent with its statutory mandate, scrutinize the Rhodes' application in

accordance with the applicable statutory criteria before taking action on it. Penick Corporation, one of the competitors who had requested a hearing on Rhodes' application, filed a complaint against DEA, the Department of Justice, and two federal officials (collectively "the federal defendants") seeking declaratory and injunctive relief requiring DEA to rescind the January 25, 2007 Notice and conduct the hearing requested by Rhodes' competitors

As explained in the accompanying memorandum of points and authorities, Rhodes seeks to intervene to protect its interest in the prompt and efficient processing by DEA of its pending application, in accordance with applicable statutory and regulatory standards.

Respectfully submitted,

Peter R. Mathers (D.C. Bar No. 294181)
Jennifer A. Davidson (D.C. Bar No. 447449)
Kleinfeld, Kaplan and Becker LLP
1140 19th Street, N.W.
Washington, D.C. 20036
(202) 223 5120

Counsel for Applicant for Intervention as
Defendant Rhodes Technologies

Dated: April 2, 2007

- 2 -

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| PENICK CORPORATION ) | |
| ) | |
| v. ) | |
| ) | CIVIL ACTION NO.: 1:07-CV-00397-RCL |
| ALBERTO R. GONZALES, *et al.*, ) | |
| ) | |
| Defendants, ) | |
| ) | |
| and ) | |
| ) | |
| RHODES TECHNOLOGIES ) | |
| 498 Washington Street ) | |
| Coventry, RI 02816 ) | |
| ) | |
| Applicant for Intervention ) | |
| as Defendant. ) | |

## RHODES TECHNOLOGIES' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS UNOPPOSED MOTION TO INTERVENE

Rhodes Technologies ("Rhodes") submits this memorandum of points and authorities in support of its unopposed motion to intervene as a defendant in the above-captioned proceeding.  As demonstrated below, Rhodes is entitled to intervene both as of right under Federal Rule of Civil Procedure 24(a)(2) and permissively under Federal Rule of Civil Procedure 24(b)(2). Counsel for plaintiff has authorized the undersigned to state that Penick does not object to the intervention of Rhodes in this matter, and counsel for defendants has authorized the undersigned to state that the government takes no position on Rhodes' proposed intervention.

## STATEMENT OF THE CASE

In this suit, Penick Corporation seeks an order requiring rescission of two Federal Register Notices published by the United States Drug Enforcement Administration ("DEA") and two corresponding orders of the DEA Administrative Law Judge, one set of which pertains to the pending application of Rhodes Technologies to be registered as an importer of certain controlled substances. Penick has also requested a Preliminary Injunction against, *inter alia,* further consideration by DEA of Rhodes' pending application.

Rhodes is a pharmaceutical company engaged in the development, manufacture, and marketing of active pharmaceutical ingredients, including controlled substances. In support of these activities, in August 2005 Rhodes submitted an application to the DEA for registration to import raw opium and concentrate of poppy straw (collectively "narcotic raw materials" or "NRMs"). Subsequently, DEA published notice of the Rhodes application in the Federal Register. *Importer of Controlled Substances; Notice of Application,* 71 Fed. Reg. 20729 (April 21, 2006). That Notice stated that any manufacturer who is currently, or is applying to be, registered with DEA to manufacture these narcotic raw materials may file comments or objections and may request a hearing on Rhodes' application.

Three competitors already registered with DEA to import, but not manufacture, narcotic raw materials, including Plaintiff Penick Corporation ("Penick"), filed requests for a hearing on the Rhodes application. Thereafter, the DEA Office of Adminstrative Law Judges placed the case on DEA's administrative hearing docket. In filings with the Administrative Law Judge and the DEA Deputy Administrator and Deputy Assistant Administrator, Rhodes questioned whether the hearing had been properly initiated, given that none of the parties who had requested a

2

hearing were entitled to a hearing under the relevant statutory and regulatory provisions and no DEA official with authority to do so had granted any of the hearing requests.

After extensive written submissions on these issues on behalf of Rhodes, Penick, and the two other competitors who had requested a hearing on Rhodes' application, the DEA published in the Federal Register what it titled a Correction to the Notice of Application. *Importer of Controlled Substances; Correction to Notice of Application,* 72 Fed. Reg. 3417 (Jan. 25, 2007). This January 25, 2007 Notice is one of the two Notices to which Penick objects in this action. In that Notice, DEA analyzed the relevant statutory and regulatory provisions, concluding that neither the Controlled Substances Act nor the DEA regulations provide a right to a hearing to anyone seeking to contest the Rhodes application. 72 Fed. Reg. at 3417-18. DEA acknowledged that it had, in the past, conducted administrative hearings on importer applications at the request of persons who had no statutory or regulatory right to a hearing. It concluded, however, that hearings should be limited to those situations in which Congress specifically provided such a right. In so concluding, DEA also acknowledged that permitting hearings on any other basis would create incentives for registrants to request hearings solely for purposes of causing delays in the registration of their competitors and, in the absence of standards for deciding whether to grant such requests, would entail potentially arbitrary decisionmaking on those requests. 72 Fed. Reg. at 3418.

Based on its interpretation of the hearing provisions, DEA directed the Administrative Law Judge to remove the hearing on Rhodes' application from the agency's administrative docket. The ALJ then terminated the hearing proceedings by order dated February 1, 2007. Rhodes' pending application remains under review by DEA.[1]

---

[1]     The other Notice and corresponding ALJ order at issue in this case relate to Cody Laboratories, Inc.'s pending application to be registered as an importer NRMs.  Administrative hearing proceedings were also initiated

## ARGUMENT

### I.    Rhodes Is Entitled To Intervene As Of Right

Federal Rule of Civil Procedure 24(a)(2) provides that, on timely application, an entity "shall be permitted to intervene" if the entity "claims an interest relating to the property or transaction which is the subject of the action" and is "so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties." Rhodes meets each of these requirements.[2]

#### A.    Rhodes Has a Direct Interest in this Action

According to long-established precedent in the D.C. Circuit, courts interpret the requirements of Rule 24(a) liberally to permit the intervention of interested parties. "[I]n the intervention area the 'interest' test is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *Natural Resources Defense Council v. Costle*, 561 F.2d 904, 910-11 (D.C. Cir. 1977) (*quoting Nuesse v. Camp*, 385 F.2d 694, 700 (D.C. Cir. 1967)). As the D.C. Circuit has observed, "the interest of justice is best served when all parties with a real stake in a controversy are afforded an opportunity to be heard." *Hodgson v. United Mine Workers*, 473 F.2d 118, 130 (D.C. Cir. 1972).

---

on the Cody application following publication of a Notice of the Cody application in the Federal Register and submission of requests for hearing by the same three existing registered importers, including Penick. Adopting the reasoning discussed at length in the January 2007 Notice on the Rhodes application, DEA concluded that no person has a statutory or regulatory right to a hearing on the Cody application either. Accordingly, DEA directed the ALJ to remove the hearing from the agency's docket. 72 Fed. Reg. 3417 (Jan. 25, 2007). The ALJ complied by order dated February 1, 2007.

[2]    Rhodes has filed an opposition to Penick's motion for a preliminary injunction. Because an answer to the complaint is not yet due, Rhodes submits that its timely filing of an opposition to Penick's motion for a preliminary injunction satisfies Federal Rule of Civil Procedure 24(c) and LCvR 7(j).

Private parties that are affected by government action have a clear interest in pending litigation where the validity of the same government action is being challenged. An applicant has a substantial and direct interest in litigation, and will be permitted to intervene, if a plaintiff seeks to have "regulatory decisions, which are obviously in the intervenors' interests" set aside. *See Natural Resources Defense Council, Inc. v. United States Envtl. Prot. Agency*, 99 F.R.D. 607, 609 (D.D.C. 1983). This is precisely the situation here. DEA's decision declining to hold an administrative hearing on Rhodes' pending application is in Rhodes' interest. In recent years, administrative hearings on importer applications triggered by requests filed by the same three competitors who requested a hearing on Rhodes' application have imposed a tremendous burden on DEA and the applicants, materially delaying DEA action on pending applications. For example, the application of Chattem Chemicals, Inc. was granted over four years after it was first filed with DEA. The hearing was conducted over a five month period in the Fall of 2002 and Winter of 2003, and the ALJ issued the initial decision two years after the conclusion of the hearing. 71 Fed. Reg. 9834, 9834-35 (Feb. 27, 2006).[3] Accordingly, Rhodes has a significant interest in ensuring that DEA's correct interpretation of the Controlled Substances Act and its implementing regulations, as reflected in the January 25, 2007 Federal Register Notices, remains undisturbed, enabling the responsible officials at DEA to timely process and act on Rhodes' pending application.

**B.    Rhodes' Ability To Protect Its Interest Would Be Impaired Without Its Intervention**

In this Circuit, courts consider the practical consequences of denying a motion to

---

[3]    DEA's grant of Chattem's importer application was appealed by Penick and is pending before the D.C. Circuit. One of the other competitors who requested a hearing on both the Rhodes and Cody applications – Mallinckrodt Inc. – has intervened in the Chattem appeal in support of Petitioner Penick. *Penick Corp., Inc. v. DEA*, No. 06-1105.

intervene. Intervention is proper if disposition of the action may harm the applicant's interests, even if the applicant could seek to reverse an unfavorable ruling in another proceeding. *Fund for Animals v. Norton,* 322 F.3d 728, 735 (D.C. Cir. 2003); *see also Friends of Animals v. Kempthorne,* 452 F.Supp.2d 64, 69-70 (D.D.C. 2006). If Penick were to succeed in this action, DEA will be forced to hold a burdensome, extraordinarily time consuming hearing on the Rhodes' application at the behest of Rhodes' competitors, not the decision-makers at DEA, and regardless of whether those decision-makers believe such a hearing would assist them in their evaluation of Rhodes' application. Disposition of this action would thus plainly impair or impede Rhodes' interests, as required by Rule 24(a)(2).

### C.    The Federal Defendants Do Not Adequately Represent Rhodes' Interests

Intervention is appropriate as long as "the applicant shows that representation of his interest 'may be' inadequate; and the burden of making that showing should be treated as minimal." *Trbovich v. United Mine Workers,* 404 U.S. 528, 538 n.10 (1972). Even when a potential intervenor and a party share certain interests and advocate the same broad position, the intervenor's interests are not adequately represented if those interests may diverge during the course of the litigation. *See Fund for Animals,* 322 F.3d at 736-37. For instance, an applicant may not be adequately represented in an action where the government agency defendant "has no financial stake in the outcome of the challenge" to its actions. *Dimond v. District of Columbia,* 792 F.2d 179, 192 (D.C. Cir. 1986).

DEA and the other federal parties are the only named defendants in this action. Rhodes assumes that the federal defendants will adequately represent their own interests in upholding DEA's actions, but notes that they have a different motivation from Rhodes for doing so. The federal defendants will be seeking to affirm DEA's interpretation of the Controlled Substances

Act and DEA's implementing regulations; they do not share Rhodes' financial interest in ensuring that its application is processed expeditiously, in accordance with statutory requirements, and without undue interference from Rhodes' competitors. While Rhodes' and the federal defendants policy interests may coincide to a large extent in this litigation, the federal defendants' lack of a financial stake in this action places Rhodes' motion for leave to intervene "squarely within the relatively large class of cases in this circuit recognizing the inadequacy of governmental representation of the interests of private parties in certain circumstances." *Id.; see also Natural Resources Defense Council I*, 561 F.2d at 912; *Natural Resources Defense Council*, 99 F.R.D. at 610.

> **D.    Rhodes' Motion Is Timely**

Rhodes is seeking leave to intervene thirty-five days after Penick brought this action and has filed a timely opposition to Penick's motion for a preliminary injunction, which was filed only eleven days ago. *See, e.g., Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1076 (D.C. Cir. 1998) (motion "to intervene a few weeks after [plaintiff] initiated its action, and before the district court [has] ruled on the preliminary injunction . . . cannot be regarded as untimely").

## II.    Rhodes Qualifies For Permissive Intervention

In the alternative, Rhodes seeks leave for permissive intervention. Permissive intervention is proper upon timely application where "an applicant's claim or defense and the main action have a question of law or fact in common," and when intervention will not "unduly delay or prejudice the adjudication of the rights of the original parties." FRCP 24(b)(2). Rhodes simply seeks to join the federal defendants in defending DEA's decision declining to hold administrative hearing on pending applications for registrations to import narcotic raw materials. Rhodes' intervention would not unduly prejudice the original parties or delay the proceedings, as

7

evidenced by the parties' agreement not to oppose Rhodes' motion. *See DSMC, Inc. v. Convera Corp.,* 273 F.Supp.2d 14, 26-27 (D.D.C. 2002).

## **CONCLUSION**

Rhodes' interest in this litigation clearly satisfies the liberal and practical standard adopted in this circuit; accordingly, Rhodes' unopposed motion for leave to intervene as a defendant should be granted.

Respectfully submitted,

Peter R. Mathers (D.C. Bar No. 294181)
Jennifer A. Davidson (D.C. Bar No. 447449)
Kleinfeld, Kaplan and Becker LLP
1140 19th Street, N.W.
Washington, D.C. 20036
(202) 223 5120

Counsel for Applicant for Intervention as
Defendant Rhodes Technologies

Dated: April 2, 2007

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PENICK CORPORATION | ) |
| | ) |
| v. | ) |
| | ) |
| ALBERTO R. GONZALES, *et al.,* | ) |
| | )    CIVIL ACTION NO.: 1:07-CV-00397-RCL |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| RHODES TECHNOLOGIES | ) |
| 498 Washington Street | ) |
| Coventry, RI  02816 | ) |
| | ) |
| Applicant for Intervention | ) |
| as Defendant. | ) |

**PROPOSED ORDER**

Upon consideration of the unopposed motion of Rhodes Technologies for leave to intervene in this action, to which plaintiff and defendants do not object, and the Court having found that movant satisfies the requirements of FRCP 24(a), it is this _____ day of April 2007,

ORDERED that said motion be, and hereby is, granted; and it is further

ORDERED that Rhodes Technologies be, and hereby is, granted leave to participate in this action as a defendant-intervenor.

_____
Royce C. Lamberth
United States District Judge

9

Notice to:

Tamara Ulrich, United States Department of Justice, Civil Division – Federal Programs, 20 Massachusetts Ave, N.W., Room 7202, Washington, DC 20530

Wayne Matelski, Joshua Fowkes, ARENT, FOX, KINTNER, PLOTKIN & KAHN, Washington Square Building, 1050 Connecticut Avenue, NW Washington, DC 20036-5339

## CERTIFICATE OF SERVICE

I hereby certify that this 2nd day of April, 2007, I caused copies of the foregoing

Unopposed Motion for Leave to Intervene of Rhodes Technologies, Rhodes Technologies'

Memorandum of Points and Authorities in Support of Its Motion to Intervene, and Proposed

Order to be served upon counsel via email as follows:

> Wayne Matelski
> Joshua Fowkes
> ARENT, FOX, KINTNER, PLOTKIN & KAHN
> Washington Square Building
> 1050 Connecticut Avenue, NW
> Washington, DC 20036-5339
> (202) 857-6340
> matelski.wayne@arentfox.com
> fowkes.joshua@arentfox.com
>
> Counsel for Plaintiff Penick Corporation
>
>
> Tamara Ulrich
> United States Department of Justice
> Civil Division – Federal Programs
> 20 Massachusetts Ave, NW
> Room 7202
> Washington, DC 20530
> (202) 305-1432
> tamara.ulrich@usdoj.gov
>
> Counsel for Defendants

_____
Peter R. Mathers

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PENICK CORPORATION <br><br> v. <br><br> ALBERTO R. GONZALES, *et al.*, <br><br> Defendants, <br><br> and <br><br> RHODES TECHNOLOGIES <br> 498 Washington Street <br> Coventry, RI 02816 <br><br> Applicant for Intervention <br> as Defendant. | CIVIL ACTION NO.: 1:07-CV-00397-RCL |

<u>PROPOSED ORDER</u>

Upon consideration of the unopposed motion of Rhodes Technologies for leave to intervene in this action, to which plaintiff and defendants do not object, and the Court having found that movant satisfies the requirements of FRCP 24(a), it is this _____ day of April 2007,

ORDERED that said motion be, and hereby is, granted; and it is further

ORDERED that Rhodes Technologies be, and hereby is, granted leave to participate in this action as a defendant-intervenor.

_____
Royce C. Lamberth
United States District Judge

9

Notice to:

Tamara Ulrich, United States Department of Justice, Civil Division – Federal Programs, 20 Massachusetts Ave, N.W., Room 7202, Washington, DC 20530

Wayne Matelski, Joshua Fowkes, ARENT, FOX, KINTNER, PLOTKIN & KAHN, Washington Square Building, 1050 Connecticut Avenue, NW Washington, DC 20036-5339

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| PENICK CORPORATION | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ALBERTO R. GONZALES, *et al.,* | ) | CIVIL ACTION NO.: 1:07-CV-00397-RCL |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| RHODES TECHNOLOGIES | ) | |
| 498 Washington Street | ) | |
| Coventry, RI  02816 | ) | |
| | ) | |
| Applicant for Intervention | ) | |
| as Defendant. | ) | |
| | ) | |

**CERTIFICATE REQUIRED BY LCvR 7.1 OF THE LOCAL RULES OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

I, the undersigned, counsel of record for Rhodes Technologies, certify that to the

best of my knowledge and belief, the following are parent companies, subsidiaries or

affiliates of Rhodes Technologies which have any outstanding securities in the hands of

the public:

None.

These representations are made in order that judges of this court may determine the need for recusal.

Respectfully submitted,

Peter R. Mathers (D.C. Bar No. 294181)
Jennifer A. Davidson (D.C. Bar No. 447449)
Kleinfeld, Kaplan and Becker LLP
1140 19th Street, N.W.
Washington, D.C. 20036
(202) 223 5120

Counsel for Applicant for Intervention as
Defendant Rhodes Technologies

Dated: April 2, 2007

## CERTIFICATE OF SERVICE

I hereby certify that this 2nd day of April, 2007, I caused copies of the foregoing

Certificate Required by LCvR 7.1 of the Local Rules of the United States District Court

for the District of Columbia to be served upon counsel via email as follows:

> Wayne Matelski
> Joshua Fowkes
> ARENT, FOX, KINTNER, PLOTKIN & KAHN
> Washington Square Building
> 1050 Connecticut Avenue, NW
> Washington, DC 20036-5339
> (202) 857-6340
> matelski.wayne@arentfox.com
> fowkes.joshua@arentfox.com
>
> Counsel for Plaintiff Penick Corporation
>
>
> Tamara Ulrich
> United States Department of Justice
> Civil Division – Federal Programs
> 20 Massachusetts Ave, NW
> Room 7202
> Washington, DC 20530
> (202) 305-1432
> tamara.ulrich@usdoj.gov
>
> Counsel for Defendants

_____
Peter R. Mathers

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| PENICK CORPORATION )<br><br>v. )<br><br>ALBERTO R. GONZALES, *et al.*, )<br><br>         Defendants, )<br><br>   and )<br><br>RHODES TECHNOLOGIES )<br>498 Washington Street )<br>Coventry, RI  02816 )<br><br>      Applicant for Intervention )<br>      as Defendant. ) | CIVIL ACTION NO.: 1:07-CV-00397-RCL |

**RHODES TECHNOLOGIES' OPPOSITION TO PLAINTIFF'S MOTION**
**FOR PRELIMINARY INJUNCTION**

    Rhodes Technologies ("Rhodes") submits this opposition to plaintiff's motion for a

preliminary injunction concurrently with its unopposed motion to intervene in this action as a

defendant.  In this action, plaintiff Penick Corporation ("Penick") challenges DEA's decision not

to hold administrative hearings on applications to import controlled substances submitted to it in

cases where the Agency's governing statute and implementing regulations do not require

hearings.  The administrative hearing process which Penick seeks to invoke, when it has been

used in the past, is a cumbersome and pointless nightmare which adds years of delay to the

registration of even the most qualified of applicants.  DEA rightly concluded that it is

inappropriate to hold such hearings under circumstances where the limited hearing rights

provided by the relevant statute and regulations plainly do not apply.  Penick nevertheless seeks to preserve this expensive and time consuming hurdle in order to protect its position as one of the few companies currently registered to import critical raw materials.  In a transparent attempt to delay the entry of new competitors into this very small market, Penick even seeks an order prohibiting DEA from engaging in any further evaluation of the pending applications before it. As demonstrated below, Penick's substantive claim is meritless, and its utter lack of any cognizable harm precludes issuance of the injunctive relief it seeks.

## PROCEDURAL BACKGROUND

Rhodes is a pharmaceutical company engaged in the development, manufacture, and marketing of active pharmaceutical ingredients ("APIs"), including controlled substances, in Coventry, Rhode Island.  In support of these activities, Rhodes applied for a DEA registration as a bulk manufacturer of several Schedule II APIs.  DEA granted Rhodes' application in 2002, and Rhodes has continuously been registered as a bulk manufacturer of Schedule II APIs since that time.

The Schedule II APIs Rhodes is registered to manufacture are generally produced from natural opiate starting materials that are also Schedule II substances – raw opium, poppy straw or poppy straw concentrate – commonly referred to as narcotic raw materials ("NRMs").  NRMs are not permitted by DEA to be produced in the United States.  Therefore, in order to make Schedule II APIs under its bulk manufacturer registration, Rhodes has had to seek supplies of opiate starting materials from the few firms who are registered by DEA to import NRMs.  In order to be able to acquire these starting materials directly from authorized foreign sources, and to eliminate the need to satisfy the terms and conditions dictated by the few existing importers, Rhodes applied to DEA, in August 2005, for its own registration to import NRMs.

DEA has not made a decision on the Rhodes application. On April 21, 2006, DEA published a notice of the Rhodes application in the Federal Register. *Importer of Controlled Substances; Notice of Application,* 71 Fed. Reg. 20729 (April 21, 2006). That Notice stated that any manufacturer who is currently, or is applying to be, registered with DEA to manufacture the NRMs Rhodes seeks to import may file comments or objections and may request a hearing on Rhodes' application. *Id.* at 20730. Three competitors already registered with DEA to import, but not manufacture, narcotic raw materials, including Penick, filed requests for a hearing on the Rhodes application. Thereafter, the DEA Office of Adminstrative Law Judges placed the case on DEA's administrative hearing docket.

In filings with the Administrative Law Judge ("ALJ") and the DEA Deputy Administrator and Deputy Assistant Administrator, Rhodes questioned whether a hearing had been properly initiated on its application, given that none of the parties who had requested a hearing were entitled to a hearing under the relevant statutory and regulatory provisions and no DEA official with authority to do so had granted any of those hearing requests. *See* Letter to Judge Bittner (June 15, 2006) (enclosing Letter to the DEA Deputy Administrator Leonhart and Deputy Assistant Administrator Rannazzisi), attached hereto as Exhibit A. Penick responded to Rhodes' arguments in a brief submitted jointly with the other two companies who had requested a hearing on Rhodes' application, Mallinckrodt, Inc. and Noramco of Delaware, Inc. *See* Letter to Deputy Administrator Leonhart and Deputy Assistant Administrator Rannazzisi (July 6, 2006), attached hereto as Exhibit B. Rhodes then submitted a reply to the ALJ and the Deputy Administrator and Deputy Assistant Administrator. *See* Letter to Deputy Administrator Leonhart and Deputy Assistant Administrator Rannazzisi, (July 14, 2006), attached hereto as Exhibit C.

Following these extensive written submissions on behalf of Rhodes, Penick, and the two other competitors who had requested a hearing on Rhodes' application, the DEA published in the Federal Register what it titled a Correction to the Notice of Application it had issued on the Rhodes application. *Importer of Controlled Substances; Correction to Notice of Application,* 72 Fed. Reg. 3417 (Jan. 25, 2007). In that Notice, DEA analyzed the relevant statutory and regulatory provisions, concluding that neither the CSA nor the DEA regulations provide a right to a hearing to anyone seeking to contest the Rhodes application. 72 Fed. Reg. at 3417-18. DEA acknowledged that it had, in the past, conducted administrative hearings on importer applications at the request of persons who had no statutory or regulatory right to a hearing. It concluded, however, that hearings should be limited to those situations in which Congress specifically provided such a right. In so concluding, DEA also acknowledged that permitting hearings on any other basis would create incentives for registrants to request hearings solely for purposes of causing delays in the registration of their competitors and, in the absence of standards for deciding whether to grant such requests, would entail potentially arbitrary decisionmaking on those requests. 72 Fed. Reg. at 3418. The January 25, 2007 Notice also stated that DEA had not reached a decision on the Rhodes application and would proceed to process the application in light of the applicable statutory criteria.

Based on its interpretation of the hearing provisions and in the exercise of its discretion not to hold a hearing on the Rhodes application, DEA directed the Administrative Law Judge to remove the hearing on Rhodes' application from the agency's administrative docket. The ALJ then terminated the hearing proceedings by order dated February 1, 2007. Rhodes' pending application remains under review by DEA.[1]

---

[1]    The other Notice and corresponding ALJ order at issue in this case relate to Cody Laboratories, Inc.'s pending application to be registered as an importer NRMs. Administrative hearing proceedings were also initiated

Penick filed two "appeals."  One appeal was filed in the United States Court of Appeals

for the District of Columbia Circuit, *Penick Corp., Inc. v DEA, et al.,* No. 07-1055 (D.C. Cir.),

and the other was this action in the U.S. District Court for the District of Columbia.  On March

22, 2007, Penick filed its Motion for Preliminary Injunction seeking, *inter alia,* an order

prohibiting DEA from continuing its consideration of the Rhodes application.  As a party whose

interests are overtly and directly targeted by the Penick actions, and by the instant Motion for

Preliminary Injunction, Rhodes has requested leave to intervene in this action as of right and

presents this Memorandum in opposition to the Penick motion.

## STATUTORY AND REGULATORY BACKGROUND

**I.     DEA Regulation of Importers and Manufacturers of Schedule II Substances**

Under the Controlled Substances Act and the Controlled Substances Import and Export

Act (together referred to as the "CSA"), DEA controls the manufacture and distribution of

controlled substances for legitimate medical and scientific purposes, in part, by registering all

parties who wish to engage legally in those activities.  With respect to the manufacture of

Schedule II APIs, the CSA requires "bulk manufacturer" registrations for the specific substances

the manufacturer desires to produce domestically.  With respect to importation of Schedule II

drugs, the CSA requires an "importer" registration specific to the substances desired to be

imported.

For international policy reasons (*e.g.*, support of traditional opium poppy-growing

countries), DEA has historically not permitted domestic cultivation of NRMs.  Consistent with

---

on the Cody application following publication of a Notice of the Cody application in the Federal Register and
submission of requests for hearing by the same three existing registered importers, including Penick.  Adopting the
reasoning discussed at length in the January 2007 Notice on the Rhodes application, DEA concluded that no person
has a statutory or regulatory right to a hearing on the Cody application either.  Accordingly, DEA directed the ALJ
to remove the hearing from the agency's docket. 72 Fed. Reg. 3417 (Jan. 25, 2007).  The ALJ complied by order
dated February 1, 2007.

this policy, the CSA explicitly permits importation of NRMs as needed to supply all domestic

U.S. requirements.

> It shall be unlawful to import into the customs territory of the United States from
> any place outside thereof (but within the United States), or to import into the
> United States from any place outside thereof, any controlled substance in schedule
> I or II of subchapter I of this chapter, or any narcotic drug in schedule III, IV, or
> V of subchapter I of this chapter, except that –
>
>> (1) such amounts of crude opium, poppy straw, concentrate of poppy straw,
>> and coca leaves as the Attorney General finds to be necessary to provide for
>> medical, scientific, or other legitimate purposes . . .
>
> may be so imported under such regulations as the Attorney General shall
> prescribe.

21 U.S.C. § 952(a).

In contrast, for domestic policy reasons (*e.g.*, support of strategically important U.S. API

manufacturing capacity), the CSA generally does not permit the importation of Schedule II APIs.

Instead, Schedule II APIs can only be imported: (1) in an emergency when domestic supplies are

inadequate (21 U.S.C. § 952(a)(2)(A)); (2) in limited quantities for scientific, analytical or

research uses (21 U.S.C. § 952(a)(2)(C)); or (3) in any case in which the Attorney General finds

that competition among domestic manufacturers of the controlled substance is inadequate and

will not be rendered adequate by the registration of additional manufacturers (21 U.S.C. §

952(a)(2)(B)).[2]

---

[2]    The full text of these provisions of 21 U.S.C. 952(a)(2) is as follows:

It shall be unlawful to import . . . any controlled substance in schedule I or II . . . , or any narcotic drug in schedule
III, IV, or V . . . , except that –

> (2) such amounts of any controlled substance in schedule I or II or any narcotic drug in schedule III, IV, or V
> that the Attorney General finds to be necessary to provide for the medical, scientific, or other legitimate needs
> of the United States –
>
>> (A)  during an emergency in which domestic suppliers of such substance or drug are found by the Attorney
>> General to be inadequate,

Depending on the type of substance proposed to be imported, certain categories of persons are afforded rights to object to, and request hearings on applications for registration as an importer of the substance.  Thus, if an applicant wants a registration as an importer of a Schedule II substance that is manufactured domestically, the CSA provides registered *domestic bulk manufacturers* of that substance with the right to object and request a hearing on the proposed importer registration.  Specifically, registered domestic bulk manufacturers of the substance sought to be imported are entitled to an opportunity for a hearing under the following CSA provision:

> [P]rior to issuing a registration under this section to a bulk manufacturer of a controlled substance in schedule I or II, and prior to issuing a regulation under section 952(a) of this title authorizing the importation of such a substance, the Attorney General shall give *manufacturers holding registrations for the bulk manufacture of the substance* an opportunity for a hearing.

21 U.S.C. § 958(i) (emphasis added).

Such hearing rights potentially apply, for instance, to proposals to import Schedule II APIs under 21 U.S.C. § 952(a)(2)(B) (cited above), where importation of the API may be permitted only if "competition among domestic manufacturers of the controlled substance is inadequate and will not be rendered adequate by the registration of additional manufacturers." Under that scenario, registered domestic bulk manufacturers would have an opportunity to present relevant evidence on the degree of competition among them.  With respect to this particular category of importer applications, DEA has even gone one prudent step further than the statute and has, by regulation, extended the hearing right to *pending applicants* seeking to

---

(B) in any case in which the Attorney General finds that competition among domestic manufacturers of the controlled substance is inadequate and will not be rendered adequate by the registration of additional manufacturers under section 823 of this title, or

(C) in any case in which the Attorney General finds that such controlled substance is in limited quantities exclusivity for scientific, analytical, or research uses,

may be so imported under such regulations as the Attorney General shall prescribe.

become registered domestic bulk manufacturers. 21 C.F.R. § 1301.34(a). This regulation further provides that, in this specific context only, DEA will publish notice of the importer registration application in the Federal Register so that, for instance, additional interested parties might apply for registration as domestic bulk manufacturers of the substance and thus help establish that competition will increase to the point where importation will not need to be permitted. The specific language of this regulation is as follows:

> In the case of an application for registration or reregistration to import a controlled substance listed in Schedule I or II under the authority of section 1002(a)(2)(B) of the Act (21 U.S.C. 952(a)(2)(B)), the Administrator shall, upon the filing of such application, publish in the Federal Register a notice naming the applicant and stating that such applicant has applied to be registered . . . . A copy of said notice shall be mailed simultaneously to each person registered as a bulk manufacturer of that controlled substance and to any other applicant therefor. Any such person may, within 30 days from the date of publication of the notice in the Federal Register, file written comments on or objections to the issuance of the proposed registration, and may, at the same time, file a written request for a hearing on the application pursuant to § 1301.41.

21 C.F.R. § 1301.34(a).

This DEA importer hearing regulation, by its terms, does not apply to any category of importation other than importation under the "inadequate competition" provision of the CSA, 21 U.S.C. § 952(a)(2)(B). The CSA hearing provision, in contrast, does potentially apply to all importations under Section 952(a), including importation of NRMs. However, because that CSA provision *only* affords a hearing right to registered domestic bulk manufacturers of the substances proposed to be imported, and because there are no registered domestic bulk manufacturers of NRMs,[3] there is *no one* who actually has any hearing rights to assert in opposition to an applicant for registration to import NRMs.

For the same reason, there is no requirement that applications for registration to import

---

[3]    As DEA has recently confirmed, there are no currently registered bulk manufacturers of NRMs. *Importer of Controlled Substances; Correction to Notice of Application,* 72 Fed. Reg. 3417 (Jan. 25, 2007).

NRMs be published, as long as there are no registered domestic bulk manufacturers of NRMs. The CSA at 21 U.S.C. § 958(i) (quoted above) does not address publication at all. Moreover, the DEA regulation at 21 C.F.R. § 1301.34(a) (quoted above) only requires publication of applications for registration to import substances covered by Section 952(a)(2)(B), *not* applications for registration to import NRMs under 952(a)(1). Indeed, in the absence of any person who is entitled to a hearing, DEA has correctly pointed out that there is no point to providing notice of applications for registration to import 952(a)(1) NRMs.

## II.    DEA's Consistent and Longstanding Interpretation of the CSA Hearing Provisions and Penick's Knowledge of that Consistent Interpretation

DEA's interpretation of the CSA hearing provisions discussed in the challenged January 25, 2007 Federal Register Notices dates back to at least 1978. That year, DEA published notice of McNeilab's application for registration to import NRMs. The notice stated that hearings were discretionary in cases where there is no registered bulk manufacturer of the substance sought to be imported:

> [The CSA] obligate[s] the Administrator to give only to manufacturers holding registrations for the bulk manufacturer of a substance sought to be imported the opportunity for a hearing on issues . . . associated with the proposed actual importation of the substance. In the case of imported raw opium, there exists no registered bulk manufacturer of the substance, hence, it is likewise left to the discretion of the Administrator to grant or deny a hearing to any party on issues concerning the importation of raw opium.

*Importation of Controlled Substances,* 43 Fed. Reg. 27908, 27909 (June 27, 1978), copy attached at Exhibit D.[4]  Penick filed a request for hearing in response to the Notice of McNeilab's

---

[4]      The June 27, 1978 Notice reached the same conclusion with respect to poppy straw and poppy straw concentrate because, at that time, those NRMs were being imported under the "emergency" provision of 21 U.S.C. § 952(a)(2)(A), which importation is explicitly exempted from the CSA hearing requirement, at what was then 21 U.S.C. § 958(h) (now 958(i)). Subsequent to 1978, the CSA provision at 21 U.S.C. § 952(a)(1) was amended so that raw opium, poppy straw, and poppy straw concentrate are now imported under the same 952(a)(1) provision that raw opium was imported under in 1978 and that DEA addressed in the above-quoted passage from the June 27, 1978 Notice.

application, and was thus aware of DEA's position that, in cases where there is no one registered as a bulk manufacturer of the substance proposed to be imported, hearings are discretionary. *McNeilab, Inc.; Importation and Manufacture of Controlled Substances; Objections, Requests for Hearing, and Hearing,* 43 Fed. Reg. 35403 (Aug. 9, 1978), included in Exhibit E.

In 2000, Penick itself argued that no hearing should be held on its then-pending application for registration to import NRMs because the parties who had requested a hearing were not bulk manufacturers of the substances Penick sought to import, and therefore they did not have standing to object, comment upon, or request a hearing on Penick's application. *See In the Matter of Penick Corp.,* Penick Corporation's Motion to Strike Comments, Objections, and Requests for Hearing Submitted by Mallinckrodt, Noramco, and Organichem, Docket No. 01-3, attached hereto as Exhibit F. Penick raised its argument in a submission to the DEA ALJ, who had initiated hearing proceedings on Penick's application. On April 13, 2001, the ALJ issued a lengthy opinion concurring that neither the CSA, nor the DEA regulations entitled the companies that had requested a hearing on Penick's application – like Penick now, registered importers, but not bulk manufacturers, of NRMs – to such a hearing. *See In the Matter of Penick Corp.,* Memorandum to Counsel and Rulings on Motions, Docket No. 01-3, at 23, attached to Penick's Motion as Exhibit A. With respect to the DEA's interpretation of 21 U.S.C. § 958(i), the ALJ quoted the 1978 McNeilab Notice stating that hearings are discretionary in cases where no one holds a registration for the bulk manufacture of the substances sought to be imported. *Id.* at 19-20. The ALJ's decision also notes that Section 1301.34 of the agency's regulations applies only to applications for registration to import under the authority of 21 U.S.C. § 952(a)(2)(B). *Id.* at 21. Despite these observations, the ALJ ultimately denied Penick's motion, finding that DEA had exercised discretionary authority to hold a hearing on Penick's application:

> I conclude that neither the statute nor DEA's implementing regulations require the agency to afford a hearing to importers of a narcotic raw material on the application of another manufacturer to import the same substance. However, I further conclude that the agency has the discretionary authority to afford that hearing right and has done so in other proceedings as well as this one.

*Id.* at 23. Having denied Penick's motion, the ALJ then proceeded with the hearing, following which, she issued her Opinion and Recommended Rulings, Findngs of Fact, Conclusions of Law and Decision. *See Penick Corporation, Inc., Grant Registration to Import Schedule II Substances,* 68 Fed. Reg. 6947, 6947-48 (Feb. 11, 2003).

The ALJ's conclusion on the right to a hearing was affirmed by the Deputy Administrator's 2003 final order granting Penick's application for registration to import NRMs. 68 Fed. Reg. at 6948. Specifically, the Deputy Administrator summarized Penick's motion and the ALJ's decision, and then adopted her conclusions:

> The ALJ also found that the CSA and its regulation do not expressly grant a right to hearing to importers of NRMs upon the application of another manufacturer to import the same substance. She concluded, however, that DEA has the discretionary authority to afford that hearing right and that it has done so in other proceedings as well as the instant matter. On that basis, the ALJ denied the motion to strike. . . . The Deputy Administrator adopts the well-reasoned ruling of the ALJ in denying Penick's motions.

68 Fed. Reg. at 6948.

Following issuance of the ALJ's decision on Penick's motion, another applicant for registration to import NRMs also objected to the initiation of hearing proceedings on the grounds that none of the companies requesting a hearing were registered as domestic manufacturers of the substances sought to be imported, and thus none were entitled to a hearing under 21 U.S.C. § 952(i). *See In the Matter of Houba, Inc.,* Memorandum to Counsel and Ruling on Request, Docket No. 02-6 (April 15, 2002), at 1-2, attached as Exhibit G. The ALJ reached the same conclusions she had in her decision on Penick's motion, finding that the CSA only provides

hearing rights to those that are registered to manufacture the substance sought to be imported.

*Id.* at p. 10. As she had in Penick's case, the ALJ nevertheless denied the applicant's request to

cancel the hearing, stating:

> I conclude that neither the statute nor DEA's implementing regulations require the agency to afford a hearing to importers of a narcotic raw material on the application of another manufacturer to import the same substance. However, I further conclude that the agency has the discretionary authority to afford that hearing right and has done so in other proceedings as well as this one.

*Id.* at 17. Penick was fully aware of the ALJ's decision, as it had requested a hearing on the

Houba application and had opposed Houba's request that the hearing not be held. *Id.* at 1.

In November 2006, DEA again confirmed that the only entities that have the right to

request a hearing on an importer application are those that are registered as bulk manufacturers

of the same substance sought to be imported. Specifically, in granting the registration of

Mallinckrodt to import NRMs, DEA rejected the hearing request submitted by Rhodes, stating,

> One comment was received; however, pursuant to 21 U.S.C. 958(i) and 21 CFR 1301.34(a), the commenter which is not a registered bulk manufacturer of the above listed controlled substances, has no legal standing to object or to request a hearing on this application.

*Importer of Controlled Substances; Notice of Registration,* 71 Fed. Reg. 65134, 65134 (Nov. 7,

2006).[5] Penick's counsel was personally apprised of the November 7, 2006 Federal Register

Notice, and the significance of the statements made by DEA in that Notice, by copy of a

November 13, 2006 letter from counsel for Rhodes to DEA. *See* Letter to Deputy Administrator

Leonhart and Deputy Assistant Administrator Rannazzisi (Nov. 13, 2006), attached hereto as

Exhibit H.

---

[5]     Rhodes was the commenter referenced in the November 7, 2006 Federal Register Notice. *See* Letter from Counsel for Rhodes to DEA Federal Register Representative/ODL (June 23, 2006), attached hereto as Exhibit I. Rhodes made a conditional request for hearing on Mallinckrodt's application for re-registration as an importer of NRMs, arguing that Rhodes had the same right to a hearing on Mallinckrodt's application as existing importers (such as Mallinckrodt and Penick) had on Rhodes' application. *Id.*

## ARGUMENT

In order to obtain the preliminary injunction it seeks, Penick must demonstrate: (1) a substantial likelihood of success on the merits; (2) that it will suffer irreparable injury in the absence of preliminary relief; (3) that other interested parties will not be substantially injured if the requested relief is granted; and (4) that granting such relief would serve the public interest. *Mova Pharmaceutical Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998) (citations omitted); *Boehringer Ingelheim Corp. v. Shalala,* 993 F.Supp. 1, 1 (D.D.C. 1997).

In this case, Penick cannot show that it has any likelihood of success on the merits, and its request for a preliminary injunction must therefore be denied. Moreover, Penick has not met its burden of establishing that it would suffer irreparable harm in the absence of an injunction, that its injury would outweigh the harm to the federal defendants and other interested parties, including Rhodes, or that granting the requested relief is in the public interest. Because Penick has failed to make the required showing on any of the four factors, it falls far short of meeting the threshold necessary to support issuance of the preliminary injunction it seeks.

## I.    Penick has no Likelihood of Success on the Merits

### A.    Neither the CSA Nor DEA Regulations Require DEA to Hold a Hearing on Rhodes' Application

#### 1.    DEA's Conclusion that No One is Entitled to a Hearing on Rhodes' Application Reflects DEA's Longstanding Interpretation of the CSA and its Implementing Regulations

On numerous occasions when DEA has considered the question, the Agency has consistently and correctly interpreted the CSA hearing provisions to mean that, in cases where there is no registered bulk manufacturer of the substance sought to be imported, no one is legally entitled to request a hearing on an application for registration to import the substance. As

explained above, Penick was fully aware of each of these consistent interpretations:

- The 1978 Federal Register Notices on the McNeilab application;
- The 2000 Penick motion and 2001 ALJ and 2003 Deputy Administrator decisions on the Penick application;
- The 2001 ALJ decision on the Houba application; and
- The November 2006 decision to deny a hearing on the Mallinckrodt application.

Penick has cited no DEA decisions whatsoever that hold to the contrary.

As the above history amply demonstrates, DEA has, *for almost three decades*, correctly interpreted the CSA to provide hearing rights only to those companies that are registered as domestic bulk manufacturers of the substance sought to be imported. Because NRMs are not cultivated domestically, no one holds registrations to manufacture them, and DEA has accordingly found that no one has a right to a hearing on applications for registration to import them. Thus, Penick's contention that DEA's decision not to hold a hearing on the Rhodes application constitutes a "dramatic reversal of its interpretation of its regulations" is specious. DEA's decision is fully consistent with its longstanding interpretation of the CSA and is nothing more than an exercise of the very discretion that the agency announced it had in 1978.

In this context, the fact that DEA has held hearings on other NRM importer applications in the past does not support Penick's contention that DEA no longer has the discretion to decide whether to hold hearings that are not required by statute or regulation. Inherent in the concept of a "discretionary hearing" is the agency's ability to determine that a hearing would not be appropriate, and therefore to decline to hold one. Otherwise, the hearing would not be discretionary. Moreover, based on the available evidence, it appears that the November 2006 and January 2007 decisions of the Deputy Administrator were the first Agency decisions on this

question made prior to the actual completion of hearings before the ALJ.[6]  Accordingly, the fact

that the ALJ has conducted hearings on NRM importer applications in the past (and that the

Deputy Administrator has considered the record developed in those hearings in reaching a final

decision on pending registrations) in no way suggests that companies in Penick's position have a

right to force DEA to conduct those hearings despite clear statutory language to the contrary and

an Agency determination to exercise its discretion to the contrary.  Simply stated, Penick has

been on notice since 1978 that, in cases where there is no registered bulk manufacturer of an

NRM proposed to be imported, any hearing requested on an application for registration to import

that NRM could be denied in the Agency's discretion.

Moreover, Penick's assertion that it was completely "surprised" by the January 25, 2007

Notice, and had been denied notice and an opportunity to comment on the "reinterpretation"

reflected in that Notice, is belied by the long history described above.  Most critically, however,

it is belied by the fact that the question was raised openly by Rhodes after Penick and others

requested a hearing on Rhodes' application.  *See* Exhibits A, C, H.  Penick thus had timely notice

that the issue was being raised by Rhodes, had every opportunity to persuade DEA to exercise its

discretion to hold a hearing, and in fact attempted, unsuccessfully, to do so.  *See* Exhibit B.

### 2. DEA's Prior Rulemaking Activity is Also Fully Consistent with the Agency's prior Decisions

As Penick points out, prior to the mid-1990's, DEA, by regulation, provided hearing

rights on domestic bulk manufacturer applications as well as importer applications.  *See* 21

C.F.R. § 1301.43 (1993).  In 1993, DEA proposed to remove unnecessary obstacles to the

registration of qualified applicants by deleting all mandatory hearing requirements from its

---

[6]      Once completed after great delay and expense, it would be very difficult to justify ignoring the record of a hearing based on a retroactive decision that the hearing had not been properly authorized or should not have been held.

- 15 -

regulations. As explained in the Federal Register notice announcing the proposal, DEA made

this proposal in order to avoid unnecessary, expensive, and time consuming hearings that serve

only to protect the narrow competitive interests of the objectors:

> The record of these proceedings notwithstanding, currently registered
> manufacturers use the regulatory hearing requirement to deter others from
> applying or to delay entry of competitors into their marketplace. As often as not,
> a company whose new application is opposed by a current manufacturer retaliates
> by opposing the annual renewal of the other's registration. This abuse of the
> regulatory hearing requirement adversely affects competition by delaying new
> registrations and results in the unnecessary expenditure of the DEA resources
> needed to hear and review these cases.

*Registration of Manufacturers and Importers of Controlled Substances,* 58 Fed. Reg. 52246,

52247 (Oct. 7, 1993).

The following year, DEA withdrew its proposal as it applied to applications for the

importation of controlled substances listed in Schedule I or II under the authority of 21 U.S.C. §

952(a)(2)(B), so as not to contradict the statutory requirement that "manufacturers holding

registrations for the bulk manufacture of the substance" be provided an opportunity for a hearing.

*Registration of Manufacturers and Importers of Controlled Substances,* 59 Fed. Reg. 30555,

30555 (June 14, 1994) (relying on 21 U.S.C. § 958(i)). DEA therefore decided not to amend the

provisions of its importer regulations specifying the persons entitled to request a hearing on

importer applications submitted pursuant to the "inadequate competition" provision of the CSA,

21 U.S.C. § 952(a)(2)(B). *Compare* 21 C.F.R. § 1311.42 (1993) *with* 21 C.F.R. § 1301.34(a). In

contrast, DEA did, in 1995, finalize its proposal on bulk manufacturer applications and, since

that time, DEA has sought only written comments and objections on applications for the bulk

manufacture of controlled substances. *Registration of Manufacturers and Importers of*

*Controlled Substances,* 60 Fed. Reg. 32099 (June 20, 1995).

Penick suggests that this rulemaking proceeding somehow contradicts the Agency's consistent recognition of the discretionary nature of importer registration hearings held at the behest of parties who are not registered bulk manufacturers of the substances proposed to be imported, or that the 1990's rulemaking history proves that notice-and-comment rulemaking is required before DEA should be permitted to exercise its discretion to deny a hearing on Rhodes' importer application. Penick is wrong on both counts.

DEA engaged in rulemaking activities in the 1990's because it sought to revise its regulations. Here, DEA has not revised its regulations and has no need to do so. Instead, the Agency has, consistent with its long-standing interpretation of the CSA and its regulations, declined to hold a discretionary hearing on a pending application. Thus, the fact that DEA's regulations did in 1993 and still do today provide limited hearing rights under other circumstances has no bearing whatsoever on Rhodes' application or this action. Indeed, it is hard to see any way in which DEA's 1995 decision to remove all non-statutorily based hearing rights from its regulations supports Penick's argument that, somehow, DEA no longer has the discretion to deny hearings that are required by neither statute or regulation.

* * * * *

Thus, Penick lacks any legitimate basis for suggesting that DEA's decision not to hold a hearing on the Rhodes application was either: (1) legally wrong under the CSA or DEA regulations; (2) outside of the scope of DEA's long-recognized discretion; or (3) taken without giving Penick and other interested parties a full and fair opportunity to make their case that DEA should exercise its discretion in their favor.

For these reasons, we respectfully submit that Penick has demonstrated no likelihood of success on its basic premise that DEA is required to hold a hearing on Rhodes' application to

import NRMs. Thus, the relief first sought by Penick in its current motion – that DEA be ordered to suspend processing of Rhodes' application, is completely inappropriate.

**B.      Neither the CSA Nor DEA Regulations Require DEA to Publish Notices of NRM Importer Applications**

No provision of the CSA requires DEA to publish notice of NRM importer applications submitted to the agency. Essentially acknowledging that the statute contains no such requirement, Penick relies solely on one provision of DEA's implementing regulations – 21 C.F.R. § 1301.34(a) – that it characterizes as "expressly" requiring DEA to publish these notices in the Federal Register. In fact, Section 1301.34(a) of DEA's regulations does not apply to applications for registration to import NRMs. Instead, the regulation, by its terms, applies only to applications submitted for registration as an importer of substances covered by 21 U.S.C. § 952(a)(2)(B). Accordingly, Penick has no likelihood of success on its claim to enjoin DEA from enforcing that aspect of the January 25, 2007 Notices stating that DEA is not required to publish notices of applications for registration to import NRMs.

Moreover, it is undisputed that DEA did publish notice of the Rhodes application in the Federal Register. Therefore, Penick's argument, even if correct, could never justify issuance of an injunction preventing DEA from continuing its review of Rhodes' application.

**II.      Penick has not Shown that it will Suffer Irreparable Injury Absent the Requested Preliminary Injunction**

To obtain the injunction it seeks, Penick must not only demonstrate a substantial likelihood of success on the merits, but it must also show that it will suffer irreparable injury if its request is not granted. Moreover, because Penick's likelihood of success is extremely slim at best, it "would have to make a very substantial showing of severe irreparable injury" in order to prevail on its motion. *National Pharm. Alliance v. Henney,* 47 F.Supp.2d 37, 41 (D.D.C. 1999).

Irreparable injury is a "very high standard." *See Varicon Int'l v. Office of Personnel Mgmt.,* 934 F.Supp. 440, 447 (D.D.C. 1996) (*quoting American Coastal Line Joint Venture, Inc. v. United States Lines, Inc.,* 580 F.Supp. 932, 936 (D.D.C. 1983)). A party must demonstrate that it will suffer certain, imminent, and irreparable injury without the requested relief. *Wisconsin Gas Co. v. FERC,* 758 F.2d 669, 674 (D.C. Cir. 1985).

In its Motion, Penick argues that it will be irreparably harmed by the possibility that the burden of proof might change if DEA were allowed to register Rhodes and then were required to attempt to revoke that registration. Penick provides no explanation of why it believes a post-registration challenge to Rhodes' registration would proceed under the CSA revocation procedures. Even if it did, however, Penick cannot show that it would be confronted with a different burden of proof.

Under DEA regulations, a third-party participant in any hearing (*e.g.*, a registrant who objects to the registration of a competitor) has the burden of proving any proposition it seeks to advance. 21 C.F.R. § 1301.44. This burden is the same regardless of whether the registration at issue involves a new registration, a re-registration, or the proposed revocation of a registration. Thus, assuming that a person in Penick's position has any standing at all to request or participate in a hearing on a competitor's application, there is no respect in which that interloper is entitled to the "benefit" (if it can be called that) of the allocation of the burden of proof between the applicant and DEA.

Neither can Penick credibly assert that it faces cognizable harm from being denied a hearing to which it has no right under the CSA or DEA regulations. Quite clearly, Penick is motivated in this action by a legitimate fear that Rhodes could receive a registration to import NRMs more quickly than would be the case if Penick were able to force DEA to engage in a

multi-year, administrative hearing process before the Agency could issue a final decision.

However, even if Penick had the forthrightness to cite this harm as its motivation, given that it

has no statutory or regulatory right to such a hearing, it obviously also has no cognizable right to

be free from the harm that would be caused by DEA's contrary exercise of its long-

acknowledged discretion in the matter.

**III.    The Balance of Harms and the Public Interest Weigh Strongly Against Penick's Request for Injunctive Relief**

Finally, the balance of harms weighs strongly against granting Penick the extraordinary

injunctive relief it seeks. Indeed, Penick's claim that DEA will not suffer harm from the

requested injunction ignores the significant harm that would befall not only DEA and the public,

but also Rhodes. While DEA has no commercial stake in this litigation, it is the government

agency charged with implementing the statutory scheme governing the closed system of

production and distribution of controlled substances in the United States. Accordingly, DEA's

interest coincides with that of the public. Therefore the third factor in the preliminary injunction

analysis, the balance of harms, is largely subsumed by the fourth prong, the public interest. If an

injunction were granted prohibiting DEA from properly administering the CSA and its

implementing regulations and processing Rhodes' pending application, the harm to the agency,

the public, and to Rhodes would be substantial.

Penick's requested injunction is extraordinary. It asks this court to enter an order halting

all activity on Rhodes' application during the pendency of this lawsuit. It also asks for an order

precluding DEA from "enforcing" its January 25, 2007 Federal Register Notices. The scope and

significance of this latter request is unclear, but it could well entail a complete cessation of the

Agency's registration activities. If instead this latter request pertains only to the two specific

applications referenced in those Notices, then later filed applications could be evaluated and

acted upon while Rhodes continues to wait.  Whatever the effect of Penick's latter request, the former would clearly result in a material delay in action on Rhodes' application, which has already been pending before the Agency for over a year and a half.  Penick offers no basis for its assertion that the delay would be "brief" and certainly the injunction, if entered, could be in place for many months, if not well over a year.

The harm to Rhodes is plain.  Lacking an NRM importer registration of its own, Rhodes has thus far been forced to seek supplies of these critical opiate starting materials from the few firms who are registered by DEA to import NRMs.  Rhodes has a substantial interest in acquiring these starting materials directly from authorized foreign sources as soon as possible, to eliminate the need to satisfy the terms and conditions dictated by the few existing importers.

The requested injunction is also contrary to the interest, shared by both DEA and the public, in ensuring that DEA is able to fulfill its statutory mandate by processing all applications submitted to it in a timely and efficient manner.  Relatedly, the public benefits from enhanced competition when qualified applicants, such as Rhodes, obtain registrations to import or manufacture controlled substances.  The unjustified interruption of DEA's evaluation of Rhodes' application, and resulting delay in final action on that application, would therefore substantially harm DEA, the public, and Rhodes.

## CONCLUSION

For the foregoing reasons, Rhodes respectfully requests that the Court deny Penick's

motion for preliminary injunction.

Respectfully submitted,

Peter R. Mathers (D.C. Bar No. 294181)
Jennifer A. Davidson (D.C. Bar No. 447449)
Kleinfeld, Kaplan and Becker LLP
1140 19th Street, N.W.
Washington, D.C. 20036
(202) 223 5120

Counsel for Applicant for Intervention as
Defendant Rhodes Technologies

Dated: April 2, 2007

## CERTIFICATE OF SERVICE

I hereby certify that this 2nd day of April, 2007, I caused copies of the foregoing

Opposition to Plaintiff's Motion for Preliminary Injunction to be served upon counsel via email

as follows:

Wayne Matelski
Joshua Fowkes
ARENT, FOX, KINTNER, PLOTKIN & KAHN
Washington Square Building
1050 Connecticut Avenue, NW
Washington, DC 20036-5339
(202) 857-6340
matelski.wayne@arentfox.com
fowkes.joshua@arentfox.com

Counsel for Plaintiff Penick Corporation

Tamara Ulrich
United States Department of Justice
Civil Division – Federal Programs
20 Massachusetts Ave, NW
Room 7202
Washington, DC 20530
(202) 305-1432
tamara.ulrich@usdoj.gov

Counsel for Defendants

_____
Peter R. Mathers

Rhodes' Opposition to Plaintiff's
Motion for Preliminary Injunction
April 2, 2007

# EXHIBIT A

THOMAS O. HENTELEFF
RICHARD S. MOREY
KINSEY S. REAGAN
PETER R. MATHERS
ANTHONY L. YOUNG
ANNE V. MAHER
BONNIE A. BEAVERS
DANIEL R. DWYER
GLENN E. DAVIS
STACY L. EHRLICH
JENNIFER A. DAVIDSON
STACEY L. VALERIO
JONATHAN M. WEINRIEB
CARRIE C. HORN

OF COUNSEL:
WILLIAM J. HARDY

LAW OFFICES

## KLEINFELD, KAPLAN AND BECKER, LLP

1140 NINETEENTH STREET, N.W.

### WASHINGTON, D. C. 20036-6606

TELEPHONE (202) 223-5120

FACSIMILE (202) 223-5619

www.kkblaw.com

WEST COAST OFFICE:
ONE MARKET STREET
STEUART TOWER, SUITE 1450
SAN FRANCISCO, CA 94105-1313
TELEPHONE (415) 538-0014
FACSIMILE (415) 538-0016

VINCENT A. KLEINFELD
1907-1993

ALAN H. KAPLAN
1930-2001

June 15, 2006

<u>Via Fax - 202 307 8189 and First Class Mail</u>

Mary Ellen Bittner
Administrative Law Judge
Office of Administrative Law Judges
Drug Enforcement Administration
Washington, D.C. 20537

     Re:    Docket No. 06-57; In the Matter of Rhodes Technologies

Dear Judge Bittner:

     On behalf of Rhodes Technologies, we are writing regarding the authority of the Office of Administrative Law Judges to initiate hearing proceedings in this matter. We have inquired, but have not been advised that an official with the Drug Enforcement Administration authorized to grant discretionary hearings has granted the hearing requests submitted by Mallinckrodt Inc., Noramco of Delaware, and Penick Corporation.

     None of the parties who have requested a hearing in this matter are entitled to a hearing under the relevant statutory and regulatory provisions. Both the Controlled Substances Act and DEA's implementing regulations provide only that manufacturers holding registrations for the bulk manufacture of the substances sought to be imported are entitled to an opportunity for a hearing. 21 U.S.C. § 958(i); 21 C.F.R. § 1301.34(a). Because raw opium and concentrate of poppy straw cannot be produced domestically, no manufacturers hold a registration for the bulk manufacture of these substances, and no companies have an application pending for such a registration. Thus, no one is entitled to a hearing on Rhodes' application. Indeed, the Deputy Administrator recently acknowledged that, while DEA has the discretionary authority to conduct a hearing on an application to import narcotic raw materials ("NRM"), including raw opium and concentrate of poppy straw, registered importers of NRMs have no statutory or regulatory right to such a hearing. 68 Fed. Reg. 6947, 6948 (Feb. 11, 2003).

KLEINFELD, KAPLAN AND BECKER, LLP

Mary Ellen Bittner
June 15, 2006
Page 2 of 2

If a hearing is to be held in this matter, there should be no delay in those proceedings. Therefore, Rhodes is prepared to meet the filing deadlines set in the June 5, 2006 Order for Prehearing Memoranda. However, in light of the above, the jurisdiction of the Office of Administrative Law Judges to conduct hearing proceedings in this matter should be clarified. In connection with this clarification, we have today filed with the Deputy Administrator and Deputy Assistant Administrator a letter suggesting that the requests for hearing filed in this matter be denied.

Respectfully submitted,

Peter R. Mathers
Jennifer A. Davidson
Counsel to Rhodes Technologies

cc:    Wayne Patrick, Esq., Office of Chief Counsel, DEA
       Steven J. Poplawski, Esq., Counsel for Mallinckrodt Inc.
       Andrew D. Schau, Esq., Counsel for Noramco of Delaware, Inc.
       Wayne H. Matelski, Esq., Counsel for Penick Corporation

THOMAS O. HENTELEFF
RICHARD S. MOREY
KINSEY S. REAGAN
PETER R. MATHERS
ANTHONY L. YOUNG
ANNE V. MAHER
BONNIE A. BEAVERS
DANIEL R. DWYER
GLENN E. DAVIS
STACY L. EHRLICH
JENNIFER A. DAVIDSON
STACEY L. VALERIO
JONATHAN M. WEINRIEB
CARRIE C. HORN

OF COUNSEL:
WILLIAM J. HARDY

LAW OFFICES
## KLEINFELD, KAPLAN AND BECKER, LLP
1140 NINETEENTH STREET, N.W.
### WASHINGTON, D. C. 20036-6606
TELEPHONE (202) 223-5120
FACSIMILE (202) 223-5619
www.kkblaw.com

WEST COAST OFFICE:
ONE MARKET STREET
STEUART TOWER, SUITE 1450
SAN FRANCISCO, CA 94105-1313
TELEPHONE (415) 538-0014
FACSIMILE (415) 538-0016

VINCENT A. KLEINFELD
1907-1993

ALAN H. KAPLAN
1930-2001

June 15, 2006

<u>Via Fax and Overnight Courier</u>

Michelle Leonhart
Deputy Administrator
Drug Enforcement Administration
Lincoln Place-West
Room 12058
700 Army Navy Drive
Arlington, VA 22202

Joseph T. Rannazzisi
Deputy Assistant Administrator
Office of Diversion Control
Drug Enforcement Administration
Lincoln Place-East
Room 6295
600 Army Navy Drive
Arlington, VA 22202

Re:    Application of Rhodes Technologies for Registration as an Importer
of Raw Opium and Concentrate of Poppy Straw

Dear Deputy Administrator Leonhart and
Deputy Assistant Administrator Rannazzisi:

## Action Requested

We write on behalf of Rhodes Technologies concerning the requests for hearing submitted in response to the Federal Register notice announcing Rhodes' application for registration as an importer of raw opium and concentrate of poppy straw. 77 Fed. Reg. 20729 (April 21, 2006). The Office of Administrative Law Judges has recently initiated hearing proceedings on Rhodes' application, apparently in response to requests for hearing filed by Mallinckrodt Inc., Noramco of Delaware, Inc., and Penick Corporation (the "Requestors"). *See* Attachment 1. We have inquired, however, and learned that no Drug Enforcement Administration official authorized to grant discretionary hearings has formally granted these hearing requests. *See* 28 C.F.R. Appendix to Subpart R of Part 0 – Redelegation of Functions. For the reasons described below, the Drug Enforcement Administration ("DEA") should deny these requests for a hearing, and instead should process Rhodes' application expeditiously, taking into account, as appropriate, the comments and objections presented by the Requestors in their respective submissions.

June 15, 2006        KLEINFELD, KAPLAN AND BECKER, LLP
Page 2 of 6

## Summary of Argument

None of the parties who have requested a hearing are entitled to a hearing under the relevant statutory and regulatory provisions.  Both the Controlled Substances Act and DEA's implementing regulations provide only that manufacturers holding registrations for the bulk manufacture of the substances sought to be imported are entitled to an opportunity for a hearing.  21 U.S.C. § 958(i); 21 C.F.R. § 1301.34(a).  Because raw opium and concentrate of poppy straw are not permitted to be produced domestically, no manufacturers hold a registration for the bulk manufacture of these substances, and none of the Requestors (or anyone else) currently has an application pending for such a registration.[1]  Thus, no one is entitled to a hearing on Rhodes' application.  This conclusion was affirmed by the Deputy Administrator's 2003 ruling that, while DEA has the discretionary authority to conduct a hearing on an application to import narcotic raw materials ("NRM"), including raw opium and concentrate of poppy straw, registered importers of NRMs have no statutory or regulatory right to such a hearing.  68 Fed. Reg. 6947, 6948 (Feb. 11, 2003).

Moreover, DEA should not grant hearing requests on applications seeking registration as an importer of controlled substances, except where required by the statute or regulations.  For applications where objectors have no statutory or regulatory right to a hearing, DEA should use the same process that it has successfully used since the mid-1990's to evaluate applications for bulk manufacture of Schedule I and II substances:  written comments and objections should be solicited and considered by DEA in the course of its evaluation of the application, but no hearing should be conducted at the request of objectors who lack standing as bulk manufacturers of the substances proposed for importation.  *See* 21 C.F.R. § 1301.33(a).[2]

## Background and Rationale for This Request

In 1993, DEA proposed to remove unnecessary obstacles to the registration of qualified applicants by deleting mandatory hearing requirements from its regulations governing applications for the bulk manufacture or

---

[1]        In its request for hearing, Mallinckrodt incorrectly states that it is "a registered bulk manufacturer and importer of raw opium, opium poppy, and poppy straw concentrate."  In fact, Mallinckrodt is not registered as a bulk manufacturer of raw opium (9600), poppy straw (9650), or concentrate of poppy straw (9670), 70 Fed. Reg. 48441 (Aug. 17, 2005); nor did Mallinckrodt seek to be registered as a bulk manufacturer of these substances in its most recent renewal application.  71 Fed. Reg. 33315 (June 8, 2006).

[2]        Interested third parties may be permitted to participate in a hearing requested by the applicant after issuance by DEA of an Order to Show Cause.  *See* 21 C.F.R. § 1301.37. However, third parties should not be allowed to force a hearing to be held even when DEA staff conclude that the applicant meets the applicable standards for registration.

KLEINFELD, KAPLAN AND BECKER, LLP

importation of Schedule I and II substances, and hold hearings only in those limited circumstances in which the Administrator determined a hearing would materially assist the agency. As explained in the Federal Register notice announcing the proposal, DEA sought to avoid unnecessary, expensive, and time consuming hearings that serve only to protect the narrow competitive interests of the objectors:

> The record of these proceedings notwithstanding, currently registered manufacturers use the regulatory hearing requirement to deter others from applying or to delay entry of competitors into their marketplace. As often as not, a company whose new application is opposed by a current manufacturer retaliates by opposing the annual renewal of the other's registration. This abuse of the regulatory hearing requirement adversely affects competition by delaying new registrations and results in the unnecessary expenditure of the DEA resources needed to hear and review these cases.

58 Fed. Reg. 52246, 52247 (Oct. 7, 1993).

The following year, DEA withdrew its proposal as it applied to applications for the importation of controlled substances due to the statutory requirement that "manufacturers holding registrations for the bulk manufacture of the substance" be provided an opportunity for a hearing. 59 Fed. Reg. 30555 (June 14, 1994) (relying on 21 U.S.C. § 958(i)). In the same notice, DEA modified its proposal as it related to applications for the bulk manufacture of controlled substances to eliminate entirely all hearing provisions, finding that the hearing process had been abused and remained a future source of potential abuse and delay. *Id.* This proposal was finalized in 1995 and, since that time, DEA has sought only written comments and objections on applications for the bulk manufacture of controlled substances. 60 Fed. Reg. 32099 (June 20, 1995).

Since the elimination of competing bulk manufacturer hearings in 1995, DEA appears to have continued routinely to hold hearings on NRM importer registrations, upon request by the existing registered NRM importers, despite the fact that the existing importers have no statutory or regulatory right to such hearings. This experience amply demonstrates that the concerns DEA expressed in its 1993 and 1994 proposals remain valid today. There can be no question that hearings continue to consume significant agency, as well as applicant, resources and materially delay DEA action on applications. For example, the most recent application to be subjected to a hearing – that of Chattem Chemicals, Inc. – was granted over four years after it was first filed with DEA in February 2002. The hearing was conducted over a five month period in the Fall of 2002 and Winter of 2003, and the Administrative Law Judge issued the initial decision two years after the conclusion of the hearing. 71 Fed. Reg.

9834, 9834-35 (Feb. 27, 2006). It is clear that the hearing process imposes a tremendous burden on DEA and consumes resources that should instead be devoted to the timely fulfillment of these and other statutory responsibilities.

As DEA observed in its 1993 proposal, the hearing process is self-perpetuating. So long as DEA continues to grant legally-unnecessary hearings on applications to import NRMs, companies with existing registrations and pending applications feel compelled to invoke the process, whether or not they have comments or objections that are truly likely to assist DEA in its evaluation of the application and whether or not a hearing is in any way necessary to the consideration of such comments or objections as they may be in a position to present. Put another way, until there is adequate competition among importers, there will continue to be an economic incentive to try to invoke burdensome and unnecessary hearing procedures solely to obstruct competition. Thus, until enough importers are registered to ensure adequate competition among them, the only means of breaking the hearing cycle and freeing up valuable DEA resources is to deny hearing requests and consider only written comments and objections.

Written comments and objections are, without question, adequate to inform DEA of relevant issues and to ensure a thorough agency evaluation of an application. In explaining its proposal to eliminate the hearing provision relating to bulk manufacturers, DEA noted that all comments and objections can be conveyed in writing and will be considered by the agency in evaluating an application:

> [T]he proposed change continues to permit current registrants and applicants to submit written comments and objections concerning an applicant's registration. There is no reason to believe that this procedure does not provide an adequate mechanism for these individuals to convey the substance and criticality of any objections or that DEA would fail to consider such evidence prior to making a final determination.

59 Fed. Reg. 30555, 30556 (June 14, 1994). DEA's experience in processing applications for the bulk manufacture of Schedule I and II substances since 1995 confirms that the agency is well equipped to conduct a probing evaluation of an application and to apply the relevant statutory criteria without resort to the inordinately cumbersome and legally unnecessary formal hearing process.

There is one potential scenario where administrative law could require adjudicatory hearings based on the objections of existing applicants; namely where there are more applicants seeking registration than there are registrations available for DEA to grant. Under this scenario, all applicants seeking registration or re-registration should be the subject of consolidated hearings at

KLEINFELD, KAPLAN AND BECKER, LLP

which the merits of all of the competing applications are weighed and a determination made of which applicants warrant registration. *See Ashbacker Radio Corp. v. Federal Communications Commission,* 326 U.S. 327 (1945). However, these types of hearings would properly be initiated under the existing Order to Show Cause procedures, not at the behest of existing registrants who would use the process to delay legitimate and needed competition. Moreover, the Deputy Administrator has concluded that there is no evidence of any Congressional intent to impose a strict limit on the number of importers that may be registered. *See* 71 Fed. Reg. 9834, 9835 (Feb. 27, 2006) and 67 Fed. Reg. 39041, 39043 (June 6, 2002).[3]

Penick Corporation's request for a hearing suggests that the adequacy of competition among importers should be assessed each time an application for registration as an importer is submitted, and therefore a hearing is necessary to consider what Penick characterizes as this "complex" issue. As an initial matter, unless the Deputy Administrator's most recent Final Order granting a registration to import NRMs is overruled, it is not necessary to assess the adequacy of competition among registered importers in connection with each new application. Specifically, in the matter of Chattem Chemicals, Inc., the Deputy Administrator concluded that DEA need not consider the adequacy of competition or supply unless DEA finds that diversion cannot be effectively controlled. 71 Fed. Reg. 9834, 9838 (Feb. 27, 2006). Moreover, pursuant to 21 U.S.C. § 823(a), DEA has been considering these issues in the context of applications for registration of bulk manufacturers, without hearings, since 1995. There is no reason to believe that DEA cannot also evaluate the adequacy of competition and supply among importers of NRMs in the absence of a hearing, particularly when the anticompetitive situation is facially obvious. In the case of a registered bulk manufacturer of Schedule II substances such as Rhodes, a time consuming and expensive hearing opportunity serves only to perpetuate the ability of currently registered importers to compete unfairly, either by charging inflated prices for imported NRMs (which are commodities to which the importers have added no value), or by simply refusing to deal. Finally, because the criteria for registration and re-registration are precisely the same, Penick's position would require DEA

---

[3]    These more recent Administration statements are entirely consistent with the Administrator's findings on the application of Mallinckrodt, Inc. over 25 years ago. In that case, the Administrator concluded that DEA could register at least eight importers of NRMs in a manner consistent with U.S. law and international obligations under the Single Convention on Narcotic Drugs. 46 Fed. Reg. 24747, 24748 (April 24, 1981). On this basis, objections that had been raised to the re-registration of Mallinckrodt were rejected because the Mallinckrodt registration was not a bar to the registration of additional competitors. The Requestors should not be allowed to litigate this issue over and over again, indefinitely, in a hearing process to which they have no legal right and which serves only to protect them from legitimate and needed competition.

June 15, 2006          KLEINFELD, KAPLAN AND BECKER, LLP
Page 6 of 6

to hold a hearing every time a new importer seeks registration *and* every time an existing importer seeks re-registration.[4]

For all of these reasons, we request that DEA deny the requests for a hearing submitted by Mallinckrodt Inc., Noramco of Delaware, Inc., and Penick Corporation , and process Rhodes' application expeditiously, taking into account, as appropriate, the comments and objections presented by the Requestors in their respective submissions.

Respectfully submitted,

Peter R. Mathers
Jennifer A. Davidson
Counsel to Rhodes Technologies

cc:    Mary Jane Bittner, Esq., Office of Administrative Law Judges, DEA
       Wayne Patrick, Esq., Office of Chief Counsel, DEA
       Steven J. Poplawski, Esq., Counsel for Mallinckrodt Inc.
       Andrew D. Schau, Esq., Counsel for Noramco of Delaware, Inc.
       Wayne H. Matelski, Esq., Counsel for Penick Corporation

---

[4]    Of course, Penick's position also flatly contradicts the position it took when, just a few years ago, it was seeking its own new registration as an NRM importer:

> As the basis for Penick's Motions, Penick asserted that because Organichem, Mallinckrodt, and [Noramco] are not bulk manufacture[r]s of the substances that Penick seeks to import, none of them had standing to object, comment upon, or request a hearing on Penick's application. Penick further asserted that none of the objecting manufacture[r]s had prudential standing to comment, object or request a hearing.

68 Fed. Reg. 6947, 6948 (Feb. 11, 2003).

Rhodes' Opposition to Plaintiff's
Motion for Preliminary Injunction
April 2, 2007

# EXHIBIT B



Scott M. Badami
Direct Dial: (202) 508-6116
smbadami@bryancave.com

July 6, 2006

**Bryan Cave LLP**

700 Thirteenth Street NW

Washington, DC 20005-3960

Tel (202) 508-6000

Fax (202) 508-6200

www.bryancave.com

Chicago

Hong Kong

Irvine

Jefferson City

Kansas City

Kuwait

Los Angeles

New York

Phoenix

Riyadh

Shanghai

St. Louis

United Arab Emirates (Dubai)

Washington, DC

*And Bryan Cave,*
*A Multinational Partnership,*

London

## VIA FEDERAL EXPRESS

Michele Leonhart
Deputy Administrator
Drug Enforcement Administration
Lincoln Place – West
Room 12058
700 Army Navy Drive
Arlington, VA 22202

Joseph T. Rannazzisi
Deputy Assistant Administrator
Office of Diversion Control
Drug Enforcement Administration
Lincoln Place – East
Room 6295
600 Army Navy Drive
Arlington, VA 22202

Re:    In the Matter of Rhodes Technologies, DEA Docket No. 06-57

Dear Deputy Administrator Leonhart and
    Deputy Assistant Administrator Rannazzisi:

On June 15, 2006, counsel for Rhodes Technologies ("Rhodes") in the above-captioned proceeding submitted a letter to you challenging the authority of DEA to hold hearings on narcotic raw material importation registration applications. On June 20, 2006, DEA Chief Administrative Law Judge Mary Ellen Bittner (who was assigned the Rhodes case) ordered that responses to Rhodes' letter be filed with her before 4:00 p.m. on July 5, 2006. Pursuant to Judge Bittner's order, the attached brief (filed jointly on behalf of Intervenors Mallinckrodt Inc., Normaco of Delaware Inc. and Penick Corporation) was timely filed.

As Rhodes submitted its letter to you, the Intervenors similarly are providing you a copy of the brief filed yesterday.

Sincerely yours,

Scott M. Badami

Enclosure

cc:    Service List



Scott M. Badami
Direct Dial: (202) 508-6116
smbadami@bryancave.com

July 5, 2006

Bryan Cave LLP

700 Thirteenth Street NW

Washington, DC 20005-3960

Tel (202) 508-6000

Fax (202) 508-6200

www.bryancave.com


Chicago

Hong Kong

Irvine

Jefferson City

Kansas City

Kuwait

Los Angeles

New York

Phoenix

Riyadh

Shanghai

St. Louis

United Arab Emirates (Dubai)

Washington, DC


And Bryan Cave,
A Multinational Partnership.

London

**VIA FACSIMILE AND FIRST CLASS MAIL**

The Honorable Mary Ellen Bittner
U.S. Department of Justice
Drug Enforcement Administration
Office of Administrative Law Judges
Washington, D.C. 20537

   Re:  In the Matter of Rhodes Technologies, Docket No. 06-57

Dear Judge Bittner:

    Pursuant to your June 20, 2006 Memorandum to Counsel, please find enclosed an original and two copies of the Joint Response of Mallinckrodt, Noramco of Delaware and Penick Regarding the Authroity of the Office of Administrative Law Judges to Initiate a Hearing in the above-captioned proceeding.

    As always, if you or your staff have any questions about this filing, please let me know.

        Sincerely yours,

        Scott M. Badami

Enclosure

cc:  Service List

UNITED STATES DEPARTMENT OF JUSTICE
DRUG ENFORCEMENT ADMINISTRATION

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| In the Matter of | ) | |
| | ) | Docket No.  06-57 |
| Rhodes Technologies | ) | |
| | ) | |

JOINT RESPONSE OF MALLINCKRODT, NORAMCO, AND PENICK
REGARDING THE AUTHORITY OF THE OFFICE OF
ADMINISTRATIVE LAW JUDGES TO INITIATE A HEARING

Pursuant to the Court's June 20, 2006 Order, Intervenors Mallinckrodt Inc.,

Noramco of Delaware Inc., and Penick Corporation (collectively the "Intervenors") submit

this Response to the June 15, 2006 letter from Rhodes Technologies ("Rhodes") challenging

the authority of the DEA Office of Administrative Law Judges to hold a hearing on Rhodes'

narcotic raw material ("NRM") import application.

I.      Summary of Argument

Rhodes' main argument – that DEA holds "legally-unnecessary"

importation registration hearings – has been previously considered and rejected by DEA

administrative law judges as well as the DEA Deputy Administrator.  Specifically, when

confronted with this precise point three years ago, the agency concluded:

> The ALJ also found that the CSA [Controlled Substances Act] and its
> regulations do not expressly grant a right to hearing to importers of NRMs
> upon the application of another manufacturer to import the same substance.
> She concluded, however, that **DEA has the discretionary authority to
> afford that hearing right and that it has done so in other proceedings
> as well as the instant matter … The Deputy Administrator adopts the
> well-reasoned ruling of the ALJ [on this point].**

See Penick Corporation Inc., Grant of Registration to Import Schedule II Substances, 68

Fed.Reg. 6947 (February 11, 2003) (emphasis added).  DEA's decision to hold importation

hearings is further supported by the Agency's Supplemental Notice of Proposed Rulemaking

("SNPR") which specifically highlighted the differences between an importation applicant (for which there can be a hearing) and a manufacturing applicant (for which only written comments can be submitted). See 59 Fed.Reg. 3055 (June 14, 1994).

Rhodes offers nothing of substance which requires DEA to change what the Deputy Administrator found was a "well-reasoned ruling of the ALJ" with respect to NRM importation hearings. Rhodes' argument contravenes the CSA – a point made by DEA a decade ago in its SNPR. Furthermore, Rhodes' request fails to appropriately take into account the historical differences between manufacturers and importers as detailed in the CSA.

Finally, Rhodes' reliance on Ashbacker Radio Corp. v. Federal Communications Commission, 326 U.S. 327 (1945) to support a consolidated hearing on all importation applications is without merit. Most significantly, any discussion of this issue is at most premature (and certainly is not ripe), as DEA has not set a maximum number of importation registrants. Without an absolute limit on the number of importer registrants (which DEA has never identified nor has the agency ever indicated that there is a specific maximum number), mutual exclusivity between applicants does not exist and an Ashbacker comparative hearing is unwarranted.

## II.    The CSA Provides DEA With the Authority to Hold Importation Hearings

As Rhodes acknowledges, DEA amended its CSA administrative hearing regulations just over ten years ago. The final rule amended the regulations and removed the third-party manufacturer hearing provision when requested by another applicant or registrant. See DEA Registration of Manufacturers and Importers of Controlled Substances, 60 Fed.Reg. 32099 (June 20, 1995). Rhodes' submission, however, is silent with respect to why the agency preserved the hearing option for importation cases.

Specifically, on October 7, 1993, DEA published a Notice of Proposed Rulemaking (58 Fed.Reg. 52246) to amend its regulations to entirely eliminate the third-party hearing requirement for objections to applications to manufacture and import certain controlled substances. At that time, DEA proposed to amend two sections of its regulations when requested to do so by any other current bulk manufacturer. The amended regulation would have provided for a hearing only when DEA "determines that a hearing is necessary to receive factual evidence and/or expert testimony with respect to issues raised by the applications or objections thereto." Id.

On June 14, 1994, however, DEA published its SNPR (59 Fed.Reg. 3055). This supplemental notice provided that while the agency would indeed eliminate the bulk manufacturer hearing requirement:

> DEA would **not** change the hearing provision relating to the registration of importers, section 1311.42(a), because of the statutory requirements under 21 U.S.C. § 958(i). Section 958(i) states that DEA shall provide current bulk manufacturers of controlled substances an opportunity for a hearing prior to issuing an importer registration to another bulk manufacturer. **With an existing statute in effect, DEA is not empowered to adopt regulations that contravene the express language of that statute.**

See DEA Registration of Manufacturers and Importers of Controlled Substances, 60 Fed.Reg. 32099 (June 20, 1995) (emphasis added). In its explanation of the amended rule, the agency also expressed why it is appropriate to hold importer hearings while not permitting manufacturer hearings:

> It is also not inconsistent to allow hearings on import registrations applications but deny them for bulk manufacturers, as one commentor suggested. First, registrations to import Schedule I and II controlled substances are arguably granted under more limited conditions than manufacturer registrations. See 21 U.S.C. § 952. Also, it is worth noting that the statute provides for the opportunity for a hearing where a current bulk manufacturer has applied for an importer registration. **Thus, it can be inferred that Congress was concerned with the potential impact on**

> **domestic competition by existing bulk manufactures who wanted to import controlled substances as well.**

Id. (emphasis added). Compliance with the CSA and legitimate concern over the potential impact on domestic competition is exactly what is being reviewed by the agency, for example, in the Houba proceeding, In the Matter of Houba Inc., DEA Docket No. 02-46.

In Houba, the ALJ – after a hearing requested by the Intervenors and held by DEA – concluded that Houba had not shown that its NRM importation registration would be in the public interest and recommended that the agency issue a Notice to Show Cause why the application should not be denied. Much of the information which was used by the ALJ in reaching her conclusions was introduced by Intervenors at the DEA sponsored importation hearing.

Specifically, pursuant to 21 U.S.C. § 823(a)(1), DEA is required to limit the number of registrants to a number of companies that the agency determines can provide an adequate and uninterrupted supply under adequately competitive conditions. DEA staff reads this provision to mean that "[o]nly after finding inadequate supply or inadequate competition should DEA consider the other applicant specific factors." See Government's Exceptions to the Opinion and Recommended Ruling, Findings of Fact, Conclusions of Law, and Decision of the ALJ, In the Matter of Houba Inc., DEA Docket No. 02-06. Next, the agency noted that the CSA "requires DEA to consider and determine the supply and competition issues in the case of every new application for registration as an importer or bulk manufacturer of Schedule I and II controlled substances. Not only is the language of the statute clear, but the purpose comports with the overall goals of the CSA – creation of a closed system of distribution of controlled substances that is highly regulated." Id.

As such, the Intervenors would suggest that as DEA evaluates the competition and supply issues in each case generally and in Rhodes' specifically, the

companies already in the arena (and who are the Intervenors here) are in the best position to provide information to the agency with respect to the issues of competition and supply. Accordingly, contrary to Rhodes' argument, written comments are not "necessarily adequate to inform DEA of relevant issues and to ensure a thorough agency evaluation of an application." See Rhodes' June 15, 2006 Letter at 4.

Rhodes' request must be read for what it is: an attempt to bypass the hearing process (which is already underway) and obtain an importation registration on a different track (and without the mandated CSA scrutiny) required of every new applicant for a DEA registration to import NRMs.

## III. The CSA Entitles the Intervenors To File Objections And Request A Hearing On Rhodes' Importation Registration Application.

Rhodes also contends that the CSA does not permit the Intervenors to request a hearing on its importation application because the Intervenors are not domestic manufacturers of opium or poppy straw concentrate.

Rhodes' interpretation of the regulations is contrary to the CSA, which governs DEA's authority in this proceeding, and provides:

> Except in emergency situations as described in section 952(a)(2)(A) of this title, prior to issuing a registration under this section to a bulk manufacturer of a controlled substance in schedule I or II, and prior to issuing a regulation under section 952(a) of this title authorizing the importation of such a substance, the Attorney General **shall give manufacturers holding registrations for the bulk manufacture of the substance an opportunity for a hearing**.

21 U.S.C. § 958(i) (emphasis added).

Rhodes' assertion that DEA regulations do not entitle the Intervenors to request – and DEA to hold – a hearing is based on its mistaken notion that the Intervenors are not bulk manufacturers of the raw materials that Penick seeks to import. Rhodes'

argument ignores the statute's and DEA's definitions of "manufacturer" and "manufacture".

The CSA defines "manufacturer" as:

> a person who **manufactures** a drug or other substance

21 U.S.C. § 802(15); 21 CFR § 1300.01(b)(27)(emphasis added). The CSA defines

"manufacture" as:

> the production, preparation, propagation, compounding or processing of a drug or
> other substance ...

Id. Accordingly, the Intervenors are registered importers of opium and poppy straw

concentrate and are registered bulk manufacturers of products (such as codeine, oxycodone,

hydrocodone, morphine and thebaine) which are derived from opium and poppy straw

concentrate.

Under their bulk manufacturer registrations, the Intervenors process opium

and poppy straw concentrate into a variety of drugs. Processing of a drug or other substance

is to "manufacture" it under the CSA and DEA's rules. A company that processes or

manufactures a drug or other substance under a DEA registration is a "manufacturer" as

that term is defined by both Congress and DEA.

Because the Intervenors hold registrations to import opium and poppy straw

concentrate as well as registrations to bulk manufacture those raw materials into finished

bulk narcotics, the Intervenors are manufacturers "holding registrations for the bulk

manufacture of the substance[s]" that Rhodes seeks to import and, as such, are required by

statute to "have an opportunity for a hearing" on Rhodes' importation registration

application. See 21 U.S.C. § 958(i). Under the CSA, the only time the Intervenors would

not be entitled to a hearing regarding the importation of opium and poppy straw concentrate

is in an "emergency situation." Id. Rhodes has not alleged that such an emergency situation

exists in this case and indeed none exists.

**IV.    Prior Precedent Supports a Hearing on Rhodes' Application**

In both the <u>Penick</u> and <u>Houba</u> proceedings, this Court addressed the very issue raised by Rhodes and noted that DEA has consistently conducted hearings on new applications to import NRMs and that DEA has the discretion to conduct such importation hearings under the CSA and the Administrative Procedures Act.  <u>See</u> <u>e.g.</u> Memorandum to Counsel and Rulings on Motions, <u>In the Matter of Penick Corporation</u>, DEA Docket No. 01-3, dated April 13, 2001.   In <u>Houba</u>, this Court stated: "there is no purpose to publishing the notice of application and affording the opportunity to object, comment, or request a hearing, unless DEA intends that other importers avail themselves of that opportunity.  <u>See</u> Memorandum to Counsel, <u>In the Matter of Houba Inc.</u>, DEA Docket No. 02-06, dated April 15, 2006 at 16.  This Court went on to conclude that "by offering an opportunity for a hearing in the notice of application, the agency had already offered to conduct a hearing if requested."  <u>Id.</u> at 17.   Thus, contrary to Rhodes' position, by publishing the notice of Rhodes' application to import NRMs, the Deputy Administrator has already decided to hold hearing, if requested, and does not need to make a separate statement authorizing the hearing.

**V.    Rhodes Is Not Entitled to an Ashbacker Hearing**

Contrary to Rhodes' suggestion  a hearing featuring all of the applicants for registration or re-registration under <u>Ashbacker Radio Corporation v. Federal Communications Commission</u>, 326 U.S. 327 (1945) ("<u>Ashbacker</u>"), is not appropriate in DEA importation application proceedings because (1) Rhodes' application is not mutually exclusive with any other application and (2) DEA uses a public interest test in evaluating Rhodes' and other importation applications.

Ashbacker provides that, if a statute gives a license applicant a right to a hearing prior to denial of its application, and there are two (or more) bona fide mutually exclusive applications for the license simultaneously pending where granting one application will result in denial of the other(s), then an agency should hold a comparative hearing on the competing applications. See Ashbacker, 326 U.S. at 333. The application of Ashbacker in this proceeding fails because Rhodes' importation application is not "mutually exclusive" with any other application.

Under Ashbacker and its progeny, "mutually exclusive" applications are those which compete for a single available authorization where the grant of one application necessarily and absolutely precludes the grant of any other application. See e.g., ANR Pipeline Company v. F.E.R.C., 205 F.3d 403 (D.C. Cir. 2000); Midwestern Gas Transmission Co. v. F.E.R.C., 589 F.2d 603 (D.C. Cir. 1978); Western Radio Services Co. v. Glickman, 123 F.3d 1189 (9th Cir. 1997).

Because there is no specific number of acceptable registrants for the importation and processing of NRMs, the grant of one NRM importation registration does not absolutely preclude the grant of other NRM importation registrations. Any rejection of Rhodes' application will be based not on the mere number and/or existence of other NRM importation registrants, but instead on whether Rhodes has shown by a preponderance of the credible evidence that its registration is in the public interest (as defined by the CSA) and consistent with international treaty obligations.

Under the CSA and its implementing regulations, the DEA is given the authority and discretion to grant or deny applications to import narcotic raw materials into the United States. In 21 U.S.C. §§ 952 and 958, Congress provided the DEA with latitude to determine who should be given authority to import NRMs. Accordingly, the DEA

considers each application against the public interest, rather than against other applicants or registrants. Because the DEA has not set a specific limit to the number of registrations it will issue to importers, a grant of a previous registration does not preclude the grant of Rhodes' (or other applicant's) NRM importation applications. An <u>Ashbacker</u> comparative hearing is inappropriate if an agency policy provides a public interest reason, independent of the grant of a competing application, for the denial of an application. <u>See</u> <u>WLVA v. FCC</u>, 459 F.2d 1286 (D.C.Cir. 1972); <u>Cartwright Van Lines, inc. v. U.S.</u>, 400 F. Supp. 795 (W.D.Mo. 1985). Because DEA's denial of Rhodes' NRM importation application would be due to DEA's public interest concern that the proliferation of registrants is increasing diversion, an <u>Ashbacker</u> comparative hearing is not required in these proceedings.

## VI.    Conclusion

Accordingly, the Intervenors request that this Court reject Rhodes' suggestion that a hearing in the above-captioned proceeding is "legally unnecessary" and not be held.

Respectfully submitted,

BRYAN CAVE LLP

Steven J. Poplawski
Scott M. Badami
700 Thirteenth Street, NW, Suite 600
Washington, DC 20005-3960
(202) 508-6116 telephone
(202) 508-6200 facsimile

July 5, 2006                    Attorneys for Mallinckrodt Inc.

<u>CERTIFICATE OF SERVICE</u>

This is to certify that the undersigned on July 5, 2006, caused the above Response to be served via facsimile and first class mail to:

The Honorable Mary Ellen Bittner
U.S. Department of Justice
Drug Enforcement Administration
Office of Administrative Law Judges
Washington, D.C. 20537

Wayne Patrick
Office of Chief Counsel
Drug Enforcement Administration
Washington, DC 20537
Counsel for DEA

Peter R. Mathers
Kleinfeld Kaplan & Becker LLP
1140 Nineteenth Street, N.W.
Washington, D.C. 20036
Counsel for Rhodes Technologies

Andrew Schau
Patterson, Belknap, Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
Counsel for Noramco of Delaware

Wayne H. Matelski
Arent, Fox, Kinter, Plotkin & Kahn PLLC
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5339
Counsel for Penick Corporation

Scott M. Badami

# EXHIBIT C

THOMAS O. HENTELEFF
RICHARD S. MOREY
KINSEY S. REAGAN
PETER R. MATHERS
ANTHONY L. YOUNG
ANNE V. MAHER
BONNIE A. BEAVERS
DANIEL R. DWYER
GLENN E. DAVIS
STACY L. EHRLICH
JENNIFER A. DAVIDSON
STACEY L. VALERIO
JONATHAN M. WEINRIEB
CARRIE C. HORN

OF COUNSEL:
WILLIAM J. HARDY

LAW OFFICES

# KLEINFELD, KAPLAN AND BECKER, LLP

1140 NINETEENTH STREET, N.W.

## WASHINGTON, D. C. 20036-6606

TELEPHONE (202) 223-5120

FACSIMILE (202) 223-5619

www.kkblaw.com

WEST COAST OFFICE:
ONE MARKET STREET
STEUART TOWER, SUITE 1450
SAN FRANCISCO, CA 94105-1313
TELEPHONE (415) 538-0014
FACSIMILE (415) 538-0016

VINCENT A. KLEINFELD
1907-1993

ALAN H. KAPLAN
1930-2001

July 14, 2006

Via Fax and Overnight Courier

Michelle Leonhart
Deputy Administrator
Drug Enforcement Administration
Lincoln Place-West
Room 12058
700 Army Navy Drive
Arlington, VA 22202

Joseph T. Rannazzisi
Deputy Assistant Administrator
Office of Diversion Control
Drug Enforcement Administration
Lincoln Place-East
Room 6295
600 Army Navy Drive
Arlington, VA 22202

Re:    Application of Rhodes Technologies for Registration as an Importer of
Raw Opium and Concentrate of Poppy Straw

Dear Deputy Administrator Leonhart and
Deputy Assistant Administrator Rannazzisi:

On June 15, 2006, we wrote to you concerning the requests for hearing submitted in response to the Federal Register notice announcing Rhodes Technologies' application for registration as an importer of raw opium and concentrate of poppy straw. Specifically, we requested that the Drug Enforcement Administration deny these requests for a hearing, and instead process Rhodes' application expeditiously, taking into account, as appropriate, any comments and objections that have been presented. Our letter also noted that the Office of Administrative Law Judges had initiated hearing proceedings, even though no DEA official authorized to grant discretionary hearings had granted the hearing requests.

By letter dated July 6, 2006, counsel for one of the parties requesting a hearing provided you with a copy of a response to our June 15th letter that was submitted to the Administrative Law Judge. We are therefore providing you with a copy of Rhodes' reply, submitted earlier this week to the Administrative Law Judge. Rhodes' reply notes that the reasons offered by the Requestors as to why a hearing should be held are all contradicted by the findings already made by the DEA in the 1993-1995 rulemaking and the 2003 Deputy Administrator decision on the Penick application. We, therefore, respectfully renew our request that the Deputy Administrator or Deputy Assistant

## KLEINFELD, KAPLAN AND BECKER, LLP

July 14, 2006
Page 2 of 2


Administrator, as the DEA officials delegated the responsibility to make this decision, deny the Requestors' hearing requests in this matter.


Respectfully submitted,


Peter R. Mathers
Jennifer A. Davidson
Counsel to Rhodes Technologies


cc:    Brian Bayly, Esq., Office of Chief Counsel, DEA
       Steven J. Poplawski, Esq., Counsel for Mallinckrodt Inc.
       Andrew D. Schau, Esq., Counsel for Noramco of Delaware, Inc.
       Wayne H. Matelski, Esq., Counsel for Penick Corporation

UNITED STATES DEPARTMENT OF JUSTICE
Drug Enforcement Administration

| In the Matter of | |
|---|---|
| Rhodes Technologies | Docket No. 06-57 |

## REPLY TO JOINT RESPONSE OF REQUESTORS REGARDING THE AUTHORITY OF THE OFFICE OF ADMINISTRATIVE LAW JUDGES TO INITIATE A HEARING

Rhodes Technologies submits this Reply to the Joint Response of Mallinckrodt, Inc., Noramco of Delaware, Inc., and Penick Corporation (the "Requestors")[1] to Rhodes' June 15, 2006 submission. In its June 15, 2006 submission, Rhodes informed the Administrative Law Judge, and the Requestors, of questions regarding the authority of the Office of Administrative Law Judges to initiate hearing proceedings on Rhodes' application to import narcotic raw materials ("NRMs"). For the reasons set forth below, Requestors response does not provide a basis for the Office of Administrative Law Judges to resolve or ignore the critical questions that Rhodes has raised about the status of these hearing proceedings.

I.    **The Requestors Have No Statutory Or Regulatory Right To A Hearing On Rhodes' Application**

The Controlled Substances Act ("CSA") and DEA's implementing regulations provide only that manufacturers holding registrations for the bulk manufacture of the substances sought to be imported – here, opium and concentrate of poppy straw – are entitled to an opportunity for a hearing. 21 U.S.C. § 958(i); 21 C.F.R. § 1301.34(a). The Requestors argue that they fall within this narrow category of persons because they are registered to manufacture bulk active pharmaceutical ingredients ("API") that are derived from opium and concentrate of poppy straw.

The Administrative Law Judge ("ALJ") and the Deputy Administrator have already rejected this argument.[2] As best we can discern from the published decision of

---

[1]    The Requestors term themselves "Intervenors" in their Response. There are no existing proceedings in which the Requestors are intervening. Instead, they are the initiators of these proceedings. Thus, "Intervenors" does not appear to be an accurate or appropriate collective designation.

[2]    Indeed, it appears that this argument was presented essentially verbatim in the Penick proceedings referenced above. The Requestor's Response refers in Section III to "the raw materials that Penick seeks to import," suggesting that this argument was first presented in response to Penick's motion to strike, and, except in this one instance, has simply been modified for the purposes of this proceeding to refer to Rhodes, rather than Penick.

the Deputy Administrator, during the proceedings on its importer application, Penick filed a motion to strike the objections filed by Organichem, Mallinckrodt, and Noramco on the basis that they were not bulk manufacturers of the NRMs that Penick sought to import, and therefore none of them had standing to object, comment upon, or request a hearing upon Penick's application.[3] After an analysis of the CSA, its legislative history, and DEA regulations, the Deputy Administrator's decision indicates that the ALJ concluded neither the statute nor the regulations grant hearing rights to importers of NRMs upon application of another company to import the same substance. Instead, the Deputy Administrator states that the ALJ determined that DEA had the discretionary authority to grant such a hearing.[4] Accordingly, the ALJ denied Penick's motion to strike.[4] The Deputy Administrator stated that it adopted the ALJ's reasoning, and affirmed the denial of Penick's motion to strike. 68 Fed. Reg. 6947, 6948 (Feb. 11, 2003). Accordingly, both the ALJ and the Deputy Administrator have already determined that the Requestors have no statutory or regulatory right to a hearing on Rhodes' application.

Moreover, the Requestors proffered interpretation is inconsistent with the purpose of the CSA hearing provision. This language is intended to foster and protect domestic manufacturing capabilities for APIs by offering the opportunity for a hearing to those companies that are domestically manufacturing an API that an applicant seeks to import, such as morphine, codeine, or hydromorphone. Importation of APIs already made domestically raises a host of policy questions, such as the likelihood that significant price differentials between imported API and domestically manufactured API would decimate the strategically important domestic manufacturing capability for these critical, yet highly controlled drugs. It is these issues that were intended to be explored in a hearing, and it is, therefore, only those applications seeking registration to import foreign versions of domestically-manufactured APIs that trigger the statutory opportunity for a hearing.

Requestors' argue that they are "manufacturers" of NRMs because they use those substances in their manufacturing processes. This argument, of course, contradicts that made by Penick only a few years ago and conclusively accepted by the Deputy Administrator in 2003. Moreover, the argument attempts to bootstrap from the broad regulatory definition of "manufacturer," applied in other regulatory contexts, to a context in which that broad definition clearly does not apply. If Requestors were correct in asserting that they are truly "manufacturers" of NRMs for purposes of the DEA

---

[3]    Notably, at the time of Penick's motion, Mallinckrodt and Noramco were registered as bulk manufacturers of API derived from NRMs. *See* 65 Fed. Reg. 54069 (Sept. 6, 2000); 65 Fed. Reg. 34498 (May 30, 2000).

[4]    The discussion above is based on the Deputy Administrator's decision only, since Rhodes and its counsel have thus far been denied access by DEA to the records of prior proceedings on NRM importation applications. Despite requests therefor, Rhodes does not have access to any ALJ decisions made during the proceedings on the Penick application or any records of proceedings that the Requestors have, or may, seek to cite against Rhodes in their filings. For this reason, and because the Deputy Administrator decision in the Penick case is the final agency decision on that matter, the Deputy Administrator decision must be regarded as authoritative with regard to this issue.

registration requirements, they would need to register as manufacturers of NRMs – which they have clearly not done.[5]  The Requestors "use" NRMs in manufacturing APIs – they do not "manufacture" NRMs – and that is why they do not have, or need, a registration as manufacturers of NRMs.

## II.    The DEA Has Not And Can Not Grant Requests For A Discretionary Hearing On Rhodes' Application In Advance Of Their Submission

### A.    The Notice Of Rhodes' Application Did Not Grant All Yet-to-be-Filed Hearing Requests

Citing excerpts from two sentences in a Memorandum to Counsel issued in the Houba proceedings, the Requestors argue that by publishing the notice of Rhodes' application, the Deputy Assistant Administrator had already granted any requests for hearings submitted in response to the notice.  Rhodes is not familiar with the circumstances surrounding the Houba hearing addressed in the Memorandum to Counsel,[6] but notes that the notice of the Houba importer application said no such thing.  *See* 66 Fed. Reg. 46653 (Sept. 6, 2001).  Moreover, when a legitimate question has been timely raised as to whether a hearing has been and should be granted, as in the case of the Rhodes' application, it is improper to conclude that the matter has been prejudged by routine Agency action (*i.e.*, publication of a required Federal Register Notice) that does not even vaguely suggest how the Agency would rule on any comments, requests, or other responses received thereto.

Indeed, no language in the Federal Register notice on the Rhodes application, or any other application, states that a hearing request, if submitted, will be automatically granted, or is granted in advance.  The notice simply invites submission of comments,

---

[5]      For example, Mallinckrodt is not registered as a bulk manufacturer of raw opium (9600), poppy straw (9650), or concentrate of poppy straw (9670), 70 Fed. Reg. 48441 (Aug. 17, 2005); nor did Mallinckrodt seek to be registered as a bulk manufacturer of these substances in its most recent renewal application.  71 Fed. Reg. 33315 (June 8, 2006).  Neither is Rhodes, but the company is nevertheless authorized under its existing registrations to acquire NRMs for use in its manufacturing activities to the extent that it can do so from domestic suppliers.

[6]      The Requestors continue to rely heavily on materials from previous proceedings to which they and the Government, but not Rhodes, were parties.  This conduct, and the obvious disadvantage at which it places Rhodes in replying to the Joint Response, illustrates that Rhodes' June 21, 2006 Motion to Amend June 5, 2006 Order must be granted immediately, in order to provide Rhodes a fair opportunity to address the Requestors' arguments.  In any event, as stated in footnote 4 above, the Deputy Administrator's 2003 Decision in the Penick proceedings continues to be the only authoritative agency ruling on this matter.  That Decision says nothing about the motivations behind, or inferences that could or should be drawn from the fact that DEA publishes, as its regulations require, notices of applications to bulk manufacture or import Schedule I and II substances.  Those notices provide an opportunity for anyone who may have a right to a hearing on the matter to request one.  They also do not preclude a request for a hearing from persons who have no right to one but who nevertheless wish that there would be one.  The Notices do not state, and there is no basis on which to infer that they intend, that anyone who requests a hearing, whether entitled to one or not, or whether otherwise justified or not as a matter of agency discretion, can trigger a hearing without anyone at DEA with delegated authority reviewing the requests and making a proper determination that a hearing be held.

objections, or requests for hearing. The Requestors cite no legal support for the theory that DEA's routine publication of a form Federal Register notice amounts to a grant, in advance, of all hearing requests that might be filed, regardless of the basis for the request. Under this theory, the Deputy Assistant Administrator would be exercising absolutely no judgment in "deciding" whether or not to grant a hearing request.

Had the Deputy Assistant Administrator intended publication of the notice of Rhodes' application to constitute a grant of a discretionary hearing upon any future hearing requests, that action would be set aside as arbitrary, capricious, and an abuse of discretion. 5 U.S.C. § 706. It would be wholly inconsistent with basic Administrative Procedure Act requirements for DEA to grant discretionary hearing requests in advance, regardless of the merits of the request, and without affirmatively determining that a hearing would assist DEA in evaluating Rhodes' application under the relevant statutory criteria, and is warranted despite the significant costs, delays, and anticompetitive effect of holding such a hearing. Similarly, it would be an abrogation of DEA's delegated administrative responsibilities to effectively delegate the decision of whether or not to hold a hearing on Rhodes' application to members of the public.

**B.    The Decision In Penick Did Not Address All Future Importer Applications**

In a related argument, the Requestors contend that the Deputy Administrator's adoption of the ALJ's ruling in Penick, discussed above in Section I, amounts to a blanket decision to always hold hearings on importer applications, whenever requested. In fact, the Deputy Administrator simply agreed with the ALJ's legal reasoning (*i.e.,* that neither the statute nor the regulations grant hearing rights to importers of NRMs upon the application of another company to import the same substance), and affirmed the ALJ's denial of Penick's motion to strike.[7] No language in the Deputy Administrator's decision suggests a broader impact on future potential "discretionary" hearing was intended, and there is certainly no basis to infer from this brief discussion of a specific factual situation that the Deputy Administrator was granting, in advance, requests for hearing submitted on importer applications not yet even filed with DEA. Finally, as noted above, any attempt by the Deputy Administrator to grant all future hearing requests on all future NRM importer applications via a two paragraph discussion on Penick's motion to strike would be arbitrary, capricious, and an abuse of discretion, and would also improperly delegate the decision as to whether or not to hold a discretionary hearing to the public.

---

[7]    Certainly, the fact that the Deputy Administrator's decision was issued only at the end of a lengthy hearing process would have had some bearing on the Deputy Administrator's retrospective review of the question of whether the hearing should have been held in the first place. Once completed after great delay and expense, it would be indeed very difficult to justify ignoring the record of a hearing based on a retroactive decision that the hearing had not properly been authorized. However, such a finding in no way suggests that the hearing had been properly authorized or, even less so, that in future cases there is no need to consider whether hearings are properly authorized to be held.

### III. The Change In DEA Regulations Confirms That Hearing Requests Should Not Be Deemed To Be Granted – And Should Not Be Granted At All

The Requestors argue that DEA's rulemaking activities in the 1990's show that they are entitled to a hearing. In fact, that rulemaking confirms only that hearings have historically been abused by those requesting the hearings, and are not needed by DEA in order to properly evaluate applications. In light of those rulemaking activities, it is impossible to justify an assumption that all discretionary hearings should be granted, or have somehow been granted-in-advance. Rather, those rulemaking activities indicate that requests by third parties for hearings on competitor applications should always be denied unless they are among the narrow category of hearings that are legally required.

In 1993, DEA proposed to delete mandatory hearing requirements from its regulations governing applications for the bulk manufacture or importation of Schedule I and II substances, and hold hearings only in those limited circumstances in which the Administrator determined a hearing would materially assist the agency. 58 Fed. Reg. 52246 (Oct. 7, 1993). Recognizing that the CSA "allows current bulk manufacturer registrants to request an administrative hearing regarding their objections to the registration of *certain* importers of Schedule I and II controlled substances," DEA later withdrew its proposal as it applied to applications for the importation of controlled substances. 59 Fed. Reg. 30555 (June 14, 1994) (emphasis supplied) (relying on 21 U.S.C. § 958(i)).[8]  Thus, the importer provision (then 21 C.F.R. § 1311.42(a)) was not revised, and, like the statute, continued to provide that persons registered as bulk manufacturers of the controlled substance sought to be imported may request a hearing on an importer application. This same language remains in DEA regulations today. 21 C.F.R. § 1301.34(a).

Because NRMs are not permitted to be produced domestically, no manufacturers hold a registration for the bulk manufacture of these substances, and none of the Requestors (or anyone else) currently has an application pending for such a registration. As a result, with respect to NRM importer applications, no one qualifies for a hearing under the 21 U.S.C. § 958(i) standard or the identical 21 C.F.R. § 1301.34(a) standard, and no one is entitled to a hearing on the Rhodes application. As noted above, both the ALJ and the Deputy Administrator have confirmed this statutory interpretation, finding that, while DEA has the discretionary authority to conduct a hearing on an application to import NRMs, including raw opium and concentrate of poppy straw, registered importers of NRMs have no statutory or regulatory right to such a hearing. 68 Fed. Reg. 6947, 6948 (Feb. 11, 2003).

---

[8]     It is unclear why the Requestors assert that Rhodes' submission "is silent with respect to why the agency preserved the hearing option for importer cases." Rhodes' June 15, 2006 letter to the Deputy Administrator clearly stated that "DEA withdrew its proposal as it applied to applications for the importation of controlled substances due to the statutory requirement that 'manufacturers holding registrations for the bulk manufacture of the substance' be provided an opportunity for a hearing. 59 Fed. Reg. 30555 (June 14, 1994) (relying on 21 U.S.C. § 958(i))."

Although DEA's withdrawal of its proposal as it related to importer applications does not in any way suggest that the Requestors have a right to a hearing on Rhodes' application, the rulemaking activity does clearly illustrate why discretionary hearings should not be granted by DEA. The basis for DEA's original 1993 proposal was the agency's view that the hearing process had been abused by those requesting hearings, adversely affected competition by delaying new registrations, and wasted DEA resources. 58 Fed. Reg. 52246, 52247 (Oct. 7, 1993). A year later, in the supplemental notice of proposed rulemaking, DEA reiterated its view that the hearing process had been abused and that it could remain a future source of abuse and delay. 59 Fed. Reg. 30555 (June 14, 1994).

The preamble to the final rule makes these same points, and identifies still more reasons why DEA should not conduct non-statutorily-mandated hearings. 60 Fed. Reg. 32099, 32100 (June 20, 1995). Specifically, DEA noted that the final rule would preclude current registrants and applicants from using the "third-party manufacturer hearing process as a forum for discovery of non-relevant information from its competitors, such as marketing and pricing data." *Id.* DEA further noted that the final rule eliminated the possibility of multiple hearings, which could occur if a hearing is held at the request of a third party, and DEA later decides to issue an order to show cause:

> The final rule eliminates the problem of multiple hearings which not only promotes judicial economy but also avoids the anomalous result of DEA conducting administrative hearings which are not dispositive of the ultimate issue of whether an applicant should be registered. For example, because DEA must issue an order to show cause whenever it takes action to deny an application . . . under the current regulation a second hearing would likely be required when DEA decided to deny an application after a hearing held pursuant to a "third-party" request. Further, this second hearing would involve many of the same issues raised in the prior proceeding. The primary objective of the final rule is to limit abuse of the regulatory hearing process.

*Id.* at 32101.

The Requestors ignore these agency concerns and instead insist that a hearing must be held because they "are in the best position to provide information to the agency with respect to the issues of competition and supply."[9] Their submission is utterly devoid of any explanation as to why their position on issues of competition and supply cannot be presented via written comments, and DEA has already firmly rejected the argument that objections cannot be properly conveyed to DEA through written comments:

---

[9]      The Requestors' information on competition and supply may well be irrelevant to DEA's evaluation of Rhodes' application. Unless the Deputy Administrator's most recent Final Order granting a registration to import NRMs is overruled, it is not necessary to assess the adequacy of competition among registered importers in connection with each new application. *See* 71 Fed. Reg. 9834, 9838 (Feb. 27, 2006) (concluding that DEA need not consider the adequacy of competition or supply unless DEA finds that diversion cannot be effectively controlled).

- 6 -

> [T]he proposed change continues to permit current registrants and applicants to submit written comments and objections concerning an applicant's registration. There is no reason to believe that this procedure does not provide an adequate mechanism for these individuals to convey the substance and criticality of any objections or that DEA would fail to consider such evidence prior to making a final determination.

59 Fed. Reg. 30555, 30556 (June 14, 1994).

Indeed, experience following the change in the regulations governing manufacturer registrations shows that DEA does carefully consider written comments. For example, in a lengthy 2004 decision granting Houba's manufacturer registration, the Deputy Administrator fully evaluated written comments presented by two objectors. *See* 69 Fed. Reg. 8696 (Feb. 25, 2004).

Finally, given that the Requestors, in their Joint Response and Requests for Hearing, contend that these competitive issues were addressed in the Houba and Chattem proceedings, their position that written submissions are insufficient and that, instead, DEA should expend additional resources on yet another hearing on these same issues, is particularly baffling.

## IV.     Conclusion

Contrary to the Requestors' completely baseless assertion, Rhodes is not attempting to escape "the mandated CSA scrutiny." To the contrary, Rhodes welcomes a thorough evaluation of its application by the DEA regulators who are responsible for reviewing it. Rhodes is, however, seeking to avoid the unjustified costs, delays, and anti-competitive effect of holding a third-party hearing that is not legally required and, to this end, has requested that authorized officials within DEA deny the pending hearing requests. In the meantime, as explained above and in its June 15, 2006 submissions, unless and until a hearing is granted by an official with authority to grant discretionary hearings, Rhodes does not believe that the Office of Administrative Law Judges has jurisdiction in this matter.

Dated: July 12, 2006

Peter R. Mathers
Jennifer A. Davidson
Counsel for Rhodes Technologies

- 7 -

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of July, 2006, a copy of the foregoing Reply to Joint Response of Requestors Regarding the Authority of the Office of Administrative Law Judges to Initiate a Hearing was served by facsimile on the following:

Brian Bayly, Esq.
Office of Chief Counsel (CCD)
Drug Enforcement Administration
Washington, DC 20537

Steven J. Poplawski, Esq.
Bryan Cave LLP
211 North Broadway
St. Louis, MO 63102

Andrew D. Schau, Esq.
Patterson, Belknap, Webb & Tyler, LLP
1133 Avenue of the Americas
New York, NY 10036-6710

Wayne H. Matelski, Esq.
Arent Fox Kinter Plotkin & Kahn, PLLC
1050 Connecticut Ave., N.W.
Washington, D.C. 20036

Jennifer A. Davidson

Rhodes' Opposition to Plaintiff's
Motion for Preliminary Injunction
April 2, 2007

# EXHIBIT D

The CPHCF (whose members accounted for more than 85 percent of total U.S. production in 1977) has provided information on its members' high-carbon ferrochromium operations that indicates deteriorating economic conditions in the domestic industry. Such data for 1976, 1977, and a projection for 1978 based on January-April performance are presented in the following table.

| Item | 1976 | 1977 | 1978 (estimate) [1] |
|---|---|---|---|
| Sales (million dollars) | $78.5 | $77.7 | $57.2 |
| Net income (loss) after tax (million dollars) | $4.0 | (30.9) | (35.2) |
| Average hourly employees | 410 | 407 | 355 |
| Man-hours (1,000 hours) | 845 | 887 | 806 |

[1] Projected on the basis of January-April data.

Source: Committee of Producers of High-Carbon Ferrochromium.

## DETERMINATION

On the basis of the above information, the Commission has determined that good cause exists, within the meaning of section 201(e) of the Trade Act, for reinvestigation of high-carbon ferrochromium less than one year from the date the Commission reported to the President the results of its previous investigation of the same subject matter.

## PUBLIC INSPECTION

The resolution of the House and Ways and Means Committee and the letter received from the Committee of Producers of High-Carbon Ferrochromium are available for public inspection at the Office of the Secretary, United States International Trade Commission, 701 E Street NW., Washington, D.C. 20436, and at the New York City Office of the United States International Trade Commission located at 6 World Trade Center.

By order of the Commission.

Issued: June 22, 1978.

KENNETH R. MASON,
Secretary.

[FR Doc. 78-17848 Filed 6-26-78; 8:45 am]

## [7020-02]

### [TA-201-31]

### UNALLOYED, UNWROUGHT ZINC

### Report to the President

JUNE 20, 1978.

To the PRESIDENT:

In accordance with section 201(d)(1) of the Trade Act of 1974 (88 Stat. 1978), the United States International Trade Commission herein reports the results of an investigation relating to unalloyed, unwrought zinc.

The investigation to which this report relates (investigation No. TA-201-31) was undertaken to determine whether—

unwrought zinc, other than alloys of zinc, provided for in item 626.02 of the Tariff Schedules of the United States,

is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry producing an article like or directly competitive with the imported article.

The Commission instituted the investigation under the authority of section 201(b)(1) of the Trade Act on December 29, 1977, following receipt, on December 20, 1977, of a petition for import relief under section 201 filed by the Lead-Zinc Producers Committee.

The Commission held a public hearing on this matter in Washington, D.C., March 21-24, 1978. All interested parties were given an opportunity to be present, to present evidence, and to be heard.

Notice of the institution of the investigation and of the public hearing was published in the FEDERAL REGISTER of January 5, 1978 (43 FR 31015).

The information in this report was obtained from fieldwork; questionnaires sent to domestic producers, importers, and consumers; the Commission's files; information obtained in the course of the public hearing; briefs submitted by interested parties; and other Government agencies.

A transcript of the hearing and copies of briefs submitted by interested parties in connection with the investigation are attached.[1]

## DETERMINATION OF THE COMMISSION

On the basis of the investigation, the Commission determines (Commissioner Minchew dissenting) that un-

[1] Attached to the original report sent to the President, and available for inspection at the U.S. International Trade Commis-

wrought zinc, other than alloys of zinc, provided for in item 626.02 of the Tariff Schedules of the United States, is not being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry producing an article like or directly competitive with the imported article.

By order of the Commission:

Issued: June 21, 1978.

KENNETH R. MASON,
Secretary.

[FR Doc. 78-17849 Filed 6-26-78; 8:45 am]

## [4410-09]

## DEPARTMENT OF JUSTICE

Drug Enforcement Administration

## IMPORTATION OF CONTROLLED SUBSTANCES

### Application

Pursuant to section 1008 of the Controlled Substances Import and Export Act (21 U.S.C. 958(h)), the Attorney General shall, prior to issuing a registration under this section to a bulk manufacturer of a controlled substance in schedule I or II, and prior to issuing a regulation under section 1002(a) authorizing the importation of such a substance, provide manufacturers holding registrations for the bulk manufacture of the substance an opportunity for a hearing.

Therefore in accordance with section 1311.42 of title 21, Code of Federal Regulations (CFR), notice is hereby given that on June 8, 1978, McNeilab, Inc., Camp Hill Road, Fort Washington, Pa. 19034, made application to the Drug Enforcement Administration to be registered as an importer of the basic class of controlled substances listed below:

| Drug | Schedule |
|---|---|
| Imported raw opium (9600) | II |
| Poppy straw (9650) | II |
| Concentrate of poppy straw (9670) | II |

As to the basic class of controlled substances listed above for which application for registration has been made, any other applicant therefor, and any existing bulk manufacturer registered therefor, may file written comments on or objections to the issuance of such registration and may, at the same time, file a written request for a hearing on such application in accordance with 21 CFR 1301.54 in such form as prescribed by 21 CFR 1316.47.

sion, except for material submitted in confidence.

HeinOnline -- 43 Fed. Reg. 27908 1978

Any such comments, objections, or requests for a hearing may be addressed to the Administrator, Drug Enforcement Administration, United States Department of Justice, 1405 I Street NW., Washington, D.C., 20537, Attention: DEA Federal Register Representative (Room 1203), and must be filed no later than July 28, 1978.

This procedure is to be conducted simultaneously with and independent of the procedures described in 21 CFR 1311.42 (b), (c), (d), (e), and (f). As noted in a previous notice at 40 FR 43745-46 (September 23, 1975), all applicants for registration to import a basic class of any controlled substance in schedule I or II are and will continue to be required to demonstrate to the Administrator of the Drug Enforcement Administration that the requirements for such registration pursuant to 21 U.S.C. 958(a), 21 U.S.C. 823(a), and 21 CFR 1311.42 (b), (c), (d), (e), and (f) are satisfied.

It should be noted that poppy straw (opium plant form) and concentrate of poppy straw are presently imported into the United States under the terms of the emergency provisions of section 1002(a)(2)(A) of the Controlled Substances Import and Export Act (21 U.S.C. 952(a)(2)(A)). Thus, while the Drug Enforcement Administration (DEA) invites the filing of comments on the advisability or propriety of granting an additional registration to import poppy straw (opium plant form) and concentrate of poppy straw, the terms of section 1008(h) clearly leave it to the discretion of the Administrator to grant or deny a hearing to any party on issues concerning such importation.

In addition, the terms of section 1008(h) of the Controlled Substances Import and Export Act (21 U.S.C. 958(h)) obligate the Administrator to give only to manufacturers holding registrations for the bulk manufacturer of a substance sought to be imported the opportunity for a hearing on issues associated with the proposed registration of a bulk manufacturer of the substance or associated with the proposed actual importation of the substance. In the case of imported raw opium, there exists no registered bulk manufacturer of the substance, hence, it is likewise left to the discretion of the Administrator to grant or deny a hearing to any party on issues concerning the importation of raw opium.

Dated: June 22, 1978.

PETER B. BENSINGER,
*Administrator, Drug
Enforcement Administration.*

[FR Doc. 78-17718 Filed 6-26-78; 8:45 am]

---

[4410-01]

## MANUFACTURE OF CONTROLLED SUBSTANCES

### Application

Pursuant to 21 U.S.C. 823(a)(1), and Section 1301.43(a) of Title 21 of the Code of Federal Regulations (CFR), this is notice that on June 6, 1978, Argon Research Corp., 336 West Liberty Street, Reno, Nev. 89501, requested modification of their application to the Drug Enforcement Administration (DEA) for registration as a bulk manufacturer (Notice published in the FEDERAL REGISTER on May 25, 1978 (43 FR 22461)) to include the schedule II controlled substance morphine (9300).

Any other such applicant, and any person who is presently registered with DEA to manufacture such substances, may file comments or objections to the issuance of the above application and may also file a written request for a hearing therein in accordance with 21 CFR 1301.54 and in the form prescribed by 21 CFR 1316.47.

Any such comments, objections or requests for a hearing, for this basic class only, may be addressed to the Administrator, Drug Enforcement Administration, U.S. Department of Justice, 1405 I Street NW., Washington, D.C. 20537, attention: DEA Federal Register Representative (Room 1203), and must be filed no later than July 28, 1978.

Dated: June 22, 1978.

PETER B. BENSINGER,
*Administrator, Drug
Enforcement Administration.*

[FR Doc. 78-17717 Filed 6-26-78; 8:45 am]

---

[4410-01]

## MANUFACTURE OF CONTROLLED SUBSTANCES

### Application

Pursuant to 21 U.S.C. 823(a)(1), and Section 1301.43(a) of Title 21 of the Code of Federal Regulations (CFR), this is notice that on June 6, 1978, McNeilab, Inc., Camp Hill Road, Fort Washington, Pa. 19034, made application to the Drug Enforcement Administration (DEA) for registration as a bulk manufacturer of the basic class of controlled substances listed below.

| Drug: | Schedule |
|---|---|
| Opium extracts (0010) | II |
| Opium fluid extracts (0020) | II |
| Powdered opium (0030) | II |
| Granulated opium (0040) | II |
| Tincture of opium (0050) | II |
| Morphine (9300) | II |
| Codeine (9050) | II |
| Thebaine (9333) | II |
| Oxycodone (9143) | II |
| Concentrate of poppy straw (9670) | II |

Any other such applicant, and any person who is presently registered with DEA to manufacture such sub-

stances, may file comments or objections to the issuance of the above application and may also file a written request for a hearing therein in accordance with 21 CFR 1301.54 and in the form prescribed by 21 CFR 1316.47.

Any such comments, objections or requests for a hearing may be addressed to the Administrator, Drug Enforcement Administration, U.S. Department of Justice, 1405 I Street NW., Washington, D.C. 20537, Attention: DEA FEDERAL REGISTER Representative (Room 1203), and must be filed no later than July 28, 1978.

Dated: June 22, 1978.

PETER B. BENSINGER,
*Administrator, Drug
Enforcement Administration.*

[FR Doc. 78-17716 Filed 6-26-78; 8:45 am]

---

[4410-09]

## PRODUCTION OF ECGONINE IN THE UNITED STATES

### Statement of Policy

Section 306 of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. 826) requires the Attorney General to establish aggregate production quotas for all controlled substances in Schedules I and II each year. This responsibility has been delegated to the Administrator of the Drug Enforcement Administration pursuant to § 0.100 of Title 28 of the Code of Federal Regulations.

Ecgonine, a schedule II controlled substance, is one of the principal byproducts derived from the processing of coca leaves. It is without medical utility in its own right in the united States; however, it is used in the manufacture of cocaine.

Quantities of ecgonine are obtained during the processing of coca leaves. The coca leaf processing firm can do little to avoid building up inventories of this substance other than destroying the ecgonine which is produced. Ecgonine is considered to be a valuable commodity, as it is used to synthesize cocaine which is needed to meet the legitimate medical, scientific, and export needs of the United States. To provide for these needs, it has been and continues to be the policy of the Drug Enforcement Administration not to require the destruction of quantities of this substance which are derived in excess of that amount required to meet the legitimate needs for a given year. Excess inventories of ecgonine will continue to be stored in compliance with the Drug Enforcement Administration's security regulations (21 CFR 1301.71 and 1301.72).

Dated: June 20, 1978.

PETER B. BENSINGER,
*Administrator, Drug
Enforcement Administration.*

[FR Doc. 78-17844 Filed 6-26-78; 8:45 am]

HeinOnline -- 43 Fed. Reg. 27909 1978

Rhodes' Opposition to Plaintiff's
Motion for Preliminary Injunction
April 2, 2007

# EXHIBIT E

United States, and United States consumers, will not be adversely affected by the granting of temporary relief. It is my view that a cease and desist order preventing every respondent from importing luggage which infringes U.S. Letters Patent Des. 242, 181, except under license, during the course of this investigation would be appropriate.

I agree with the views expressed by Vice Chairman Alberger and Commissioner Bedell with respect to reason to believe there is a violation of the statute, and this opinion will be directed to the question of why a cease and desist order would provide appropriate temporary relief in this situation.

Subsection (f) of section 337 provides as follows:

Cease and Desist Orders.—In lieu of taking action under subsection (d) or (e), the Commission may issue and cause to be served on any person violating this section, or believe to be violating this section, as the case may be, an order directing such person to cease and desist from engaging in the unfair methods or acts involved, unless after considering the effect of such order upon the public health and welfare, competitive conditions in the United States economy, the production of like or directly competitive articles in the United States, and United States consumers, it finds that such order should not be issued. The Commission may at any time, upon such notice and in such manner as it deems proper, modify or revoke any such order, and, in the case of a revocation, may take action under subsection (d) or (e), as the case may be.

Because the record is devoid of any evidence showing that complainant will be injured by imports of infringing luggage before this investigation is completed,[50] I believe it would be inappropriate to issue a temporary exclusion order. However, a cease and desist order would avoid unduly burdening import trade until this case is completed, while still preventing complainant from being injured in the event that any named respondent decides to import infringing luggage. In addition, some of the named respondents have failed to respond to the complaint or to furnish discovery and these respondents, who may be importing infringing luggage, also will be prevented from importing infringing luggage until the completion of our investigation.

There is need for temporary relief because complainant is faced with numerous actual and potential foreign manufacturers and exporters located in Korea and Taiwan that have the capacity to manufacture, export and sell in the United States large quantities

[50] The presiding officer's finding of fact 111 in his recommended determination filed Mar. 24, 1978, states in part: "no direct evidence exists that any infringing luggage has been caused to be imported into the United States subsequent to or somewhat prior to Oct. 28, 1977."

of infringing imports. Because the record fails to show direct evidence of importations of infringing luggage since October of 1977, I believe the appropriate remedy is a cease and desist order.

By order of the Commission.

Issued: August 4, 1978.

KENNETH MASON,
Secretary.

[FR Doc. 78-22251 Filed 8-8-78; 8:45 am]

---

[4410-09]

## DEPARTMENT OF JUSTICE

### Drug Enforcement Administration

### McNEILAB, INC.

Importation and Manufacture of Controlled Substances; Objections, Requests for Hearing, and Hearing

On June 27, 1978, at 43 FR 27908-09, notice was given that McNeilab, Inc., Camp Hill Road, Fort Washington, Pa. 19034, had made application to the Drug Enforcement Administration to be registered as an importer of the following basic class controlled substances: Imported raw opium, poppy straw, and concentrate of poppy straw, all listed in Schedule II of the Controlled Substances Act of 1970; and that McNeilab, Inc., had also made application for registration as a bulk manufacturer of the following basic class controlled substances: Opium extracts, opium fluid extracts, powdered opium, granulated opium, tincture of opium, morphine, codeine, thebaine, oxycodone, and concentrate of poppy straw; and opportunity was given for the filing of comments and objections to said applications and for the filing of requests for hearing with respect to them.

Requests for hearing have been filed by Mallinckrodt, Inc., and by Penick Corp. with respect to both applications. Both Mallinckrodt and Penick assert that the registration of McNeilab, Inc., as an importer and as a bulk manufacturer, as applied for, is not consistent with the public interest as defined in the Controlled Substances Act and applicable regulations, and with U.S. international obligations.

Merck & Co., Inc., submitted comments indicating that, in its view, there is presently an adequate supply and adequate competition with respect to the contolled substances which are the subject of the applications filed by McNeilab and that, consequently, those applications do not meet the criteria for registration under section 303(a) of the Controlled Substances Act. In addition, Merck asserts that McNeilab seems to lack the technical competence and experience necessary to engage in the bulk manufacture of

controlled substances. Merck also believes that the declaration of an emergency provided for in the regulations refers to an emergency related only to the availability of substances and has nothing to do with the number of persons registered to import; and that section 303(a) of the Controlled Substances Act clearly shows that Congress intended that the same companies registered for bulk manufacturing a substance are to be the same companies registered for importing that controlled substance. Merck believes that any determinations made by the Drug Enforcement Administration with respect to the applications filed by McNeilab should be made in a forum where opposing views can also be expressed and weighed.

Accordingly, notice is hereby given pursuant to 21 CFR 1301.43 and 1311.42 that a hearing will be held on the aforesaid applications for registration commencing at 10 a.m. on Friday, September 15, 1978, in Room 1210, Drug Enforcement Administration, 1405 I Street NW., Washington, D.C., the proceedings on that day to be limited to a preliminary discussion to identify proper parties and issues, and to determine procedures and set dates and locations for further proceedings. Any person entitled to participate in said hearing and desiring to do so should file a notice of appearance pursuant to 21 CFR 1301.54 and 1316.48 on or before September 8, 1978. A person who had filed a request for a hearing need not also file a notice of appearance.

Dated: August 3, 1978.

PETER B. BENSINGER,
Administrator, Drug
Enforcement Administration.

[FR Doc. 78-22218 Filed 8-8-78; 8:45 am]

---

[4410-01]

[AAG/A Order No. 2-78]

### PRIVACY ACT OF 1974

Notice of New Routine Use

Notice is hereby given that pursuant to the Privacy Act of 1974, 5 U.S.C. 552a(e) (4) and (11), the Department of Justice, U.S. Parole Commission, proposes to add the routine use printed below to the JUSTICE/PRC-003, Inmate and Supervision Files system, notice of which was published in the FEDERAL REGISTER on Thursday, July 13, 1978 (43 FR 30140).

*    *    *    *    *

(J) A record from this system may be disclosed to a person or to persons who may be exposed to harm through contact with a particular parolee or mandatory releasee if it is deemed by a Commissioner to be reasonably neces-

HeinOnline -- 43 Fed. Reg. 35403 1978

Rhodes' Opposition to Plaintiff's
Motion for Preliminary Injunction
April 2, 2007

# EXHIBIT F

# UNITED STATES DEPARTMENT OF JUSTICE

## Drug Enforcement Administration

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| **PENICK CORPORATION** | )     **Docket No. 01-3** |
| | ) |
| | ) |
| | ) |

### PENICK CORPORATION'S MOTION TO STRIKE COMMENTS, OBJECTIONS, AND REQUESTS FOR HEARING SUBMITTED BY MALLINCKRODT, NORAMCO, AND ORGANICHEM

Applicant Penick Corporation ("Penick") submits this Motion for an Order striking the comments, objections, and requests for a hearing filed by Mallinckrodt, Inc. ("Mallinckrodt") and Noramco of Delaware, Inc. ("Noramco") and the comments and objections filed by Organichem, Inc. ("Organichem") (collectively, the "Objectors") on Penick's application for registration as an importer of coca leaves, raw opium, poppy straw, and poppy straw concentrate. Since the Objectors are neither bulk manufacturers of the raw materials Penick seeks to import, nor applicants currently seeking permission to import those raw materials, Objectors do not have standing to comment upon or request a hearing on Penick's application. Accordingly, their comments, objections, and requests should be striken.[1]

---

[1]  21 C.F.R. § 1301.34 does not expressly authorize the DEA to deny a request for a hearing even if that request has been improperly made. Accordingly, Penick has request tht the Objectors' comments, objections and requests for hearing be stricken. Alternatively, should the ALJ find that she has inherent power to deny the Objectors' improvident requests for a hearing, Penick requests that she deny those requests.

## Factual Background

On April 11, 2000, Penick filed an application for registration as an importer of coca leaves, raw opium, poppy straw and poppy straw concentrate (the "Raw Materials"). On August 18, 2000, notice of the application was published in the *Federal Register*, 65 Fed. Reg. 50,568 (DEA 2000).

In response to the notice, Organichem, on September 14, 2000, filed comments objecting to the grant of the registration, but did not file a request for a hearing. In its comments, Organichem stated that it was a "DEA-registered domestic bulk manufacturer of meperidine...." (*See* September 14, 2000 letter from Peter Mathers to John H. King, incorporating by reference a previous submission dated August 24, 2000, from which the quotation is taken.) On September 15, 2000, Mallinckrodt filed comments, objections, and a request for a hearing. In its submission, Mallinckrodt stated that it "is a registered importer of raw opium and poppy straw concentrate ... and a registered manufacturer of opium extracts, opium fluid extract, opium tincture, opium powdered, opium granulated and other products derived from opium and poppy straw concentrate" [citations omitted]. (*See* September 15, 2000 letter from Patricia Hitt Duft to Mr. John H. King at page 1.) Noramco also filed comments, objections, and a request for a hearing on September 15, 2000. In its submission, Noramco stated that it is "registered with DEA as an importer of raw opium and poppy straw concentrate ... and as a bulk manufacturer of codeine, oxycodone, hydrocodone, morphine and thebaine" [citations omitted]. (*See* September 15, 2000 Comments from Thomas C. Morrison *et al.* at 1.) None of the Objectors is a bulk manufacturer of the Raw Materials, nor is any an applicant for the importation of the Raw Materials.

## Argument

The Objectors have no standing to comment on, object to, or request a hearing on Penick's application. The governing regulations restrict standing to submit comments,

objections, or to request a hearing to those who are bulk manufacturers of the goods the applicant

seeks to import or other applicants for importation of the same goods. 21 C.F.R. §1301.34. The

Objectors satisfy neither of these criteria, and accordingly have no standing to comment, object,

or to obtain a hearing on Penick's application. Nor do the Objectors have prudential standing to

comment, object, or request a hearing since they are not within the zone of interest to be

protected by the regulation nor are they suitable challengers to Penick's application.

Thus, while DEA must, of course, still determine Penick's entitlement to registration as

an importer of Schedule II controlled substances under the Controlled Substances Act, the

holding of a hearing is not warranted. This is particularly the case here since Penick has learned

that one of the parties to this hearing, Mallinckrodt, which already has a substantial majority

share of the market in the United States, may have initiated a recent effort to sign its customers

to long-term exclusive contracts. If this is in fact the case, any delay in Penick's registration as

an importer would allow Mallinckrodt to increase its already substantial share of the market to

the detriment of future competitors - and the consumer.

**A.    21 C.F.R. § 1301.34 Permits Only Bulk Manufacturers of the Product to Be
Imported or Current Applicants to Comment, Object or Seek a Hearing**

Section 1301.34 of 21 C.F.R. addresses who may comment, objection, or seek to obtain a

hearing on an application for a license to import a scheduled substance. Standing to comment,

object, or to request a hearing is tied to the notice scheme provided in the regulation, which

states as follows:

> A copy of said notice [of the importer application that was published in the
> Federal Register] shall be mailed simultaneously to **each person registered as a bulk
> manufacturer of that controlled substance and to any other applicant therefor. Any
> such person** may, within 30 days from the date of publication of the notice in the Federal
> Register, file written comments on or objections to the issuance of the proposed
> registration, and may, at the same time, file a written request for a hearing on the
> application pursuant to §1301.41.

21 C.F.R. § 1301.34 (emphasis added). The regulation is unambiguous that only **bulk manufacturers of the controlled substance sought to be imported and applicants who also currently seek permission to import those substances** may file written comments, object, or request a hearing.

The rationale for conferring standing only on the specific, enumerated competitors is patent. The policy furthered by the regulations is to allow domestic manufacturers an opportunity to be heard when a potential competitor is applying to import a product that may adversely affect the domestic manufacturer's business. Thus domestic manufacturers are provided the opportunity to voice their objections to competition from products imported from abroad.

In the situation at bar the Objectors are not domestic manufacturers of the Raw Materials but rather are bulk manufacturers of secondary products derived from the Raw Materials - several steps removed from the Raw Materials themselves. The Objectors do not stand on the same footing as domestic manufacturers of the Raw Materials (if any there be) and do not have a domestic market share in the Raw Materials that they can legitimately seek to protect. Nor are they applicants for the importation of the Raw Materials since they have already applied for and received registrations to do so (at least insofar as those registrations cover raw opium and poppy straw concentrate) . As such, the Objectors do not satisfy the threshold requirements set forth in 21 C.F.R. § 1301.34 to comment or request a hearing on Penick's application.

**B.    The Objectors Do Not Have Prudential Standing to Comment, Object, or Request a Hearing**

In addition to their inability to meet the regulatory standing criteria, the Objectors do not have prudential standing to comment, object, or request a hearing on Penick's application. In order to have prudential standing, a would-be challenger to agency action must be "arguably within the zone of interests Congress intended either to regulate or protect." *Liquid Carbonic Industries Corp v. Federal Energy Regulatory Commission,* 29 F.3d 697, 704 (D.C. Cir. 1994),

citing *Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918 (D.C. Cir. 1989) (quoting *Association of* Data *Processing Serv. Orgs. v. Camp.*, 397 U.S. 150 (1970)). A litigant who can demonstrate that it is an intended beneficiary of the statute or that it is otherwise a "suitable challenger" has prudential standing. *First National Bank & Trust Co. v. Nation al Credit Union*, 988 F.2d 1272, 1275 (D.C. Cir. 1993). A would-be challenger is not deemed to be within the zone of interests or a suitable challenger simply because it is interested in the pending application or may be affected by the agency's decision. *Liquid Carbonic Industries Corp.*, 29 F.3d 704. The doctrine of prudential standing is intended to "narrow the field of potential challengers" and not to confer standing on "all incidental beneficiaries." *Id.*

While the analysis of prudential standing is fact specific to each case, the D.C. Circuit has carefully examined the doctrine in circumstances substantially similar to those here - - and found that the would-be challengers had no standing. In *Liquid Carbonic Industries, supra*, Liquid Carbonic, a producer and seller of industrial gases, sought review of 3 orders issued by the Federal Energy Regulatory Commission ("FERC") certifying certain exporters of thermal energy as "qualifying cogeneration facilities within the meaning of the Public Utility Regulatory Policies Act of 1978" ("PUPA"). *Id.* at 697. The qualifying cogeneration facilities were exporters of thermal energy and not themselves "thermal hosts," or users of thermal energy. Although not itself a cogeneration facility, Liquid Carbonic claimed it would be adversely affected by FERC's certifications because FERC's action would have the effect of decreasing Liquid Carbonic's sales of liquid carbonic dioxide, an alternative energy source to thermal energy. The D.C. Circuit held that Liquid Carbonic had no standing to challenge the FERC action. Since Liquid Carbonic was a competitor of the thermal hosts, but not a direct competitor of the certified cogeneration facilities, the court viewed Liquid Carbonic as a second-tier competitor who was not an intended beneficiary of PUPA. The court also rejected Liquid Carbonic's contention that it was a suitable challenger. Although Liquid Carbonic alleged that its interest in the FERC action was the prevention of inefficient uses of cogenerated energy, the court noted that its opposition also served another purpose - - to maximize its own profits. The

court held that Liquid Carbonic's current "fortuitous" "alignment of interests" with those intended beneficiaries of the statute was based on the vagaries of the current market and did not qualify Liquid Carbonic to be a suitable challenger.

Similarly in this case, the Objectors have no prudential standing. They are not manufacturers of the Raw Materials nor are they current applicants. As manufacturers of finished products and established registrants without pending applications, they are not within the zone of interests sought to be protected by the regulations. The regulations were plainly intended to protect domestic manufacturers of the exact product sought to be imported, not derivatives or second-tier products. Justifiable policy concerns mandate that domestic citizens who manufacture the identical product that an applicant is seeking to import should have an opportunity to challenge the application. Those such as the Objectors here, who are not in direct competition with the applicant but are merely second-tier competitors, are not within the zone of interest protected by 21 C.F.R. §1301.34.

Nor are the Objectors suitable challengers. Notwithstanding their purported concerns that Penick have the requisite financial and security resources to import the Raw Materials, their real concern is that the granting of Penick's application may have an adverse affect on their profits in the narcotic drug market. The interests of the Objectors and those who were the intended beneficiaries of 21 C.F.R. § 1301.34, the domestic manufacturers of products sought to be imported, are not actually congruent. Any purported concern about the terms of importation of the Raw Materials by the Objectors is in fact illusory. If Penick were able to import the Raw Materials and offer them for sale to the Objectors at a price lower than that regularly paid by the Objectors, Penick would be a potential supplier for the Objectors rather than a potential competitor. Thus the Objectors' interests not only fail to coincide with those of domestic manufacturers of the Raw Materials, but are arguably antithetical to them.

## CONCLUSION

Mallinckrodt, Noramco and Organichem, who are neither bulk manufacturers of raw coca leaves, raw opium, poppy straw and poppy straw concentrate nor have pending applications for the importation of those materials, do not have statutory standing under 21 C.F.R. § 1301.34. They are not within the zone of interest protected by the regulation, nor are their interests sufficiently aligned with those to be protected such that they are suitable challengers to Penick's application. For these reasons, their comments, objections, and requests for a hearing should be stricken.

Respectfully submitted,

Wayne H. Matelski
Arent Fox Kintner Plotkin & Kahn L.L.C.
1050 Connecticut Avenue, N.W.
Washington, D.C. 20035-5339
Telephone: (202) 857-6415
Fax: (202) 857-6395

Counsel for Penick Corporation

December 19, 2000

# **ORDER**

On December 19, 2000, Penick Corporation filed a "Motion to Strike Comments, Objections, and Requests for Hearing Submitted by Mallinckrodt, Inc., Noramco of Delaware, Inc., and Organichem, Inc." After considering the Motion, and the Responses thereto, and reviewing the relevant law,

IT IS HEREWITH ORDERED, that the comments, objections, and requests filed by Mallinckrodt and Noramco and the comments and objections filed by Organichem on Penick's application for registration as an importer of coca leaves, raw opium, poppy straw, and poppy straw concentrate are herewith stricken.

Dated: _____

_____
Mary Ellen Bittner
Administrative Law Judge

## Certificate of Service

I hereby certify that on this 19th day of December, 2000, true and correct copies of the foregoing "Penick Corporation's Motion to Strike Comments, Objections, and Requests for Hearing Submitted by Mallinckrodt, Noramco, and Organichem" and "Penick Corporation's Motion for an Order Recommending the Immediate Grant of its Applications to Import Coca Leaves and Poppy Straw and for an Order Limiting the Issues in this Hearing to Whether Penick's Application to Import Raw Opium and Poppy Straw Concentrate Should be Granted" and Penick Corporation's "Pre-Hearing Memorandum" were served by first class mail on the parties identified below:

> Patricia Hitt Duft
> Mallinckrodt Inc.
> 675 McDonnell Blvd., P.O. Box 5840
> St. Louis, MO 63134
>
> Thomas C. Morrison
> Andrew D. Schau
> Patterson, Belknap, Webb & Tyler LLP
> 1133 Avenue of the Americas
> New York, NY 10036-6710
>
> John A. Gilbert
> Hyman, Phelps & McNamara, P.C.
> 700 Thirteenth St., N.W.
> Suite 1200
> Washington, DC 20005
>
> Robert Walker
> Office of Chief Counsel
> Drug Enforcement Administration
> Washington, DC 20537

Wayne H. Matelski
Counsel to Penick Corporation

# EXHIBIT G

UNITED STATES DEPARTMENT OF JUSTICE
Drug Enforcement Administration

In the Matter of

**Houba, Inc.**

Docket No. 02-6

MEMORANDUM TO COUNSEL AND RULING ON REQUEST
I. Background

On January 31, 2001, Houba, Inc. (Houba), filed an application for registration as an importer of the Schedule II substances raw opium, opium poppy, and poppy straw concentrate. On September 6, 2001, the Drug Enforcement Administration (DEA) published a notice of Houba's application in the Federal Register.[1] The notice named the controlled substances listed in Houba's application and advised, among other things, that "[a]ny manufacturer holding, or applying for, registration as a bulk manufacturer of these basic classes of controlled substances may file written comments on or objections to the application . . . and may, at the same time, file a written request for a hearing on such application in accordance with 21 C.F.R. § 1301.43 in such form as prescribed by 21 C.F.R. § 1316.47."[2]

On October 9, 2001, Penick Corporation (Penick), Noramco of Delaware, Inc. (Noramco), and Mallinckrodt, Inc. (Mallinckrodt), each filed comments on and objections to Houba's application and requested a hearing. By letter dated October 17, 2001, Houba requested that the Administrator and the Deputy Assistant Administrator, Office of Diversion Control, approve its application without an administrative hearing. On January 2, 2002, by letter, the Administrator advised me that he was forwarding Houba's request to me for consideration. On January 24, 2002, the Government, Penick, Mallinckrodt, and Noramco filed oppositions to Houba's request. Subsequently, on February 28, 2002, Houba responded to these oppositions, and on March 21, 2002, Penick, Noramco, and Mallinckrodt filed replies to Houba's response.

II. The Parties' Contentions

In its October 17, 2001 letter, Houba asserts, in substance, that none of the industry objectors to its application is legally entitled to a hearing in this matter and that none of them "has raised any genuine issue of material fact that arguably could warrant an exercise of DEA's discretionary authority."[3] Houba argues that although 21 U.S.C. § 958(i) specifies a right to a hearing prior to issuing either a registration under 21 U.S.C. § 958(a) to a manufacturer of a Schedule I or II controlled substance or a regulation under 21 U.S.C. § 952(a) authorizing the

---

[1] Notice of Application, 66 Fed. Reg. 46,653 (DEA 2001).

[2] Id.

[3] Letter from Eugene Pfeifer, Esq., counsel for Houba, to Asa Hutchinson, Administrator, Drug Enforcement Administration, United States Department of Justice, and Laura M. Nagel, Deputy Assistant Administrator, Office of Diversion Control, Drug Enforcement Administration 1 (Oct. 17, 2001).

importation of such a substance, only manufacturers have that right, and there are no domestic manufacturers of opium and poppy straw concentrate. More specifically, Houba contends that neither Mallinckrodt, Noramco, nor Penick is registered to manufacture opium or poppy straw concentrate, and indeed, that none of them has claimed standing on that basis. Houba asserts that "[United States] policy prohibits the domestic cultivation of opium poppy (*Papaver somniferum*) and the production of opium and [poppy straw concentrate],"[4] citing 21 C.F.R. § 1312.13(f). Houba also emphasizes that the Controlled Substances Import and Export Act (CSIEA) and DEA's implementing regulations distinguish between importing and manufacturing, and that Mallinckrodt's and Noramco's registrations and Penick's application clearly specify that they import (or in Penick's case has applied to import) opium and poppy straw concentrate. Houba contends that DEA regulations are consistent with its interpretation, noting that 21 C.F.R. § 1301.34 applies to hearings on applications pursuant to 21 U.S.C. § 952(a)(2)(B), and that 21 C.F.R.§ 1301.34(a) specifies that DEA will provide notice of an application to import "to each person registered as a bulk manufacturer of that controlled substance and to any other applicant therefor," and that "[a]ny such person may . . . file a written request for a hearing on the application . . . ."[5]

Houba cites *McNeilab, Inc.*, 42 Fed. Reg. 27,908, 27,909 (1978), for the proposition that where there is no registered bulk manufacturer of the substance sought to be imported, the Administrator has discretion to grant or deny a hearing on the importation. Houba notes that in 1995 DEA revised a regulation that had provided to manufacturers of Schedule I and II controlled substances a right to a hearing upon the application of another manufacturer for the same substances,[6] and also cites a recent decision by the United States District Court for the District of Columbia for the proposition that the specific wording used by Congress should be considered in determining who is entitled to a hearing.[7] According to Houba, Congress could have used broader language in 21 U.S.C. § 958(i); the failure to do so requires DEA to strictly construe that provision and to find that none of the industry objectors is entitled to a hearing in this proceeding.

Houba also asserts that none of the industry objectors has identified any issue to cause DEA to consider holding a hearing in this matter. Houba contends that almost identical issues have been raised in the last two years in two other cases involving applications to import narcotic raw materials, that these same issues have been raised repeatedly since the late 1970s, and that allowing repeated airing of these issues delays the entry of new competition into the narcotic raw material market. Houba further notes that there are several pending applications to import opium and poppy straw concentrate, and urges that "it is appropriate and desirable for the agency to consider and rule upon the applications concurrently, with a consistent basis for decision."[8]

Finally, Houba contends that although hearings have been held on applications filed by Johnson Matthey, Inc. (Johnson Matthey), and Penick, the participation of currently registered

---

[4] Id. at 3.

[5] Id. at 6.

[6] 60 Fed. Reg. 32,100 (DEA 1995).

[7] Quoting *PDK Labs, Inc. v. Reno*, 134 F. Supp.2d 24, 29 (D.D.C. 2001).

[8] Houba's October 17, 2001 letter at 10.

2

importers in those hearings "was without serious objection of the applicant. . . . ,"[9] and such acquiescence does not preclude Houba from objecting to a hearing or bind the agency to hold one in the instant case.

Noramco, in its opposition to Houba's request, notes that Penick raised the same issue in *Penick Corporation*, Docket No. 01-3, and that "[g]iven the literal wording of 21 U.S.C. § 958(i), there is a fair question whether Congress intended to give registered importers the right to a hearing."[10] Noramco asserts that the analysis in a Memorandum to Counsel and Rulings on Motions I issued in *Penick* on April 13, 2001, is controlling in the instant case. Noramco further asserts that Congress intended to afford registered importers the right to a hearing in these cases, noting that DEA has consistently provided currently registered importers the opportunity for a hearing on other companies' applications to import, that in 1993 and 1994 DEA considered and rejected eliminating hearings in import cases,[11] and that the Committee on the Judiciary of the House of Representatives also considered and rejected the suggestion that the opportunity for hearings on import applications should be eliminated.[12]

Noramco contends that in the instant case, DEA has exercised its discretion to offer a hearing by publishing the notice of Houba's application quoted above. Noramco agrees with Houba's assertion that no one can be registered to manufacture narcotic raw materials in the United States, but contends that the notice of application "makes no sense unless DEA means to afford importers the opportunity to request a hearing."[13]

Noramco also contends that Houba's assertions that there are no material facts in dispute in this case and that Noramco seeks to delay entry into the market of another competitor are incorrect. More specifically, Noramco contends that Houba's parent company, Halsey Drug Co. (Halsey), "is on the brink of financial collapse"[14] and may be using Houba's import application to attract investors and funding, former Halsey executives committed narcotics-related felonies while working for the company, and a security guard was shot and killed in a 1992 incident at Halsey's facility. Noramco further notes that in 1993 I issued an opinion recommending that Houba's application to manufacture methylphenidate be granted, that I subsequently rescinded that opinion and granted a motion to reopen the record to receive evidence of Halsey's misconduct, and that Houba eventually withdrew its application.

Finally, Noramco asserts that "[e]xpanding the pool of approved importers is inherently risky,"[15] and that the public interest analysis of an application may vary with the number of potential importers.

The Government also opposes Houba's request, stating that it joins Noramco in its

---

[9] Id.

[10] Noramco of Delaware, Inc.'s Opposition to Houba, Inc.'s Request for Final Approval of Importer Registration Without Administrative Hearing at 3, *Houba, Inc.* (Docket No. 02-6) (January 24, 2002).

[11] Citing 58 Fed. Reg. 52246 (DEA 1993) (Notice of Proposed Rule Making) and 59 Fed. Reg. 32009 (DEA 1995) (Final Rule).

[12] Citing H.R. Rep. No. 98-835, Part 1, 98th Cong. 2d Sess., at 11 (June 12, 1984).

[13] Noramco's January 24, 2002 Opposition at 8.

[14] Id.

[15] Id. at 15.

3

opposition, that the Government opposes Houba's application on the same grounds that it opposes a recent application in *Chattem Chemicals, Inc.*, Docket 01-45, and that "an administrative hearing will be necessary to that end."[16]

Mallinckrodt, in its opposition to Houba's request, asserts that DEA precedent supports holding a hearing on Houba's application, noting my April 13, 2001 Memorandum to Counsel and Rulings on Motions in *Penick* cited above. Mallinckrodt further asserts that DEA's practice of holding hearings in these cases is consistent with the Controlled Substances Act, and that the Administrator has exercised his discretion to subject Houba's application to the hearing process by publishing the notice of the application.

Mallinckrodt also contends that there are issues of material fact in this proceeding. More specifically, Mallinckrodt asserts that there are questions about the merits of Houba's technology to process poppy straw concentrate and opium; whether Houba has an appropriate business and marketing plan; whether Houba has the requisite plans and commitments of capital for construction of its processing facility; Houba's "negative compliance history";[17] how Houba's registration would affect competition in the bulk active pharmaceutical ingredient market; and how the widening pool of applicants to import affect DEA's ability to prevent diversion, increased production in exporting countries and the resulting potential for diversion, and the global raw narcotic material market.

Mallinckrodt also argues that there is no basis for DEA to depart from its practice of conducting hearings in these cases, and that the need for such a hearing is underscored by the Government's position in *Chattem* that DEA is concerned about the number of potential importers of narcotic raw materials and the agency's ability to prevent and monitor possible diversion of these substances.

Penick, in opposing Houba's request, asserts that 21 C.F.R. § 1301.34 requires that notice of an application to import narcotic raw materials be sent to other applicants who have applied for importer registrations, and that the regulation provides those applicants with an opportunity for a hearing. Penick further asserts that as an applicant to import narcotic raw materials[18] it is entitled to a hearing on Houba's application in order "to ascertain whether subsequent applicants are subjected to the same level of scrutiny and to meet the same rigorous standards as Penick has in place."[19] Penick also contends that Houba incorrectly asserts that participation in other hearings was "'without serious objection of the applicant'";[20] Penick notes that it objected to a hearing on its application but that I nonetheless concluded that DEA had exercised its discretionary authority to afford other importers a hearing in that proceeding. Penick also argues

---

[16] Government's Response to Houba's Request at 1, *Houba, Inc.*, (Docket No. 02-6) (January 24, 2002).

[17] Mallinckrodt's Opposition to Houba's Request for an Importation Registration Without an Administrative Hearing at 4, *Houba, Inc.* (Docket No. 02-6) (January 24, 2002).

[18] A hearing was held in *Penick Corporation*, Docket No. 01-3, in July and August 2001. The case is pending before me.

[19] Penick Corporation's Opposition to Houba Inc.'s Request for an Immediate Grant of its Importer Registration Without an Administrative Hearing at 3-4, *Houba, Inc.*, (Docket No. 02-6) (January 24, 2002).

[20] Id. at 5.

that although Houba correctly asserts that no hearing was held on Penick's application to import poppy straw, no hearing was requested on that aspect of the application.

Penick contends that the issues in this case argue more strongly for a hearing than did the concerns raised in *Penick*, noting Houba's lack of experience in importing and processing opium and poppy straw concentrate, Houba's lack of technical skills to manufacture opiates, and Halsey's history of financial difficulties. Penick notes that it was required to undergo the type of hearing that Houba seeks to avoid, and that "[i]f an application by an experienced manufacturer and importer such as Penick merited a hearing, a hearing is, perforce, necessary for an application by Houba, a company with minimal experience and with a poor history of regulatory compliance."[21]

Penick asserts that an agency is required to treat similar cases similarly unless it has a legitimate reason for doing otherwise, and that Penick and other pharmaceutical firms have been required to undergo hearings on their applications for registrations to import controlled substances.[22] Penick contends that to allow Houba to avoid a hearing would be arbitrary and unfair and that there are no changed circumstances justifying a departure from DEA's usual practice in these cases. Finally, Penick contends that "the dynamics of [narcotic raw material] sourcing and competition are currently in a state of uncertainty, and a decision further to expand that market to include Houba should be made only after all pertinent issues are fully vetted and carefully deliberated."[23]

Responding to the other parties' objections to its request that its application be processed without a hearing, Houba contends that I have already determined in my April 13, 2001 memorandum in *Penick* that neither the relevant statutes nor the implementing regulations require DEA to afford a hearing to registered manufacturers that object to applications to import narcotic raw materials. Houba further contends that no party has offered any precedent that would undercut that interpretation and that Penick cannot legitimately dispute that determination inasmuch as it sought to avoid a hearing on its application to import narcotic raw materials.

Houba further asserts that the opportunity to request a hearing does not guarantee that there will be one, and that I must require Mallinckrodt, Noramco, and Penick to "show that there are genuine and substantial issues of disputed material fact requiring judicial assessment,"[24] in order to conduct a hearing in this proceeding. Houba also asserts that "an administrative evidentiary hearing is not the proper forum for debating legal and policy (as compared with factual) questions,"[25] and that my obligation to avoid delay in resolving this matter requires me to deny Mallinckrodt's, Penick's, and Noramco's requests for a hearing that is not required by law or fact.

Houba further argues that I should require Mallinckrodt, Noramco, and Penick to show that specific facts material to Houba's application are in dispute, and that none of the firms that

---

[21] Id. at 7.

[22] Citing *McNeilab, Inc.*, Docket No. 78-13; and *Johnson Matthey*, Docket No. 99-27. [7]

[23] Penick's January 24, 2002 Opposition at 8.

[24] Response of Houba, Inc. to the Oppositions to Houba's Request for Decision Without Administrative Hearing at 3, *Houba, Inc.* (Docket No. 02-6) (February 28, 2002).

[25] See Houba's February 28, 2002 Response at 4, citing *Independent Bankers Assoc. v. Board of Governors of Federal Reserve System*, 516 F. 2d 1206, 1215 (D.C. Cir. 1975).

oppose Houba's application have made such a showing. Houba contends that I should rely on DEA to state what, if any, factual clarification is needed, and notes that the only factual issue the Government has raised in its filings in this proceeding is whether DEA can control illicit diversion if the pending applications to import narcotic raw materials are granted. Houba asserts that it "does not anticipate that DEA could reasonably suggest Houba's importer registration would increase the general potential for overseas [narcotic raw material] diversion,"[26] but if the agency considers it necessary to address the interplay between domestic demand for narcotic raw materials and control of diversion overseas, a rulemaking proceeding would be appropriate. Houba also contends that if DEA is considering limiting the number of firms that will be registered to import opium and poppy straw concentrate, the agency will need to convene a hearing as contemplated by *Ashbacker Radio Corporation v. FCC*, 326 U.S. 327 (1945).

Finally, Houba requests that if I conclude a hearing is warranted in this case, I require the parties opposing Houba's application to: (1) state specifically the factual issues on which they wish to be heard and explain the relevance of those issues; (2) state whether documentary evidence and written testimony will sufficiently clarify each factual issue; and (3) substantiate any argument that written submissions would not be sufficient. Houba asserts that I have "substantial flexibility"[27] to determine how information is to be presented, that the opposing parties are aware of the burdens that an oral hearing would impose on the participants, and that delay of an appropriate registration imposes a burden on the public interest. Houba asserts that the procedural approach it suggests is consistent with prior practice before DEA and within my authority to direct.

Replying to Houba's February 28 response, Noramco asserts that Houba ignored my conclusion in the April 13, 2001 memorandum that DEA exercised its discretion to hold a hearing by publishing the notice of application specifying the opportunity for a hearing. Noramco further asserts that this exercise of discretion is justified because Houba's application raises various issues under the public interest standard, and that until Houba sets out its case for granting its application, it is impracticable for the other parties to make the showing Houba seeks. Noramco notes that in *Penick*, DEA personnel admitted that the agency did not analyze the adequacy of competition in the domestic market for active pharmaceutical ingredients, but that economic evidence "played a featured role"[28] at the hearing. Noramco asserts that in the instant case economic issues also warrant an evidentiary hearing. Similarly, Noramco contends that a hearing is necessary on technological issues because DEA is required to limit the number of registered importers in order to control diversion, that less efficient technologies require more narcotic raw materials to produce the same quantity of output, and that an increase in narcotic raw material demand will mean more production in India and consequent potential for diversion. Noramco further asserts that Houba's financial condition warrants a hearing because "DEA

---

[26] Houba's February 28, 2002 Response at 9.

[27] Id. at 10.

[28] Noramco of Delaware, Inc.'s Reply Memorandum in Opposition to Houba, Inc.'s Request for Final Approval of Importer Registration Without Administrative Hearing at 4, *Houba, Inc.*, (Docket No. 02-6) (March 21, 2002).

should hear evidence as to whether a company in Houba's precarious condition can develop and implement a credible plan for the secure manufacture and transport of narcotic [active pharmaceutical ingredients]."[29]

Noramco agrees with Houba that the hearing should be premised on written submissions to the extent practicable, and suggests that the practice followed in *Penick*, in which the parties submitted the direct testimony of their witnesses in written form, would be appropriate in the instant case. Noramco further asserts that Houba appears to contend that the parties opposed to granting its application should be required to identify the facts to be tried before Houba submits its explanation for why its application should be granted. Noramco characterizes such a proposal as "both unprecedented and backwards."[30]

In its reply, Mallinckrodt agrees with Noramco that I concluded in the April 13, 2001 memorandum that by publishing notices of application in the Federal Register DEA has exercised its discretion to afford an opportunity for hearing to current importers. Mallinckrodt further asserts that the public interest would be served by a hearing in this proceeding because the public interest determination is essentially adjudicative and because the hearing process provides to the agency "a more in-depth understanding of the facts relevant to the public interest inquiry. . . ."[31]

Mallinckrodt argues that an "*Ashbacker*-type" hearing is not appropriate in this case because granting Houba's application depends on whether Houba meets its burden of proof by showing that its application meets the requirements of the Controlled Substances Act. Mallinckrodt contends that Houba has not shown that there are not issues of fact as to whether its registration to import would be in the public interest and that Houba bears the burden of proof. Mallinckrodt contends that it and Noramco have, in any event, raised issues about whether Houba's registration would be in the public interest and that although DEA makes decisions on applications for registration in some cases without a hearing, it "has consistently held hearings in cases involving requests to import opium and [poppy straw concentrate] in order to bulk manufacture active pharmaceutical ingredients when such hearings have been requested by existing manufacturers."[32]

In its reply, Penick asserts that in Houba's February 28 response, it "has still failed to demonstrate how it somehow deserves treatment that is different from that which DEA has consistently afforded to every other applicant that has been similarly situated."[33] Penick contends that Houba has not refuted Penick's argument that it is entitled to a hearing pursuant to 21 C.F.R. § 1304.34, and that on this basis alone a hearing is necessary in this case. Penick further asserts

---

[29] Id. at 7.

[30] Id. at 8.

[31] Mallinckrodt's Reply to Houba's Response to the Opposition to Houba's Request for Decision on its Importation Application Without an Administrative Hearing at 4, *Houba, Inc.*, (Docket No. 02-6) (March 21, 2002).

[32] Id. at 7.

[33] Penick's Reply to Houba's Response to the Opposition to Houba's Request for an Immediate Grant of its Importation Registration Without an Administrative Hearing at 2, *Houba, Inc.*, (Docket No. 02-6) (March 21, 2002).

that even if it is not entitled to a hearing as a matter of right, DEA has the discretionary authority to afford it a hearing and has done so. Penick contends that Houba is seeking to avoid the level of scrutiny that would be associated with a hearing, but that Penick, Mallinckrodt, and Noramco have all raised questions that pertain to DEA's determination of whether Houba satisfies the statutory criteria for granting its application.

Penick asserts that the standard of specificity that Houba would require of other firms requesting a hearing has never existed in DEA proceedings, and that if Houba's argument is accepted, the logical outcome would be "that the applicant best situated to avoid a hearing on its application would be the one about which the *least* was known". . . .[34]

### III. The Statutory and Regulatory Framework
### A. The Controlled Substances Act

Pursuant to 21 U.S.C. § 952(a), it is unlawful to import into the United States any Schedule I or II controlled substances except that

> (1) such amounts of crude opium, poppy straw, concentrate of poppy straw, and coca leaves as the Attorney General finds to be necessary to provide for medical, scientific, or other legitimate purposes, and

> (2) such amounts of any controlled substance in Schedule I or II or any narcotic drug in Schedule III, IV or V that the Attorney General finds to be necessary to provide for the medical, scientific, or other legitimate needs of the United States –

> (A) during an emergency in which domestic supplies of such substance or drug are found by the Attorney General to be inadequate,

> (B) In any case in which the Attorney General finds that competition among domestic manufacturers of the controlled substance is inadequate and will not be rendered adequate by the registration of additional manufacturers under section 823 of this title, or

> (C) in any case in which the Attorney General finds that such controlled substance is in limited quantities exclusively for scientific, analytical, or research uses, may be imported under such regulations as the Attorney General shall prescribe.[35]

Pursuant to 21 U.S.C. § 958(a),

> The Attorney General shall register an applicant to import or export a controlled substance in schedule I or II if he determines that such registration is consistent with the public interest and with United States obligations under international treaties, conventions, or protocols in effect on May 1, 1971.[36]

---

[34] Id. at 4.

[35] 21 U.S.C. § 952 (1996).

[36] 21 U.S.C. § 958(a) (1996).

8

The basis for hearings in proceedings such as this is 21 U.S.C. § 958(i):

> Except in emergency situations as described in section 952(a)(2)(A) of this title, prior to issuing a registration under this section to a bulk manufacturer of a controlled substance in schedule I or II, and prior to issuing a regulation under section 952(a) of this title authorizing the importation of such a substance, the Attorney General shall give manufacturers holding registrations for the bulk manufacture of the substance an opportunity for a hearing.[37]

The Controlled Substances Act defines "manufacturer" as "a person who manufactures a drug or other substance,"[38] and "manufacture" as

> the production, preparation, propagation, compounding, or processing of a drug or other substance, either directly or indirectly or by extraction from substances of natural origin, or independently by means of chemical synthesis or by a combination of extraction and chemical synthesis, and includes any packaging or repackaging of such substance or labeling or relabeling of its container. . . .[39]

In addition, 21 U.S.C. § 823(c) provides, in pertinent part:

> Registration granted under [§ 823(a)(b)] shall not entitle a registrant to manufacture or distribute controlled substances in Schedule I or II other than those specified in the registration. . . .[40]

### B. The Implementing Regulations

The principal regulatory provision relevant to Houba's request is 21 C.F.R. § 1301.34:

> (a) In the case of an application for registration or reregistration to import a controlled substance listed in Schedule I or II, under the authority of ... (21 U.S.C. 952(a)(2)(B)), the Administrator shall, upon the filing of such application, publish in the FEDERAL REGISTER a notice naming the applicant and stating that such applicant has applied to be registered as an importer of a Schedule I or II controlled substance, which substance shall be identified. A copy of said notice shall be mailed simultaneously to each person registered as a bulk manufacturer of that controlled substance and to any other applicant therefor. Any such person may, within 30 days from the date of publication of the notice in the FEDERAL REGISTER, file written comments on or objections to the issuance of the proposed registration, and may, at the same time, file a written request for a hearing on the application pursuant to § 1301.43. If a hearing is requested, the Administrator shall hold a hearing on the application in accordance with § 1301.41. Notice of the hearing shall be published in the FEDERAL REGISTER, and shall be mailed

---

[37] 21 U.S.C. § 958(i) (1996).
[38] 21 U.S.C. § 802(15) (1996).
[39] Id.
[40] 21 U.S.C. § 823 (c) (1996).

9

simultaneously to the applicant and to all persons to whom notice of the application was mailed. Any such person may participate in the hearing by filing a notice of appearance in accordance with § 1301.43 of this chapter.[41]

## IV. Discussion
### A. The Interpretation of 21 U.S.C. § 958(i)

As noted above, Section 958(i) specifies that, except in emergency situations described in 21 U.S.C. § 952(a)(2)(A), before DEA issues a regulation permitting importation of a Schedule 1 or II controlled substance or grants a registration to a bulk manufacturer to import such a substance, "manufacturers holding registrations for the bulk manufacture of the substance" are entitled to a hearing. Taking these words at face value, it would seem that the right to a hearing applies to all proposed importations under § 952(a) except those permitted in emergency situations. In other words, the right to a hearing would apply to proposed importations of narcotic raw materials (including coca leaves, poppy straw concentrate and crude opium); proposed importations of any Schedule I or II controlled substance or narcotic drug that is manufactured in the United States where the person seeking the importation asserts that competition among domestic manufacturers is inadequate and will not be rendered adequate by registering additional manufacturers; and proposed importations of controlled substances in limited quantities for scientific, analytical, or research uses. It would further seem, again from the face of the statutory provision, that the only registrants entitled to request a hearing are those that are registered to manufacture the same substance sought to be imported.[42] Consequently, literal interpretation of § 958(i) would have the result that bulk manufacturers that are registered to import narcotic raw materials would not have the statutory right to request a hearing on the application of another manufacturer for registration to import those same raw materials.

### 1. Whether It Is Unlawful to Produce Opium Poppies in the United States

As noted above, Houba asserts in its October 17, 2001 letter that federal policy prohibits the cultivation of the opium poppy and the manufacture of opium or poppy straw concentrate in the United States.[43] Consequently, according to Houba, there are no pharmaceutical manufacturers that are entitled to a hearing on its application.

I have not found any provision in the Controlled Substances Act specifying that it is unlawful to produce narcotic raw materials in the United States. According to my research, domestic production of opium was lawful until passage of the Opium Poppy Control Act of 1942,[44] although opium was subject to tax and producers of opium were required to register with

---

[41] 21 C.F.R. 1301.34 (2000).

[42] In the April 13, 2001 memorandum, I said that it would seem that "the only registrants entitled to request a hearing are those who are registered to manufacture the same substance sought to be imported or those who have applied for registration to manufacture that substance." On reviewing the statute and my earlier memorandum, I now conclude that I erred, because the statutory provision does not refer to applicants. As discussed below, the applicable regulations do include applicants among those entitled to a hearing.

[43] Houba's October 17, 2001 letter at page 3, citing 21 C.F.R. § 1312.13(f).

[44] See The Opium Poppy Control Act of 1942, Pub. L. No. 797 (1942).

10

the collector of internal revenue.[45] The Opium Poppy Control Act restricted production of opium, requiring producers of the opium poppy to be licensed by the Secretary of the Treasury pursuant to regulations issued by him. However, the Controlled Substances Act repealed the Opium Poppy Control Act.[46] I am not aware of any provision in the Controlled Substances Act or in the implementing regulations that distinguishes production of the opium poppy from the manufacture of other Schedule II controlled substances.

Consequently, it appears that a manufacturer may lawfully grow and process opium poppies in the United States if it obtains a DEA registration for that purpose pursuant to 21 U.S.C. § 823(a).[47]

## 2. Pertinent Legislative History

In an attempt to understand Congress's intent in enacting Section 958(i), I reviewed the legislative history of the Controlled Substances Act, the Controlled Substances Import and Export Act (21 U.S.C. § 951 et seq.), and some of the earlier federal legislation regulating controlled substances.

In 1909, Congress prohibited importation of opium except for medicinal purposes.[48] In an effort to control opium production, Congress passed legislation in January 1914 requiring manufacturers of opium for smoking to file various records with district collectors of internal revenue and to pay a prohibitive tax.[49] In December 1914, Congress passed the Harrison Narcotic Act, providing that all persons (except physicians, dentists, and veterinary surgeons who dispensed the regulated drugs in the course of professional practice) who produced, imported, manufactured, or otherwise handled opium or coca leaves were required to register with the appropriate collector of internal revenue and pay an occupational tax.[50] Subsequent legislation imposed additional requirements on manufacturers and importers of opium and coca leaves.

Beginning in 1922, the Narcotic Drugs Import and Export Act prohibited the importation of any finished controlled substances into the United States. However, importation of crude opium and coca leaves for medical and legitimate use was permitted pursuant to regulations promulgated by the Federal Narcotics Control Board.[51] The legislation did not include any provisions for hearings before issuance of these regulations.

In 1969, the administration introduced legislation that ultimately resulted in the Controlled Substances Act of 1970 and the Controlled Substances Import and Export Act.[52] Each of these bills included a change in existing law to permit importation of finished controlled substances:

---

[45] *See* The Harrison Narcotic Act, Pub. L. No. 223 (1914) (hereinafter, The Harrison Act).
[46] *See* Controlled Substances Act, Pub. L. No. 91-513 § 1101(7) (1970).
[47] As noted, Houba asserts that 21 C.F.R. § 1312.13(f) requires that narcotic raw materials must be imported from specified countries. Although that provision lists the countries from which narcotic raw materials may be imported, it does not state or imply that the only narcotic raw materials used in the United States are those that are imported.
[48] An Act to prohibit the importation and use of opium for other than medicinal purposes, Pub. L. No. 221 (1909).
[49] Act of January 17, 1914, Pub. L. No. 47 (1914) (subsequently amended).
[50] The Harrison Act.
[51] Narcotic Drugs Import and Export Act, Pub. L. No. 227, § 2(b) (1922).
[52] H.R. 13742 and H.R. 13743, 91st Cong. (1969); S. 2637, 91st Cong. (1969).

Sec. 401. (a) It shall be unlawful to import or land into the United States any controlled dangerous substance listed in Schedules I and II . . . unless pursuant to such exceptions as the Attorney General may provide by regulation as being necessary for medical, scientific, or other legitimate purposes.

The bills also included general provisions for hearings:

Sec. 605. (a) In carrying out his function, the Attorney General may hold hearings, sign and issue subpoenas, administer oaths, examine witnesses and receive evidence at any place in the United States.
(b) Except as otherwise provided in this Act, notice shall be given and hearings shall be conducted under appropriate procedures of subchapter II of chapter 5, title 5, United States Code.

None of these bills included any specific provisions for registering importers.
These bills were later replaced by H.R. 17463 and S. 3246.[53] Neither of these bills referred to registering importers and both included a provision that:

Sec. 401. (a) It shall be unlawful to import or bring into the continental United States, State of Hawaii, or Puerto Rico from any insular possession or other place subject to the jurisdiction of the United States, any controlled dangerous substance listed in schedules I or II of title II of this Act, or any narcotic drug listed in schedules III or IV of title II of this Act, except that

(1) such amounts of crude opium and coca leaves as the Attorney General finds to be necessary to provide for medical scientific or other legitimate purposes, or
(2) such amounts of any schedule I or II substance or any narcotic drug that the Attorney General finds to be necessary to provide for the medical, scientific, or other legitimate needs of the United States (A) during an emergency in which domestic supplies of such substance are found by the Attorney General to be inadequate or (B) if the Attorney General finds that competition among domestic manufacturers of the drug is inadequate and will not be rendered adequate by the registration of additional manufacturers under section 303 hereof,
may be imported under such regulations as the Attorney General shall prescribe. . . .[54]

The provisions for hearings, however, differed. The provision in S. 3246 read the same as that in S. 2637. The provision in H.R. 17463 read:

Sec. 605. (a) In carrying out his functions, the Attorney General may hold hearings, sign and issue subpoenas, administer oaths, examine witnesses, and receive evidence at any place in the United States.
(b) Except in emergency situations as described in subsection 401(a)(2), prior to issuing a registration under subsection 303(a) to a bulk manufacturer of a controlled substance included in schedule I or II of title II of this Act, and prior to

---

[53] H.R. 17463, 91st Cong. (1970); S. 2346, 91st Cong. (1969).
[54] Id.

12

issuing a regulation under subsection 401(a) authorizing the importation of such a substance, the Attorney General shall give manufacturers holding registrations for the bulk manufacture of the substance an opportunity for a hearing.
(c) Except as otherwise provided in this Act, notice shall be given and hearings shall be conducted under appropriate procedures of subchapter II of chapter 5, title 5, United States Code.

On February 5, 1970, S. 3246 passed the Senate. A new bill, H.R. 18583,[55] replaced H.R. 17463, and for the first time included provisions requiring registration of importers. Title III of H.R. 18583 was enacted as the Controlled Substances Import and Export Act on October 14, 1970, and included, in substance and insofar as pertinent here, what are now 21 U.S.C. §§ 952(a)(1), 952(a)(2)(A) and (B), and 958(a), (b), and (i). Specifically, relevant sections provided:

Sec. 1002. (a) It shall be unlawful to import or bring into the United States and controlled dangerous substance listed in schedules I or II of title II of this Act, or any narcotic drug listed in schedules III or IV of title II of this Act, except that –
(1) such amounts of crude opium and coca leaves as the Attorney General finds to be necessary to provide for medical, scientific, or other legitimate purposes, or
(2) such amounts of any schedule I or II substance or any narcotic drug that the Attorney General finds to be necessary to provide for the medical, scientific, or other legitimate needs of the United States (A) during an emergency in which domestic supplies of such substances are found by the Attorney General to be inadequate or (B) if the Attorney General finds that competition among domestic manufacturers of the drug is inadequate and will not be rendered adequate by the registration of additional manufacturers under section 303 hereof,
may be imported under such regulations as the Attorney General shall prescribe.[56]

Sec. 1008. (h) Except in emergency situations as described in section 1002(a)(2), prior to issuing a registration under this section to a bulk manufacturer of a controlled substance included in schedule I or II of title II of this Act, and prior to issuing a regulation under subsection 1002(a) authorizing the importation of such a substance, the Attorney General shall give manufacturers holding registrations for the bulk manufacture of the substance an opportunity for a hearing.[57]

The legislative history described above leads to the observations that (1) when Congress permitted importation only of narcotic raw materials and not finished goods, importers of those raw materials had no right to a hearing on any issue pertaining to their own or another importer's authority to import; and (2) the first provision affording competitors a right to a hearing appeared in bills that also included specific limitations on the circumstances in which finished Schedule I or II substances could be imported.

In 1984 there were proposals to amend what is now § 958(i) to read:

---

[55] H.R. 18583, 91st Cong. (1970).
[56] Pub. L. No. 91-513, Title III, § 1002, Oct 27, 1970, 84 Stat. 1285.
[57] Pub. L. No. 91-513, Title III, § 1008, Oct 27, 1970, 84 Stat. 1289.

13

Prior to issuing a registration under section [952(a)(2)(B)], the Attorney General shall give manufacturers holding registrations for the bulk manufacture of such controlled substance an opportunity to comment upon the adequacy of existing competition among domestic manufacturers.[58]

These proposals were not adopted, and the substance of § 958(i) has remained the same from 1970 to date.

### 3. The Agency's Interpretation of Sec. 958(i)
### i. The Notice of Hearing in *McNeilab*

In *McNeilab,* the applicant sought to import raw opium, poppy straw, and concentrate of poppy straw pursuant to an application filed in1978. In the Federal Register notice of the application[59] the then-Administrator advised that poppy straw and concentrate of poppy straw were currently imported into the United States only under the emergency provisions of 21 U.S.C. § 952(a)(2)(A), and that therefore

the terms of section 1008(h) clearly leave it to the discretion of the Administrator to grant or deny a hearing to any party on issues concerning such importation.

In addition, the terms of section 1008(h) of the Controlled Substances Import and Export Act (21 U.S.C. 958(h)) obligate the Administrator to give only to manufacturers holding registrations for the bulk manufacturer of a substance sought to be imported the opportunity for a hearing on issues associated with the proposed actual importation of the substance. In the case of imported raw opium, there exists no registered bulk manufacturer of the substance, hence, it is likewise left to the discretion of the Administrator to grant or deny a hearing to any party on issues concerning the importation of raw opium.[60]

Presumably, the Administrator concluded that it was appropriate to conduct a hearing on that application, for there was a hearing that resulted in the final order in *McNeilab.*[61]

### ii. The 1995 Regulatory Change

Prior to July 1995, as now, DEA regulations provided that manufacturers have the right to a hearing on another manufacturer's application to import a Schedule I or II controlled substance.[62] The regulations also provided that if a manufacturer applied for registration to manufacture a Schedule I or II controlled substance, other manufacturers of that same basic class of substance were entitled to a hearing.[63]

By notice published in the Federal Register on October 7, 1993, the then-Director of DEA's Office of Diversion Control proposed to delete both these provisions.[64] In explaining the reasons for the proposed change, the Director stated:

---

[58] H.R. 4698, 98th Cong. (1984); H.R. 5656, 98th Cong. (1984); S. 1762 98th Cong. (1984).

[59] Importation of Controlled Substances, Application, 43 Fed. Reg. 27,908 (DEA 1978).

[60] Id. at 27,909; *see also* 21 U.S.C. § 958(h) (1970) (as amended § 958(i) (1984)).

[61] 46 Fed. Reg. 22,089 (1981).

[62] 21 C.F.R.§ 1311.42 (1995).

[63] *See* 21 C.F.R. § 1301.43 (1995).

[64] Registration of Manufacturers and Importers of Controlled Substances, 58 Fed. Reg. 52,246 (1993).

Pursuant to the subject regulations, manufacturers may object to the registration of additional manufacturers or importers as adversely affecting diversion or competition in a highly regulated environment.

These regulations have been in existence for more than two decades. In that time, no [Administrator] has [ever] denied registration to an applicant on the basis of increased danger of diversion or adverse impact upon domestic competition. To the contrary, the Administrators to whom these issues have been presented have found that registration of additional manufacturers would not have an adverse impact upon this agency's efforts to control diversion and that such registration would have a salutary effect upon competition among bulk manufacturers. The record of these proceedings notwithstanding, currently registered manufacturers use the regulatory hearing requirement to deter others from applying or to delay entry of competitors into their marketplace. As often as not, a company whose new application is opposed by a current manufacturer retaliates by opposing the annual renewal of the other's registration. This abuse of the regulatory hearing requirement adversely affects competition by delaying new registrations and results in the unnecessary expenditure of the DEA resources needed to hear and review these cases.[65]

However, in a Supplemental Notice of Proposed Rulemaking published June 14, 1994,[66] the Director announced that the provisions relating to hearings on applications to import would remain unchanged, on grounds that "the proposed amendment to [§ 1311.42] cannot be reconciled with the hearing provisions of [21 U.S.C. § 958(i)]."[67]

### B. The Agency's Interpretation of 21 C.F.R. Sec. 1301.34

Although Section 1301.34[68] on its face requires publication only of applications for registration to import under the authority of 21 U.S.C. § 952(a)(2)(B), the Office of Diversion Control also publishes notices of applications – and of the right to object, comment, or request a

---

[65] Id. at 52,247.

[66] Registration of Manufacturers and Importers of Controlled Substances, 59 Fed. Reg. 30555 (1994).

[67] Id. I note, however, that in *United States v. Florida East Coast Railway Company*, the court adhered to prior decisions holding that the phrase "after hearing" in implementing legislation does not necessarily mean "on the record after opportunity for an agency hearing" as used in the Administrative Procedure Act, 5 U.S.C. § 553(c). 410 U.S. 224, 234 (1973). Thus, it may well be that DEA has authority to revise its regulations with respect to hearings on applications to import Schedule I and II substances. That issue is not before me.

[68] As noted above, Penick asserts that 21 C.F.R. § 1301.34 (2001), requiring that a copy of the notice of application be sent to "each person registered as a bulk manufacturer of that controlled substance and to any other applicant therefor," means that "entities with registrations pending to import those same substances -- that is, other applicants -- may file written comments, object, or request a hearing." *See* Penick's January 24, 2002 opposition to Houba's request at 3. I disagree, because I interpret the word "therefor" to refer back to the phrase "registered as a bulk manufacturer of that controlled substance." Thus, I find that the regulation provides for notice of applications only to bulk manufacturers *of the substance to be imported*, and not to other importers or applicants for registration to import.

15

hearing on the application – filed pursuant to Sections 952(a)(1)[69] and 952(a)(2)(C).[70] It thus appears that the agency has decided to afford a right to a hearing on any application to import other than those filed pursuant to Section 952(a)(2)(A).

It further appears that by publishing notices of applications filed pursuant to Section 952(a)(1), DEA at least implicitly affords a hearing to manufacturers who are registered to import, rather than to manufacture, the substances the applicant seeks to import. For, although I have found above that it is at least theoretically possible to obtain a registration to manufacture narcotic raw materials in the United States, it is undisputed that there are no manufacturers registered to do so, nor, as far as I am aware, are there any pending applications for such registration. Consequently, there is no purpose to publishing the notice of application and affording the opportunity to object, comment, or request a hearing, unless DEA intends that other importers avail themselves of that opportunity.[71]

Granting this right is apparently within the agency's discretion. As the United States Court of Appeals for the Fifth Circuit held in *Ecee, Inc. v. FERC*:

> [W]ithin their legislative mandates, agencies are free to hear actions brought by parties who might be without standing if the same issues happened to be before a federal court (citations omitted). An agency's responsibility for implementation of statutory purposes justifies a wider discretion, in determining what actions to entertain, than is allowed to the courts by either the Constitution or the common law (citation omitted.)[72]

The court found that in the case before it, the interested person standard was the appropriate test, in light of the Administrative Procedure Act's provision that "an interested person may appear before an agency for the presentation, adjustment, or determination of an issue, request or controversy in a proceeding, whether interlocutory, summary or otherwise, in

---

[69] Witness the instant case and also Chattem Chemical, Inc., 66 Fed. Reg. 42,239 (DEA 2001); Penick Corporation, 65 Fed. Reg. 50,568 (DEA 2000); Mallinckrodt, Inc., 65 Fed. Reg. 24,226 (DEA 2000); Stepan Company, 65 Fed. Reg. 68,158 (DEA 2000); Noramco of Delaware, Inc., 64 Fed. Reg. 24,679 (DEA 1999); Mallinckrodt Chemical, Inc., 64 Fed. Reg. 22,645 (DEA 1999); Stepan Company, 64 Fed. Reg. 22,646 (DEA 1999); Ethical Nutritional, LLC, 64 Fed. Reg. 18,056 (DEA 1999); Johnson Matthey, Inc., 64 Fed. Reg. 17,415 (DEA 1999) (a hearing was held in this proceeding in January 2000); Stepan Company, 63 Fed. Reg. 27,591 (DEA 1998); Mallinckrodt Chemical Inc., 63 Fed. Reg. 10,944 (DEA 1998); Noramco of Delaware, Inc., 63 Fed. Reg. 10,946 (DEA 1998); Penick Corporation, 62 Fed. Reg. 25,972 (DEA 1997) (a hearing was scheduled in that proceeding (Docket No. 97-16) but cancelled when the applicant withdrew its application); Mallinckrodt Chemical, Inc., 62 Fed. Reg. 14,946 (DEA 1997); Stepan Company, 62 Fed. Reg. 14,947 (DEA 1997); Noramco of Delaware, Inc., 62 Fed. Reg. 8041 (DEA 1997).

[70] *See e.g.*, Cerilliant Corporation, 66 Fed. Reg. 2003 (DEA 2001) and 65 Fed. Reg. 70,936 (DEA 2000); Research Triangle Institute, 65 Fed. Reg. 70,938 (DEA 2000); Calbiochem-Novabiochem Corporation, 65 Fed. Reg. 51,331 (DEA 2000); Radian International LLC, 65 Fed. Reg. 38,860 (DEA 2000).

[71] Indeed, DEA has published a notice of application to import and stated in the notice that there are no domestic producers of the substances at issue. *See* Wildlife Laboratories, Inc., 62 Fed. Reg. 32,824 (DEA 1997).

[72] *Ecee*, 645 F.2d at 349-350.

16

conjunction with an agency function."[73]

Houba asserts, as discussed above, that none of the objectors has raised any material issue of fact warranting exercise of the agency's discretion to hold a hearing. However, there is no such threshold to the agency's exercise of its discretion,[74] and, as discussed above, by offering an opportunity for a hearing in the notice of application, the agency had already decided to conduct a hearing if requested. In addition, Houba's argument is inconsistent with prior holdings that in these proceedings the applicant bears the burden of proof.[75] I therefore find no merit to this assertion.

### C. Conclusion

Based on the foregoing, I conclude that neither the statute nor DEA's implementing regulations require the agency to afford a hearing to importers of a narcotic raw material on the application of another manufacturer to import the same substance. However, I further conclude that the agency has the discretionary authority to afford that hearing right and that it has done so In other proceedings as well as this one. Accordingly, Houba's Request for Final Approval of Importer Registration Without Administrative Hearing is denied.[76]

I grant any party permission to appeal this ruling on or before April 29, 2002, pursuant to 21 C.F.R. § 1316.62 (2001). Copies of any appeal shall be filed with the Hearing Clerk in triplicate. The filing of an appeal will not stay further proceedings in this matter.

Dated: April 15, 2002

Mary Ellen Bittner
Administrative Law Judge

---

[73] *Ecee*, 645 F. 2d at 350.
[74] The decisions Houba cites for this proposition rely on statutory and/or regulatory schemes that are not analogous to that at issue here.
[75] *Johnson Matthey, Inc.*, 60 Fed. Reg. 26,050, 26,053 (DEA 1995), relying on the wording of then-21 C.F.R. § 1301.55(a) that "[a]t any hearing on an application to manufacture any controlled substance listed in Schedule I or II, the applicant shall have the burden of proving that the requirements for such registration pursuant to . . . 21 U.S.C. 823(a) . . . are satisfied. Any other person participated in the hearing pursuant to § 1301.43 shall have the burden of proving any propositions of fact or law asserted by him in the hearing." The regulation allocating the burden of proof in the instant case is 21 C.F.R. § 1301.44(c) (2001), which provides, "[a]t any hearing on the granting or denial of an application to be registered to import or export any controlled substance listed in Schedule I or II, the applicant shall have the burden of proving that the requirements for such registration pursuant to . . . 21 U.S.C. 958(a) and (d) . . . are satisfied. Any other person participating in the hearing pursuant to § 1301.34 shall have the burden of proving any propositions of fact or law asserted by him/her in the hearings."
[76] In light of my conclusion, I find it unnecessary to consider any issues raised by Noramco's letter filed April 10, 2002.

17

## CERTIFICATE OF SERVICE

This is to certify that the undersigned on April 15, 2002, caused a copy of the foregoing to be delivered via interoffice mail to Government's counsel, Robert Walker, Esq., Office of Chief Counsel, Drug Enforcement Administration, Washington, D.C. 20537; and copies to be mailed, postage paid, to counsel for Houba, Inc. Euguene M. Pfeifer, Esq., King & Spalding, 1730 Pennsylvania Avenue N.W., Washington, DC 20006-4706; counsel for Mallinckrodt, Scott M. Badami, Bryan Cave, LLP, 700 Thirteenth Street, N.W., Suite 600, Washington, D.C. 20005-3960; counsel for Noramco of Delaware, Inc., John A. Gilbert, Esq., Hyman, Phelps & McNamara, 700 Thirteenth Street, N.W., Suite 1200, Washington, D.C. 20005; and counsel for Penick Corporation, Wayne Matelski, Esq., Arent, Fox, Kinter Plotkin & Kahn, 1050 Connecticut Avenue, N.W., Washington, D.C. 20036-5339.

Patricia A. Medico
Secretary to Mary Ellen Bittner
Administrative Law Judge

Rhodes' Opposition to Plaintiff's
Motion for Preliminary Injunction
April 2, 2007

# EXHIBIT H

THOMAS O. HENTELEFF
RICHARD S. MOREY
KINSEY S. REAGAN
PETER R. MATHERS
ANTHONY L. YOUNG
ANNE V. MAHER
BONNIE A. BEAVERS
DANIEL R. DWYER
GLENN E. DAVIS
STACY L. EHRLICH
JENNIFER A. DAVIDSON
STACEY L. VALERIO
JONATHAN M. WEINRIEB
CARRIE C. HORN

OF COUNSEL:
WILLIAM J. HARDY

LAW OFFICES
**KLEINFELD, KAPLAN AND BECKER, LLP**

1140 NINETEENTH STREET, N.W.

**WASHINGTON, D. C. 20036-6606**

TELEPHONE (202) 223-5120

FACSIMILE (202) 223-5619

www.kkblaw.com

WEST COAST OFFICE:
ONE MARKET STREET
STEUART TOWER, SUITE 1450
SAN FRANCISCO, CA 94105-1313
TELEPHONE (415) 538-0014
FACSIMILE (415) 538-0016

VINCENT A. KLEINFELD
1907-1993

ALAN H. KAPLAN
1930-2001

November 13, 2006

<u>Via Fax and Overnight Courier</u>

Michelle Leonhart
Deputy Administrator
Drug Enforcement Administration
Lincoln Place-West
Room 12058
700 Army Navy Drive
Arlington, VA 22202

Joseph T. Rannazzisi
Deputy Assistant Administrator
Office of Diversion Control
Drug Enforcement Administration
Lincoln Place-East
Room 6295
600 Army Navy Drive
Arlington, VA 22202

Re:    Application of Rhodes Technologies for Registration as an Importer of
Raw Opium and Concentrate of Poppy Straw

Dear Deputy Administrator Leonhart and
Deputy Assistant Administrator Rannazzisi:

We write in follow up to our correspondence of June 15, July 14, and July 19,
2006, concerning the requests for hearing submitted by Mallinckrodt Inc., Noramco of
Delaware, and Penick Corporation in response to the Federal Register notice announcing
Rhodes Technologies' application for registration as an importer of narcotic raw
materials ("NRMs"), *i.e.*, raw opium and concentrate of poppy straw. Specifically, we
requested that the Drug Enforcement Administration deny those requests for a hearing,
and instead process Rhodes' application expeditiously.

As we pointed out in our prior correspondence, no companies hold a registration
for the bulk manufacture of NRMs, and no companies currently have an application
pending for such a registration and, therefore, no one has a right to a hearing on the
Rhodes' application, or on any other application to import NRMs. As we also pointed
out, this was the conclusion reached by DEA in 2003. (68 Fed. Reg. 6947, 6948 (Feb.
11, 2003)) DEA reaffirmed this conclusion last week in a Federal Register notice
granting an NRM importer registration to Mallinckrodt. That notice stated: "One
comment was received; however, pursuant to 21 U.S.C. 958(i) and 21 CFR 1301.34(a),
the commenter which is not a registered bulk manufacturer of the above listed controlled
substances, has no legal standing to object or to request a hearing on this application." 71
Fed. Reg. 65134 (Nov. 7, 2006).

KLEINFELD, KAPLAN AND BECKER, LLP

Deputy Administrator
November 13, 2006
Page 2 of 2

Rhodes was apparently the "commenter" referenced in the November 7, 2006 Federal Register notice.  As we pointed out in our above-referenced letter of July 19th, and in our June 23rd comment and request for hearing, Rhodes has the same legal standing to request and to be granted a hearing on the Mallinckrodt NRM importer application as Mallinckrodt and others have on the Rhodes NRM importer application.  Last week's DEA publication confirms, correctly, that no one has such standing because there is, indeed, no one who holds a registration as a bulk manufacturer of NRMs, and there are no applicants for such registration, because DEA prohibits the domestic manufacture or cultivation of NRMs.

In light of this recent ruling on the Mallinckrodt application, we renew our request that the Deputy Administrator promptly deny the pending requests by Mallinckrodt, Penick and Noramco for a hearing on Rhodes' application for registration as an importer of NRMs and proceed to process Rhodes' application expeditiously.  We also reiterate Rhodes' interest in providing the DEA with any additional information it may require to evaluate Rhodes' application, which has been pending since August 29, 2005, and therefore invite the agency to contact Rhodes, or the undersigned, with any questions about the application or about Rhodes' qualifications.

Respectfully submitted,

Peter R. Mathers
Jennifer A. Davidson
Counsel to Rhodes Technologies

cc:     Mary Jane Bittner, Esq., Office of Administrative Law Judges, DEA
        Brian Bayly, Esq., Office of Chief Counsel, DEA
        Steven J. Poplawski, Esq., Counsel for Mallinckrodt Inc.
        Andrew D. Schau, Esq., Counsel for Noramco of Delaware, Inc.
        Wayne H. Matelski, Esq., Counsel for Penick Corporation

Rhodes' Opposition to Plaintiff's
Motion for Preliminary Injunction
April 2, 2007

# EXHIBIT I

THOMAS O. HENTELEFF
RICHARD S. MOREY
KINSEY S. REAGAN
PETER R. MATHERS
ANTHONY L. YOUNG
ANNE V. MAHER
BONNIE A. BEAVERS
DANIEL R. DWYER
GLENN E. DAVIS
STACY L. EHRLICH
JENNIFER A. DAVIDSON
STACEY L. VALERIO
JONATHAN M. WEINRIEB
CARRIE C. HORN

OF COUNSEL:
WILLIAM J. HARDY

LAW OFFICES

# KLEINFELD, KAPLAN AND BECKER, LLP

1140 NINETEENTH STREET, N.W.

WASHINGTON, D. C. 20036-6606

TELEPHONE (202) 223-5120

FACSIMILE (202) 223-5619

www.kkblaw.com

WEST COAST OFFICE:
ONE MARKET STREET
STEUART TOWER, SUITE 1450
SAN FRANCISCO, CA 94105-1313
TELEPHONE (415) 538-0014
FACSIMILE (415) 538-0016

VINCENT A. KLEINFELD
1907-1993

ALAN H. KAPLAN
1930-2001

June 23, 2006

<u>Via Overnight Courier</u>

Drug Enforcement Administration Headquarters
Attention: DEA Federal Register Representative/ODL
2401 Jefferson-Davis Highway
Alexandria, VA 22301

Re:   Objections and Request for Hearing on Mallinckrodt Inc.'s Application for
      Registration as an Importer of Narcotic Raw Materials

Dear Sir or Madam:

Rhodes Technologies ("Rhodes") submits the following comments, objections and request for hearing on Mallinckrodt Inc.'s application for renewal of its registration as an importer of narcotic raw materials, announced at 71 Fed. Reg. 30166 (May 25, 2006).

Rhodes' application for registration as an importer of raw opium (9600) and concentrate of poppy straw (9670) is currently pending before DEA. 71 Fed. Reg. 20729 (April 21, 2006). Rhodes is currently registered as a bulk manufacturer of the following Schedule I and II controlled substances: tetrahydrocannabinols (7370), methylphenidate (1724), codeine (9050), dihydrocodeine (9120), oxycodone (9143), hydromorphone (9150), hydrocodone (9193), thebaine (9333), noroxymorphone (9668), and fentanyl (9801). 70 Fed. Reg. 61160 (Oct. 20, 2005). Accordingly, Rhodes is submitting comments on and objections to the Mallinckrodt application, and requesting a hearing on that application. *See* 21 U.S.C. 958(i), 21 C.F.R. §§ 1301.34, 1301.43.

Rhodes has the same legal right to a hearing on Mallinckrodt's importer application as Mallinckrodt has to a hearing on Rhodes' pending importer application. Moreover, to the extent that DEA grants or otherwise holds a hearing to address issues raised by Mallinckrodt in its May 22, 2006 request for a hearing on the Rhodes application, it would be arbitrary and capricious for the agency to fail to hold a hearing on the issues raised by Rhodes herein.

## KLEINFELD, KAPLAN AND BECKER, LLP

DEA Headquarters
DEA Federal Register Representative/ODL
June 23, 2006
Page 2 of 3

## REQUEST FOR HEARING

Pursuant to the Administrative Procedure Act, 5 U.S.C. § 551 *et seq*, the Ashbacker Doctrine, *Ashbacker Radio Corp. v. Federal Communications Com'n,* 326 U.S. 327 (1945), and 21 C.F.R. §§ 1316.47 and 1301.43, to the extent applicable, Rhodes hereby requests a hearing on the application of Mallinckrodt to import narcotic raw materials ("NRMs"), and takes the following positions in opposition thereto:

A.       On August 29, 2005, Rhodes Technologies applied to be registered as an importer of raw opium and concentrate of poppy straw. This application was announced in the Federal Register as *Importer of Controlled Substances; Notice of Application,* 71 Fed. Reg. 20729 (April 21, 2006). Because Mallinckrodt also seeks renewal of its registration as an importer of raw opium and concentrate of poppy straw, Rhodes Technologies has a significant interest in the proceedings on the Mallinckrodt application. Mallinckrodt, and other current holders of DEA registrations to import NRMs, have filed objections to the pending registration of Rhodes, and have requested hearings thereon, based in part on the allegation that federal law limits the number of registrations that can be granted by the DEA for this purpose, regardless of the qualifications of the applicants, to a number that is too small to permit the issuance of a registration to Rhodes. Rhodes disagrees, as a factual and legal matter, that there is such a limit on the number of registrations that may be issued by DEA for this purpose or that it would be in the public interest for DEA to impose such a limit. If there is such a limit, however, the Supreme Court decision in *Ashbacker Radio Corp. v. Federal Communications Com'n,* 326 U.S. 327 (1945) requires that DEA hold a hearing at which the relative qualifications of all applicants (including current registrants) are weighed and a decision made as to which of them should receive the limited number of available registrations. The registration of Mallinckrodt must be addressed in any such proceeding.

B./C.    Rhodes Technologies seeks to be heard on the matters discussed above relating to the relative merits of Mallinckrodt's and Rhodes' applications, as well as the following issues: (1) whether registration of Mallinckrodt would be consistent with the United States' obligations under international treaties, conventions, or protocols in effect on May 1, 1971, and (2) whether the requirements of 21 U.S.C. § 958(a) and § 823(a) and 21 C.F.R. § 1301.34(b) are met to show that registration of Mallinckrodt to import these materials is in the public interest. In this regard, it is Rhodes' position that Mallinckrodt cannot demonstrate that renewal of its registration to import NRMs is in the public interest and consistent with U.S. international treaty obligations according to the above-referenced legal standards. It is Rhodes' further position that the public interest would be better served by denying Mallinckrodt a registration to import NRMs and, instead, requiring Mallinckrodt to secure imported NRMs from Rhodes or other registered importers, than by denying Rhodes a registration to import NRMs and, instead, requiring Rhodes to continue to attempt to secure imported NRMs from Mallinckrodt or other registered importers.

KLEINFELD, KAPLAN AND BECKER, LLP

Finally, Rhodes Technologies reserves the right to present evidence, testimony or views regarding additional issues that may be identified upon reviewing the Mallinckrodt application, other materials submitted by Mallinckrodt in support of its application, and materials submitted by DEA Staff or other entities participating in any proceedings on the Mallinckrodt application or other pending applications for similar registrations to import NRMs.

All notices to be sent pursuant to this appearance should be addressed to:

Peter R. Mathers, Esq.
Kleinfeld, Kaplan and Becker LLP
1140 19th Street, N.W.
Washington, D.C. 20036
(202) 223-5120
(202) 223-5619 (fax)
pmathers@kkblaw.com

Thank you for your kind assistance.

Sincerely,

Peter R. Mathers
Jennifer A. Davidson
Counsel for Rhodes Technologies